# EXHIBIT 2

<u>Exhibit 2</u>

<u>**Declaration of Michelle R. Whittington**</u>

I, Michelle R. Whittington, declare as follows:

1.      I am the in-house Intellectual Property Counsel for Mitel Networks Corporation ("MNC").

2.      I work in Mesa, Arizona.

3.      I have personal knowledge of the facts herein.

4.      MNC is a corporation organized and existing under the laws of Canada, and its principal place of business is in Ontario, Canada.

5.      This dispute is over a Domain Name Assignment Agreement ("Contract") between MNC and Colocation America, Inc. ("Colocation"), which was entered into on March 7, 2016.  A true and correct copy of the Contract is attached hereto as Ex. 2A.

6.      The Contract identifies Colocation as being a Nevada corporation with offices in Nevada.  Ex. 2A ¶ 1.

7.      The Contract identifies MNC as being a Canadian corporation with principal offices in Ontario, Canada.  *Id.*

8.      The Contract involves a quit claim of rights in a domain name by MNC in Canada in favor of Colocation in Nevada.  Ex. 2A ¶ A.  To the extent there would be a transfer of rights, the transfer would occur electronically from MNC in Canada to Colocation in Nevada and no performance would occur in Arizona.  *Id.*

9.      Payment under the Contract was to be made by Colocation to MNC's Canadian bank through an on-line escrow account.  Ex. 2A ¶ B and Schedule A.

10.     To the extent intellectual property mentioned in the Contract, and that is the subject of the Complaint, is held by MNC, it is held in Canada.

11.     The domain name to be transferred under the Contract is a Canadian domain name ("gandalf.ca") with a Canadian, ".ca," extension.  The domain name is not in use, no

1

website or email accounts are associated with it, and it is not accessible.

12.     Colocation has taken the position that the Contract requires assignment of IPv4 addresses "associated with" the domain name "gandalf.ca."  MNC disputes this allegation.

13.     To the extent the IPv4 addresses have a physical location, they are in Canada. The IPv4 addresses are not being used, and cannot be accessed.

14.     The block of IPv4 addresses Colocation claims are associated with the domain name "gandalf.ca" totals 64,000 address.  These addresses are governed and managed by the American Registry for Internet Numbers ("ARIN").

15.     Attached as Ex. 2B are print outs showing that IPv4 addresses cost between $8.50 and $15.00 each.

16.     At $8.50 each for an IPv4 ARIN address, the 64,000 addresses at issue would have a total value of over $500,000, which exceeds $75,000 exclusive of interest and costs.

17.     As of the present time, MNC is unaware if the IPv4 addresses associated with the domain name "gandalf.ca" are owned by MNC.

18.     On May 5, 2016, Colocation filed a complaint in Los Angeles Superior Court ("California Complaint") with essentially the same allegations as contained in the present Complaint ("Arizona Complaint").

19.     On June 30, 2016, MNC filed a Motion to Dismiss the California Complaint for lack of personal jurisdiction against MNC.

20.     After discovery and various motions, on October 18, 2016, Judge Ongkeko dismissed the California Complaint for lack of personal jurisdiction against MNC.

21.     On October 27, 2016, MNC filed a Complaint in Ontario ("Canadian Complaint"), where MNC is based against Colocation seeking relief under the Contract. Specifically, the Canadian Complaint calls for rescission of the Contract, or for the Canadian court to order the transfer of the domain name "gandalf.ca" to Colocation for $10,000, and to find that transferring the IPv4 addresses was not required under the Contract. *See* Ex. 2C.

22.     On December 28, 2016, Colocation was served with the Canadian Comlaint.

23.     This Arizona Complaint was filed on January 6, 2017.

24.     The complaint in the Arizona Complaint was served on MNC on January 19, 2017.

25.     Colocation filed a motion to dismiss the Canadian Complaint on January 23, 2017.  Ex. 2D.

26.     The Canadian Complaint and this Arizona Complaint involve the same facts and issues, and resolution of the Canadian Complaint would resolve the issues in this Arizona Complaint, which Colocation admits in its motion to dismiss the Canadian lawsuit.  *See Id.*

I declare under penalty of perjury that the foregoing is true and correct.

_____        _____
Date                                     Michelle R. Whittington

# EXHIBIT 2A

## DOMAIN NAME ASSIGNMENT AGREEMENT

THIS AGREEMENT is made this 7th day of March, 2016 ("the Agreement"), by and between MITEL NETWORKS CORPORATION, on behalf of itself and its subsidiaries, a Canadian corporation with offices at 350 Legget Drive, Ottawa, Ontario, Canada K2K2W7 ("Mitel") and Colocation America, Inc., a Nevada Corporation with offices at 9360 W Flamingo Rd, Suite 110-178, Las Vegas, NV 89147 ("INTELLECTUAL PROPERTY PURCHASER").

**WHEREAS**, Dividend Advisors LLC has introduced the INTELLECTUAL PROPERTY PURCHASER to intangible rights which may be claimed as a result of a prior bankruptcy proceeding, including domain name and related intellectual property.

**WHEREAS**, Mitel hereby agrees to quit claim, transfer and assign, and INTELLECTUAL PROPERTY PURCHASER hereby agrees to purchase the domain name <gandalf.ca> (the "Domain Name") and related rights, subject to the terms and conditions of this Agreement.

**NOW, THEREFORE**, in consideration of the promises and agreements set forth herein, the parties, each intending to be legally bound hereby, do promise and agree as follows:

**A. Quit Claim**. For good and valuable consideration, payable as more particularly described herein, Mitel hereby agrees to quit claim to INTELLECTUAL PROPERTY PURCHASER any of Mitel's right, title and interest in and to the Domain Name <gandalf.ca> and the registration thereof, together with the goodwill of the business connected with and symbolized by such Domain Name and the associated IPv4 134.22.0.0/16 and any associated trade dress, or other intellectual property intellectual property rights relating thereto, to the extent any such rights exist. The quit claim transfer and assignment shall take effect as set forth herein upon INTELLECTUAL PROPERTY PURCHASER'S making the payment as provided for herein.

