*Colocation America, Inc.*
*v.*
*Mitel Networks Corporation*

## INDEX OF ATTACHED EXHIBITS

**DESCRIPTION OF EXHIBIT**                                          **EXHIBIT**

Proposed Amended Pleading Showing Changes                          EXHIBIT 1

Deposition of Corey Allen Kotler                                   EXHIBIT 2

Colocation's Initial Disclosure                                    EXHIBIT 3

Colocation's Amended and Restated Disclosure                       EXHIBIT 4

Declaration of Noe Bermudez                                        EXHIBIT 5

Declaration of M. Graham Miller                                    EXHIBIT 6

Declaration of Antonio Villanueva                                  EXHIBIT 7

Email dated July 31, 2017                                          EXHIBIT 8

Rule 30(b)(6) Deposition of Colocation                            EXHIBIT 9

E-mail dated August 10, 2017                                      EXHIBIT 10

# EXHIBIT 1

1   David E. Rogers (#19274)
    David G. Barker (#024657)
2   Jacob C. Jones (#029971)
    SNELL & WILMER L.L.P.
3   One Arizona Center
    400 E. Van Buren, Suite 1900
4   Phoenix, Arizona 85004-2202
    Telephone: 602.382.6000
5   Facsimile: 602.382.6070
    E-Mail: drogers@swlaw.com
6           dbarker@swlaw.com
            jcjones@swlaw.com
7
    Attorneys for Defendant
8   Mitel Networks Corporation

9
                    IN THE UNITED STATES DISTRICT COURT
10
                      FOR THE DISTRICT OF ARIZONA
11

12  Colocation America, Inc.,                    Case No. CV-17-00421-PHX-NVW

13          Plaintiff,                           **MITEL NETWORKS
                                                 CORPORATION'S (1) AMENDED
14          v.                                   ANSWER TO COMPLAINT; (2)
                                                 AMENDED COUNTERCLAIM; AND
15  Mitel Networks Corporation,                  (3) DEMAND FOR JURY TRIAL**

16          Defendant.

17  Mitel Networks Corporation,

18          Counterclaimant,

19          v.

20  Colocation America, Inc.; and Corey Allen
    Kotler and Mojgan Tabibnia, husband and
21  wife,

22          Counterdefendants.

23          Defendant and Counterclaimant Mitel Networks Corporation ("MNC")

24  serves submits the following (1) Amended Answer and Counterclaim in response to the

25  Complaint of Colocation America, Inc. ("Colocation" or "Plaintiff")."), (2) Amended

26  Counterclaim, including against a newly joined party, Colocation's broker, Corey Allen

27  Kotler ("Kotler"), and (3) Demand for Jury Trial. Except as specifically admitted, MNC

28  denies each and every allegation in the Complaint.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona  85004-2202
602.382.6000

## ANSWER

## PARTIES, JURISDICTION, AND VENUE

1.    MNC lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 1, and therefore denies them.

2.    MNC admits that Colocation brought suit against MNC.  MNC denies that it maintains any office or direct subsidiaries in Arizona except for Mitel US Holdings, Inc. ("MUSHI~~") in Arizona~~.").    MNC admits that Ms. Whittington is MNC's intellectual property counsel, a member of the Arizona Bar ~~and that she~~, who has an office located at 1146 North Alma School Rd., Mesa, AZ 85201~~, but~~.  MNC denies that she is an employee of MNC.  MNC admits that Ms. Whittington was involved in the negotiation of the ~~contract~~Domain Name Assignment Agreement ("Contract"; Exhibit 1 to Colocation's Complaint) at issue in this case, but she did not "initiate" or "consummate" it.  MNC denies any remaining allegations in Paragraph 2.

3.    MNC ~~denies the allegations in in Paragraph 3 of the complaint.  By way of further answer, in 1997, MNC did not acquire assets of~~ admits that it indirectly acquired assets from the Gandalf Technologies~~,~~ Inc. ~~In or about 2001 MNC acquired the rights to the~~ bankruptcy and that those assets include the Canadian domain name ~~"~~<Gandalf.ca~~"~~, ~~and is unaware at if it acquired rights to the IPv4 internet protocol address block referenced in the Complaint~~>.  To the extent understood, MNC lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations of Paragraph 3, and therefore denies them.

## ~~"~~RIGHTS, NEGOTIATION, AND AGREEMENT~~"~~

4.    Denied.  MNC never contemplated ~~the~~a sale of what Colocation defines in Paragraph 3 as "Gandalf rights."

5.    MNC admits that its counsel prepared a draft agreement ~~by a quit claim of~~to sell the <Gandalf.ca> domain name and associated goodwill~~, and~~.  MNC denies that ~~MNC understood~~it discussed  MNC's acquisition of rights in the domain name <Gandalf.ca> or any other rights.  Colocation ~~to have accepted that offer.~~added the quit claim language to

Snell & Wilmer

L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

1    the draft Contract.  MNC denies the remaining allegations in Paragraph 5.

2        6.    MNC admits that Exhibit 1 of the Complaint (, which is the "Contract"), is

3    the final written agreement executed by MNC and Colocation.  MNC admits that the

4    parties agreed to confidentiality, and that the Contract contains an integration clause.

5    MNC denies the remaining allegations of Paragraph 6, including Colocation's

6    characterization of the Contract., the allegation that the Contract reflects the parties'

7    mutual understanding, expressly recites intangible rights, and that it was prepared solely

8    by MNC's counsel.  Paragraph 6 of the Complaint further omits operative language from

9    the Contract, and alleges that the Contract states:

10
11           together with ... the associated IPv4 134.22.0.0/16 and any associated
             trade dress, or other intellectual property intellectual property rights
12           relating thereto, to the extent any such rights exist.

13   The actual language of the Contract is as follows:

14
15           [MNC] hereby agrees to quit claim to [Colocation] any of [MNC's]
             rights, title and interest in and to the Domain Name <gandalf.com>
16           and the registration thereof, together with the goodwill of the
             business connected with and symbolized by such Domain Name and
17           the associated IPv4 134.22.0.0/16 and any associated trade dress, or
             other intellectual property intellectual property rights relating thereto,
18           to the extent any such rights exist.

19

20       7.    MNC admits that Colocation was required to submit payment to MNC

21   through <Escrow.com> and that Colocation has failed to release any payment to MNC.

22   MNC denies the remaining allegations of Paragraph 7, including Colocation's

23   characterization of the Contract.: the Contract, the Contract's subject matter, and MNC's

24   duties and obligations under the Contract.

25       8.    MNC admits that the Contract was executed in Canada. by MNC's General

26   Counsel.  MNC denies the remaining allegations of Paragraph 8.

27                          **BREACH OF AGREEMENT**

28       9.    Denied.

- 3 -

**PRIOR ACTION**

10.     MNC admits that ~~Colocation's~~Colocation commenced an action in Superior Court in California (the "California action"), that MNC challenged personal jurisdiction over it in the California action, and that the California action was dismissed for lack of personal jurisdiction over MNC. Colocation was also sanctioned approximately $40,000 for discovery misconduct in the California action, which it has not paid. MNC denies the remaining allegations of Paragraph 10.

**LITIGATION HOLD**

11.     Paragraph 11 is not a proper pleading, and no response to Paragraph 11 is required.

**FIRST CLAIM FOR RELIEF**
**(Breach of Contract)**

12.     MNC incorporates by reference the prior paragraphs of this Answer.

13.     Denied.

14.     Denied.

15.     Denied.

16.     To the extent a response is required, denied.

17.     Denied.

**SECOND CAUSE OF ACTION**
**(Specific Performance against Mitel)**

18.     MNC incorporates by reference the prior paragraphs of this Answer.

19.     Denied.

20.     Denied.

21.     Denied.

22.     Denied.

23.     Denied.

MNC denies that Plaintiff is entitled to any of the relief it seeks.

**ADDITIONAL DEFENSES**

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

1   ~~Defendant~~ MNC reserves the right to rely upon one or more of the following

2   defenses, as well as raise any further defenses as may arise during the course of discovery.

3   By alleging the following, MNC does not ~~necessarily~~ admit that the following are

4   affirmative defenses, and does not assume the burden of pleading or proving any matter as

5   to which MNC does not have such burden under applicable law.

6                          **FIRST AFFIRMATIVE DEFENSE**

7        24.    Plaintiff's Complaint fails, in whole or in part, to state a claim against

8   Defendant upon which relief can be granted.

9                          **SECOND AFFIRMATIVE DEFENSE**

10       25.    Plaintiff's claims are barred, in whole or in part, by estoppel.

11                          **THIRD AFFIRMATIVE DEFENSE**

12       26.    Plaintiff's claims are barred, in whole or in part, by failure of consideration.

13                          **FOURTH AFFIRMATIVE DEFENSE**

14       27.    Plaintiff's claims are barred, in whole or in part, by fraud or concealment by

15   Plaintiff. ~~Specifically, Plaintiff's broker~~ and/or its agent, Corey Allen Kotler ("Kotler")

16   during negotiation and formation of the Contract.  Kotler contacted MNC with the express

17   purpose of acquiring the domain name <Gandalf.ca> ("Domain Name").  Kotler expressly

18   ~~stated in an email~~represented to ~~MNC's representative~~ MNC that only ~~MNC's~~ the domain

19   ~~name <Gandalf.ca> and~~ "goodwill" (if any) of the business symbolized by the domain

20   name, associated ~~with the~~ IPv4 addresses, and associated trade dress would be

21   ~~transferred~~quit claimed under the ~~proposed agreement.~~Contract.  Plaintiff ~~and its broker~~

22   ~~both~~, which is experienced in domain name and IPv4 transactions~~—~~, knew that ~~statement~~

23   ~~was~~representation to be false and that Plaintiff intended to later argue that the

24   ~~agreement~~Contract required transfer of ~~the~~ IPv4 addresses themselves.  Plaintiff and

25   Kotler intended MNC to rely on ~~that statement~~their misrepresentations to MNC's

26   detriment, ~~and~~ MNC did ~~in fact~~ rely on ~~that statement~~those misrepresentations to its

27   detriment, ~~which~~and MNC has ~~to this point cost MNC~~been damaged at least ~~significant~~by

28   (a) not being paid $10,000 for the Domain Name, and (b) incurring attorney fees ~~that were~~

1  directly caused by Plaintiff's fraud.

**FIFTH AFFIRMATIVE DEFENSE**

2

3  28.    Plaintiff's claims are barred, in whole or in part, by mistake. ~~Specifically,~~

4  To the extent that the Court interprets the Contract as requiring a transfer or quit claim of

5  IPv4 addresses~~, the parties (or~~ themselves, at least MNC~~), were~~ was under the mistaken

6  belief that the Contract did not require a quit claim or transfer of IPv4 addresses, but only

7  a quit claim of the Domain Name and any goodwill ~~that MNC may or may not have had~~ in

8  ~~such~~ the business connected with and symbolized by the Domain Name and the associated

9  IPv4 addresses~~. to the extent any such rights exist.~~  MNC's belief was reasonable,

10  Colocation knew of MNC's mistake and intended for MNC to be mistaken, and

11  Colocation has relied on MNC's mistake to MNC's detriment.  Enforcement of the

12  Contract would be unconscionable because MNC would be required to transfer rights in

13  IPv4 addresses that it currently is not capable of transferring through the American

14  Registry for Internet Numbers, and Colocation would receive a windfall by receiving IPv4

15  addresses that are worth hundreds of thousands of dollars when it is required to pay only

16  $10,000 under the Contract.  Colocation's fraudulent misrepresentation and concealment

17  caused the mistake.

**SIXTH AFFIRMATIVE DEFENSE**

18

19  29.    Plaintiff would be unjustly enriched if awarded the remedies it seeks.

**SEVENTH AFFIRMATIVE DEFENSE**

20

21  30.    Plaintiff's claims are barred, in whole or in part, because of Plaintiff's

22  unclean hands.

23  Defendant reserves the right to ~~have~~assert additional defenses that it learns through

24  the course of discovery.

**COUNTERCLAIM**

25

26  1.    Mitel Networks Corporation ("MNC") alleges the following for its

27  Counterclaim against Colocation America, Inc. ("Colocation") and Corey Allen Kotler

28  ("Kotler"), whom MNC joins as a counterdefendant under Fed. R. Civ. P. 13(h) and

Snell & Wilmer

L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

20(a)(2)(A).

1.2.   MNC is a Canadian corporation with its corporate headquarters and principal place of business in Ottawa, Ontario.

2.3.   Colocation is a Nevada company with its ~~corporate headquarters in Las Vegas, Nevada~~principal place of business in Woodland Hills, California.

~~1.   On March 7, 2016, MNC signed the Contract (attached as Exhibit 1 to Colocation's Complaint), believing it would receive $10,000 USD from Colocation in exchange for the quit claim of rights to the Canadian domain name <Gandalf.ca> (the "Domain Name"), and the related good will to Colocation.~~

~~2.   At the time of signing the Contract, MNC did not believe the terms of the Contract related to any right, title, or interest in any IPv4 addresses.~~

~~3.   After the Contract was signed, Colocation stated that the Contract also assigned to it ownership of a block of IPv4 addresses worth approximately $500,000-$1,000,000, for no further consideration.~~

4.   Kotler and his wife, Mojgan Tabibnia, are married and are California residents. At all material times, Kotler was acting on behalf of and in furtherance of the marital community.

**Jurisdiction and Venue**

4.   This Court has ~~personal jurisdiction over Colocation because Colocation have consented to this Court's exercise of personal jurisdiction by filing its Complaint in Arizona.~~

3.5.   ~~This Court has original~~subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 ~~in that~~because (a) there is complete diversity of citizenship, and (b) the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs.  The crux of the dispute is whether the Domain Name Assignment Agreement ("Contract") requires MNC to ~~assign~~quit claim rights in about 64,000 IPv4 addresses, worth at least hundreds of thousands of dollars, to ~~Plaintiff~~ Colocation.

