From: Corey Allen [mailto:Corey.Allen@dividendadvisors.com]
Sent: Wednesday, February 24, 2016 1:04 PM
To: Michelle Whittington <Michelle.Whittington@mitel.com>
Subject: Attn: Michelle Whittington Re: Gandalf.ca

Dear Ms. Whittington,

      I am sorry for the delay in responding to you. I was out of the office for the better part of the week as the result of the flu. As a follow up to my request, our company would like to purchase the domain Gandalf.ca as well as any potential intellectually properties or scenarios that may be associated at a future point in time with the name Gandalf.ca. My company is in position to offer Mitel the sum of ten thousand American dollars ($10,000) for all rights. If you are in position to accept our offer, please draw up an agreement and upon my review and acceptance, I will place the funds in an escrow account of your choosing.

Sincerely,

Corey Allen
Principal Advisor
Dividend Advisors, LLC.
433 North Camden Drive Suite 970
Beverly Hills, California 90210
Phone: (310) 962-5602
www.DividendAdvisors.com
email: Corey.Allen@DividendAdvisors.com

**EXHIBIT A**

From: Michelle Whittington <Michelle.Whittington@mitel.com>
Sent: Wednesday, February 24, 2016 7:53 PM
To: Corey Allen
Subject: RE: Attn: Michelle Whittington Re: Gandalf.ca

Dear Corey, Mitel accepts the offer and provides a draft Domain Name Assignment Agreement for your review.

Please insert the purchasers information where indicated in the attached draft and return to me. If you have any further edits, please redline and return to me.

Thank you,
Michelle

# DOMAIN NAME ASSIGNMENT AGREEMENT

THIS AGREEMENT is made this [Date] ("the Agreement"), by and between MITEL NETWORKS CORPORATION, on behalf of itself and its subsidiaries, a Canadian corporation with offices at 350 Legget Drive, Ottawa, Ontario, Canada K2K2W7 ("Mitel") and _____,

[an individual] [a company] ("INTELLECTUAL PROPERTY PURCHASER").

**WHEREAS**, Mitel hereby agrees to sell, transfer and assign, and INTELLECTUAL PROPERTY PURCHASER hereby agrees to purchase the domain name <gandalf.ca> (the "Domain Name") subject to the terms and conditions of this Agreement.

**NOW, THEREFORE**, in consideration of the promises and agreements set forth herein, the parties, each intending to be legally bound hereby, do promise and agree as follows:

**A. Assignment of Domain Name**. For good and valuable consideration, payable as more particularly described herein, Mitel hereby agrees to transfer and assign to INTELLECTUAL PROPERTY PURCHASER all of Mitel's right, title and interest in and to the Domain Name <gandalf.ca> and the registration thereof, together with the goodwill of the business connected with and symbolized by such Domain Name, and any intellectual property rights relating thereto, to the extent any such rights exist. The transfer and the assignment shall take effect as set forth herein upon INTELLECTUAL PROPERTY PURCHASER'S making the payment provided for herein.

**B. Payment**. The consideration (the "Consideration") to be paid by INTELLECTUAL PROPERTY PURCHASER for the transfer of the Domain Name shall be $10,000 USD (one ten thousand United States dollars). The Consideration shall be a single wire transfer pursuant to the instructions on Schedule A. Consideration shall be completed on or before _____ [date] _____ unless the parties agree otherwise.

**C. Mitel's Obligations.** Mitel agrees to cooperate with INTELLECTUAL PROPERTY PURCHASER and to follow INTELLECTUAL PROPERTY PURCHASER'S reasonable instructions in order to effectuate the transfer of the Domain Name registration in a

timely manner. Specifically, upon confirmation of the Consideration, Mitel agrees to prepare and transmit the necessary Registrant Name Change Agreement (RNCA) and or to correspond with the Registrar to authorize transfer of the Domain Name.

**D. Warranty.** Mitel warrants and represents that: (i) it has the full power and lawful authority to enter into this assignment and transfer the Domain Name, and (ii) it is the lawful owner of the Domain Name.

**E. INTELLECTUAL PROPERY PURCHASER Obligations.** INTELLECTUAL PROPERTY PURCHASER agrees not to: use the Domain Name or any resulting website: (i) to disparage Mitel in any way; (ii) and (iii) disclose the material terms of this Agreement, such as the Consideration, however either party may disclose the existence of the Agreement.

