# EXHIBIT 6

```
 1
 2              IN THE UNITED STATES DISTRICT COURT
 3                  FOR THE DISTRICT OF ARIZONA
 4
 5   COLOCATION AMERICA, INC.,        )
                                      )
 6                     Plaintiff,     )
                                      )
 7        vs.                         )  No. CV-17-00421-
                                      )       PHX-NVW
 8   MITEL NETWORKS CORPORATION,      )
                                      )
 9                     Defendant.     )
     _____)
10
11
12        DEPOSITION OF ALBERT ARASH AHDOOT, a witness
13        herein, noticed by Snell & Wilmer L.L.P.,
14        taken at 350 South Grand, Los Angeles,
15        California, at 10:02 a.m., on Tuesday,
16        August 22, 2017, before Diane M. Lytle,
17        CSR 8606.
18
19
20
21
22
23
24
25
```

Page 18

1   Do they work at the leased spaces we just
2   talked about?
3       A. Correct.
4       Q. Okay.
5       And what kind of work do they do there?
6       A. 24/7, around the clock, just making sure
7   everything is up and up.
8       Q. Do you have a job title at Colocation?
9       A. Business development.
10      Q. Business development?
11      A. Correct.
12      Q. And is it director of business
13  development or just business development?
14      A. Just business development.
15      Q. Are you -- Well, let me ask -- ask it
16  more broadly.
17      Who owns Colocation right now?
18      A. I do.
19      Q. 100 percent?
20      A. Correct.
21      Q. And you don't -- you didn't want to take
22  the title of president or CEO?
23      A. CEO, no, thank you.
24      Q. Have you had any full-time work
25  experience other than at Colocation?

Page 19

1       A. No.
2       Q. What is the full legal name of
3   Colocation?
4       A. Colocation America Corporation, Inc.
5       Q. What is Colocation's approximate annual
6   revenue? And we can keep this -- we can keep this
7   confidential.
8       A. Yeah, we'll keep it confidential.
9       So do I need to give out the number?
10      Q. (Nods head in the affirmative.)
11      A. It's over 10 million.
12      Q. Is it under 12 million?
13      A. I honestly don't know the exact numbers.
14  It was over 10- last year, so -- we have grown, so
15  I'm sure it's over 10- still.
16      Q. Last year was it under 12-?
17      A. Last year was, I would say, between 10-
18  and 15-.
19      Q. And is Colocation privately held?
20      A. It is.
21      Q. With you being the sole owner; correct?
22      A. Correct.
23      Q. Does Colocation have any subsidiary
24  companies?
25      A. Not that I know of.

Page 20

1       Q. Well, you should know.
2       A. I don't. There isn't any.
3       Q. What is Samantha Walters' position at
4   Colocation?
5       A. I think she's a director of some sort. I
6   don't know her exact title.
7       Q. Does she work in Woodland --
8       A. Woodland Hills.
9       She does.
10      Q. -- Woodland Hills?
11      A. Correct.
12      Q. What are her responsibilities?
13      A. She mostly overlooks -- she's my right
14  hand, so she overlooks what I overlook. So the
15  things that I cannot get to, she goes over. She
16  overlooks the company from marketing perspective
17  down to, like, our contracts, down to overlooking
18  employees. So she overlooks the company.
19      Q. Do you know what her educational
20  background is?
21      A. She has a Ph.D. in -- forgot, honestly.
22  I have no idea, but she does have a Ph.D. in
23  something.
24      Q. And I guess she is knowledgeable about
25  Colocation services; correct?

Page 21

1       A. She is.
2       Q. How long has she worked for you?
3       A. I believe seven years.
4       Q. Do you know where she worked before that?
5       A. I don't recall.
6       Q. Colocation produced documents in response
7   to MNC's document production requests in this
8   lawsuit; correct?
9       A. Correct.
10      Q. How was the search conducted to locate
11  documents?
12      A. We looked it up in our mail server.
13      THE REPORTER: I'm sorry, I can't hear you.
14      THE WITNESS: We looked it up in our mail
15  server.
16      MR. ROGERS:
17      Q. And when you say, "we," who conducted the
18  search?
19      A. Myself and Samantha.
20      Q. When you say you looked at the mail
21  server, does Colocation have a server that all
22  email comes through?
23      A. Correct.
24      Q. And how -- how long are documents
25  stored -- Let me rephrase.