1



**B. Payment.**   The consideration (the "Consideration") to be paid by INTELLECTUAL PROPERTY PURCHASER shall be in the amount and through escrow as set forth in the standard Escrow.com instructions, to be entered concurrent with this Agreement by the parties and for the amount therein to be deposited by purchaser upon opening the escrow along with the escrow fees. Within 1 business day after notification from Escrow.com that the purchase funds have been received from the INTELLECTUAL PROPERTY PURCHASER, Mitel shall change the registered ownership of the Domain Name with a third-party registrar so that the "WHOIS" information will be registered to   the INTELLECTUAL PROPERTY PURCHASER, or agent of its choosing, and transfer the Domain Name to a hosting service designated by the INTELLECTUAL PROPERTY PURCHASER and further execute any instrument of transfer may be required to effectuate the purchase of any of the quit intellectual property rights.   Upon notice to Escrow.com of visible "Whois" registration and all related intellectual property transfer, the CONSIDERATION funds are to be released to Mitel by wire transfer as Mitel provides in the escrow instruction.

**C. Mitel's Obligations.** Mitel agrees to cooperate with INTELLECTUAL PROPERTY PURCHASER and to follow INTELLECTUAL PROPERTY PURCHASER'S reasonable instructions in order to effectuate any transfer of the Domain Name or any intellectual property in a timely manner. Specifically, upon receipt of the consideration, Mitel further agrees to prepare and transmit any necessary registration agreement or correspondence to authorize the transfers.

**D. Warranty.**   Mitel warrants and represents that: (i) it has the full power and lawful authority to enter into this quit claim assignment and transfer the Domain Name, and (ii) it is the lawful owner of the Domain Name and any associated intellectual property rights.

**E. INTELLECTUAL PROPERY PURCHASER Obligations.** INTELLECTUAL PROPERTY PURCHASER agrees not to: use the Domain Name or any resulting website: (i) to disparage Mitel in any way; (ii) and disclose the material terms of

2



this Agreement, such as the Consideration, however either party may disclose the existence of the Agreement.

**F. Entire Agreement.** This Agreement embodies the entire understanding of the parties with respect to the subject matter hereof, and merges all prior discussions between them, and neither of the parties shall be bound by any conditions, definitions, warranties, understandings, or representations with respect to the subject matter hereof other than as expressly provided herein.   No oral explanation or oral information by either party hereto shall alter the meaning or interpretation of this Agreement.


**IN WITNESS WHEREOF**, the parties have caused this Agreement to be made and executed on the date signed by Mitel below ("Effective Date").

**MITEL NETWORKS CORPORATION**

Name: _Greg Hiscook_

Position: _General Counsel. Corporate Secretary_

Date: _March 15/16_


**COLOCATION AMERICA, INC.**

Name: _Albert A Ahdoot / Busines_

Date: _3/10/16_

3

**SCHEDULE A TO
DOMAIN NAME ASSIGNMENT AGREEMENT**

## INCOMING WIRE TRANSFER

Please ensure all funds in are paid in favor of **Mitel Networks Corporation** as per instructions below:

**RECEIVING BANK / INSTITUTION**

| | |
|---|---|
| Name: | **BANK OF NOVA SCOTIA** |
| Branch: | **Toronto BSC (Servicing Transit)** |
| Address: | **20 Queen St W 4th Floor** |
| | **Toronto, Ontario** |
| | **M5H 3R3** |
| | **CANADA** |

SWIFT BIC:

ABA Routing #:

**BENEFICIARY**

| | |
|---|---|
| Name: | **MITEL NETWORKS CORPORATION** |
| Address: | **350 Legget Drive** |
| | **Ottawa, Ontario** |
| | **K2K 2W7** |
| | **CANADA** |

Branch Transit:
Inst. number:
Account number
Currency code:            **CAD**

Global Treasury & Risk Management Operations
| | | |
|---|---|---|
| **Tel:** | (613) 592-2122 | x: 71823 or 74433 |
| **Fax:** | | (613) 592-4784 |
| **@** | | treasury@mitel.com |

4

# EXHIBIT 2B

(index.php)

# BUY IPs

### Acquire ARIN IPv4 Address Space

The following IPv4 subnets are available for transfer to pre-qualified recipients under ARIN's 8.3 and 8.4 transfer guidelines.

Click here (/ip-information.php) to learn more about the IPv4 transfer process and the steps to acquiring new IP space.

| Subnet for Transfer | # of /24s | # of Ips | Price/IP | Total | Buy Now |
|---|---|---|---|---|---|
| 172.93.32.0/19 | 32 | | $8.50 | $69,632 | Buy Now >> |
| 69.194.64.0/20 | 16 | | $8.90 | $36454.40 | Buy Now >> |
| 64.52.128.0/20 | 16 | | $9.50 | $38,912 | Buy Now >> |
| 64.190.192.0/20 | 16 | | $9.50 | $38,912 | Buy Now >> |
| 64.52.176.0/20 | 16 | | $9.50 | $38,912 | Buy Now >> |

| Subnet for Transfer | # of /24s | # of Ips | Price/IP | Total | Buy Now |
|---|---|---|---|---|---|
| 64.52.88.0/21 | 8 | | $9.50 | $21,504 | Buy Now >> |
| 64.52.24.0/21 | 8 | | $9.50 | $21,504 | Buy Now >> |
| 69.194.80.0/21 | 8 | | $9.00 | $18,432 | Buy Now >> |
| 64.52.168.0/21 | 8 | | $9.50 | $21,504 | Buy Now >> |
| 64.52.96.0/21 | 8 | | $9.50 | $21,504 | Buy Now >> |
| 64.45.184.0/21 | 8 | | $9.50 | $21,504 | Buy Now >> |
| 64.190.44.0/22 | 4 | | $9.50 | $11,776 | Buy Now >> |
| 64.190.84.0/22 | 4 | | $9.50 | $11,776 | Buy Now >> |
| 64.190.252.0/22 | 4 | | $9.50 | $11,776 | Buy Now >> |