Snell & Wilmer

L.L.P.

LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

6.     This Court has personal jurisdiction over Colocation because Colocation has consented to this Court's exercise of personal jurisdiction by filing its Complaint in Arizona.

7.     This Court has personal jurisdiction over Kotler because he purposefully availed himself of the privilege of conducting business in Arizona by contacting and negotiating the Contract with MNC's representative in Arizona.  The Counts against Kotler arise out of his intentional torts (e.g., fraud) directed to Arizona, including by intentionally misrepresenting to and concealing facts from MNC's Arizona representative. Kotler's intentional torts harmed MNC in Arizona, and exercise of jurisdiction over him in Arizona is reasonable.

4.8.    Venue lies in the Phoenix Division of this Court under 28 U.S.C. § 1391. This action was originally brought in the Maricopa County Superior Court in the State of Arizona, and the Complaint alleges that some of the events occurred at least in part in Maricopa County, Arizona.  Kotler also contacted and negotiated the Contract with MNC's representative in Mesa, Arizona.

**Factual Background**

9.     Colocation entered into a business arrangement with Kotler in or around January-February 2016.

10.    Colocation entered into the business arrangement with Kotler before Kotler contacted MNC.

11.    Colocation entered into the business arrangement with Kotler before MNC signed the Contract.

12.    The business arrangement between Colocation and Kotler was memorialized in a written agreement between Colocation and Kotler (the "Kotler Contract").

13.    A true and correct copy of the Kotler Contract is attached hereto as Exhibit A.

14.    The Kotler Contract includes the name "Corey Kotler."

15.    The Kotler Contract does not include the name "Corey Allen."

Snell & Wilmer

L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

1    16.    The American Registry for Internet Numbers ("ARIN") manages and
2    distributes Internet Protocol version 4 ("IPv4") addresses.
3        ~~5.~~17.  An IPv4 address is ~~a unique address~~ used to identify ~~each~~a server, computer
4    or other device ~~connected to~~on the internet ~~and is used to allow servers, computers or~~
5    ~~devices to communicate with each other~~.
6        18.    ~~Because~~ All of the approximately 4.3 billion IPv4 addresses in existence
7    have been assigned since 2011~~,~~.
8        19.    IPv4 addresses are ~~quite~~ valuable ~~and~~ .
9        ~~6.~~20.  IPv4 addresses continue to increase in value.
10       21.    ~~The~~ Under the Kotler Contract, Kotler was to (a) contact companies with
11   IPv4 addresses ~~only~~ , and (b) negotiate on ~~the transfer~~behalf of Colocation to acquire the
12   IPv4 addresses.
13       22.    The Kotler Contract makes no mention of domain names.
14       23.    Kotler negotiated the Contract (attached as Exhibit 1 to the Complaint) on
15   behalf of Colocation.
16       24.    Kotler negotiated the Contract as Colocation's agent.
17       25.    During negotiations, Kotler represented to MNC that Kotler was negotiating
18   on behalf of an unnamed company.
19       26.    During negotiations, Kotler represented to MNC that an unnamed company
20   wanted to acquire the Canadian domain name <Gandalf.ca> (the "Domain Name ~~and the~~
21   ").
22       27.    Before executing the Contract, Colocation believed that MNC owned the
23   IPv4 addresses referenced in the Contract.
24       28.    Albert Ahdoot ("Adhoot") identified the IPv4 addresses referenced in the
25   Contract.
26       29.    ARIN does not list MNC as the owner of the IPv4 addresses referenced in
27   the Contract.
28       30.    Colocation instructed Kotler to contact MNC to attempt to obtain the IPv4

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

1   addresses referenced in the Contract.

2        31.    Kotler has never been an employee of Colocation.

3        32.    Kotler is not a lawyer.

4        33.    Kotler is an actor who is self-described as the "tighty whitey guy," and

5   whose "niche as an actor is the fat guy, shirtless, wearing a Speedo or tighty whities."

6        34.    Kotler negotiated the Contract on behalf of Colocation.

7        35.    Kotler revised the Contract on behalf of Colocation.

8        36.    During negotiations with MNC, Kotler represented to MNC that Kotler's

9   name was "Corey Allen."

10        37.    During negotiations with MNC, Kotler never informed MNC that his last

11   name was Kotler.

12        38.    Kotler intentionally concealed his last name, Kotler, from MNC during

13   negotiations.

14        39.    Kotler intentionally concealed his full name, Corey Allen Kotler, from

15   MNC during negotiations.

16        40.    Kotler intentionally concealed his full name from MNC to induce MNC to

17   negotiate the Contract.

18        41.    Kotler intentionally concealed his full name from MNC to induce MNC to

19   enter into the Contract.

20        42.    Kotler believed that MNC would not have negotiated the Contract with him

21   if MNC knew his full name.

22        43.    Kotler believed that MNC would not have entered into the Contract if MNC

23   knew his full name.

24        44.    Colocation was aware that Kotler's last name was Kotler before Kotler

25   contacted MNC.

26        45.    Colocation was aware that Kotler communicated with MNC using the name

27   "Corey Allen."

28        46.    Colocation was aware that Kotler was not using the name "Kotler" when

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

communicating with MNC.

47.   During negotiations with MNC before the Contract was signed, no email that Kotler sent to MNC referenced IPv4 addresses in the body of the email.

48.   There were no discussions about transferring IPv4 addresses at any time before signing the Contract.

49.   Kotler first attempted to contact MNC on February 17, 2016, and Kotler said, "The reason I have been trying to contact you is because you have a domain that we would like to buy."  This email did not reference IPv4 addresses.

50.   On February 19, 2017, Michelle Whittington, Intellectual Property Counsel for MNC, emailed Kotler and said, "I have been asked to respond to your email request regarding the <<gandalf.ca>> domain name."   This email did not reference IPv4 addresses.

51.   During negotiations, Kotler referred to the proposed Contract in email communications as a domain name purchase.

52.   Colocation and Kotler exchanged email communications about contacting MNC.

53.   Colocation and Kotler exchanged email communications about negotiating the Contract with MNC.

54.   Kotler emailed drafts of the Contract to Colocation.

55.   Colocation emailed drafts of the Contract to Kotler.

~~7.~~56.  On February 24, 2016, Kotler wrote to MNC: "our company would like to purchase the domain Gandalf.ca as well as any potential intellectual properties or scenarios that may be associated ~~good will~~at a future point in time with the name Gandalf.ca."  This email did not reference IPv4 addresses.

57.   ~~The Contract refers to~~An IPv4 address ~~in only one instance and makes this~~is not intellectual property.

58.   An IPv4 address is not a "scenario."

59.   On February 24, 2016, Ms. Whittington provided a draft Contract to Kotler.

- 11 -

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

60.    By February 24, 2016, Colocation had not been identified as a party to the Contract.

61.    The email from Ms. Whittington that included the February 24, 2016 draft stated that the draft Contract reflected the parties' agreement.

62.    The draft Contract provided by Ms. Whittington had no reference ~~with respect~~ to IPv4 addresses.

63.    In response to the draft Contract provided by MNC, Colocation, through Kotler, provided a ~~quit claim~~revised draft that included a specific reference to the goodwill of ~~the good will connected with and~~business symbolized by ~~them to the extent~~: the Domain Name, associated IPv4 addresses, and trade dress.

64.    When the reference to IPv4 addresses was introduced after an agreement between the parties had been reached, neither Colocation nor Kotler stated that IPv4 addresses themselves were to be transferred or quit claimed under the Contract.

65.    At no time did Colocation, through Kotler or otherwise, communicate any ~~such rights exist~~willingness to provide consideration other than $10,000 under the Contract.

66.    On March 7, 2016, MNC signed the Contract with Colocation.

~~8.~~67.    The only reference to IPv4 addresses in the Contract is reproduced below:

> … Mitel hereby agrees to quit claim to INTELLECTUAL PROPERTY PURCHASER any of Mitel's right, title and interest in and to the Domain Name <Gandalf.ca> and the registration therefore, together with the goodwill of the business connected with and symbolized by such Domain Name and the associated IPv4 134.22.0.0/16 and any associated trade dress~~…~~, or other intellectual property rights related thereto, to the extent any such rights exist.

~~5.    On February 24, 2016, Michelle Whittington, Intellectual Property Counsel for MNC, provided a draft Domain Name Assignment Agreement to Corey Allen of Dividend Advisors, a Registered Investment Advisor.  At this point, Colocation had not been identified as a contracting party.  The draft had no reference to IPv4 addresses.~~

68.   ~~There were no discussions or communications in relation to the transfer of any~~The Contract does not state that it assigns IPv4 addresses.

69.   The Contract does not state that it quit claims IPv4 addresses ~~at any~~.

70.   The Contract does not define IPv4 addresses as being intellectual property rights.

~~9.~~71.   At the time ~~prior to the~~of signing ~~of~~the Contract, MNC did not believe the Contract required an assignment or quit claim of IPv4 addresses.

~~6.   In response to the draft Contract provided by MNC, Colocation, through Mr. Allen as its agent, provided a single draft in return, which included a specific reference to IPv4 addresses.~~

~~7.   When the reference to IPv4 addresses was introduced, Colocation did not draw any attention to the revision, or claim that IPv4 addresses were to be transferred or quit claimed. At no time did Colocation, through Mr. Allen or otherwise, communicate any willingness to provide further consideration for a purported transfer or quit claim of IPv4 addresses.~~

~~10.~~72. It was not MNC's intent to ~~transfer~~assign IPv4 addresses or to quit claim rights in them.

~~8.   The value of IPv4 addresses at issue vastly exceeds the $10,000 offered by Colocation for the Domain Name.~~

73.   ~~As the transfer of IPv4 addresses was never contemplated,~~ MNC did not ~~intend to~~ warrant or represent ~~any ownership of~~that it owned the IPv4 addresses~~.~~ referenced in the Contract.

~~11.~~74. A review of the ~~American Registry for Internet Numbers~~ARIN database reveals that the IPv4 addresses ~~at issue~~referenced in the Contract are not in MNC's name.

75.   On information and belief, Colocation was aware at all ~~relevant~~times that the IPv4 addresses referenced in the Contract were not in MNC's name.

~~12.~~76. On information and belief, Kotler was aware at all times that the IPv4 addresses ~~at issue~~referenced in the Contract were not in MNC's name.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

- 13 -

1    ~~13.~~77. Colocation's allegation that it would be assigned the IPv4 addresses
2    referenced in the Contract was first communicated after the Contract was executed.

3    78.    The warranty section of the Contract has no reference to IPv4 addresses.

4    79.    Goodwill in a domain name does not include an assignment or quit claim of
5    IPv4 addresses.

6    80.    After the Contract was signed, Colocation took the position that the Contract
7    assigned to it ownership of the IPv4 addresses referenced in the Contract.

8    81.    The Contract's consideration of $10,000 is a fair price for the Domain
9    Name.

10   82.    The IPv4 addresses referenced in the Contract are worth approximately
11   $500,000-$1,000,000, or more.

12   83.    Before the Contract was signed, Colocation and Kotler concealed from
13   MNC that Colocation wanted to obtain the IPv4 addresses referenced in the Contract.

14   84.    Before the Contract was signed, Kotler knew that the IPv4 addresses
15   referenced in the Contract were valuable.

16   85.    Before the Contract was signed, Kotler knew that the IPv4 addresses
17   referenced in the Contract were worth more than $10,000.

18   86.    Before the Contract was signed, Colocation knew that the IPv4 addresses
19   referenced in the Contract were valuable.

20   87.    Before the Contract was signed, Colocation knew that the IPv4 addresses
21   referenced in the Contract were worth more than $10,000.

22   **Kotler's Company – Dividend  Advisors L.L.C. ("Dividend")**

23   88.    Kotler formed a Delaware entity called Dividend Advisors, L.L.C. before
24   working for Colocation.

25   89.    Kotler formed Dividend at the suggestion of Adhoot.

26   90.    Adhoot provided Kotler with the name of a person in Delaware to help
27   Kotler form Dividend.

28   91.    Dividend is no longer a valid legal entity.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona  85004-2202
602.382.6000

Snell & Wilmer

L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

92.     Dividend never filed any tax returns.

93.     On information and belief, Dividend did not have a bank account separate from Kotler.

94.     Kotler was paid directly by Colocation for his work, including for his negotiations with MNC.

95.     When it existed, Dividend was the alter ego of Kotler.

96.     On information and belief, neither Kotler nor Dividend is or was a registered investment advisor.

**Escrow.com Transactions**

97.     Colocation initiated three transactions related to the Contract through Escrow.com after the Contract was executed.

98.     MNC initiated three transactions related to the Contract through Escrow.com after the Contract was executed.

99.     All of the transactions referenced in the preceding two paragraphs stated in the "Description" field that they were for a domain name transfer or a domain name assignment.

100.    None of the transactions referenced in paragraphs 97-98 stated in the "Description" field that they were for a transfer of rights in IPv4 addresses.

101.    In March 2016, there was no reference in the Escrow.com General Escrow Instructions related to the Contract that referred to IPv4 transfers.

102.    Kotler had no role in dealing with Escrow.com.

**Further Communications on or After March 28, 2016**

14.103.       On March 28, 2016, Samantha Walters, VP of Online Strategies for Colocation, wrote to Ms. Whittington in an email advising that the $10,000 had been placed in escrow at Escrow.com, and provided the transaction number.

15.104.       On March 28, 2016, in the same email, Ms. referenced in the preceding paragraph, Ms. Walters stated that "our next step is to transfer the IP range from Mitel to Colocation…"

16.105.    On March 28, 2016, Ms. Whittington replied to Ms. Walter's email later the same day, referenced in the preceding two paragraphs, advising Ms. Walters that there appeared to have been a miscommunication between the parties that would need to be resolved.