**F. Entire Agreement.** This Agreement embodies the entire understanding of the parties with respect to the subject matter hereof, and merges all prior discussions between them, and neither of the parties shall be bound by any conditions, definitions, warranties, understandings, or representations with respect to the subject matter hereof other than as expressly provided herein. No oral explanation or oral information by either party hereto shall alter the meaning or interpretation of this Agreement.

IN WITNESS WHEREOF, the parties have caused this Agreement to be made and executed on the date signed by Mitel below ("Effective Date").

MITEL NETWORKS CORPORATION

_____

Name: _____

Position: _____

Date: _____

**INTELLECTUAL PROPERTY PURCHASER**

_____

Name: _____

Date: _____

(SCHEDULE A TO FOLLOW)

```
 1            IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF ARIZONA

 3

 4

 5   COLOCATION AMERICA, INC.,          )
                                        )
 6                                      )
                  Plaintiff,            )
 7                                      )
     v.                                 )   Case No.
 8                                      )   2:17-cv-00421-NVW
     MITEL NETWORKS CORPORATION,        )
 9                                      )
                                        )
10                Defendant.            )
     _____)

11

12

13         DEPOSITION OF MICHELLE WHITTINGTON

14         30(b)(6) Mitel Networks Corporation

15

16                  Phoenix, Arizona
                 Friday, August 18, 2017
17                     10:10 a.m.

18

19                CERTIFIED
                 TRANSCRIPT
20

21

22

                 KATE E. ROUNDY, RPR
23               Certified Reporter
             Certificate Number 50582

24

25
```

1     Q.   Does that look similar to the agreement that you

2   would have prepared?

3     A.   It does.

4     Q.   And would you have used a prior form or how did

5   you prepare this?

6     A.   I would have used a form, uh-huh, that I had

7   worked on in the past.

8     Q.   Without talking about the substance of it, did

9   you discuss this proposed agreement with your CIO or the

10  general counsel before it was sent to Corey Allen?

11    A.   No.

12    Q.   Looking at the next document, it's a Mitel

13  document and it's marked 550.

14         This is from Corey Allen to you, and it looks

15  like it's dated February 26th.

16         It says, here is the revised domain name

17  assignment.

18         And the last sentence says, the company

19  recognizes that you may or may not have rights as a result

20  of the old bankruptcy proceedings but is willing to go

21  forward on a quitclaim basis.

22         Do you recall any discussions with Corey Allen

23  before February 26th about the bankruptcy proceedings?

24    A.   No.

25    Q.   Do you recall any discussions with him -- and by


Alliance
REPORTING SOLUTIONS

Alliance Reporting Solutions
www.AllReportingSolutions.com

(602) 230-8448
20174697

1    discussion, I'm talking about the verbal, that's not the

2    e-mail, about the quitclaim basis?

3    A.    No.

4    Q.    Okay.  What was your understanding that the

5    quitclaim meant in this transaction?

6    A.    That in the event that Mitel had rights in the

7    domain name due to the bankruptcy that their --

8    Corey Allen's company -- whoever -- well, he says, you

9    know, the company, so I guess -- I assume the client that

10   he was working for was willing to take the risk that in

11   the event that Mitel did have rights in that domain name,

12   they would still go forward.

13   Q.    And so by "risk," in other words, if they paid

14   the money and it turned out that Mitel didn't own it, they

15   were taking that risk?

16   A.    Yes.

17   Q.    At that point in time, on February 26th, had you

18   done any investigation to see if Mitel owned that trade

19   name?

20   A.    I did.

21   Q.    Domain name.  I'm sorry.

22   A.    Yes, I did.

23   Q.    What type of investigation?

24   A.    That would have been from Paulo Ferreira, one of

25   the originals, works in the IT group.  So I would have

Alliance
REPORTING SOLUTIONS

Alliance Reporting Solutions
www.AllReportingSolutions.com

(602) 230-8448
20174697

1    A.   Yes.  It's similar to the others with a few

2  changes.

3    Q.   At about this time frame on February 26th, did

4  you review the changes that Corey was requesting?

5    A.   I believe so.

6    Q.   And, again, without asking for any legal advice,

7  do you recall reviewing Corey's changes with the IOC (sic)

8  or the general counsel?

9    A.   I did review internally.

10    Q.   Who would you have reviewed with?

11    A.   That would have been with the -- another business

12  person.