Page 22

```
 1        How long are emails stored in that server?
 2    A.  Lifetime.  Since the company started.
 3    Q.  Did you search any individual computers?
 4    A.  All the individuals' computers connect to
 5  the main -- main server.
 6    Q.  How about if documents are created at
 7  Colocation, do they also go into that same main
 8  server?
 9    A.  When you say documents are produced --
10    Q.  Word document.
11    A.  Yeah, everything, as long as it passes
12  mail back and forth, it goes to the mail server.
13    Q.  And how about if it doesn't go through
14  the mail?
15    A.  Then it's not part of Colocation America.
16    Q.  How about -- No, how about if you create
17  a Word document, but you don't email it off to
18  somebody?
19    A.  We don't -- We keep everything on the
20  mail server.  So everything that's printed gets
21  scanned and gets stored in the mail server.
22    Q.  So every -- everything created at
23  Colocation America goes onto that server?
24    A.  We hardly keep any paperwork in files.
25  So most of it is scanned, then it goes into our
```

Page 23

```
 1  mail server.
 2    Q.  And anything that would be created
 3  electronically is stored in that server?
 4    A.  Correct.
 5    Q.  And anything that would come into the
 6  company electronically would be on that server?
 7    A.  Correct.
 8    Q.  So, therefore, there was no need to
 9  search individual computers because whatever
10  documents there were would be on that server;
11  correct?
12    A.  Correct.
13    Q.  When you and Samantha did the search, do
14  you remember what search terms you used?
15    A.  "Mitel."
16    Q.  Anything else that you can remember?
17    A.  Anything that had to do with Mitel,
18  basically.
19    Q.  Can you think of any other terms?
20    A.  My name, Samantha's name, "Mitel," "Corey
21  Allen."  I forgot the attorney's name on the other
22  side.  So any conversation that went back and
23  forth.
24    Q.  Were you assisted in the search by a
25  lawyer?
```

Page 24

```
 1    A.  No.
 2    Q.  Did you also search for "Corey Kotler"?
 3    A.  Yes.
 4    Q.  Did you also search for "Paul Sigelman"?
 5    A.  I -- I'm thinking was he part of it.  We
 6  searched with anyone that had any interactions
 7  with Mitel.
 8    Q.  Well, do you recall searching for the
 9  name "Paul Sigelman" or --
10    A.  He wasn't --
11    Q.  -- just "Sigelman"?
12    A.  -- involved, so there was no reason for
13  him -- to search his name, basically.
14    Q.  How about "Deborah Perlman"?
15    A.  Deborah Perlman was not involved until
16  after the fact.
17    Q.  So she wasn't searched --
18    A.  Correct.
19    Q.  -- because she -- Okay.
20        To your knowledge, have any communications
21  about Mitel -- Mitel been deleted over time?
22    A.  We don't delete anything.
23    Q.  When you located documents, to whom were
24  they sent?
25    A.  When we located documents, we sent it to
```

Page 25

```
 1  Ms. Perlman.
 2    Q.  Why at Colocation do you not delete
 3  anything?
 4    A.  How technical do you want me to get?
 5        We are HIPAA-compliant, and we're also
 6  PCI-compliant.  We're also SSAE 16-compliant.  So
 7  we have to keep everything on record.  Just like
 8  the bank has to keep it for seven years, we have
 9  to keep it lifetime.
10    Q.  Have you ever been deposed before?
11    A.  Yes.
12    Q.  How many times?
13    A.  Same case, twice.
14    Q.  Same case, twice.
15        Tell me about that case.  What was -- what
16  was the case about?
17    A.  It was a personal involvement into
18  property that I purchased.
19    Q.  Was it a residential property or
20  commercial?
21    A.  It was residential.
22    Q.  Residential.
23        And what was -- just basically, what was the
24  case about?
25    A.  We had a dispute over property that I
```

Page 170

1   I, Diane M. Lytle, CSR 8606, do hereby declare:

2

3   That, prior to being examined, the witness named in the foregoing deposition was by me duly sworn pursuant to Section 30(f)(1) of the Federal

4   Rules of Civil Procedure and the deposition is a true record of the testimony given by the witness.

5

6   That said deposition was taken down by me in shorthand at the time and place therein named and thereafter reduced to text under my direction.

7

8   ____ That the witness was requested to review the transcript and make any changes to the transcript as a result of that review

9   pursuant to Section 30(e) of the Federal Rules of Civil Procedure.

10

11   ____ No changes have been provided by the witness during the period allowed.

12   ____ The changes made by the witness are appended to the transcript.

13

14   ____ No request was made that the transcript be reviewed pursuant to Section 30(e) of the Federal Rules of Civil Procedure.

15

16   I further declare that I have no interest in the event of the action.

17   I declare under penalty of perjury under the laws of the United States of America that the

18   foregoing is true and correct.

19   WITNESS my hand this 1st day of

20   September, 2017.

21   _____

22   Diane M. Lytle, CSR 8606

23

24

25