Buy IPs (BuyIPs.php)    IP Leases (ip-leases.php)    Compute (server-packages.php)    Colocation (colocation.php)    IP Information (ip-information.php)    Acceptable Use Policy (AUP.htm)

## Need more IPs? Click to Contact sales for custom orders.

Copyright © 2017 IPV4HOSTING.com



## IPv4 MARKET GROUP
Setting the Standard for IPv4 Transfers

(http://ipv4marketgroup.com/)

# 1.716.348.6768

(http://www.linkedin.com/company/2273350?
trk=tyah)

(https://twitter.com/Ipv4mg)

(http://www.youtube.com/channel/UCIGKPEAFiH3AStJJhN5QhzA)

(https://www.facebook.com/IPv4MarketGroup/)

Menu ▾

Home (http://ipv4marketgroup.com/) / IPv4 Pricing in a Post ARIN Runout World

# IPv4 Pricing in a Post ARIN Runout World



IPv4 prices were at an all time low through the first half of 2015, and then, with the ARIN runout upon us, they spiked upwards. Has the bottom of the IPv4 market occurred and where prices will go from here?

Let's start at the beginning. IPv4 Market Group has facilitated over 150 IPv4 transfers through the Regional Internet Registries over 5 years, and from 2011 to the present, prices have generally fallen.

While prices have gone down, the other trend that has become apparent is that price per IP decreases as block size increases. IPv4 Market Group calculated its average price of IPv4 addresses sold over the last five years. The table below clearly shows that across all block sizes, average price per IP has been declining by year. This trend has been consistent since IPv4 Market Group entered the market space in 2011 when the market was in its infancy.

| Block Size | 2011 | 2012 | 2013 | 2014 | 2015 YTD |
|---|---|---|---|---|---|
| /16 | 10.0 | 10.58 | $9.42 | $7.28 | $6.99 |
| /17 | | | $10.17 | $8.89 | $7.98 |
| /18 | | 9.95 | $9.90 | $9.09 | $8.79 |
| /19 | | | $11.00 | $10.58 | $9.03 |

| /20 | | 15.00 | $15.30 | $13.63 | $12.18 |  |
| --- | --- | --- | --- | --- | --- | --- |

Figure 1. Prices Observed by IPv4 Market Group

Very large blocks trade less frequently, and it would be difficult to state average prices without putting some buyers and sellers at risk of identification, but it is generally accepted that blocks of /13 to /10 have traded at as high as $7.00 per IPv4 address and at as low as $4.00 per IPv4 address.

This says that there is a premium for small blocks and a discount for buying bigger blocks. The reason seems to be because the fixed costs of a transfer, both real and intangible, are spread across fewer IPv4 addresses.

Going forward, IPv4 Market Group foresees two IPv4 market changes: 1) the price decline will reverse, and 2) there will be an inflection in prices as larger blocks become harder to obtain. Large block price increases will outpace medium block price increases as buyers will pay more to get large contiguous blocks.

With ARIN runout (http://ipv4marketgroup.com/arin-ipv4-run-out/), there are no more "free IPs". The low hanging fruit has already been sold.

With large blocks, in observing the IPv4 marketplace, the low hanging fruit of Merck, Lilly, Dupont, and Nortel have seemingly mostly been sold. This means that the next available large blocks do not appear to be as free or available. The large blocks remaining to be sold either need to be re-IP'd, for which the sellers want more money, or the sellers have simply set a higher price threshold.

Thus prices are on their way up.

It is difficult to predict where the price inflection point will fall. Because there are many /16's for sale, it would seem that the price will be less for a /16 than for some blocks larger than a /16 that are extremely rare and contiguous. All we can say is that a /8 block, if available as a whole, could sell for a higher price per IP than a /16.



(http://ipv4marketgroup.com/wp-content/uploads/2015/08/ipv4-price-curve-by-block-size-ipv4-market-group.jpg)

Figure 2. Shape of IPv4 price curve by block size, small blocks to the left, large blocks to the right

Should your company buy IPv4 addresses now?

YES!

While dollar cost averaging may be a suitable strategy for most assets, it does not seem appropriate for IPv4 addresses in this market. IPv4 Market Group believes we are at the cusp of a period of increasing prices for at least the next five years. This suggests that a buyer should buy (http://ipv4marketgroup.com/broker-services/buy/) as much as it can as soon as it can. ARIN runout, global supply and demand, the harmonization of inter-regional transfer policy, and the alignment of price per IP across regions, all point to an inevitable escalation of IPv4 prices.

## REGISTERED AND APPROVED IPv4 **BROKER SERVICES**

# EXHIBIT 2C

Court File No. | (o - 70903

## *ONTARIO*
## SUPERIOR COURT OF JUSTICE

B E T W E E N:

### MITEL NETWORKS CORPORATION

Applicant



and

### COLOCATION AMERICA, INC.

Respondent

## NOTICE OF APPLICATION

TO THE RESPONDENT:

A LEGAL PROCEEDING HAS BEEN COMMENCED by the Applicant.  The claim made by the Applicant appears in the following pages.