17.106.    On April 11, 2016, Ms. Whittington wrote another email to Ms. Walters stating that MNC had agreed only to the transfer of "the domain name and all goodwill associated thereof [sic.]"

As of October 26, 2016,**Additional Factual Allegations**

18.107.    The Domain Name has not been transferred from MNC to Colocation and no monies have been exchanged between Colocation and MNC.

108.    Colocation served its Initial Disclosure on May 15, 2017, which listed "Corey Allen" of "Dividend Advisors" as a person with knowledge who could be contacted through Colocation's Arizona counsel of record in this action.

109.    Before serving the Initial Disclosure, Colocation knew "Corey Allen" was not the full legal name of the person who negotiated the Contract with MNC.

110.    Before serving the Initial Disclosure, Colocation's lawyers knew "Corey Allen" was not the full legal name of the person who negotiated the Contract with MNC.

111.    Before serving the Initial Disclosure, Colocation knew the person who negotiated the Contract with MNC was Kotler.

112.    Before serving the Initial Disclosure, Colocation's lawyers knew its agent who negotiated the Contract with MNC was Kotler.

113.    Before serving the Initial Disclosure, Colocation knew "Corey Allen" was not Kotler's stage name.

114.    Before serving the Initial Disclosure, Colocation's lawyers knew "Corey Allen" was not Kotler's stage name.

115.    Before serving the Initial Disclosure, Colocation knew that Kotler's address was not 433 North Camden Drive, Suite 970, Beverly Hills, California 90210.

116.    Before serving the Initial Disclosure, Colocation's lawyers knew that

Snell & Wilmer

L.L.P.

LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

1    Kotler's address was not 433 North Camden Drive, Suite 970, Beverly Hills, California

2    90210.

3    117.    Before serving the Initial Disclosure, Colocation knew that Dividend was no

4    longer an existing legal entity.

5    118.    Before serving the Initial Disclosure, Colocation's lawyers knew that

6    Dividend was no longer an existing legal entity.

7    119.    Colocation's Amended and Restated Initial Disclosure was served on May

8    18, 2017, and disclosed the following address for "Corey Allen" and Dividend Advisors":

9    433 North Camden Drive, Suite 970, Beverly Hills, California 90210.

10   120.    Before serving the Amended and Restated Initial Disclosure, Colocation

11   knew "Corey Allen" was not the full legal name of the person who negotiated the

12   Contract with MNC.

13   121.    Before serving the Amended and Restated Initial Disclosure, Colocation's

14   lawyers knew "Corey Allen" was not the full legal name of the person who negotiated the

15   Contract with MNC.

16   122.    Before serving the Amended and Restated Initial Disclosure, Colocation

17   knew that the person who negotiated the Contract with MNC was Kotler.

18   123.    Before serving the Amended and Restated Initial Disclosure, Colocation's

19   lawyers knew that the person who negotiated the Contract with MNC was Kotler.

20   124.    Before serving the Amended and Restated Initial Disclosure, Colocation

21   knew that "Corey Allen" was not Kotler's stage name.

22   125.    Before serving the Amended and Restated Initial Disclosure, Colocation's

23   lawyers knew that "Corey Allen" was not Kotler's stage name.

24   126.    Before serving the Amended and Restated Initial Disclosure, Colocation

25   knew that Kotler's address was not 433 North Camden Drive, Suite 970, Beverly Hills,

26   California 90210.

27   127.    Before serving the Amended and Restated Initial Disclosure, Colocation's

28   lawyers knew Kotler's address was not 433 North Camden Drive, Suite 970, Beverly

Hills, California 90210.

128.   Before serving the Amended and Restated Initial Disclosure, Colocation knew that Dividend was no longer an existing legal entity.

129.   Before serving the Amended and Restated Initial Disclosure, Colocation's lawyers knew that Dividend was no longer an existing legal entity.

130.   Colocation's interrogatory responses identify "Corey Allen" as a person it expects to call at trial.

131.   Colocation's interrogatory responses do not identify Corey Kotler.

132.   Colocation's interrogatory responses do not include the name Kotler.

133.   Paul Sigelman, an attorney for Colocation, maintains an office at 433 North Camden Drive, Suite 970, Beverly Hills, California 90210.

134.   Sigelman has never represented Kotler as an attorney.

135.   Kotler's emails to MNC included the address of 433 North Camden Drive, Suite 970, Beverly Hills, California 90210.

136.   On June 15, 2017, a process server for MNC attempted to serve subpoenas on "Corey Allen" and Dividend at 433 North Camden Drive, Suite 970, Beverly Hills, California 90210.

137.   On June 15, 2017, the process server took the subpoenas to 433 North Camden Drive, Suite 970, Beverly Hills California 90210, and a man identifying himself as "Rick" took the subpoenas.

138.   The man who identified himself as "Rick" in the preceding paragraph was Sigelman.

139.   Sigelman never contacted MNC about the subpoenas to "Corey Allen" and Dividend.

140.   On June 15, 2017, the process server noted that "Corey Allen" and Dividend were not listed on the door to Suite 970 as having an office there.

141.   "Corey Allen" and Dividend are not listed on the door to Suite 970 at 433 North Camden Drive, Suite 970, Beverly Hills California 90210.

Snell & Wilmer

L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

142.   MGM Management Company ("MGM") manages the leases for Suite 970 of the building at 433 North Camden Drive, Beverly Hills, California 90210.

143.   On July 19, 2017, MNC served a subpoena on MGM.

144.   MGM stated that it had never heard of "Corey Allen" or Dividend.

145.   MGM confirmed that, according to its leasing records, "Corey Allen" and Dividend have never been tenants in Suite 970 of the building at 433 North Camden Drive.

146.   Kotler is listed as the registrant of the <dividendadvisors.com> domain name, with an email address coreykotler18k@aol.com, and a physical address 2385 Roscomore Road, Unit E11, Los Angeles, California 90077.

147.   Kotler is listed as the registrant of the <coreyallenkotler.com> domain name, with the same email address coreykotler18k@aol.com and the same physical address at 2385 Roscomore Road.

148.   Colocation provided none of the information in the preceding two paragraphs to MNC.

149.   On July 25, 2017, MNC had Kotler served with subpoenas at 2385 Roscomore Road, Unit E11.

150.   On July 25, 2017, the process server attempted to hand the subpoenas to Kotler, but Kotler refused to take them.

151.   Kotler denied to the process server that his name was Corey Kotler.

152.   The process server placed the subpoenas under the door of Unit E11, where Kotler lives.

153.   Several days later, Sigelman contacted MNC about Kotler's compliance with the subpoenas.

154.   Sigelman never informed MNC of "Corey Allen's" full name until after MNC served Kotler.

155.   Neither Colocation nor any of its attorneys informed MNC of Kotler's full name until after Kotler was served.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

156.   Had MNC known it was negotiating a contract with an actor using a false name, it would neither have negotiated with Kotler nor entered into the Contract.

## COUNT ONE
**Breach of Contract by Colocation and Specific Performance**

19.157.   29.   The Contract is an agreement ~~between MNC and Colocation that required~~ for Colocation to pay MNC $10,000 for (a) the Domain Name, and (b) the goodwill of the business connected with and symbolized by the Domain Name and the associated ~~goodwill, but not~~ IPv4 addresses and any associated trade dress, or other intellectual property rights relating thereto, to the extent any such rights exist.

158.   30.   The Contract does not require an assignment or quit claim of IPv4 addresses.

20.159.   MNC substantially performed under the Contract.

160.   31.   MNC has not yet transferred the Domain Name to Colocation ~~is~~ because Colocation has not yet requested transfer of the Domain Name.

161.   Colocation has taken the ~~incorrect~~ position that ~~the Contract requires~~ MNC ~~to~~must transfer IPv4 addresses~~, plus~~ before transferring the Domain Name.

21.162.   MNC has not received $10,000 from Colocation.

22.163.   32.   Colocation's contention that MNC is required to transfer IPv4 addresses to Colocation is an anticipatory breach of the Contract.

164.   33.   Colocation's failure to pay MNC $10,000 for the Domain Name and associated goodwill (if any) is a breach of the Contract.

23.165.   MNC has been harmed by Colocation's breach in the amount of $10,000, plus costs, attorney fees, and interest accruing since Colocation's breach.

24.166.   34.   MNC is entitled to ~~specific performance by~~a payment from Colocation~~; i.e., to pay MNC~~ of $10,000 for the Domain Name and associated goodwill~~,~~ ~~but not the IPv4 addresses.~~ (if any).

25.167.   35.   MNC is entitled to an award of costs~~,~~ and attorney fees, including under A.R.S. §§ 12-341 and 12-341.01(A), and interest accruing since

Snell & Wilmer

L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona  85004-2202
602.382.6000

Colocation's breach.

### COUNT TWO (In the Alternative)
### Rescission or Avoidance of the Contract

168.   MNC incorporates by reference the prior paragraphs of this Counterclaim as if fully set forth herein.

169.   There was no meeting of the minds with respect to the subject matter of the Contract.

170.   36.   MNC had no reason to know that Colocation believed the Contract required a transfer or quit claim of the IPv4 addresses.

171.   Colocation took the position immediately after the Contract was signed that the Contract does require a transfer or quit claim of the IPv4 addresses.

172.   That the Contract did not require a transfer or quit claim of the IPv4 addresses is an essential term of the Contract.

173.   Accordingly, the Contract is void, and MNC is entitled to rescind the Contract, because there was no meeting of the minds and therefore no contract was formed.

174.   Alternatively, the Contract is void due to uncertainty, mistake, or fraud, as alleged herein, and MNC is entitled to rescind the Contract.

175.   To the extent that the Court interprets the Contract as requiring a transfer or quit claim of IPv4 addresses themselves, at least MNC was under the mistaken belief that the Contract did not require transfer of IPv4 addresses, but only a quit claim of any goodwill that MNC may or may not have had in such addresses associated with the domain name <Gandalf.ca>.

176.   MNC's belief was reasonable, Colocation knew of MNC's mistake and intended for MNC to be mistaken, and Colocation has relied on MNC's mistake to MNC's detriment.

177.   Enforcement of the Contract would be unconscionable because MNC would be required to transfer rights in IPv4 address that it currently is not capable of transferring

through ARIN and Colocation would receive a windfall by receiving IPv4 addresses that are worth hundreds of thousands of dollars when it is required to pay only $10,000 under the Contract.

178.   Colocation's fraudulent misrepresentation and concealment caused the mistake.

**COUNT THREE**
**Fraud: Intentional Misrepresentation and Concealment**
**(against Colocation and Kotler)**

179.   MNC incorporates by reference the prior paragraphs of this Counterclaim as if fully set forth herein.

180.   Kotler intentionally concealed information from MNC during negotiation of the Contract.

181.   Kotler intentionally misrepresented information to MNC during negotiation of the Contract.

182.   Colocation instructed Kotler to contact MNC.

183.   Kotler was Colocation's agent during the Contract negotiation.

184.   Kotler was Colocation's agent when the Contract was executed.

185.   Kotler had authority from Colocation to negotiate the Contract with MNC.

186.   Kotler is liable for misrepresentations he made to MNC.

187.   Kotler is liable for concealing information from MNC.

188.   Before the Contract was signed, Kotler knew MNC expected to only transfer the <Gandalf.ca> domain name and not any IPv4 addresses.

189.   Colocation intended to take the position, after the Contract was executed, that the Contract assigned rights to IPv4 addresses to Colocation.

190.   Kotler and Colocation intentionally concealed and/or misrepresented the information in the preceding paragraph from MNC.

191.   On information and belief, Colocation instructed Kotler to mislead MNC about Colocation's intent when negotiating the Contract.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

192.   During the Contract negotiation, Kotler never used his last name "Kotler."

193.   During the Contract negotiation, MNC did not know that "Corey Allen" was not the name of the person with whom it was dealing.

194.   During the Contract negotiation, MNC did not know that Kotler was misrepresenting his identity.

195.   During the Contract negotiation, MNC did not know that Kotler was concealing his identity.

196.   During the Contract negotiation, MNC did not know that Kotler was an actor.

197.   Kotler misrepresented to MNC that Kotler was a registered investment advisor.

198.   Kotler knew that he was not a registered investment advisor.

199.   Through his misrepresentations and concealment, Kotler intended to deceive MNC and induce it to negotiate with him.

200.   Through his misrepresentations and concealment, Kotler intended to deceive MNC and induce it to enter into the Contract.

201.   Kotler's misrepresentations and concealment were material, in that MNC would not have negotiated the Contract had it known the truth of Kotler's misrepresentations or of the information he concealed.

202.   Kotler's misrepresentations and concealment were material, in that MNC would not have entered into the Contract had it known the truth of Kotler's misrepresentations or of the information he concealed.

203.   Kotler's concealment of his true identity was material because Kotler was negotiating on behalf of a yet-unnamed company.

204.   Kotler's concealment of his true identity was material because had MNC known that it was negotiating with a person whose full name was being concealed, MNC would not have negotiated with him.

205.   Kotler's concealment of his true identity was material because had MNC

known that it was negotiating with a person whose full name was being concealed, MNC would not have entered into the Contract.

206.   Kotler's concealment of his true identity was material because MNC would not negotiate with an actor with no experience in the Contract's subject matter, on behalf of a company whose identity MNC did not know.  Nor would MNC have executed such a contract.

207.   Kotler and Colocation intended that MNC act on Kotler's misrepresentations and concealment.

208.   MNC acted on Kotler's misrepresentations and concealment and negotiated and executed the Contract.

209.   MNC reasonably relied on Kotler's misrepresentations.

210.   MNC's reasonable reliance is supported by the Contract purchase price, which was a fair price for the domain name <Gandalf.ca>, but is not a fair price for rights to the IPv4 addresses referenced in the Contract.