13    Q.   Like what type of business person?

14    A.   Business strategy, vice president of business

15  strategy.

16    Q.   What about intellectual property?

17    A.   I'm the only IP counsel there.

18    Q.   What does the IOS (sic) person do?  I'm sorry.  I

19  don't have any background on this.

20    A.   IOS?

21    Q.   Yes.  Isn't that what you said?

22    MR. ROGERS:  CIO.

23    THE WITNESS:  CIO, chief information officer.

24    So my understanding is his responsibilities

25  involved information systems, which would be data privacy,

Alliance
REPORTING SOLUTIONS

Alliance Reporting Solutions
www.AllReportingSolutions.com

(602) 230-8448
20174697

1    A.   I have -- I have no -- I don't know if there is

2  any at all.  There could be, but I don't know.

3    Q.   So in negotiating the Mitel agreement,

4  Corey Allen was asking for IPv4 addresses; correct?

5    A.   No, he was not.  There was never any discussion

6  of an IPv4 address.

7    Q.   So was something else going on in March of 2016

8  that was having you investigate what an IPv4 address was

9  and what it was worth?

10    A.   No, only the agreement.  And when I, you know,

11  verbally -- I asked Corey Allen:  What is this?

12         I did not get a response so I turned internally.

13    Q.   To find out what an IPv4 address is?

14    A.   Correct, and what this could mean.

15    Q.   And whatever response you got -- I don't mean to

16  ask you about your response -- you were comfortable going

17  forward with the agreement?

18    A.   Right.  We had came to a conclusion and intended

19  that any goodwill that may exist with that IPv4 address

20  from our understanding of the agreement.

21    Q.   Okay.  On here in the declaration it states,

22  "quite valuable."

23         When you signed the declaration in January of

24  2015, what did you have -- what did you mean by "quite

25  valuable"?  Did you have a number or a dollar amount?

**Alliance**
REPORTING SOLUTIONS
Alliance Reporting Solutions
www.AllReportingSolutions.com
(602) 230-8448
20174697

## Status

Select any status for help

| | |
|---|---|
| 1 | BUYER AND SELLER AGREE TO TERMS |
| 2 | BUYER SENDS PAYMENT TO ESCROW.COM |
| 3 | SELLER SHIPS MERCHANDISE TO BUYER |
| 4 | BUYER RECEIVES MERCHANDISE |
| 5 | ESCROW.COM PAYS SELLER |

## The Milestone Transaction is opened

Actions will be available based on milestone statuses
If available please select Action for every milestone

### Payment details

If you have not sent your payment yet, here are our wire transfer details:

| | |
|---|---|
| Bank Name: | Wells Fargo Bank, N.A.<br>420 Montgomery St<br>San Francisco, CA 94104 |
| ABA Routing #: | 121000248 |
| Swift Code: | WFBIUS6S |
| Credit Account Name: | Internet Escrow Services Inc |
| Credit Account #: | 7101167844 |
| Wire Beneficiary Address: | 180 Montgomery St<br>Suite 650<br>San Francisco, CA 94104<br>USA |
| Additional Instructions: | Reference Escrow Transaction #<br>847266 |

### Merchandise

| Actions | Milestone No | Status | Item Description | Inspection Period (calendar days) | Delivery Type | Unit Price/Installment |
|---|---|---|---|---|---|---|
| N.A. | 1 | | **Gandalf.ca**<br>When Seller records the Escrow.com that Gandalf.ca and the IP 44.134.12.0016 netblocks have been transferred. Escrow.com will verify that the Buyer is the registrant on both WHOIS No content, software, addenda or income generating accounts incl | 30 | No Shipping Needed | $10,000.00 |
| Buyer funds secured by Escrow.com | | | | | | |

| | |
|---|---|
| Subtotal: | $10,000.00 |
| Escrow Fee | $175.50 |
| Total<br>Transaction ID:<br>847266<br>Escrow ID: 561965 | $10,175.50 |

### Terms

| | |
|---|---|
| Transaction #: | 847266 |
| Escrow #: | 561965 |
| Transaction Title: | Modified - Gandalf.ca Domain Name Transfer |

### History

Mar 25 2016 3:14PM PDT
Escrow.com approved payment

Mar 25 2016 1:26PM PDT
Both parties have accepted the offer, revealing this information