THIS APPLICATION will come on for a hearing on ___January 19___ at 10:00 a.m. at the Ottawa Courthouse, 161 Elgin Street, Ottawa, Ontario, K2P 2K1.

IF YOU WISH TO OPPOSE THIS APPLICATION, to receive notice of any step in the application or to be served with any documents in the application, you or an Ontario lawyer acting for you must forthwith prepare a notice of appearance in Form 38A prescribed by the Rules of Civil Procedure, serve it on the applicants' lawyers or, where the applicants do not have a lawyer, serve it on the applicants, and file it, with proof of service, in this court office, and you or your lawyer must appear at the hearing.

IF YOU WISH TO PRESENT AFFIDAVIT OR OTHER DOCUMENTARY EVIDENCE TO THE COURT OR TO EXAMINE OR CROSS-EXAMINE WITNESSES ON THE APPLICATION, you or your lawyer must, in addition to serving your notice of appearance, serve a copy of the evidence on the applicants' lawyers or, where the applicants do not have a lawyer, serve it on the applicant, and file it, with proof of service, in the court office where the application is to be heard as soon as possible, but at least two days before the hearing.

IF YOU FAIL TO APPEAR AT THE HEARING, JUDGMENT MAY BE GIVEN IN YOUR ABSENCE AND WITHOUT FURTHER NOTICE TO YOU.  IF YOU WISH TO OPPOSE

THIS APPLICATION BUT ARE UNABLE TO PAY LEGAL FEES, LEGAL AID MAY BE AVAILABLE TO YOU BY CONTACTING A LOCAL LEGAL AID OFFICE.

DATE:        October 28, 2016        Issued by _____

                                     Address of court office:  161 Elgin Street
                                                                Ottawa, Ontario
                                                                K2P 2K1

TO:          COLOCATION AMERICA, INC.
             9360 W. Flamingo Road
             Ste. 110-178
             Las Vegas, NV 89147

- 3 -

## APPLICATION

1.     **THE APPLICANT MAKES APPLICATION FOR:**

a)     Rescission or avoidance of a contract alleged to be binding as between the parties dated March 7, 2016 (the "**Alleged Contract**") on the basis that no contract was formed. In other words, the parties failed to arrive at a meeting of the minds or a *consensus ad idem*;

b)     Rescission or avoidance of the Alleged Contract on the basis that the parties were mistaken as to the subject matter of the Alleged Contract;

c)     In the alternative, rescission or avoidance of the Alleged Contract on the basis that the Alleged Contract is void due to uncertainty;

d)     In the further alternative, an Order declaring that the Alleged Contract provides for the transfer of the <gandalf.ca> domain name and associated good will, but not any Internet Protocol version 4 ("**IPv4**") address(es);

e)     Costs of the Application; and

f)     Such further and other relief as to this Honourable Court seems just.

**2.     THE GROUNDS FOR THE APPLICATION ARE:**

**The Parties**

a)      The Applicant Mitel Networks Corporation ("**Mitel**") is a Canadian corporation with its corporate headquarters and principal place of business in Ottawa, Ontario.

b)      The Respondent Colocation America, Inc. ("**Colocation**") is a Nevada company with its corporate headquarters in Las Vegas, Nevada, the United States of America.

**The Dispute**

c)      On March 7, 2016, Mitel signed the Alleged Contract believing it would receive $10,000.00 USD from Colocation in exchange for assigning a Canadian domain name, <gandalf.ca> (the "**Domain Name**"), and the related good will to Colocation.

d)      At the time of signing the Alleged Contract, Mitel did not believe the terms of the Alleged Contract related to any right, title or interest in any IPv4 addresses.

e)      After the Alleged Contract was signed, and while the parties were in the process of performing the Alleged Contract, Colocation began insisting that the Alleged Contract also assigned to it ownership of a block of IPv4 addresses worth approximately $800,000.00, for no further consideration.

f)      An IPv4 address is a unique address used to identify each computer or
        device connected to the internet and is used to allow computers or devices
        to communicate with each other.

g)      Because all of the approximately 4.3 billion IPv4 addresses in existence
        have been assigned since 2011, IPv4 addresses are quite valuable and
        continue to increase in value.

**The Alleged Contract**

h)      The Alleged Contract is focused throughout only on the transfer of the
        Domain Name and the associated good will and nothing further.

i)      The Alleged Contract refers to IPv4 addresses in only one instance and
        makes this reference with respect to the good will associated with the
        Domain Name. The language used clearly expresses that Mitel is not
        assigning its right, title or interest in the specified block of IPv4 addresses.
        Rather, Mitel agrees to transfer the Domain Name, the registration and the
        goodwill associated with the Domain Name and the specified block of IPv4
        addresses, not the block of IPv4 addresses itself:

> [...]Mitel hereby agrees to quit claim to
> INTELLECTUAL PROPERTY PURCHASER any of
> Mitel's right, title and interest in and to the Domain
> Name <gandalf.ca> and the registration thereof,
> together with the goodwill of the business connected
> with and symbolized by such Domain Name and the
> associated IPv4 134.22.0.0/16 and any associated
> trade dress,[...]