211.   MNC's reasonable reliance is supported by the fact that ARIN does not list MNC as the owner of the IPv4 addresses referenced in the Contract (although MNC may have unperfected rights) and cannot currently transfer them.

212.   MNC has been injured by Kotler's misrepresentations and concealment in the amount of the Contract purchase price of $10,000.

213.   MNC may suffer further injury if MNC is required to assign or quit claim rights to the block of IPv4 addresses referenced in the Contract to Colocation, to the extent MNC has any rights, in which case MNC's damages could potentially be in the hundreds of thousands of dollars.

214.   Through his misrepresentations and concealment, Kotler fraudulently induced MNC to enter into the Contract.

215.   Because Kotler was Colocation's agent, Kotler and Colocation are jointly and severally liable for Kotler's misrepresentations and concealment.

216.   Because Kotler was Colocation's agent, MNC is entitled to rescind the

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

1   Contract, and MNC seeks that relief from the Court.

2   217.   Because no money has been paid and the Domain Name has not been

3   transferred, the Court need do nothing to restore the parties to the positions they held

4   before the Contract was signed other than declaring the Contract void and awarding MNC

5   its attorneys' fees.  To the extent MNC is required to tender anything, MNC is willing and

6   prepared to tender.

7   218.   Kotler committed his aggravated and outrageous actions fraudulently and

8   maliciously and in conscious disregard of MNC's rights, with evil mind, and with intent to

9   injure MNC, and Kotler is liable for punitive damages.

10   219.   Colocation, as Kotler's principal, is jointly liable for punitive damages

11   based on Kotler's conduct.

**COUNT FOUR**
**Civil Conspiracy**
**(against Colocation and Kotler)**

15   26.220.   MNC incorporates by reference the prior paragraphs of this

16   Counterclaim as if fully set forth herein.

17   221.  37.   On information and belief, Colocation agreed with Kotler to

18   fraudulently induce MNC to enter into the Contract by intentionally concealing and

19   misrepresenting information, as discussed above.

20   222.   On information and belief, Colocation agreed with Kotler to accomplish the

21   unlawful purpose of depriving MNC of any rights to the IPv4 addresses referenced in the

22   Contract through fraud and deceit.

23   27.1.  The KotlerThere was no meeting of the minds with respect to the subject

24   matter of the Contract.

25   38.   MNC is entitled to rescind the Contract on the basis that no contract was

26   formed.

27   223.  39.   Alternatively, the Alleged Contract evidences Colocation's and

28   Kotler's pre-Contract intent to attempt to acquire IPv4 addresses from MNC.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

224.    Kotler never told MNC before the Contract was executed that Colocation wanted to acquire IPv4 addresses.

225.    Kotler attempted to acquire rights to IPv4 addresses from MNC through fraud and deceit, which were unlawful means.

226.    Kotler's and Colocation's conspiracy has directly and proximately caused harm and economic damages to MNC.

227.    Kotler and Colocation are liable to MNC for the harm and damages referenced in the preceding paragraph.

228.    Colocation, as the principal, is jointly liable for the harm and damages caused by its agent Kotler.

229.    Kotler and Colocation committed the aggravated and outrageous actions fraudulently and maliciously and in conscious disregard of MNC's rights, with evil mind, and with intent to injure MNC.

230.    Kotler and Colocation are liable to MNC for punitive damages.

231.    Colocation, as the principal, is ~~void due to uncertainty~~liable for punitive damages based on Kotler's conduct.

## COUNT FIVE
### Aiding and Abetting
### (against Colocation)

232.    MNC incorporates by reference the prior paragraphs of this Counterclaim as if fully set forth herein.

233.    Kotler committed the torts alleged above.

234.    On information and belief, Colocation knew that Kotler was committing the alleged torts against MNC, including fraud, intentional misrepresentation, and fraudulent concealment.

235.    Colocation was aware of Kotler's duty to provide true and accurate information to MNC during negotiation of the Contract.

236.    On information and belief, Colocation substantially assisted or

1   ~~mistake~~encouraged Kotler in committing the alleged torts and breaching his duty to MNC.

2          237.   Colocation's aiding and abetting has directly and proximately caused harm

3   and economic damages to MNC.

4          ~~28.~~238.   Colocation committed these aggravated and outrageous actions

5   fraudulently and maliciously and in conscious disregard of MNC's rights, with evil mind,

6   and with intent to injure MNC, and Colocation is thus liable for punitive damages.

7                          **DEMAND FOR JURY TRIAL**

8          MNC demands a trial by jury on all issues so triable.

9                           **PRAYER FOR RELIEF**

10         **WHEREFORE**, MNC prays for the following relief:

11         1.     ~~1.     The~~That Colocation's Complaint be dismissed with prejudice, and

12   that judgment be entered in favor of MNC and against Colocation and Kotler.

13         2.     ~~2.~~   That the Court enter judgment on MNC's Counterclaim in favor of

14   MNC and against Colocation and Kotler.

15         ~~2.~~3.   That MNC be awarded damages for Colocation's breach of contract, and

16   that Colocation be ordered to pay MNC $10,000 for the Domain Name and associated

17   goodwill, but not the IPv4 addresses.

18         ~~3.~~4.   ~~3.~~   Alternatively, a declaration that the ~~Alleged~~ Contract is void or

19   rescinded.

20         5.     ~~4.~~   That MNC be awarded damages for Colocation's and Kotler's

21   tortious actions.

22         6.     That MNC be awarded punitive damages for Colocation's and Kotler's

23   tortious actions.

24         7.     That Colocation be judged to be jointly liable for damages and punitive

25   damages caused by Kotler.

26         ~~4.~~8.   That MNC recover its costs~~,~~ and attorney fees, including under A.R.S. §§

27   12-341 and 12-341.01(A), and pre- and post-judgment interest.

28

Snell & Wilmer

L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

5.9.   5.    That MNC be granted any further relief to which it is entitled, even if it has not been demanded by MNC in its pleadings, in accordance with Rule 54(c) of the Federal Rules of Civil Procedure.

DATED this 16th day of February, 2017.
DATED this ____ day of September, 2017.

SNELL & WILMER L.L.P.

By: /s/ Jacob C. Jones
    David E. Rogers (#19274)
    David G. Barker (#024657)
    Jacob C. Jones (#029971)
    One Arizona Center
    400 E. Van Buren, Suite 1900
    Phoenix, Arizona  85004-2202
    Telephone: 602.382.6000
    Facsimile: 602.382.6070

    Attorneys for Defendant
    Mitel Networks Corporation

- 28 -

**<u>Certificate of Service</u>**

I hereby certify that on ~~February 16,~~September __, 2017, I electronically

transmitted the foregoing document to the Clerk's Office using the CM/ECF System for

filing and transmittal of a Notice of Electronic Filing to the CM/ECF registrants on record

to:

Teresa H. Foster
Brier, Irish, Hubbard & Erhart, P.L.C.
2400 East Arizona Biltmore Circle
Suite 1300
Phoenix, AZ 85016
ctfiling@thfosterlaw.com
~~Attorney~~
Paul Stephen Sigelman
Sigelman Law Corporation
433 N Camden Dr., Suite 970
Beverly Hills, CA 90210
paul@sigelmanlaw.com

Attorneys for Plaintiff

*s/*_____
~~Jacob C. Jones~~

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona  85004-2202
602.382.6000

# **Exhibit A**

**WORKING AGREEMENT BETWEEN Dividend Advisors AND CoLocation America**

The following agreement is being entered into between Colocation America (9360 W. Flamingo Rd. Suite 110-178 Las Vegas, NV 89147 and Dividend Advisors LLC (433 N. Camden Dr. Suite #970 Beverly Hills CA 90210) on this the 21st day of April, 2016 in Los Angeles, California.

Article 1 The Agreement:

This agreement states that Corey Kotler promises to make best faith efforts to facilitate the sale and transfers of IPV4 blocks to CoLocation America.

Article 1 A. Length of Contractual Terms:

The length of this agreement commences on May 1st 2016 and will span over a trial period of three months. Upon the conclusion of the three month trial period the agreement shall continue on a month to month basis.

Article 2. Compensation Terms

Colocation America agrees to compensate Dividend Advisors as follows:

2A. Corey Kotler is to receive a monthly retainer of $5,000 to be paid in full on the 1st of every month and no later than the 5th of every month. The payment schedule is as follows:

-May 1st 2016

-June 1st 2016

-July 1st 2016

2B. Upon the close of escrow of the transfer of any IPV4 block, Dividend Advisors LLC is to receive a ten thousand dollar ($10,000) commission from Colocation America. This commission is to be paid by Colocation America to Dividend Advisors LLC within 72 hours of the closing of escrow.

2C. Upon Colocation America selling an IPV4 block that Corey Kotler assisted in the facilitation of acquiring, Corey Kotler is to receive an additional $10,000 commission. This additional $10,000 commission is to be payable within 72 hours after Albert Ahdoot or Colocation America or any of Albert Ahdoot' or CoLocationAmerica's associates or employees facilitate a sale of the said IPV block.

2D. Termination

The terms of this trial agreement are binding for a period of three (3) months, commencing on May 1, 2016.  Should a pending transaction close after the termination of the 'month to month agreement', a transaction that Corey Kotler initiated, Corey Kotler is still owed his full commission for initiating the initial transaction. Initiating the transaction will be defined as Corey Kotler furnishing initial email

correspondence with a representative, representing the sellers company. A written notice of termination notice of the month agreement is required upon Corey Kotler receiving payment for the coming month. Example: the terms of this contact terminate July Friday July 1th 2016. Should Albert Ahdoot decide to terminate the ongoing month to month agreement in August, Albert Ahdoot agrees to inform Corey Kotler in writing of the of the month to month termination no later than July 3th 2016.Or it is to be mutually agreed and understood by both parties that the month to month agreement shall continue under all of the same terms for the following month.

Exclusivity

Mutually agreed upon on this the 18th day of April, 2016.


Corey Allen Kotler

Dividend Advisors LLC.

5/03/16


Albert Ahdoot

Colocation America

5/3/16

# EXHIBIT 2

**Corey Kotler**

**Date: September 7, 2017**

COLOCATION AMERICA

vs

MITEL NETWORKS



40 N. Central Ave #1400
Phoenix, AZ 85004
602-358-0225

1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF ARIZONA

3

4

5
                                    )
6   COLOCATION AMERICA, INC.,       )
                                    )
7                   Plaintiff,      )
                                    )
8       vs.                         )  Case No.
                                    )  CV-17-00421-PHX-
9   MITEL NETWORKS CORPORATION,     )  NVW
                                    )
10                  Defendant.      )
    _____)
11

12

13

14

15      VIDEOTAPED DEPOSITION OF COREY ALLEN KOTLER

16              Los Angeles, California

17            Thursday, September 7, 2017

18

19

20

21

22

23  Reported by:

24  Claudia Badano, CSR No. 8974

25  Job No. 2629

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF ARIZONA

 3

 4

 5
                                       )
 6    COLOCATION AMERICA, INC.,         )
                                       )
 7                      Plaintiff,      )
                                       )
 8       vs.                           )  Case No.
                                       )  CV-17-00421-PHX-
 9    MITEL NETWORKS CORPORATION,       )  NVW
                                       )
10                      Defendant.      )
      _____)
11

12

13

14

15

16

17

18

19

20

21         Deposition of COREY ALLEN KOTLER, taken on

22    behalf of Defendant, at 350 South Grand Avenue, Suite

23    3100, Los Angeles, California, at 11:10 a.m., on

24    Thursday, September 7, 2017, before Claudia Badano,

25    Certified Shorthand Reporter No. 8974.
```

```
 1        A.    That's why I came out here.  That's why I
 2   moved 3,000 miles away from my comfort zone.
 3        Q.    Are you married?
 4        A.    Yeah.
 5        Q.    What's your wife's name?
 6        A.    Mojgan Tabibnia.
 7        Q.    Could you spell it for the record, please.
 8        A.    M-O-J-G-A-N, Tabibnia, T-A-B-I-B-N as in
 9   Nancy, I-A.
10        Q.    And does your wife live with you?
11        A.    Yeah.
12        Q.    And what's your home address?
13        A.    2385 Roscoemare Road, Apartment E-11,
14   Los Angeles, California 90077.  You guys know all
15   this stuff.  I don't know why you are asking me, but
16   I'm getting paid, so ask.
17              By the way, the subpoena guy, he almost made
18   me fall down the stairs.  He didn't.  It would have
19   been a world of ugliness, so you may want to get
20   another subpoena guy.
21        Q.    We'll get to that.
22              Who owns Dividend Advisors, LLC?
23        A.    It doesn't exist anymore.
24        Q.    Explain.  When did it go out of existence?
25        A.    A while back.
```

1    know, House of Wax, but I like the name Dividend

2    Advisors.  It sounded like a good name, so I kept it.

3        Q.   Great.  Who set up the entity Dividend

4    Advisors LLC?

5        A.   Who set it up?  A lady in Delaware.

6        Q.   Right.  And who -- who worked with her to

7    set it up?

8        A.   Albert introduced me to the lady.

9        Q.   So Albert Ahdoot encouraged you to set up

10   Dividend Advisors LLC?

11       A.   No, no, no, no, no.  Don't put words in my

12   mouth.  I had Dividend Advisors.  I told you, I liked

13   the name, so I kept the name.  But I decided that if

14   I'm going to move forward, I should make it more of a

15   formal entity and we did it -- he recommended this

16   lady, and that's what we did.

17       Q.   When you say us, what was Albert's role in

18   forming Dividend Advisors LLC?

19       A.   He just introduced me to the lady.

20       Q.   And he was the one who encouraged you to set

21   up the LLC?

22       A.   No.  I wanted to set up an LLC.

23       Q.   So why did -- how did -- how did Albert get

24   involved at all?

25       A.   In what?  Could you be more -- could you

```
 1        Q.   Two or three years ago.