Mar 25 2016 1:26PM PDT
Buyer initiates the transaction

**EXHIBIT C**

Mar 25 2016 12:26PM PDT
Buyer initiates the Transaction

**Swift Code:** WFBIUS6S

**Credit Account Name:** Internet Escrow Services Inc

**Credit Account #:** 7101167844

**Wire Beneficiary Address:** 180 Montgomery St
Suite 650
San Francisco, CA 94104
USA

**Additional Instructions:** Reference Escrow Transaction #
847266

## Merchandise

| Milestone No. | Actions | Status | Item Description | Inspection Period (calendar days) | Delivery Type | Unit Price/installment |
|---|---|---|---|---|---|---|
| 1 | N/A | Buyer funds secured by Escrow.com | **Gandalf.ca** When Seller notifies Escrow.com that gandalf.ca and the IPv4 154.20.0.0/16 netblocks have been transferred, Escrow.com will verify that the Buyer is the registrant on both "WHOIS". No content, software, absence of income generating accounts incl | 30 | No Shipping Needed | $10,000.00 |

| | | | | | Subtotal | $10,000.00 |
| | | | | | Escrow Fee | $175.50 |
| | | | | | **Total Transaction ID: 847266 Escrow ID: 561965** | **$10,175.50** |

## Terms

| | |
|---|---|
| **Transaction #:** | 847266 |
| **Escrow #:** | 561965 |
| **Transaction Title:** | Modified - Gandalf.ca Domain Name Transfer |
| **Buyer:** | Albert Ahdoot (albert@colocationamerica.com) |
| **Seller:** | MICHELLE WHITTINGTON (Michelle.Whittington@mtel.com) |
| **Inspection Period:** | Milestone Transaction |
| **Escrow Fee to be paid by:** | Buyer The buyer is responsible for 100% of the escrow fee in the event the transaction is cancelled or the merchandise is returned |
| **Transaction fulfilled using:** | Milestone Transaction |

**Transaction 847266 (Escrow 561965)**

| Description | Modified - Gandalf.ca Domain Name Transfer |
| --- | --- |
| Status | Milestone transaction open |
| Created | 2016-03-25 12:26:30 |
| Total Value | 10000.00 USD |
| Buyer | 984834 (albert@colocationamerica.com) |
| Seller | 984847 (Michelle.Whittington@mitel.com) |

**Transaction History**

| Date | Status | Message | Cust ID | IP |
| --- | --- | --- | --- | --- |
| 2016-03-25 12:26:30 | BuyerInitiate | Buyer initiates the transaction | 984834 | 104.173.192.95 |
| 2016-03-25 14:04:44 | BothAccept | Both parties have accepted the offer, awaiting buyer payment. | 984847 | 75.172.228.73 |
| 2016-03-25 14:05:07 | sellersettlemen | seller selected WT as a settlement method to BANK OF NOVA SCOTIA, Account Number *******9518. | 984847 | 75.172.228.73 |
| 2016-03-28 15:44:16 | PaymentApproved | Escrow.com approves payment. | | |

CONFIDENTIAL

MITEL001868

EXHIBIT D

3

4

5                                              **CERTIFIED**
                                           **ORIGINAL TRANSCRIPT**
6    COLOCATION AMERICA, INC.,        )
                                      )
7                    Plaintiff,       )
                                      )
8       vs.                           )    Case No.
                                      )    CV-17-00421-PHX-
9    MITEL NETWORKS CORPORATION,      )    NVW
                                      )
10                   Defendant.       )
     _____)

11

12

13

14

15       VIDEOTAPED DEPOSITION OF COREY ALLEN KOTLER

16              Los Angeles, California

17            Thursday, September 7, 2017

18

19

20

21

22

23   Reported by:

24   Claudia Badano, CSR No. 8974

25   Job No. 2629                    **EXHIBIT E**

1    deposition?

2        A.   No.   I just told her I have to go take care

3    of this.

4        Q.   And all the papers that you reviewed for the

5    deposition are in that stack that you have?

6        A.   All the papers that I reviewed that I was

7    able to review for the deposition are here, yeah.   I

8    glanced them over.

9        Q.   Did you make any notes on them?

10        A.   No.

11             MR. ROGERS:   Okay.   I'm going to take this

12    stack.

13             THE WITNESS:   I would have handed it over to

14    you.