**Circumstances Leading to Alleged Contract**

j)  On February 19, 2016, Michelle Whittington, Intellectual Property Counsel for Mitel, responded to a request from Corey Allen of Dividend Advisors, a Registered Investment Advisor, in relation to the purchase of the <gandalf.ca> domain name.

k)  On February 24, 2016, Mr. Allen replied, communicating an offer to purchase the Domain Name "as well as any potential intellectually [sic] properties or scenarios that may be associated at a future point in time with the Domain Name" for $10,000.00 USD.

l)  In the evening of February 24, 2016, Ms. Whittington communicated Mitel's acceptance of the offer and provided a draft Domain Name Assignment Agreement. This initial draft of the Domain Name Assignment Agreement made no reference to any IPv4 addresses.

m)  There were no discussions or communications in relation to the transfer of any IPv4 addresses at any time prior to Mitel's acceptance of the offer from Mr. Allen or prior to the signing of the Alleged Contract.

n)  In response to the draft Domain Name Assignment Agreement provided by Mitel, Colocation, through Mr. Allen as their agent, provided a single draft in return which incorporated the specific reference to the block of IPv4 addresses.

o)    When the reference to the block of IPv4 addresses was introduced, Colocation did not draw attention to the revision. At no time did Colocation, through Mr. Allen or otherwise, communicate any willingness to provide further consideration for the transfer of the block of IPv4 addresses.

p)    At all times, Ms. Whittington, and every other individual involved in the negotiation of the Alleged Contract on behalf of Mitel, believed that the reference to the block of IPv4 addresses in the Alleged Contract was for the purposes of specifying the good will associated with the Domain Name being transferred by Mitel.

q)    The circumstances clearly illustrate that it was not Mitel's intention to transfer the block of IPv4 addresses:

i.    The value of the block of IPv4 addresses vastly exceeds the $10,000.00 offered by Colocation.

ii.    As the transfer of the block of IPv4 addresses was never contemplated, Mitel did not intend to warrant or represent any ownership of the block of IPv4 addresses. A review of the American Registry for Internet Numbers reveals that the block of IPv4 addresses introduced into the Alleged Contract by Colocation are not in Mitel's name.

**Events Following Alleged Contract**

r)      Colocation's apparent expectation that they would be assigned the block of IPv4 addresses was first communicated after the signing of the Alleged Contract.

s)      On March 28, 2016, Samantha Walters, VP of Online Strategies for Colocation, wrote to Ms. Whittington in an email advising that the $10,000.00 USD had been placed into escrow and provided the transaction number.

t)      On March 28, 2016, in the same email, Ms. Walters stated that "our next step is to transfer the IP range from Mitel to Colocation...".

u)      Ms. Whittington replied to Ms. Walter's email later the same day advising that there appeared to have been a miscommunication between the parties that would need to be resolved.

v)      On April 11, 2016, Ms. Whittington wrote another email to Ms. Walters clarifying Mitel's position. Ms. Whittington's email stated that Mitel had agreed only to the transfer of "the domain name and all goodwill associated thereof [sic]."

w)      The transfer of the block of IPv4 addresses was never in the contemplation of Mitel.

x)      As of October 26, 2016, the Domain Name has not been transferred from Mitel to Colocation and no monies have been exchanged between Colocation and Mitel through escrow or otherwise.

y)      Rule 14.05(3)(d) and (f) of the *Rules of Civil Procedure*, R.R.O. 1990, Reg. 194.

z)      Such further and other grounds as counsel may advise.

3.      **THE FOLLOWING DOCUMENTARY EVIDENCE WILL BE USED AT THE HEARING OF THE APPLICATION:**

a)      The Affidavit of Michelle Whittington; and

b)      Such further and other material as counsel may advise.

DATE:  October 26, 2016

**GOWLING WLG (CANADA) LLP**
Barristers & Solicitors
Suite 2600
160 Elgin Street
Ottawa ON  K1P 1C3

Tel:    613-233-1781
Fax:    613-563-9869

**Todd J. Burke (#33586B)**
Tel:      613-786-0226
Fax:      613-788-3513
todd.burke@gowlingwlg.com

**Zac DeLong (#67475R)**
Tel:      613-786-0285
Fax:      613-788-3467
zac.delong@gowlingwlg.com

Lawyers for the Applicant

MITEL NETWORKS CORPORATION                    -and-    COLOCATION AMERICA, INC.

Applicant                                                            Respondent

Court File No. 16-70403

---

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**

PROCEEDING COMMENCED AT
OTTAWA

---

**NOTICE OF APPLICATION**

---

**GOWLING WLG (CANADA) LLP**
Barristers & Solicitors
Suite 2600
160 Elgin Street
Ottawa ON  K1P 1C3

**Todd J. Burke (#33586B)**
Tel:      613-786-0226
Fax:     613-788-3513
todd.burke@gowlingwlg.com

**Zac DeLong (#67475R)**
Tel:      613-786-0285
Fax:     613-788-3467
zac.delong@gowlingwlg.com

Lawyers for the applicant

# EXHIBIT 2D

Court File No. 16-70403

### *ONTARIO*
### SUPERIOR COURT OF JUSTICE

B E T W E E N :

### MITEL NETWORKS CORPORATION

Applicant

- and -

### COLOCATION AMERICA, INC.

Respondent

### RESPONDENT'S FACTUM
### AND BOOK OF AUTHORITIES

January 23, 2017

**McCague Borlack LLP**
99 Bank Street, Suite 1450
Ottawa, Ontario
K1P 1H4

**Noah J. Shapiro**
LSUC No. 65706D
Tel:    (613) 566-5982
Fax:    (613) 569-3882

Lawyers for the respondent

TO:    **Gowling WLG (Canada) LLP**
       160 Elgin Street, Suite 2600
       Ottawa, Ontario
       K1P 1C3

       **Todd J Burke**
       LSUC No. 33586B
       Tel:    (613) 786-0226
       Fax:    (613) 788-3513

       Lawyers for the applicant

# Index

Court File No. 16-70403

## ONTARIO
### SUPERIOR COURT OF JUSTICE

B E T W E E N :

#### MITEL NETWORKS CORPORATION

Applicant

- and -

#### COLOCATION AMERICA, INC.

Respondent

### TABLE OF CONTENTS

**FACTUM – TAB 1**                                                         Page

   **PART I – OVERVIEW**                                                      1

   **PART II – BACKGROUND FACTS**                                            1

   **PART III – ISSUES**                                                      3

   **PART IV – LAW AND ANALYSIS**                                            4

   **PART V – RELIEF REQUESTED**                                            10

   **Schedule "A" – List of Authorities**                                   11

   **Schedule "B" – Text of Statutes**                                      12

**BOOK OF AUTHORITIES – TAB 2**

   *Agemian v Pactiv LLC*, 2012 ONSC 4571.                                   A

   *Amchem Products Inc. v. British Columbia (Workers' Compensation Board)*,  B
       [1993] 1 SCR 897.