 2             So this dispute, as you know, is over a

 3   contract with Mitel -- when I talk about "Mitel"

 4   today, I'm going to refer to them usually as MNC

 5   which is for Mitel Networks Corporation, if that's

 6   okay.

 7        A.   Right, okay.  No problem.

 8        Q.   And how long before you started negotiating

 9   with MNC did you meet Albert roughly?  I'm not going

10   to pin you down to an exact date.

11        A.   Maybe two months, three months.

12        Q.   And it was after that that you formed

13   Dividend Advisors LLC?

14        A.   That whole time frame is murky.  I can't

15   give you actual answers.  I don't remember the exact.

16        Q.   But you -- but you set up --

17        A.   I'm giving you a ballpark.

18        Q.   Got it.  And you set up Dividend Advisors

19   LLC, as you've already stated, after you first met

20   Albert?

21        A.   Yes, yes, absolutely, that is accurate.

22        Q.   You mentioned that Dividend Advisors LLC is

23   now no longer in existence; correct?

24        A.   Right, to the best of my knowledge.

25        Q.   And why didn't you maintain it in good
```

1    standing?

2        A.    What do I need it for?

3        Q.    I don't know.  What did you need it for

4    before?

5        A.    I was working with Albert.

6        Q.    And so you needed it solely for the work

7    that you were doing with Colocation?

8        A.    Yeah.

9        Q.    Has --

10       A.    Solely.

11       Q.    Has Dividend Advisors LLC ever received

12   money?

13       A.    No.

14       Q.    Has Dividend Advisors LLC ever filed tax

15   returns?

16       A.    No.

17       Q.    Do you have copies of --

18       A.    Nothing.  I have copies of nothing.

19       Q.    No paperwork related to --

20       A.    No, nothing.

21       Q.    Why not?

22       A.    Why do I need it for?  It doesn't exist.

23       Q.    When did you get rid of it?

24       A.    After I stopped working with Albert.

25       Q.    When was that?

1    numbered Paragraph 1.

2            It states, "I have not represented Corey

3    Allen Kotler."

4        A.   Okay.

5        Q.   Did I read that correctly?

6        A.   Yeah.

7        Q.   Okay.  We're done with it.  You can put it

8    back in the middle.

9            So is Paul Sigelman your counsel for today?

10       A.   No.

11       Q.   So he's never acted as your lawyer?

12       A.   Nope.

13       Q.   So you are not paying his fees for being

14   here today?

15       A.   No.

16       Q.   Do you know who is?

17       A.   Who is paying his -- I have no idea what

18   Paul is doing.

19       Q.   Are you aware he's a lawyer for Colocation?

20       A.   Yeah.

21       Q.   Are you aware he's been a lawyer for

22   Colocation for some time?

23       A.   That's -- yeah, that's how we were

24   introduced.

25       Q.   Yeah.  Are you aware he's also the lawyer

1     Q.   And then the two of you -- then he got in

2     the elevator with you; correct?

3        A.   No.  What had happened was he went in the --

4     I was creeped out.  I thought it was a home invasion,

5     to tell you the truth.  I mean, you know I -- I was

6     creeped out.  I didn't know who -- a process server?

7     I didn't know who he was.  I thought it could

8     potentially be a home invasion, a robber.  It was one

9     creepy guy, so, you know --

10       Q.   You didn't take the subpoena from the

11    process server, did you?

12       A.   Nope.

13       Q.   You denied your name was Corey Kotler,

14    didn't you?

15       A.   Yeah.

16       Q.   And the process server had to leave the

17    subpoena under your door, didn't he?

18       A.   Yes.

19       Q.   Why were you afraid of being served?

20       A.   A, I didn't know I was being served.  B, I

21    didn't know who he was, okay?  I was creeped out.

22    And then he's running after me -- okay, check this

23    out.  I had a big bale in my hands of parrot liner, I

24    have parrots.  I have four parrots.  And this big

25    huge, huge bale, so I'm carrying this up.  Some

1    between Colocation and MNC because the changes that

2    were made were all approved by Colocation; correct?

3       A.   Yeah.   They were -- Colocation was the one

4    that said I want boom-ba-doom-ba-doom, and I just

5    transferred the message over to Michelle from Albert.

6    I was the messenger.

7       Q.   When did you first meet Paul Sigelman?

8       A.   Five, six years ago.

9       Q.   And how did you meet him?

10      A.   Maybe -- several years ago.   Whatever -- I

11   can't give you an exact amount of time.   I met him at

12   a buddy's house.

13      Q.   Whose house?

14      A.   Ralph Smith.   Mutual friends.

15      Q.   Smith.   And was it just a social gathering?

16      A.   Social, yeah.

17      Q.   And how did you learn of Colocation?

18      A.   Paul said, "I have a client."   He knew me as

19   an actor from another mutual friend, Jack Keller, and

20   he thought that I would be -- between jobs might be

21   helpful to -- it might be mutually beneficial for me

22   to help his client.

23      Q.   And what happened after that?

24      A.   I spoke to Albert and we met and here we are

25   today.   Fast forward.

1        Q.   Are you familiar with this document?

2        A.   Yes, I am.

3        Q.   Who prepared this document?

4        A.   We went back and forth and we hashed it

5    down.

6        Q.   When you say "we," who is we?

7        A.   Myself and the world famous Albert Ahdoot,

8    president or owner of Colocation America.

9        Q.   Did an attorney review this for you?

10       A.   No.  We just went back and forth.

11       Q.   Did you communicate with an attorney while

12   negotiating --

13       A.   No.

14       Q.   -- this agreement?

15       A.   No.  I'm sorry.  She said wait until you

16   finish.  Give me the question again.  I don't want to

17   mess up the stenographer.

18       Q.   Did you communicate with an attorney while

19   negotiating this agreement?

20       A.   No.

21       Q.   Did you communicate with any attorney

22   working on behalf of Colocation while you negotiated

23   this agreement?

24       A.   No.

25       Q.   Does this agreement accurately reflect what

1    Colocation asked you to negotiate with MNC?

2         A.    Let me check it out.

3              Promises to make.

4                   (Reading to self.)

5              Yeah.  Yes.

6         Q.    Is this agreement still in force or has it

7    been terminated?

8         A.    We are no longer working together if that's

9    what you are asking.  "Upon the close of escrow," I'm

10   going -- too big.  "Upon the close of escrow of the

11   transfer of an IPv" -- I'm just reading out loud --

12   "4 block, Dividend Advisors is to receive a $10,000

13   commission from Colocation America."  Yeah.  "The

14   commission is to be paid by Colocation America within

15   72 hours" --  yeah.

16        Q.    My question is is this -- has this agreement

17   ever been terminated?

18        A.    It's never been terminated, but we don't

19   work together.

20        Q.    Why don't you work together anymore?

21        A.    Because he was -- well, I was working with

22   him and, you know, he just -- I guess it wasn't cost

23   effective.

24        Q.    You just read Paragraph 2B.  Did you ever

25   receive a $10,000 payment according to Paragraph 2B?

1       Q.   So Colocation knew that your legal name was

2   Corey Kotler --

3       A.   My legal name is Corey Allen Kotler.

4       Q.   Right.  Your last name is Kotler; correct?

5       A.   Kotler.

6       Q.   Right.  This agreement doesn't say Corey

7   Allen Kotler, does it?  It says Corey Kotler.

8       A.   You know, when I was a kid in the school

9   yard, they used to say, "Hey, Kotler, come here."

10  It's part of my name.

11      Q.   Thanks.  Let's go back to my question.  In

12  this agreement it doesn't say Corey Allen Kotler,

13  does it?  It says Corey Kotler.

14      A.   Is that against the law, Counselor, not to

15  uses my middle name?

16      Q.   I'm just asking you a question.

17      A.   It says -- well, you saw it.  It says Corey

18  Kotler.

19      Q.   Kotler.  So Colocation knew when they hired

20  you that your last name was Kotler?

21      A.   Absolutely.

22      Q.   And Colocation knew because of the

23  communications between you and MNC that you are

24  referring to yourself as Corey Allen in the

25  communications with MNC?

1       A.    Yes.

2       Q.    And using the name Corey Allen was solely

3  your decision?

4       A.    Yeah, it was.

5       Q.    Colocation didn't tell you --

6       A.    No.  Do you want to know why?

7       Q.    Sure.  Why did you falsify your name on

8  communications back and forth to MNC?

9       A.    Well, respectfully, you are mistaken.  If

10  one said falsification, what you just said would be a

11  lie.  I'm not calling you a liar, I'm just saying,

12  Counselor, you are mistaken.  Okay?  So I'm forgiving

13  you for your mistake.

14          Now, I'll clarify.  For the purpose of the

15  court and why I decided not to use my full legal name

16  is because I am an actor, a proud member of the

17  Screen Actors Guild of America.  It's going to be a

18  little long, so humor me.  Okay?  I want you to

19  understand this and it's very important that you

20  follow this crystal clear.

21          Let's assume -- because you don't want me

22  asking you questions, I'll assume there's quite a few

23  members of your law firm.  Outside there's a

24  secretary, there's a this one and that one, and they

25  have to have a certain professional air to them.  You

1    don't have to answer it, but in a professional

2    setting you have to have a certain professional air.

3    Okay?

4          With that said, as an actor in a town of

5    hundreds of thousands of members of the Screen Actors

6    Guild, it's highly competitive to get work.  You

7    follow me?  You with me, Dave?  Did I lose you?  You

8    with me?  Okay.

9          So in an effort as an actor to get work,

10   let's say I go out for a job, when I went out for

11   Ugly Betty as a policeman -- and I only had two lines

12   in Ugly Betty, my first TV job -- casting director

13   say there were only 500 submissions and they only

14   brought in 20 people.  Competition is very thick.

15         So what I do in order to optimize my odds of

16   getting work -- and there's a relevance, it's a

17   complete relevance, but I just have to explain.

18   Okay, Dave?  What I have -- what I decided to do, why

19   I work so much, why I did Transparent, two episodes,

20   why I got Rizzoli & Isles, why I got ten episodes of

21   The Tonight Show, why I got Jimmy Kimmel Live, why I

22   got Two Broke Girls is because I created a niche for

23   myself.  My niche as an actor is the fat guy,

24   shirtless, wearing a Speedo or tighty whities.

25         Now, let's just assume for a second -- I had

1    to move there.

2              Are you cool, Mike?  Mike, are you cool with

3    the camera?

4              Let's assume for a second, okay, you are

5    dealing with Corey Allen Kotler.  Corey Allen Kotler

6    calls Michelle Whittington in Canada somewhere.  In

7    2000 -- what was it, 2016?  In 2016, it's very common

8    that you'll Google somebody.

9              Now, if you Googled me as an actor, that's

10   completely cool.  But what you would probably see is

11   you would probably see Jay Leno waxed Louis

12   Vuitton -- I'm sorry, Versace into my back hair.

13   Okay?  Now, my question to you, counselor -- okay.

14   Also, Two Broke Girls.  I can show you right now, I

15   can pull up the video, I have a 16-second clip on the

16   phone.  Okay?  I came out in front of 50,000 people

17   on Two Broke Girls in tighty whities.

18             Now, let's just assume that I'm trying to

19   buy something from a corporate attorney and let's

20   assume that the corporate attorney does their due

21   diligence and they Google Corey Allen Kotler.  Would

22   that potentially hurt my professional credibility

23   as -- would it be odd?  So if it would in fact be

24   odd, you probably would not hire me to be a

25   receptionist at your law firm, you know, if you saw

1    the tighty whitey guy.

2        So I figured my legal name that my mother

3    and father gave me, Corey is my first time, my middle

4    name is my grandfather's name -- World War I

5    veteran -- Allen, and my last name is Kotler.  So

6    that's my full name.  And just like the kids in the

7    school yard who call me, "Hey, Kotler," or he calls

8    me Corey and you call me Corey, I'll answer it.  It

9    it's my name.

10        If my job working for Mr. Ahdoot is to be

11    corporate and deal with corporate attorneys that

12    don't always read their full e-mails probably, but if

13    my -- if my position here is to deal with someone on

14    a corporate level, then I would not disclose too much

15    information.

16        Why would I tell them that I'm an actor?

17    I'm not finished.  Why would I tell them?  Let's

18    assume theoretically -- theoretically let's assume

19    the attorney is a swinger.  She wouldn't tell me

20    she's a swinger.  Why?  Because it's unprofessional.

21    It's weird.  It's too much information.  It has no

22    relevance to do with this, so I wouldn't disclose it.

23        I'm finished.

24    Q.    And Corey Allen is your stage name; right?

25    A.    No.  Corey Allen Kotler is my full stage

1    name which is my legal name, but my full name is

2    Corey Allen Kotler.   You can call me Corey, you can

3    call me C. Allen, you can call me Corey Allen.

4         Q.   When you do business with --

5         A.   I call you Mr. Rogers.   You are Mr. Rogers.

6         Q.   You can do that.   That's fine.

7         A.   But you'll answer to that.   I call you Dave.

8    When you were in the schoolyard and the kids would

9    say, "Hey, Rogers," you'd come over.   So what's the

10   big deal?

11        Q.   Nobody calls me David Eric.

12        A.   Why?

13        Q.   I don't go by David Eric.

14        A.   Eric?   Eric?   Who is Eric?

15        Q.   My middle name.   No person goes -- nobody --

16   nobody in business goes by their first name and their

17   middle name, do they?

18        A.   Well, no, you are wrong and I'll tell you

19   why.   You are completely wrong and now I can explain

20   to you why.

21             I'm a baseball fan.   Okay?   Some baseball

22   players, they go by their -- you know -- their middle