15             MR. ROGERS:   That's fine.   We're going to

16    mark this as Exhibit 3.

17             (Defendants' Exhibit 3 was marked for

18             identification and attached to and

19             made a part of this deposition.)

20    BY MR. ROGERS:

21        Q.   When you were served with a subpoena in this

22    case, the process server met you in the elevator;

23    correct?

24        A.   No, actually not in the elevator.   In the

25    lobby.

1      Q.   And then the two of you -- then he got in

2   the elevator with you; correct?

3      A.   No.   What had happened was he went in the --

4   I was creeped out.   I thought it was a home invasion,

5   to tell you the truth.   I mean, you know I -- I was

6   creeped out.   I didn't know who -- a process server?

7   I didn't know who he was.   I thought it could

8   potentially be a home invasion, a robber.   It was one

9   creepy guy, so, you know --

10      Q.   You didn't take the subpoena from the

11   process server, did you?

12      A.   Nope.

13      Q.   You denied your name was Corey Kotler,

14   didn't you?

15      A.   Yeah.

16      Q.   And the process server had to leave the

17   subpoena under your door, didn't he?

18      A.   Yes.

19      Q.   Why were you afraid of being served?

20      A.   A, I didn't know I was being served.   B, I

21   didn't know who he was, okay?   I was creeped out.

22   And then he's running after me -- okay, check this

23   out.   I had a big bale in my hands of parrot liner, I

24   have parrots.   I have four parrots.   And this big

25   huge, huge bale, so I'm carrying this up.   Some

1  creepy guy is waiting for me in my building.  No one

2  waits -- it's a private building.

3        "You Corey Kotler?"

4        "No.  Who are you?"

5        "I don't know."

6        "Did I invite you here?  I don't know who

7  you are.  It's none of your business."

8        So then he starts following me around.  I

9  decide to go up the stairs to walk away from this

10  creepy guy that could be a home invasion.  I don't

11  know who he is.  You know, it's -- whatever.

12        So then he's chasing me and I have the bale

13  of bird liner, a huge bale, I almost fell down the

14  stairs because he's like running after me and I

15  almost lost my balance.  So then I went in the

16  elevator and screw him.

17     Q.  But he got in the elevator with you?

18     A.  Yeah.  And then I walked out of the

19  elevator.

20     Q.  And then you went into your condo and you

21  shut the door?

22     A.  Yeah.  If I popped out of your bushes,

23  wouldn't you be creeped out if you didn't know me?

24     Q.  Have you ever been --

25     A.  See, you didn't answer the question.  You

1   would be creeped out.

2       Q.   I'm not the deponent.

3       A.   You know, but you would.  Anyone would be

4   creeped out.

5       Q.   Have you been involved in any litigation

6   before?

7       A.   Define it.

8       Q.   Have you ever been involved in a lawsuit

9   before?  I'll back it up.  I'll break it out.  Have

10  you ever been sued before?

11      A.   Yes.

12      Q.   When?

13      A.   Years ago.  Many, many years ago.  We owned

14  hair salons and we had a falling out with the

15  franchise.

16      Q.   Any other time?

17      A.   Have I ever been sued.  I'm trying to

18  remember.  Not that I could recall off the top of my

19  head.

20      Q.   Have you ever been convicted of fraud?

21      A.   Nope.

22      Q.   Have you ever been arrested?

23      A.   Nope.

24      Q.   Have you ever been convicted of a crime?

25      A.   Nope.

1    A.    Yes.

2    Q.    And using the name Corey Allen was solely

3  your decision?

4    A.    Yeah, it was.

5    Q.    Colocation didn't tell you --

6    A.    No.  Do you want to know why?

7    Q.    Sure.  Why did you falsify your name on

8  communications back and forth to MNC?

9    A.    Well, respectfully, you are mistaken.  If

10 one said falsification, what you just said would be a

11 lie.  I'm not calling you a liar, I'm just saying,

12 Counselor, you are mistaken.  Okay?  So I'm forgiving

13 you for your mistake.

14        Now, I'll clarify.  For the purpose of the

15 court and why I decided not to use my full legal name

16 is because I am an actor, a proud member of the

17 Screen Actors Guild of America.  It's going to be a

18 little long, so humor me.  Okay?  I want you to

19 understand this and it's very important that you

20 follow this crystal clear.