   *Canadian Imperial Bank of Commerce v Glasford*, 2015 ONSC 197.           C

   *Club Resorts Ltd v Van Breda*, 2012 SCC 17.                             D

   *MCRL Overseas Printing Inc v Company's Coming Publishing Ltd*, 2016      E
       ONSC 4327.

*Speers Estate v Reader's Digest Association (Canada) ULC*, [2009] OJ No 2332.   F

*Trillium Motor World Ltd v General Motors of Canada Ltd*, 2014 ONCA 497.   G

*Tyoga Investments Ltd v Service Alimentaire Desco Inc*, 2015 ONSC 3810.   H

# TAB 1

Court File No. 16-70403

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**

B E T W E E N :

**MITEL NETWORKS CORPORATION**

Applicant

- and -

**COLOCATION AMERICA, INC.**

Respondent

**RESPONDENT'S FACTUM**

**PART I – OVERVIEW**

1.  The Respondent, Colocation America, Inc. (hereinafter "Colocation") entered into an agreement with Mitel Networks Corporation (hereinafter "Mitel"), on March 7, 2016 (hereinafter the "Contract") for the sale of certain intellectual property. Mitel brings this application to rescind or avoid the Contract.

2.  Colocation has issued a concurrent proceeding in the Arizona Superior Court, case number CV2017-000025, seeking specific performance and damages arising out of breach of contract. The Respondent seeks that this application be dismissed as it was commenced in the improper jurisdiction and constitutes a duplicity of proceedings.

**PART II – BACKGROUND FACTS**

3.  Colocation is a United States corporation with its address for service in Nevada, USA.

> Affidavit of Michelle Whittington, affirmed January 6, 2017, at para 7.

4.  Mitel has carried on business in Arizona, USA, since at least March of 2003.

> Affidavit of Michelle Whittington, affirmed January 6, 2017, at paras 1 and 2.

1

5. In fact, all responsibility for Mitel's intellectual property matters, including the intellectual property matters of Mitel Networks' worldwide subsidiaries and divisions, fall upon Mitel's agent in Mesa, Arizona, USA.

   Affidavit of Michelle Whittington, affirmed January 6, 2017, at para 2.

6. Colocation retained the services of Dividend Advisors LLC ("Dividend Advisors") to facilitate a purchase of certain intellectual property.

   Affidavit of Michelle Whittington, affirmed January 6, 2017, at paras 9 and 13.

7. Mr. Allen communicated an offer to purchase <gandalf.ca> along with "any potential intellectually [sic] properties or scenarios that may be associated at a future point in time with <gandalf.ca>", which was accepted by Mitel on the same date.

   Affidavit of Michelle Whittington, affirmed January 6, 2017, at paras 15 and 16.

   Exhibit "D" to the Affidavit of Michelle Whittington, affirmed January 6, 2017.

8. It was Mitel, via its agent, Ms. Whittington, in Arizona, who provided the draft Domain Name Assignment Agreement (hereinafter the "Contract").

   Affidavit of Michelle Whittington, affirmed January 6, 2017, at para 16.

9. Mr. Allen proposed certain changes to the Contract, which specifically added the reference to a block of Internet Protocol Version 4 (IPv4) addresses.

   Affidavit of Michelle Whittington, affirmed January 6, 2017, at para 18

10. These changes were accepted by Mitel. The Contract appears to have been hand-signed by Colocation on March 10, 2016 and by Mitel on March 15, 2016. Each page of the Contract was initialled by both parties.

    Exhibit "H" to the Affidavit of Michelle Whittington, affirmed January 6, 2017.

11. There was no exclusive or other forum or choice of law clause in the Contract.

    Exhibit "H" to the Affidavit of Michelle Whittington, affirmed January 6, 2017.

12. On March 28, 2016, Colocation transferred its consideration of $10,000.00 USD into escrow pending receipt of the domain name and its associated intellectual property. On the same day, and reportedly reiterated again on April 11, 2016, Ms. Whittington advised Colocation that Mitel would not be fulfilling its requirements under the Contract.

       Applicant's application record, Notice of Application, page 8 at paras s, u, and v.

13. Mitel suggests that it may not own the subject block of IPv4 addresses referred to in the Contract; rather, that it is owned by Gandalf Technologies Inc.

       Affidavit of Michelle Whittington, affirmed January 6, 2017, at para 21.

       Exhibit "G" to the Affidavit of Michelle Whittington, affirmed January 6, 2017.

14. Mitel also affirms that it purchased assets of Gandalf Technologies Inc. prior to 2001, which was in receivership at the time and ultimately went bankrupt. Mitel has not clarified whether or not it received the subject block of IPv4 addresses as part of the assets purchased prior to 2001.

       Affidavit of Michelle Whittington, affirmed January 6, 2017, at para 5.

15. On May 5, 2016, Colocation filed an action in the Superior Court of the State of California against Mitel for breach of contract. That action was dismissed on October 14, 2016 following Mitel's challenging of California's jurisdiction. Mitel filed an <u>Amended</u> Notice of Application on November 2, 2016 in the Ontario Superior Court of Justice. At or about the same time, Colocation sought to bring its action in the Arizona Superior Court. That proceeding was commenced on January 6, 2017 and served on Mitel on January 19, 2017.