23   name, their first initial, their middle name.   It's

24   common in sports all the time.   What about F. Murray

25   Abraham?

1    BY MR. ROGERS:

2        Q.   If you had --

3        A.   Where did you go to law school?

4             MR. ROGERS:  Move to strike.

5        Q.   Okay.

6        A.   Hey.  Convenient.

7        Q.   Have you ever had any previous experience

8    with IPv4 addresses prior to this?

9        A.   No.

10       Q.   You had phone conversations with Michelle

11   Whittington; correct?

12       A.   Yeah.

13       Q.   And you had -- did you have phone

14   conversations with her before the agreement was

15   signed?

16       A.   Yes.

17       Q.   And why didn't you tell her that Colocation

18   was really interested in acquiring the IPv4 addresses

19   or did you think the contract language spoke for

20   itself?

21       A.   Well, number one, any attorney worth their

22   salt should be able -- especially a corporate

23   attorney, should be able to read a basic -- if I'm an

24   actor that goes on TV -- I'm answering your question.

25       Q.   No, you are not.

1    shop for IPv4 addresses rather than just doing it

2    itself?

3        A.    Because those people have other jobs to do.

4    I'm sure your law firm has other lawyers, but you are

5    the guy who is here.

6        Q.    But then they let you go --

7        A.    No, they didn't let me go.  It was

8    mutually -- it was mutually -- just wasn't -- you

9    know, Mitel were the only people that agreed to this

10   and then they backpeddled so --

11       Q.    Well, you said it was too costly for

12   Colocation?

13       A.    Yeah.  Because there was nothing going on

14   besides Mitel.  It was a lot of time and -- I had to

15   put in a lot of time knocking on doors and just

16   wasn't -- after three months, after Mitel, you know,

17   went back on their word, they were the only people

18   that I was able to get dialogue with that agreed to

19   sell their IPv4 block along with everything.

20       Q.    Paul Sigelman knew that you were using the

21   name Corey Allen instead of Corey Kotler to

22   communicate with MNC; correct?

23       A.    Probably because that's how I get my mail.

24   Federal mail.

25       Q.    When you say that's how you get your mail,

1    what do you mean?

2        A.    When I was getting my mail over at his

3    office.

4        Q.    Do you still get it there?

5        A.    No.

6        Q.    When did you stop getting it there?

7        A.    When I stopped dealing with Albert.

8        Q.    And did you start getting it there when you

9    were dealing with Albert?

10       A.    Before when I had the other endeavor.

11       Q.    Refresh my memory.   What was the other

12   endeavor?

13       A.    We never discussed it.

14             So there was this company for about a very

15   short time selling overages.   It's whatever it was,

16   it was like a course that you would take and --

17       Q.    You mean like a tax credit or something?

18       A.    No, no.   You know what, man, Mr. Rogers, I

19   -- the name of the company -- Hooked On Overages was

20   the name of the company.   Jack Keller, our mutual

21   friend, denied -- we took this course.   We tried to

22   do it, but there was no money to be made so we

23   stopped.

24       Q.    And so you had communications to that

25   company also sent to Mr. Sigelman's address?

# EXHIBIT 3

BRIER, IRISH, HUBBARD & ERHART, P.L.C.
2400 East Arizona Biltmore Circle, Suite 1300
Phoenix, Arizona 85016
Telephone (602) 522-3940
Facsimile (602) 522-3945
Teresa H. Foster, Of Counsel (010877)
For Court Filings/Pleadings:
ctfilings@thfosterlaw.com
Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| COLOCATION AMERICA, INC., | Case No. 2:17-cv-00421-NVW |
| Plaintiff, | |
| v. | **PLAINTIFF'S INITIAL DISCLOSURE** |
| MITEL NETWORKS CORPORATION, | (Honorable Neil V. Wake) |
| Defendant. | |

Pursuant to FRCP Rule 26(a)(1) and the Case Management Order, Plaintiff Colocation America, Inc.'s ("Colocation") makes the following initial disclosures to Defendant Mitel Networks Corporation ("Mitel"). These disclosures are based on information presently known and reasonably available to Colocation and which Colocation reasonably believes it may use in support of its claims and defenses. Continuing investigation and discovery may cause Colocation to amend these initial disclosures, including by identifying other potential witnesses, documents and by disclosing other pertinent information. Colocation therefore reserves the right to supplement these initial disclosures. By providing these initial disclosures, Colocation does not represent that it is identifying every document, tangible thing or witness possibly relevant to this action. In addition, these disclosures are made without Colocation in any way waiving its right to

object to any discovery request or proceeding involving or relating to the subject matter of these disclosures on any grounds, including competency, privilege, relevancy and materiality, hearsay, undue burden, confidentiality, or any other appropriate grounds. Furthermore, these disclosures are not an admission by Colocation regarding any matter. Each and every disclosure set forth below is subject to the above qualifications and limitations.

I.    Individuals Likely to Have Discoverable Information: Individuals likely to have discoverable factual information that Colocation may use to support its claims and defenses to the counterclaim are identified in Attachment A, which by this reference is incorporated herein.

II.    Description of Documents: The following enumerates documents, data compilations, and other tangible things in the possession, control or custody of Colocation that Colocation may use to support its claims:

a.    Documents which evidence the Contract entered into by the parties wherein Colocation purchased the domain name gandolf.ca and associated IPv4 134.22.0.0/16 rights ("IPv4 Block") and related intellectual property, from Mitel.

b.    Documents evidencing Colocation's deposit of funds to the escrow account, for the registering by Mitel of the Domain Name and the transfer of the IPv4 134.22.0.0/16 rights ("IPv4 Block").

c.    Email or regular correspondence between representatives of the parties regarding the drafting, revising, and finalizing of the Contract, and subsequent rescission of the Contract.

d.    All electronically stored information ("ESI"), as well as documents and tangible things, potentially relevant to the facts and issues plead in the complaint, including by the way of example, correspondence, memoranda, journal entries, pertaining to acquisition of intellectual rights identified herein, all investigations and evaluations made in regard to such rights prior to

and at the time the subject agreement was entered, all inter-company memoranda, email, and messages since the agreement was entered pertaining to the subject rights, investigation, and evaluation thereof. ESI includes by the way of example information electronically, magnetically or optically stored, such as digital communications, word processed documents, calendar and diary entry data, backup and archival files, all as stored on Colocation and/or Mitel's computer systems and employee systems, or other media and devices, such as their personal is digital assistants, voice-messaging systems, on-line repositories and cell phones.

     e.     Documents evidencing Mitel's registration of the IPv4 Block via association of Point of Contact (TE157-ARIN) to IPv4 Block and Updating Organization (GANDAL) Information for IPv4 Block.

     f.     Documents pertaining to the contractually referenced "prior bankruptcy proceeding".

     III.     <u>Computation of Damages</u>: Colocation has suffered damages as a result of the failure of Defendant to transfer the required domain name "gandalf.ca" and "the associated IPv4 134.22.0.0/16" block and any associated trade dress, or other intellectual property rights thereto, for which it paid $10,000.

     Colocation denies liability for damages relating to the counterclaim.

     Colocation will present evidence of its court costs and attorney fees after its claims are awarded and/or Mitel's counterclaims are dismissed.

     IV.     Insurance:  No insurance is applicable for Colocation to these claims or counterclaims.

DATED: May 15, 2017.

BRIER, IRISH, HUBBARD & ERHART, P.L.C.

/s/ Teresa H. Foster
Teresa H. Foster
2400 E. Arizona Biltmore Cr, Ste 1300
Phoenix, AZ 85016
Attorneys for Plaintiff

CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of May, 2017, I emailed Plaintiff's Initial Disclosure to:

David E. Rogers
David G. Barker
Jacob C. Jones
SNELL & WILMER, LLP
One Arizona Center
400 E. Van Buren, Suite 1900
Phoenix, AZ 85004-2202
drogers@swlaw.com
dbarker@swlaw.com
jcjones@swlaw.com

/s/ Harry Stanford

Attachment A (Witness list)

1.　　Samantha Walthers
　　　c/o Plaintiff's counsel

2.　　Albert Ahdoot
　　　c/o Plaintiff's counsel

3.　　Corey Allen
　　　Dividend Advisors, LLC
　　　c/o Plaintiff's counsel

4.　　Michelle Whittington
　　　c/o Defendant's counsel

5.　　Greg Hiscook
　　　c/o Defendant's counsel

# EXHIBIT 4

BRIER, IRISH, HUBBARD & ERHART, P.L.C.
2400 East Arizona Biltmore Circle, Suite 1300
Phoenix, Arizona 85016
Telephone (602) 522-3940
Facsimile (602) 522-3945
Teresa H. Foster, Of Counsel (010877)
For Court Filings/Pleadings:
ctfilings@thfosterlaw.com
Attorneys for Plaintiff

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| COLOCATION AMERICA, INC., | Case No. 2:17-cv-00421-NVW |
| Plaintiff, | |
| v. | **PLAINTIFF'S AMENDED AND RESTATED INITIAL DISCLOSURE** |
| MITEL NETWORKS CORPORATION, | (Honorable Neil V. Wake) |
| Defendant. | |

Pursuant to FRCP Rule 26(a)(1), Plaintiff Colocation America, Inc.'s ("Colocation") amends and restates its initial disclosures to Defendant Mitel Networks Corporation ("Mitel"). **The Amendments are in bold.** These disclosures are based on information presently known and reasonably available to Colocation and which Colocation reasonably believes it may use in support of its claims and defenses. Continuing investigation and discovery may cause Colocation to amend these initial disclosures, including by identifying other potential witnesses, documents and by disclosing other pertinent information. Colocation therefore reserves the right to supplement these initial disclosures. By providing these initial disclosures, Colocation does not represent that it is identifying every document, tangible thing or witness possibly relevant to this action. In addition, these disclosures are made without Colocation in any way waiving its right to

object to any discovery request or proceeding involving or relating to the subject matter of these disclosures on any grounds, including competency, privilege, relevancy and materiality, hearsay, undue burden, confidentiality, or any other appropriate grounds. Furthermore, these disclosures are not an admission by Colocation regarding any matter. Each and every disclosure set forth below is subject to the above qualifications and limitations.

I.      Individuals Likely to Have Discoverable Information: Individuals likely to have discoverable factual information that Colocation may use to support its claims and defenses to the counterclaim are identified in Attachment A, which by this reference is incorporated herein.

II.     Description of Documents: The following enumerates documents, data compilations, and other tangible things in the possession, control or custody of Colocation that Colocation may use to support its claims:

a.      Documents which evidence the Contract entered into by the parties wherein Colocation purchased the domain name gandolf.ca and associated IPv4 134.22.0.0/16 rights ("IPv4 Block") and related intellectual property, from Mitel.

b.      Documents evidencing Colocation's deposit of funds to the escrow account, for the registering by Mitel of the Domain Name and the transfer of the IPv4 134.22.0.0/16 rights ("IPv4 Block").

c.      Email or regular correspondence between representatives of the parties regarding the drafting, revising, and finalizing of the Contract, and subsequent rescission of the Contract.

d.      All electronically stored information ("ESI"), as well as documents and tangible things, potentially relevant to the facts and issues plead in the complaint, including by the way of example, correspondence, memoranda, journal entries, pertaining to acquisition of intellectual rights identified herein, all investigations and evaluations made in regard to such rights prior to

and at the time the subject agreement was entered, all inter-company memoranda, email, and messages since the agreement was entered pertaining to the subject rights, investigation, and evaluation thereof. ESI includes by the way of example information electronically, magnetically or optically stored, such as digital communications, word processed documents, calendar and diary entry data, backup and archival files, all as stored on Colocation and/or Mitel's computer systems and employee systems, or other media and devices, such as their personal is digital assistants, voice-messaging systems, on-line repositories and cell phones.

 e. Documents evidencing Mitel's registration of the IPv4 Block via association of Point of Contact (TE157-ARIN) to IPv4 Block and Updating Organization (GANDAL) Information for IPv4 Block.

 f. Documents pertaining to the contractually referenced "prior bankruptcy proceeding".

 III. <u>Computation of Damages</u>: Colocation has suffered damages as a result of the failure of Defendant to transfer the required domain name "gandalf.ca" and "the associated IPv4 134.22.0.0/16" block and any associated trade dress, or other intellectual property rights thereto, for which it paid $10,000.

 Colocation denies liability for damages relating to the counterclaim.

 Colocation will present evidence of its court costs and attorney fees after its claims are awarded and/or Mitel's counterclaims are dismissed.

 IV. Insurance: No insurance is applicable for Colocation to these claims or counterclaims.

DATED: May 18, 2017.

BRIER, IRISH, HUBBARD & ERHART, P.L.C.


 /s/ Teresa H. Foster
Teresa H. Foster
2400 E. Arizona Biltmore Cr, Ste 1300
Phoenix, AZ 85016
Attorneys for Plaintiff


CERTIFICATE OF SERVICE

I hereby certify that on this 18th day of May, 2017, I emailed Plaintiff's Initial Disclosure to:

David E. Rogers
David G. Barker
Jacob C. Jones
SNELL & WILMER, LLP
One Arizona Center
400 E. Van Buren, Suite 1900
Phoenix, AZ 85004-2202
drogers@swlaw.com
dbarker@swlaw.com
jcjones@swlaw.com


 /s/ Harry Stanford

Attachment A (Witness list)

1.  Samantha Walthers
    c/o Plaintiff's counsel

**Subject of testimony:  Terms and negotiation of the Contract and Mitel's breach of same.**

2.  Albert Ahdoot