21        Let's assume -- because you don't want me

22 asking you questions, I'll assume there's quite a few

23 members of your law firm.  Outside there's a

24 secretary, there's a this one and that one, and they

25 have to have a certain professional air to them.  You

1   don't have to answer it, but in a professional

2   setting you have to have a certain professional air.

3   Okay?

4          With that said, as an actor in a town of

5   hundreds of thousands of members of the Screen Actors

6   Guild, it's highly competitive to get work.  You

7   follow me?  You with me, Dave?  Did I lose you?  You

8   with me?  Okay.

9          So in an effort as an actor to get work,

10  let's say I go out for a job, when I went out for

11  Ugly Betty as a policeman -- and I only had two lines

12  in Ugly Betty, my first TV job -- casting director

13  say there were only 500 submissions and they only

14  brought in 20 people.  Competition is very thick.

15         So what I do in order to optimize my odds of

16  getting work -- and there's a relevance, it's a

17  complete relevance, but I just have to explain.

18  Okay, Dave?  What I have -- what I decided to do, why

19  I work so much, why I did Transparent, two episodes,

20  why I got Rizzoli & Isles, why I got ten episodes of

21  The Tonight Show, why I got Jimmy Kimmel Live, why I

22  got Two Broke Girls is because I created a niche for

23  myself.  My niche as an actor is the fat guy,

24  shirtless, wearing a Speedo or tighty whities.

25         Now, let's just assume for a second -- I had

1    to move there.

2            Are you cool, Mike?  Mike, are you cool with

3    the camera?

4            Let's assume for a second, okay, you are

5    dealing with Corey Allen Kotler.  Corey Allen Kotler

6    calls Michelle Whittington in Canada somewhere.  In

7    2000 -- what was it, 2016?  In 2016, it's very common

8    that you'll Google somebody.

9            Now, if you Googled me as an actor, that's

10   completely cool.  But what you would probably see is

11   you would probably see Jay Leno waxed Louis

12   Vuitton -- I'm sorry, Versace into my back hair.

13   Okay?  Now, my question to you, counselor -- okay.

14   Also, Two Broke Girls.  I can show you right now, I

15   can pull up the video, I have a 16-second clip on the

16   phone.  Okay?  I came out in front of 50,000 people

17   on Two Broke Girls in tighty whities.

18           Now, let's just assume that I'm trying to

19   buy something from a corporate attorney and let's

20   assume that the corporate attorney does their due

21   diligence and they Google Corey Allen Kotler.  Would

22   that potentially hurt my professional credibility

23   as -- would it be odd?  So if it would in fact be

24   odd, you probably would not hire me to be a

25   receptionist at your law firm, you know, if you saw

1       Q.    Do you know why Colocation's lawyers would

2   list your name on court documents as Corey Allen and

3   leave off your last name Kotler?

4       A.    Well, as we discussed before, professionally

5   when I'm doing business, I don't think it's necessary

6   or appropriate to disclose it.    I'm the tighty

7   whities guy.    You know, the guy that goes on network

8   TV, you know, it's a different -- that's my

9   character.    That's my acting character and I don't

10  feel the need or think it's appropriate to disclose

11  that when I'm working in a professional environment

12  other than an acting professional environment.

13      Q.    And so did you instruct the lawyers to only

14  use your -- only use Corey Allen?

15      A.    No.

16      Q.    So you don't know why Colocation's lawyers

17  listed you in court documents as Corey Allen?

18      A.    Well, logic would probably say that if this

19  is how I represent myself professionally, that they

20  just -- that's how -- I mean, you know, it's -- I

21  mean, why would I even -- why would I have a picture

22  of me on The Tonight Show with, you know, Louis

23  Vuitton waxed into my back.    There would be no

24  relevance to it.    If I'm working -- if I'm speaking

25  to Michelle Whittington as Corey Allen which is part

Paul Sigelman, SBN 45954
SIGELMAN LAW CORP
433 N. Camden Dr., #970
Beverly Hills, CA 90210
Telephone:  (310) 278-8011
Facsimile:  (310) 278-2254

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

COLOCATION AMERICA, INC.,
          Plaintiff,

v.

MITEL NETWORKS CORPORATION,

          Defendant.