       Arizona Superior Court proceeding, Exhibit "A", found at Tab 1A of the Respondent's application record.

       Affidavit of Service, Exhibit "B", found at Tab 1B of the Respondent's application record.

**PART III – ISSUES**

16. Does this Honourable Court have jurisdiction to hear this application?

3

17. In the alternative, if this Honourable Court should have jurisdiction to hear this application, should same be declined?

18. Further and in the alternative, is this application simply an anti-suit injunction brought under another name?

## PART IV – LAW AND ANALYSIS

*Does this Honourable Court have jurisdiction to hear this application?*

19. It is trite law that an action should be tried in the jurisdiction that has the closest connection with the action and the parties, and not merely where one litigant will secure a juridical advantage.

   *Amchem Products Inc. v. British Columbia (Workers' Compensation Board)*, [1993] 1 SCR 897.

20. Rule 21.01 (3) of the *Rules of Civil Procedure* provides that a judge may stay or dismiss a proceeding on the grounds that the court has no jurisdiction or that another proceeding is pending in another jurisdiction between the same parties in respect of the same subject matter.

   Rule 21.01 (3) of the *Rules of Civil Procedure*.

21. Another proceeding is pending in another jurisdiction between the same parties in respect of the same subject matter.

   Arizona Superior Court proceeding, Exhibit "A", found at Tab 1A of the Respondent's application record.

22. Once the party seeking to challenge the jurisdiction of the Court has established that there is some other forum appropriate for the proceeding, as Colocation has done, the applicant, in this case, Mitel, then has the onus of showing that justice requires that the proceeding take place in its proposed forum.

   *Club Resorts Ltd v Van Breda*, 2012 SCC 17 at para 64.

23. The Supreme Court of Canada established the test for choice of law in contract disputes. The Court determined that the ultimate question should be whether there is a sufficient

4

relationship between "the subject matter of the litigant and the forum such that it would be reasonable to expect that the defendant would be called to answer legal proceedings in that forum." This is known as the "real and substantial connection test".

*Club Resorts Ltd v Van Breda*, 2012 SCC 17 at para 92 [*Van Breda*].

24. In applying the real and substantial connection test, Colocation highlights that the subject matter of the parties' dispute is interpretation of a contract.

25. The offer was initially made by a party in California acting on behalf of Colocation (a Nevada corporation).

Affidavit of Michelle Whittington, affirmed January 6, 2017, at paras 9 and 15.

26. The agent for Mitel brokering the Contract carried on business in Arizona. This agent has affirmed that she is "responsible for all of Mitel Networks' intellectual property matters, including the intellectual property matters of Mitel Networks' worldwide subsidiaries and divisions."

Affidavit of Michelle Whittington, affirmed January 6, 2017, at para 2.

27. The offer was accepted by Mitel's agent in Arizona.

Affidavit of Michelle Whittington, affirmed January 6, 2017, at para 16.

28. The Contract itself was drafted in Arizona.

Affidavit of Michelle Whittington, affirmed January 6, 2017, at paras 14 and 16.

29. While Mitel maintains its head office in Ontario, that the contract was negotiated and completed in Arizona destroys any connotation that Mitel's business activities relating to this matter are being carried on "in the province". It is clear that Ms. Whittington was carrying on the business of offering for sale, and accepting offers to purchase, in Arizona, of "all responsibility for Mitel's intellectual property matters, including the intellectual property matters of Mitel Networks' worldwide subsidiaries and divisions".

Affidavit of Michelle Whittington, affirmed January 6, 2017, at para 2.

5

30. The Contract was signed by Colocation in Nevada, USA. Mr. Greg Hiscock, General Counsel of Corporate Security, signed for Mitel, though the specific location and his affiliation with Mitel has not been determined with any certainty. There is a clear need for Mitel to be discovered on those questions.

Exhibit "H" to the Affidavit of Michelle Whittington, affirmed January 6, 2017.

31. The place that the Contract was actually made is disputed by the parties. In *Tyoga Investments Ltd v Service Alimentaire Desco Inc*, the Court ultimately determined that the contract was made in the jurisdiction where offers were made, and accepted, by e-mail. This included consideration of where the contract was first negotiated. The actual place of signing was not considered.

*Tyoga Investments Ltd v Service Alimentaire Desco Inc*, 2015 ONSC 3810 at para 27.

32. In any event, the Court of Appeal has ruled that the place a contract is made can be fortuitous and not strongly connected to the transaction or the dispute from which it arises. In such situations, a broader, more contextual analysis is therefore required.

*Trillium Motor World Ltd v General Motors of Canada Ltd*, 2014 ONCA 497 at para 70.

33. And while Mitel argues that <gandalf.ca> is a Canadian domain name, intellectual property itself is, by its very definition, intangible. Truly, such property is accessible anywhere in the world and cannot be said to "reside" or belong to any particular jurisdiction no matter the appendage affixed.

34. Colocation respectfully submits that there is no recognized connecting factor in this matter – whether listed or new – to Ontario. The property itself is intangible. The Contract is silent as to exclusive forum, and it was contemplated, drafted, and edited in Arizona by Ms. Whittington on behalf of Mitel. The only connection to Ontario is Mitel's head office, which must be considered in light of Colocation's being in Nevada.

35. In applying the real and substantial connection test, the presence of one or more parties in Ontario is not, on its own, a connecting factor sufficient for a court to assume jurisdiction.

*Canadian Imperial Bank of Commerce v Glasford*, 2015 ONSC 197 at para 17, relying upon *Club Resorts Ltd v Van Breda*, 2012 SCC 17 at paras 86.

36. Where the parties have similar connections to their preferred forums, the other factors become critical to the test under *Van Breda*. These include the location of witnesses.