    c/o Plaintiff's counsel

**Subject of testimony:  Execution of Contract and Mitel's breach of same.**

3.  Corey Allen
    Dividend Advisors, LLC
    433 North Camden Drive
    Suite 970
    Beverl  Hills  CA 90210
    (310) 962-5602

**Subject of testimony:  Negotiation of Contract and Mitel's breach of same.**

4.  Michelle Whittington
    c/o Defendant's counsel

**Subject of testimony:  Terms and negotiations of the Contract; preparation of Contract; execution of Contract and Mitel's breach of same.**

5.  Greg Hiscook
    c/o Defendant's counsel

**Subject of testimony:  Terms and negotiation of the Contract and Mitel's breach of same.**

# EXHIBIT 5

## DECLARATION OF NOE BERMUDEZ

I, Noe Bermudez, state of my personal knowledge:

1.    I am now, and at all times herein mentioned, an employee of TransWest Investigations, Inc. a duly licensed private investigation firm, whose California State license number is AA009930, and I both performed and supervised the investigative efforts summarized below.

2.    I am over the age of eighteen years and not a party to, nor do I have any proprietary interest in, this action. The Law Office of Snell & Wilmer LLP referred this matter to TransWest Investigations, Inc. for the purpose of effectuating service of process upon one Corey Allen and Dividend Advisors LLC (for personal service).

3.    On Thursday, June 15, 2017, I personally served subpoenas (the "Subpoenas") for Corey Allen and Dividend Advisors, LLC at the following address:   433 North Camden Drive, Suite 970, Beverly Hills, CA 90210.

4.    Attached as collective Exhibit 1 are true and correct copies of the Subpoenas.

5.    Attached as Exhibit 2 is a true and correct photograph of the building located at 433 North Camden Drive, Beverly Hills, CA 90210.

6.    I arrived at the 433 North Camden Drive, Beverly Hills, CA 90210 at 1:15 p.m. on Thursday, June 15, 2107.  I entered the building, went to the 9th floor and knocked on the door of Suite 970.

7.    A white, bald male, approximately 70 years of age, answered the door.  I told him that I had documents (which were the Subpoenas) to serve on Corey Allen and Dividend Advisors, LLC.  He said he knew Corey Allen and Dividend Advisors, LLC and would accept the documents, which I handed to him.

8.    I asked the individual his name.  He said it was "Rick" and then walked away.

9.    I saw that there was another white male (approximately 55 years old) sitting behind the receptionist desk at Suite 970.

10.    I left Suite 970 after the individual mentioned in paragraphs 6 and 7 walked away. I went back about 5 minutes later to obtain more information about that individual.

11.    When I returned to Suite 970, I spoke to the male mentioned in paragraph 8 who was still sitting at the receptionist desk, and he stated:  "You can just tell them that Rick Bradford accepted the documents" and "I don't know why you guys delivered those documents here because those have to be served in person."

12.    I determined later that day that the person who accepted the Subpoenas was Paul Sigelman.  I identified him by the photograph on his website located at www.sigelmanlaw.com. A true and correct copy of that photograph is attached as Exhibit 3.

13.    Attached as collective Exhibit 4 are true and correct photographs of the door to suite 970 at 433 North Camden Drive, Beverly Hills, CA 90210.  Neither Corey Allen nor Dividend Advisors, LLC is listed as having an office there.  Paul Sigelman is listed as having an office there.

I declare under penalty of perjury that the foregoing is true and correct.

8/8/17
Date

Noe Bermudez

4824-3106-3884.1

# EXHIBIT 6

1
2
3
4
5
6
7

8              IN THE UNITED STATES DISTRICT COURT

9                  FOR THE DISTRICT OF ARIZONA

10   Colocation America, Inc.,

11            Plaintiff,                    No. CV-17-00421-PHX-NVW

12      v.                                  **Declaration of M. Graham Miller**

13   Mitel Networks Corporation,

14            Defendant.

15

16        I, M. Graham Miller, make the following declaration.  I am over the age of 18 and

17   have personal knowledge of the facts set forth herein (except where indicated otherwise)

18   and, if called to be a witness, I could competently testify hereto.

19        1.      I am the owner of MGM Management Company.

20        2.      I have managed the office space located at 433 North Camden Drive,

21   Beverly Hills, California 90210, including Suite 970 of that building, since approximately

22   April 1979.

23        3.      My offices are located on the eleventh floor, Suite 1111, of the same

24   building at 433 North Camden Drive.

25        4.      Suite 970 of the 433 North Camden Drive building is leased to Paul

26   Sigelman, who has leased that office space since approximately September 2001.

27        5.      A true and correct copy of the lease agreement with Paul Sigelman, and

28   amendments thereto, are attached as Exhibit A.  These documents were made at or near

4839-9802-3500.1

1  the time Paul Sigelman entered the lease or when amendments to the lease were made.

2  Such documents are made in the course of MGM Management Company's regularly

3  conducted business, and making such documents is a regular practice of MGM

4  Management Company.

5        6.      Prior to receiving a subpoena in this matter on July 19, 2017, I had never

6  heard of Dividend Advisors, LLC; Corey Allen; or Corey Kotler.

7        7.      To the best of my knowledge, Dividend Advisors, LLC; Corey Allen; and

8  Corey Kotler are not tenants of any offices at 433 North Camden Drive, Beverly Hills,

9  California 90210.

10       I declare under penalty of perjury that the foregoing is true and correct.

11  8/7/17

12  Date                                      M. Graham Miller

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4839-9802-3500.1                    - 2 -

# EXHIBIT 7

## DECLARATION OF ANTONIO VILLANUEVA

I, Antonio Villanueva, state of my personal knowledge:

1.     I am now, and at all times herein mentioned, an employee of TransWest Investigations, Inc. a duly licensed private investigation firm, whose California State license number is AA009930, and I both performed and supervised the investigative efforts summarized below.

2.     I am over the age of eighteen years and not a party to, nor do I have any proprietary interest in, this action. The Law Office of Snell & Wilmer LLP referred this matter to TransWest Investigations, Inc. for the purpose of effectuating service of process upon one Corey A. Kotler (for personal service).

3.     On July 25, 2017, I served Corey A. Kotler with the subpoenas attached as collective Exhibit 1 ("Subpoenas") at 2385 Roscomare Road, Unit E11, Los Angeles, California 90077.

4.     On July 25, 2017 at about 12:15 p.m., I arrived at 2385 Roscomare Road, Los Angeles, California 90077, which is a condominium complex called the Chateau Chamberly.

5.     I had previously reviewed Mr. Kotler's Facebook page and Instagram posts and as a result was familiar with his appearance and his wife's name and appearance.  His wife is Mojgan Tabibnia and she resides with Mr. Kotler.  I printed Mr. Kotler's Facebook page and Instagram posts with his photograph on them and took them with me when serving Mr. Kotler on July 25, 2017.

6.     At about 1 p.m. on July 25, 2017, I knocked on the door of Mr. Kotler's Unit E11. His wife, Mojgan Tabibnia, opened the door.  I recognized her from photos on Mr. Kotler's Facebook page and Instagram postings.  Ms. Tabibnia informed me that Mr. Kotler was not at home, but would be back in about an hour, so I waited for Mr. Kotler on the ground floor.

7.     At approximately 1:40 p.m., I observed Mr. Kotler waiting for an elevator at 2385 Roscomare Road, Los Angeles, California 90077.  When the elevator arrived I stepped into the

elevator with Mr. Kotler.

8.      Once inside the elevator, I advised Mr. Kotler that I had service documents (which were the Subpoenas inside of an envelope) for him. Mr. Kotler denied that he was Corey Kotler and refused to take the service documents. I then showed Mr. Kotler the Facebook and Instagram photos of him that I had downloaded and Mr. Kotler's demeanor became frantic.

9.      When the elevator door opened, Mr. Kotler hurried to Unit E11 and slammed the door shut behind him. I spoke to Mr. Kotler through the door, stated he was served, and left the service documents wedged under the door at Unit E11. A true and correct copy of a photo of the service documents under the door at 2385 Roscomare Road, Unit E11, Los Angeles, California 90077 is attached as Exhibit 2. I heard Mr. Kotler speaking to his wife on the other side of the door and state "they are looking at my Facebook photos."

I declare under penalty of perjury that the foregoing is true and correct.

_____8/9/17_____

Date

_____

Antonio Villanueva

# EXHIBIT 8

**Jones, Jacob**

| | |
|---|---|
| **From:** | Paul Sigelman <paul@sigelmanlaw.com> |
| **Sent:** | Monday, July 31, 2017 6:01 PM |
| **To:** | Jones, Jacob; Barker, David; Rogers, David |
| **Subject:** | Re: Corey Kotler Deposition/Colocation vs Mitel |

Dear Jacob,

I don't work on Saturdays. I was not in the office Saturday or Sunday. The first view of David's communication was today. At this time I do not represent Mr. Kotler. I did, however, attempt to call him and finally spoke to him a few minutes ago. It is still not clear what date the documents can be produced, if he can find his old hard drive, but I believe you have most documents already in your possession. Given the foregoing, your comment that I did not respond within a few hours of David's email and have ever_thin_ or_anized is _resum_tuous. Nevertheless, once it is determined what, if any, additional documents he can find, I will notify you and proceed in accord with the subpoena.

Meanwhile, please provide the dates Michelle Whittington will be available in Arizona and Greg Hiscook is available in Ontario.

**Paul Sigelman**

SIGELMAN LAW CORPORATION
433 N. Camden Drive, Suite 970
Beverly Hills, CA 90210
T (310) 278-8011
F (310) 278-2254

TRIAL LAWYERS | BUSINESS • REAL PROPERTY • INJURY

CONFIDENTIALITY WARNING: This email may contain privileged or confidential information and is for the sole use of the intended recipient(s). Any unauthorized use or disclosure of this communication is prohibited. If you believe that you have received this email in error, please notify the sender immediately and delete it from your system.

On Mon, Jul 31, 2017 at 4:32 PM, Jones, Jacob <jcjones@swlaw.com> wrote:

Dear Mr. Sigelman,

You have not responded to the email below.  Given the lack of response, we must insist that Mr. Kotler produce documents responsive to the subpoena duces tecum no later than August 11, 2017, at our offices in Los Angeles, as set forth in the subpoena.  His deposition will take place the following Monday, August 14, 2017, at 10:00 AM at our Los Angeles offices.  Please contact us if you have any questions.

Regards,


Jacob

---

**From:** Rogers, David
**Sent:** Saturday, July 29, 2017 12:33 AM
**To:** Paul Sigelman
**Cc:** Barker, David; Jones, Jacob
**Subject:** Re: Corey Kotler Deposition/Colocation vs Mitel


I was not called and there is no record of a message from you.   Our system records phone message on our email system.   Please let us know what day works for Mr. Kotler's deposition in Los Angeles and by what day he will produce documents responsive to the subpoena duces tecum.  He was properly served.  Thank you,  Dave Rogers

Sent from my iPhone


On Jul 29, 2017, at 2:22 AM, Paul Sigelman <paul@sigelmanlaw.com> wrote:

> Mr. Corey Kotler came into my office this afternoon. He informed me that  a subpoena had been left at his home on July 25th, which as it turns out is a subpoena for a deposition for Monday at 9am.
>
>
> While less than a week is  hardly reasonable time under the rules for subpoena to a deposition (originally drafted on the 14th),  I have been unable to determine if there was a served notice of that deposition. I have no problem with Mr. Kotler's deposition swiftly taking place, but he had not read the papers until now and does not know whether he has in his possession any of the documents.
>
>
> We have tried to call both the Phoenix and Los Angeles offices asking for you all, but it was not clear who was taking the deposition. The last person we spoke to was Alina Mooradian of your Los Angeles office who quite professionally offered to determine what was the status of the deposition. Unless I hear otherwise (cell number for the weekend: 310-767-6857, Mr. Kotler will not attend at 9am.
>
> **Paul Sigelman**

SIGELMAN LAW CORPORATION

433 N. Camden Drive, Suite 970

Beverly Hills, CA 90210

T (310) 278-8011

F (310) 278-2254

TRIAL LAWYERS | BUSINESS • REAL PROPERTY • INJURY

CONFIDENTIALITY WARNING: This email may contain privileged or confidential information and is for the sole use of the intended recipient(s). Any unauthorized use or disclosure of this communication is prohibited. If you believe that you have received this email in error, please notify the sender immediately and delete it from your system.

# EXHIBIT 9

**Albert Ahdoot**

**Date: August 22, 2017**

COLOCATION AMERICA

vs

MITEL NETWORKS



40 N. Central Ave #1400
Phoenix, AZ 85004
602-358-0225

1

2                   IN THE UNITED STATES DISTRICT COURT

3                     FOR THE DISTRICT OF ARIZONA

4

5    COLOCATION AMERICA, INC.,          )
                                        )
6                         Plaintiff,    )
                                        )
7         vs.                           )  No. CV-17-00421-
                                        )      PHX-NVW
8    MITEL NETWORKS CORPORATION,        )
                                        )
9                         Defendant.    )
     _____)

10

11

12        DEPOSITION OF ALBERT ARASH AHDOOT, a witness

13        herein, noticed by Snell & Wilmer L.L.P.,

14        taken at 350 South Grand, Los Angeles,

15        California, at 10:02 a.m., on Tuesday,

16        August 22, 2017, before Diane M. Lytle,

17        CSR 8606.

18

19

20

21

22

23

24

25

1      A.   I looked at pretty much the documents

2  that were given to me or I'd actually seen.

3      Q.   Uh-huh.

4      And -- I'll move on.

5      How did you become aware of the IPv4 block

6  that's mentioned in the contract?  And, again,

7  when I say, "contract," I mean the contract

8  between Colocation and MNC.

9      A.   By scanning the Internet.

10      Q.   Explain.

11      A.   Sure.   There's IPs that are allocated on

12  the Internet.   So we scan the Internet to see what

13  IPs were allocated, and we found this particular

14  IP.

15      Q.   When you say, "scan the Internet," what