Case No.: 2:17-cv-00421-NVW

**DECLARATION OF PAUL SIGELMAN**

I, Paul Sigelman, declare as follows:

    1.    I have not represented Corey Allen Kotler.

    2.    I am aware that he is an actor, and producer, and has dealt in numerous media of the entertainment industry of Los Angeles, including motion pictures and television series. He has a great deal of business contacts in that industry. Some time ago he met a friend and one of my clients, Jack Heller, a real estate broker and former actor himself, which led to my acquaintance of him.

    3.    I understand that Corey Allen Kotler has recommended Mr. Heller for appearances in various commercials and rehearsed him for such engagements, as well as shooting a short film pertaining to Mr. Heller's family background, and has a good business reputation in the entertainment business. Mr. Heller maintains an office within his home, but at various times uses my office suite conference room for meetings, and frequently stops by to say hello during any given week. One day I observed Mr. Heller meeting with Corey Allen Kotler on such occasion at my

EXHIBIT F

office. During one of their meetings, after I became aware that my client Colocation America was looking for someone to assist in soliciting and negotiating certain business, I suggested Corey give Colocation a call. I understand he did so, though I was not involved in their meeting or in their coming to any arrangement

4. Mr. Kotler has told me that because performers in the entertainment industry do not like to mix their business endeavors with their own acting career for various publicity reasons, that he uses the name "Corey Allen" when involved in business. While his office is in his home, he asked if he, like Mr. Heller, could use my Beverly Hills address as a meeting place and mail drop for Corey Allen business dealings. The same use of the office suite is made by others, including four Los Angeles practicing lawyers (Stan Phillips Bar#47063, Bruce Sires #54572, Ira Sigel #78142, Allen Gross #141082) who have their offices at their homes yet use my conference room and mailing address, as do a few business clients. These people, nor Corey Allen Kotler, maintain no regular presence in the suite.

5. On August 4, Corey Allen Kotler again met with Jack Heller at my office. During that time, he told me there had been an attempt to serve papers on him at his home. I asked him what the papers were. That same day, he brought me an envelope of the papers. I saw it was a subpoena for a production of documents the following Monday at Snell and Wilmer, 2 California Plaza, 350 S. Grand Ave., Suite 3100 Los Angeles. My office called Snell and Wilmer, gave them the name of the case, and asked who to speak to in regards to the production of documents. After several minutes and multiple inquiries, we were told that they knew nothing about the production of documents for Monday, and that no such arrangement had been made with them to receive the documents. At their suggestion, I then called the Snell and Wilmer Arizona office, and left a message that I would assist by having any documents in possession produced. I told Corey Allen Kotler to search for the documents.

6. I have also read the declaration of Noe Bermudez in regard to an attempt to service on June 15th at my office. His declaration is wrong in part. I do recall the event and it requires me to set the record straight.

7. When Mr. Bermudez arrived, the door was suite was (as it always is) unlocked and

allows anyone to enter. At the time, I was passing through the door headed to the men's' room. Mr. Bermudez stopped me and said he had papers for Corey Allen. I told him that I knew the name, but that he was not, and had not, been present in the office. I told him he should speak to Rick at the front desk and left for the restroom. I did not speak with him again.

8.     Apparently thereafter Mr. Bermudez did speak with Rick Bradford at the front desk. When I returned Mr. Bradford asked that I take a look at the papers left. I informed Rick that the papers were a subpoena, but the service was noncompliant with code as they needed to be personally served. I understand from Mr. Bermudez's declaration that he returned later that afternoon, and Rick Bradford told him that though he had the subpoena, it needed to be personally served.

9.     Thereafter I never received an inquiry, or even a call from anyone asking about Corey Allen, his address, his use of "Corey Allen" or of my office suite.

I declare under penalty of perjury in the State of California that the foregoing is true and correct, and if called upon as a witness, could and would testify competently thereto

Executed this 22nd day of August, 2017, at Beverly Hills, California.


___/S/_____
Paul Sigelman

---------- Forwarded message ----------
From: **Paul Sigelman** <paul@sigelmanlaw.com>
Date: Tue, Aug 22, 2017 at 8:09 AM
Subject: Re: Appearance at Deposition
To: "Rogers, David" <drogers@swlaw.com>, Teri Foster <tfoster@bihlaw.com>

David,
Having received no citation, and because you don't know of what you speak, nor have you ever
asked me, I provide you the attached, which you should take into consideration for the judge.

Paul Sigelman

**EXHIBIT G**