*MCRL Overseas Printing Inc v Company's Coming Publishing Ltd*, 2016 ONSC 4327 at para 24.

37. Colocation submits that most of all of the witnesses and the relevant documentation are in Arizona or its adjacent states. To wit, the applicant, Mitel's sole affidavit evidence to be relied upon in this application is one affirmed by Ms. Whittington, herself a resident of Mesa, Arizona.

Affidavit of Michelle Whittington, affirmed January 6, 2017.

*If this Honourable Court should have jurisdiction to hear this application, should same be declined?*

38. The Supreme Court in *Van Breda* also posited that the effect of the common law real and substantial connection test is that the court should not assume jurisdiction, even if it has the power to do so, if no recognized presumptive connecting factor applies. It states that the opposite would:

> ...*open the door to assumptions of jurisdiction based largely on the case-by-case exercise of discretion and would undermine the objectives of order, certainty and predictability that lie at the heart of a fair and principled private international law system.*

*Club Resorts Ltd v Van Breda*, 2012 SCC 17 at para 93.

39. Stated in another way, Courts retain the discretion to not exercise its jurisdiction over a dispute insofar as the party responding to a proceeding can show that there is a real and substantial connection with another forum that is more appropriate for the dispute. This is on the basis of the doctrine of *forum non conveniens*.

*Club Resorts Ltd v Van Breda*, 2012 SCC 17 at paras 103, 108, and 109.

40. While the subject matter of this case relates to the disputed passing of intangible intellectual property, that which inherently has no place of domicile and operates beyond any borders,

the key witnesses to this matter reside in either Arizona, California, or Nevada, and there are ongoing proceedings in Arizona regarding this same subject matter. There would therefore be a risk of duplicative and inconsistent findings with those of the Arizona Superior Court should Ontario take jurisdiction.

### *Is this application simply an anti-suit injunction brought under another name?*

41. Following Mitel's refusal to fulfil its obligations under the Contract, it was Colocation who commenced proceedings in California. Colocation was the original plaintiff, is currently the party seeking specific performance and damages for breach of contract, and is therefore the primary litigant. The within application is nothing more than an attempt to block the respondent from bringing suit to that effect.

42. Indeed, Mitel's relief sought is merely declaratory in nature.

> Applicant's application record, Notice of Application, page 3 at para 1.

43. This anti-suit injunction attempts to make Mitel, a responding party to Colocation's claim, the moving party in an effort to block Colocation from bringing its suit elsewhere.

44. Because it raises serious issues of international comity, an anti-suit injunction should only be issued if the foreign court departs from the Canadian rule of "inconvenient forum" or *forum non conveniens*, to an extent which justifies our courts in refusing to respect its assumption of jurisdiction because of the serious injustice occasioned.

> *Amchem Products Inc. v. British Columbia (Workers' Compensation Board)*, [1993] 1 SCR 897 at p 912-913.

45. The Supreme Court makes it clear that Canadian Courts should only grant such injunctions where the moving party can establish that the Canadian Court is clearly a more appropriate forum for hearing the dispute than the foreign court, and that the responding party will not be unjustly deprived of personal or juridical advantages in the foreign court.

> *Amchem Products Inc. v. British Columbia (Workers' Compensation Board)*, [1993] 1 SCR 897 at p 930.

46. The test for an anti-suit injunction contains two parts. First, the applicant must establish that the foreign court assumed jurisdiction on the basis that is inconsistent with the principles

relating to *forum non conveniens*. In the event the applicant establishes the first test, the court must then go on to determine whether an injustice will result from allowing the foreign action to proceed in the foreign jurisdiction.

> *Amchem Products Inc. v. British Columbia (Workers' Compensation Board)*, [1993] 1 SCR 897 at p 931-932.

47. Mitel cannot succeed on the first part of the test as this application has pre-empted the decision of the foreign court. The Supreme Court in *Amchem* states:

> *In order to resort to this special remedy consonant with the principles of comity, it is preferable that the decision of the foreign court not be pre-empted until a proceeding has been launched in that court <u>and the applicant for an injunction in the domestic court has sought from the foreign court a stay or other termination of the foreign proceedings and failed. [emphasis added]</u>*
>
> *Amchem Products Inc. v. British Columbia (Workers' Compensation Board)*, [1993] 1 SCR 897 at p 931.

48. This principle allows the foreign court to consider a request for an anti-suit injunction, which would ultimately reduce the perceived interference by the Canadian court.

> *Speers Estate v Reader's Digest Association (Canada) ULC*, [2009] OJ No 2332 at para 59.

49. Although the applicant therefore cannot establish the first part of the test, Colocation respectfully submits that the second part of the test cannot be met in any case as no injustice to Mitel would result from allowing the Arizona Court to proceed.

50. Litigation is understood to be time consuming and expensive regardless of what jurisdiction it takes place in. There is no presumptive basis on which to find that inconvenience and cost of defending an action in either jurisdiction gives rise to any injustice.

> *Agemian v Pactiv LLC*, 2012 ONSC 4571 at para 33.

51. There is simply no evidence before this Honourable Court that establishes that Mitel would suffer a loss of juridical advantage if the Arizona proceedings continue against it.

52. Accordingly, Colocation respectfully submits that the relief sought by the Applicant in this application as brought cannot be granted.

**PART V – RELIEF REQUESTED**

53. The respondent respectfully requests the following:

    a.   That this application be dismissed in whole;

    b.   In the alternative, that a timetable be established so that the parties can conduct examinations for the proper hearing of this application; and

    c.   An award of costs be made payable by the Applicant to the Respondent.

**ALL OF WHICH IS RESPECTFULLY SUBMITTED.**

January 23, 2017

                                          NOAH J. SHAPIRO
                                          LSUC No. 65706D