16  exactly are you scanning?

17      A.   If I could explain it in other terms.

18  It's like scanning all the phone numbers that are

19  given out in Los Angeles, for example.

20      So all the 310 numbers, all the 213 numbers,

21  all the 818 numbers.   So there's so many IPs that

22  are allocated.   So we looked at what was allocated

23  in Northern -- I guess from U.S. and Canada, and

24  we ran into Mitel's IPs.

25      Q.   And the -- Again, when you say that you

1   scanned, is there a particular site that you go on

2   to scan for them?

3       A.   There's a list of all the IPs that are

4   allocated on the Internet.  So we just looked it

5   over, and we went through them one by one.  So we

6   scanned the whole IP tables.

7       Q.   And when you say, "on the Internet,"

8   where on the Internet?  What site has that

9   information?

10      A.   ARIN.

11      Q.   The ARIN site?

12      A.   American Registry for Internet Numbers.

13      Q.   And how -- when you -- when you see

14  the -- the blocks that are listed by ARIN, how do

15  you know if those blocks are in use or not in use?

16      A.   You can ping them to see if they're

17  announced.

18      Q.   And so -- Okay.

19      Again, bring me down to lay terms, please.

20      A.   Sure.  It's like calling the phone number

21  to see if it's -- if someone -- if it rings to

22  someone or if it just rings.  So it was just there

23  and it wasn't being used.

24      Q.   And when -- when you ping them, do you

25  type in the Internet address into your computer to

1    see if it actually lands on a web site?  Is that

2    how it's done?

3        A.  If it's live, basically.  You ping it to

4    see if it's live.  It's literally like poking

5    someone to see if they giggle.  So if it's up,

6    they're going to giggle.  If not, they're not.

7        Q.  And how -- how do you do -- I don't

8    understand.  I'm just asking you.

9        How do you do the poke?  What exactly do you

10   do on your computer?

11       A.  You go on a DOS command prompt, and you

12   put in the IP, and you ping it.

13       Q.  And if it's not being used, what do you

14   get back?

15       A.  It won't reply back.  And if it's being

16   used, it will reply back.

17       Q.  I see.

18       And so that's how you -- that's how you

19   located the IPv4 block.

20       Do you remember when that was done?

21       Let me -- let me ask it in an easier way.

22       That was done before MNC was contacted by

23   Corey Allen and Dividend Advisors; correct?

24       A.  Correct.

25       Q.  And who is the person who actually

1      Q.  Whittington?

2      A.  Whittington.  I apologize.

3      Q.  Yeah.

4      Where did she confirm that?

5      A.  In the contract.

6      Q.  So it's your belief that that's confirmed

7  in the contract?

8      A.  Yes.

9      Q.  Okay.

10     After you located this IPv4 block and pinged

11  it, you've already said that you asked Corey Allen

12  Kotler to negotiate a deal to acquire it from

13  Mitel; correct?

14     A.  Correct.

15     Q.  How did you -- how did you -- Let's go

16  back.

17     Who introduced you to Corey Allen Kotler?

18     A.  Mr. Sigelman.

19     Q.  And when was that?

20     A.  I don't know the exact date.

21     Q.  Did you -- did you know him before

22  this -- Did you know him before finding out about

23  the block of IPv4 addresses?

24     A.  I did not, no.

25     Q.  And so this isn't attorney-client

 1    I need IPs," and they allocate them to you.

 2         Q.  Uh-huh.

 3         But you don't automatically get a block of

 4    100,000 from ARIN?

 5         A.  You have to justify what you need.

 6         Q.  And ARIN also has to have it.

 7         A.  Correct.

 8         Q.  Are you aware that in 2011, Microsoft

 9    bought the Nortel IPv4 addresses out of bankruptcy

10    for $11 each?

11         A.  I am, yeah.

12         Q.  Did you do any research on Corey Allen

13    Kotler before you engaged him as a broker?

14         A.  Research how?

15         Q.  Any kind of research.

16         A.  Not really.

17         Q.  What -- what did you know about him?

18         A.  He's looking for a job or a gig, so we

19    brought him on board.

20         Q.  Did -- did he know anything about IPv4

21    addresses?

22         A.  No.  I had to teach him what it is.

23         Q.  Is it safe to say that Corey Allen Kotler

24    did what you instructed him to?

25         A.  Yes and no.  I mean --

1        Q.   What's the yes, and what's the no?

2        A.   The yes is, he was supposed to make phone

3    calls and find the right contact to put us in

4    touch with them, basically.

5        And the no, he didn't know anything about

6    IPv4 addresses, so I had to teach him exactly what

7    they were.

8        Q.   You've seen the communications between

9    Corey Allen because that was the name he used --

10       A.   Sure.

11       Q.   -- and MNC; correct?

12       A.   Correct.

13       Q.   Is there anything in those communications

14   that was against your wishes?

15       A.   He was negotiating a contract with them

16   so when you say against my wishes --

17       Q.   Right.

18       Did -- did he do anything in those

19   communications -- You were aware of those

20   communications?

21       A.   Sure.

22       Q.   So there was nothing in those

23   communications that you disapproved of from Corey

24   Allen?

25       A.   Nothing illegal, as far as I'm concerned.

1   He was negotiating contract.

2        Q.  On behalf of Colocation?

3        A.  On behalf of himself, on behalf of

4   Colocation, correct.

5        Q.  And per your instructions; correct?

6        A.  When you say per my instructions, again,

7   we gave him a list, and he was supposed to find

8   the actual people that own them, and he was

9   supposed to negotiate a contract to buy the

10  assets, including the IPv4 address.

11       Q.  Well, let's talk specifically, though,

12  about MNC.

13       A.  Sure.

14       Q.  You had already located the IPv4 block,

15  you've stated that; correct?

16       A.  Correct.

17       Q.  And you'd already pinged it; correct?

18       A.  Correct.

19       Q.  And you told Corey Allen Kotler to try

20  and negotiate a deal to get that block; correct?

21       A.  We told him to reach out to find the

22  person who's responsible for selling the assets,

23  being the domain and the IPv4 in this case, and he

24  reached out and he negotiated the contract,

25  correct.

1   else at Dividend Advisors, LLC, other than Corey

2   Kotler?

3        A.   No.

4        Q.   Would you do business with somebody who

5   uses a fake name?

6        A.   No.

7        Q.   Do you know what the legal definition of

8   goodwill is?

9        A.   Somewhat.

10       Q.   What do you think it means?

11       A.   If it's there -- If it's physically

12   there, basically, if it's part of something.

13       Q.   How much do you think the block of IP4

14   addresses in the contract between Colocation --

15   Let me rephrase that.

16       How much do you think the block of IP4

17   addresses mentioned in the contract is worth?

18       A.   Worth when and to who?

19       Q.   At the time the contract was executed and

20   to you, to Colocation.

21       A.   Exactly what we stated it because we just

22   needed at the time to turn up customers, we're

23   short on IPs.

24       Q.   Do you have any documents to support that

25   value?

1        Q.   Never were.

2        A.   They claimed that they were.  If not, you

3   know, they wouldn't sign a contract.  I wouldn't

4   sign a --

5        Q.   When did they --

6        A.   -- contract --

7        Q.   But you didn't talk to them?

8        A.   I did.

9        Q.   You're -- you're just going by your

10  interpretation of the contract; correct?

11       A.   I saw -- I mean, I read what I read off

12  of a contract.  I mean, I don't need to speak to

13  anyone.  I don't speak to a lot of our customers.

14       Q.   And it was never represented in any

15  emails from Michelle Whittington.

16       A.   Of course there was.  She even asked what

17  this IP address is.

18       Q.   Was there -- was there -- You know, was

19  there a single email that we looked at today --

20  You're talking about a markup on a contract.

21       I understand how you want to interpret the

22  contract.  There's not a single email from

23  Michelle Whittington that says, "We are the owners

24  of those IPv4 addresses."

25       A.   That was presented to me today, no.  I

1   did see it in the exhibits that Corey and Michelle

2   went back and forth, and Michelle did state, "What

3   is this?"

4        And Corey did state back, "That's the IP."

5   And, hence, that's why we signed it, including the

6   IP address, which was the whole intention of, you

7   know, going to Mitel.

8        Q.  You're saying that Corey stated -- that

9   Corey stated that in a document?

10       A.  Yes.  Same document that was signed,

11  being the contract.

12       Q.  So, in other words -- Okay.

13       Now we're switching it around a little bit.

14  So it wasn't stated in any email.  You're just,

15  again, giving your own interpretation of the

16  contract?

17       A.  That's not true.  The contract was part

18  of the email going back and forth.  So when you

19  say was it --

20       Q.  It was --

21       A.  -- yes, it was.

22       Q.  Okay.

23       It was an attachment.  Let's not talk about

24  an attachment.

25       A.  Okay.

# EXHIBIT 10

| | |
|---|---|
| **From:** | Rogers, David |
| **Sent:** | Thursday, August 10, 2017 3:01 PM |
| **To:** | Teri Foster |
| **Cc:** | Harry Stanford; Jones, Jacob; Barker, David |
| **Subject:** | RE: Depo dates for MNC  8-1-17 |

Teri.  Please discuss with David today.   I'm not entirely sure what the message below means.  Jacob sent the subpoenas.  As far as we know, if Allen, Kotler, and Dividend Advisors exist, they are third parties and are not part of Colocation.  Are they employees/division of Colocation?

I don't think it bodes well for Colocation to intentionally misrepresent the identity of its agent in disclosure documents and contracts.  Also, Paul Sigelman accepted service on Allen's behalf and on behalf of Dividend Advisors.

We still need complete disclosure from Colocation regarding documents to and from Allen, Kotler, and Dividend Advisors.

Finally, we've never heard back about the tentative deposition of Colocation for next Tuesday, and Paul Sigelman has not even applied for PHV.  It's now near the end of the day on Thursday.  Thanks,  Dave

---

**From:** Teri Foster [mailto:tfoster@bihlaw.com]
**Sent:** Thursday, August 10, 2017 2:50 PM
**To:** Rogers, David
**Cc:** Harry Stanford
**Subject:** Re: Depo dates for MNC 8-1-17

David: Please see below.  This may be outdated, but lets start with this during our call re scheduling for third party depos.

I never received a Subpoena or Notice of Depo for Kotler or for a depo on 7/31 (the date mentioned in one of your emails), so we assumed he was a rep for MGM (the landlord for Sigelman and the former landlord for Allen). See below.
(highlights in red added by me). I mentioned this before and you thought I was complaining about service on the witness. We were just confused because we didn't have this (I do now from the affidavits that you just sent).

Paul left for vacation before I returned, so I never got a chance to discuss this with him.

==We learned yesterday that Allen and Kotler are one in the same. Apparently he is an "actor" and one of these is his stage name.==
Colocation did not have a file under the name Allen, but did locate a folder under Kotler. There is one document and it is a commission agreement entered into on 5/3/16 (after this transaction).
It will be produced later today. Our client indicates that it was only a verbal agreement between Colocation and Allen (aka Kotler) and there are no other documents (no emails or even texts) until 5/3/16.

I have a few minor changes to the stip and will send you a redlined copy this afternoon.

1

*Teresa H. Foster, Esq., Of Counsel*
*Brier, Irish, Hubbard & Erhart, P.L.C.*
*2400 East Arizona Biltmore Circle*
*Suite 1300*
*Phoenix, Arizona 85016-2115*
*Telephone: 602-515-0181*
*Direct: 602-515-0154*
*Fax: 602-522-3945*
*E-Mail: tfoster@bihlaw.com*
-------------------------------------------------------------------------
*This e-mail message contains confidential, privileged information intended solely for the addressee. Please do not read, copy, or disseminate it unless you are the addressee. If you have received it in error, please call us (collect) at (602) 515-0181 and ask to speak with the message sender.*
*Also, we would appreciate your forwarding the message back to us and deleting it from your system. Thank you.*

*TREASURY DEPARTMENT CIRCULAR 230 DISCLAIMER: To ensure compliance with certain U.S. Treasury regulations, we inform you that, unless expressly stated otherwise, any U.S. federal tax advice contained in this e-mail, including any attachments, is not intended or written to be used, and cannot be used, by any person for the purpose of avoiding any penalties that may be imposed by the Internal Revenue Service. (The foregoing statement is made in accordance with Circular 230, 31 C.F.R. Part 10.)*

---

**From:** Harry Stanford
**Sent:** Thursday, August 3, 2017 1:15 PM
**To:** Rogers, David
**Cc:** Teri Foster
**Subject:** Re: Depo dates for MNC 8-1-17

Dave:

Here is the all of the outstanding discovery that we are aware of:

| Date | Document | Due date |
|------|----------|----------|
| 06/15/17 | Subpoena Commanding Production of Documents Corey Allen | 7/10/17 * |
| *has been extended to 8/13/17 | | |
| 06/15/17 | Subpoena Commanding Production of Documents Dividend Advisors | 7/10/17 |
| 6/22/17 | Subpoena Commanding Production of Documents Davinci Virtual LLC | 7/10/17 |
| 7/13/17 | Subpoena Commanding Production of Documents Barrister Executive Suites Inc | 7/27/17 |
| 7/21/17 | Subpoena Commanding Production of Documents (was there a request for oral testimony as well?) MGM Management Company ** | 8/1/17 |

** date for producing documents to August 11 and for taking Kotler's deposition to August 14 (it is my understanding he is the representative for MGM).

1.  Are there any more outstanding notices or subpoenas?
2   We do not have the one the one that was scheduled for 7/31
3.  Please forward any other subpoenas or notices of deposition which we are missing others and
4.  Have any documents been produced to date?
5.  Is Mr. Kotler the representative for MGM?

Thanks,

Harry Stanford, Legal Assistant
Brier Irish Hubbard & Erhart PLC