David E. Rogers (#19274)
David G. Barker (#024657)
Jacob C. Jones (#029971)
SNELL & WILMER L.L.P.
One Arizona Center
400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
Telephone: 602.382.6000
Facsimile: 602.382.6070
E-Mail: drogers@swlaw.com
         dbarker@swlaw.com
         jcjones@swlaw.com

Attorneys for Defendant
Mitel Networks Corporation

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Colocation America, Inc.,<br><br>    Plaintiff,<br><br>v.<br><br>Mitel Networks Corporation,<br><br>    Defendant. | Case No. CV-17-00421-PHX-NVW<br><br>**MITEL NETWORKS CORPORATION'S (1) AMENDED ANSWER TO COMPLAINT; (2) AMENDED COUNTERCLAIM; AND (3) DEMAND FOR JURY TRIAL** |
| Mitel Networks Corporation,<br><br>    Counterclaimant,<br><br>v.<br><br>Colocation America, Inc.; and Corey Allen Kotler and Mojgan Tabibnia, husband and wife,<br><br>    Counterdefendants. | |

Defendant and Counterclaimant Mitel Networks Corporation ("MNC") submits the following (1) Amended Answer in response to the Complaint of Colocation America, Inc. ("Colocation" or "Plaintiff"), (2) Amended Counterclaim, including against a newly joined party, Colocation's broker, Corey Allen Kotler ("Kotler"), and (3) Demand for Jury Trial. Except as specifically admitted, MNC denies each and every allegation in the Complaint.

4820-5247-2652

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

## ANSWER

## PARTIES, JURISDICTION, AND VENUE

1.      MNC lacks knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 1, and therefore denies them.

2.      MNC admits that Colocation brought suit against MNC.  MNC denies that it maintains any office or direct subsidiaries in Arizona except for Mitel US Holdings, Inc. ("MUSHI").  MNC admits that Ms. Whittington is MNC's intellectual property counsel, a member of the Arizona Bar, who has an office located at 1146 North Alma School Rd., Mesa, AZ 85201.  MNC denies that she is an employee of MNC.  MNC admits that Ms. Whittington was involved in the negotiation of the Domain Name Assignment Agreement ("Contract"; Exhibit 1 to Colocation's Complaint) at issue in this case, but she did not "initiate" or "consummate" it.  MNC denies any remaining allegations in Paragraph 2.

3.      MNC admits that it indirectly acquired assets from the Gandalf Technologies Inc. bankruptcy and that those assets include the Canadian domain name <Gandalf.ca>.  To the extent understood, MNC lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations of Paragraph 3, and therefore denies them.

## RIGHTS, NEGOTIATION, AND AGREEMENT

4.      Denied.  MNC never contemplated a sale of what Colocation defines in Paragraph 3 as "Gandalf rights."

5.      MNC admits that its counsel prepared a draft agreement to sell the <Gandalf.ca> domain name and associated goodwill.  MNC denies that it discussed MNC's acquisition of rights in the domain name <Gandalf.ca> or any other rights. Colocation added the quit claim language to the draft Contract.  MNC denies the remaining allegations in Paragraph 5.

6.      MNC admits that Exhibit 1 of the Complaint, which is the Contract, is the final written agreement executed by MNC and Colocation.  MNC admits that the parties agreed to confidentiality, and that the Contract contains an integration clause.  MNC

4820-5247-2652

denies the remaining allegations of Paragraph 6, including Colocation's characterization of the Contract, the allegation that the Contract reflects the parties' mutual understanding, expressly recites intangible rights, and that it was prepared solely by MNC's counsel. Paragraph 6 of the Complaint further omits operative language from the Contract, and alleges that the Contract states:

> together with ... the associated IPv4 134.22.0.0/16 and any associated trade dress, or other intellectual property intellectual property rights relating thereto, to the extent any such rights exist.

The actual language of the Contract is as follows:

> [MNC] hereby agrees to quit claim to [Colocation] any of [MNC's] rights, title and interest in and to the Domain Name <gandalf.com> and the registration thereof, together with the goodwill of the business connected with and symbolized by such Domain Name and the associated IPv4 134.22.0.0/16 and any associated trade dress, or other intellectual property intellectual property rights relating thereto, to the extent any such rights exist.

7.    MNC admits that Colocation was required to submit payment to MNC through Escrow.com and that Colocation has failed to release any payment to MNC. MNC denies the remaining allegations of Paragraph 7, including Colocation's characterization of: the Contract, the Contract's subject matter, and MNC's duties and obligations under the Contract.

8.    MNC admits that the Contract was executed in Canada by MNC's General Counsel.  MNC denies the remaining allegations of Paragraph 8.

## **BREACH OF AGREEMENT**

9.    Denied.

## **PRIOR ACTION**

10.    MNC admits that Colocation commenced an action in Superior Court in California (the "California action"), that MNC challenged personal jurisdiction over it in the California action, and that the California action was dismissed for lack of personal

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

jurisdiction over MNC. Colocation was also sanctioned approximately $40,000 for discovery misconduct in the California action, which it has not paid. MNC denies the remaining allegations of Paragraph 10.

## LITIGATION HOLD

11.     Paragraph 11 is not a proper pleading, and no response to Paragraph 11 is required.

## FIRST CLAIM FOR RELIEF
### (Breach of Contract)

12.     MNC incorporates by reference the prior paragraphs of this Answer.

13.     Denied.

14.     Denied.

15.     Denied.

16.     To the extent a response is required, denied.

17.     Denied.

## SECOND CAUSE OF ACTION
### (Specific Performance against Mitel)

18.     MNC incorporates by reference the prior paragraphs of this Answer.

19.     Denied.

20.     Denied.

21.     Denied.

22.     Denied.

23.     Denied.

MNC denies that Plaintiff is entitled to any of the relief it seeks.

## ADDITIONAL DEFENSES

MNC reserves the right to rely upon one or more of the following defenses, as well as raise any further defenses as may arise during the course of discovery.  By alleging the following, MNC does not admit that the following are affirmative defenses, and does not assume the burden of pleading or proving any matter as to which MNC does not have

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

1  such burden under applicable law.

## FIRST AFFIRMATIVE DEFENSE

24.     Plaintiff's Complaint fails, in whole or in part, to state a claim against Defendant upon which relief can be granted.

## SECOND AFFIRMATIVE DEFENSE

25.     Plaintiff's claims are barred, in whole or in part, by estoppel.

## THIRD AFFIRMATIVE DEFENSE

26.     Plaintiff's claims are barred, in whole or in part, by failure of consideration.

## FOURTH AFFIRMATIVE DEFENSE

27.     Plaintiff's claims are barred, in whole or in part, by fraud or concealment by Plaintiff and/or its agent, Corey Allen Kotler ("Kotler") during negotiation and formation of the Contract.  Kotler contacted MNC with the express purpose of acquiring the domain name <Gandalf.ca> ("Domain Name").  Kotler expressly represented to MNC that only the domain name <Gandalf.ca> and "goodwill" (if any) of the business symbolized by the domain name, associated IPv4 addresses, and associated trade dress would be quit claimed under the Contract.  Plaintiff, which is experienced in domain name and IPv4 transactions, knew that representation to be false and that Plaintiff intended to later argue that the Contract required transfer of IPv4 addresses themselves.  Plaintiff and Kotler intended MNC to rely on their misrepresentations to MNC's detriment, MNC did rely on those misrepresentations to its detriment, and MNC has been damaged at least by (a) not being paid $10,000 for the Domain Name, and (b) incurring attorney fees directly caused by Plaintiff's fraud.

## FIFTH AFFIRMATIVE DEFENSE

28.     Plaintiff's claims are barred, in whole or in part, by mistake.  To the extent that the Court interprets the Contract as requiring a transfer or quit claim of IPv4 addresses themselves, at least MNC was under the mistaken belief that the Contract did not require a quit claim or transfer of IPv4 addresses, but only a quit claim of the Domain Name and any goodwill in the business connected with and symbolized by the Domain

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

Name and the associated IPv4 addresses to the extent any such rights exist. MNC's belief was reasonable, Colocation knew of MNC's mistake and intended for MNC to be mistaken, and Colocation has relied on MNC's mistake to MNC's detriment. Enforcement of the Contract would be unconscionable because MNC would be required to transfer rights in IPv4 addresses that it currently is not capable of transferring through the American Registry for Internet Numbers, and Colocation would receive a windfall by receiving IPv4 addresses that are worth hundreds of thousands of dollars when it is required to pay only $10,000 under the Contract. Colocation's fraudulent misrepresentation and concealment caused the mistake.

**SIXTH AFFIRMATIVE DEFENSE**

29. Plaintiff would be unjustly enriched if awarded the remedies it seeks.

**SEVENTH AFFIRMATIVE DEFENSE**

30. Plaintiff's claims are barred, in whole or in part, because of Plaintiff's unclean hands.

Defendant reserves the right to assert additional defenses that it learns through the course of discovery.

**COUNTERCLAIM**

1. Mitel Networks Corporation ("MNC") alleges the following for its Counterclaim against Colocation America, Inc. ("Colocation") and Corey Allen Kotler ("Kotler"), whom MNC joins as a counterdefendant under Fed. R. Civ. P. 13(h) and 20(a)(2)(A).

2. MNC is a Canadian corporation with its corporate headquarters and principal place of business in Ottawa, Ontario.

3. Colocation is a Nevada company with its principal place of business in Woodland Hills, California.

4. Kotler and his wife, Mojgan Tabibnia, are married and are California residents. At all material times, Kotler was acting on behalf of and in furtherance of the marital community.

4820-5247-2652

1

2

**Jurisdiction and Venue**

3       5.      This Court has subject matter jurisdiction over this action pursuant to 28

4   U.S.C. § 1332 because (a) there is complete diversity of citizenship, and (b) the matter in

5   controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs.  The

6   crux of the dispute is whether the Domain Name Assignment Agreement ("Contract")

7   requires MNC to quit claim rights in about 64,000 IPv4 addresses, worth at least hundreds

8   of thousands of dollars, to Colocation.

9       6.      This Court has personal jurisdiction over Colocation because Colocation has

10  consented to this Court's exercise of personal jurisdiction by filing its Complaint in

11  Arizona.

12      7.      This Court has personal jurisdiction over Kotler because he purposefully

13  availed himself of the privilege of conducting business in Arizona by contacting and

14  negotiating the Contract with MNC's representative in Arizona.  The Counts against

15  Kotler arise out of his intentional torts (e.g., fraud) directed to Arizona, including by

16  intentionally misrepresenting to and concealing facts from MNC's Arizona representative.

17  Kotler's intentional torts harmed MNC in Arizona, and exercise of jurisdiction over him

18  in Arizona is reasonable.

19      8.      Venue lies in the Phoenix Division of this Court under 28 U.S.C. § 1391.

20  This action was originally brought in the Maricopa County Superior Court in the State of

21  Arizona, and the Complaint alleges that some of the events occurred at least in part in

22  Maricopa County, Arizona.  Kotler also contacted and negotiated the Contract with

23  MNC's representative in Mesa, Arizona.

24                              **Factual Background**

25      9.      Colocation entered into a business arrangement with Kotler in or around

26  January-February 2016.

27      10.     Colocation entered into the business arrangement with Kotler before Kotler

28  contacted MNC.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

4820-5247-2652

- 7 -

11. Colocation entered into the business arrangement with Kotler before MNC signed the Contract.

12. The business arrangement between Colocation and Kotler was memorialized in a written agreement between Colocation and Kotler (the "Kotler Contract").

13. A true and correct copy of the Kotler Contract is attached hereto as Exhibit A.

14. The Kotler Contract includes the name "Corey Kotler."

15. The Kotler Contract does not include the name "Corey Allen."

16. The American Registry for Internet Numbers ("ARIN") manages and distributes Internet Protocol version 4 ("IPv4") addresses.

17. An IPv4 address is used to identify a server, computer or other device on the internet.

18. All of the approximately 4.3 billion IPv4 addresses in existence have been assigned since 2011.

19. IPv4 addresses are valuable.

20. IPv4 addresses continue to increase in value.

21. Under the Kotler Contract, Kotler was to (a) contact companies with IPv4 addresses, and (b) negotiate on behalf of Colocation to acquire the IPv4 addresses.

22. The Kotler Contract makes no mention of domain names.

23. Kotler negotiated the Contract (attached as Exhibit 1 to the Complaint) on behalf of Colocation.

24. Kotler negotiated the Contract as Colocation's agent.

25. During negotiations, Kotler represented to MNC that Kotler was negotiating on behalf of an unnamed company.

26. During negotiations, Kotler represented to MNC that an unnamed company wanted to acquire the Canadian domain name <Gandalf.ca> (the "Domain Name").

27. Before executing the Contract, Colocation believed that MNC owned the IPv4 addresses referenced in the Contract.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

28.   Albert Ahdoot ("Adhoot") identified the IPv4 addresses referenced in the Contract.

29.   ARIN does not list MNC as the owner of the IPv4 addresses referenced in the Contract.

30.   Colocation instructed Kotler to contact MNC to attempt to obtain the IPv4 addresses referenced in the Contract.

31.   Kotler has never been an employee of Colocation.

32.   Kotler is not a lawyer.

33.   Kotler is an actor who is self-described as the "tighty whitey guy," and whose "niche as an actor is the fat guy, shirtless, wearing a Speedo or tighty whities."

34.   Kotler negotiated the Contract on behalf of Colocation.

35.   Kotler revised the Contract on behalf of Colocation.

36.   During negotiations with MNC, Kotler represented to MNC that Kotler's name was "Corey Allen."

37.   During negotiations with MNC, Kotler never informed MNC that his last name was Kotler.

38.   Kotler intentionally concealed his last name, Kotler, from MNC during negotiations.

39.   Kotler intentionally concealed his full name, Corey Allen Kotler, from MNC during negotiations.

40.   Kotler intentionally concealed his full name from MNC to induce MNC to negotiate the Contract.

41.   Kotler intentionally concealed his full name from MNC to induce MNC to enter into the Contract.

42.   Kotler believed that MNC would not have negotiated the Contract with him if MNC knew his full name.

43.   Kotler believed that MNC would not have entered into the Contract if MNC knew his full name.

44.   Colocation was aware that Kotler's last name was Kotler before Kotler contacted MNC.

45.   Colocation was aware that Kotler communicated with MNC using the name "Corey Allen."

46.   Colocation was aware that Kotler was not using the name "Kotler" when communicating with MNC.

47.   During negotiations with MNC before the Contract was signed, no email that Kotler sent to MNC referenced IPv4 addresses in the body of the email.

48.   There were no discussions about transferring IPv4 addresses at any time before signing the Contract.

49.   Kotler first attempted to contact MNC on February 17, 2016, and Kotler said, "The reason I have been trying to contact you is because you have a domain that we would like to buy."  This email did not reference IPv4 addresses.

50.   On February 19, 2017, Michelle Whittington, Intellectual Property Counsel for MNC, emailed Kotler and said, "I have been asked to respond to your email request regarding the <<gandalf.ca>> domain name."   This email did not reference IPv4 addresses.

51.   During negotiations, Kotler referred to the proposed Contract in email communications as a domain name purchase.

52.   Colocation and Kotler exchanged email communications about contacting MNC.

53.   Colocation and Kotler exchanged email communications about negotiating the Contract with MNC.

54.   Kotler emailed drafts of the Contract to Colocation.

55.   Colocation emailed drafts of the Contract to Kotler.

56.   On February 24, 2016, Kotler wrote to MNC: "our company would like to purchase the domain Gandalf.ca as well as any potential intellectual properties or scenarios that may be associated at a future point in time with the name Gandalf.ca."  This

4820-5247-2652

Snell & Wilmer

L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

email did not reference IPv4 addresses.

57.     An IPv4 address is not intellectual property.

58.     An IPv4 address is not a "scenario."

59.     On February 24, 2016, Ms. Whittington provided a draft Contract to Kotler.

60.     By February 24, 2016, Colocation had not been identified as a party to the Contract.

61.     The email from Ms. Whittington that included the February 24, 2016 draft stated that the draft Contract reflected the parties' agreement.

62.     The draft Contract provided by Ms. Whittington had no reference to IPv4 addresses.

63.     In response to the draft Contract provided by MNC, Colocation, through Kotler, provided a revised draft that included a specific reference to the goodwill of business symbolized by: the Domain Name, associated IPv4 addresses, and trade dress.

64.     When the reference to IPv4 addresses was introduced after an agreement between the parties had been reached, neither Colocation nor Kotler stated that IPv4 addresses themselves were to be transferred or quit claimed under the Contract.

65.     At no time did Colocation, through Kotler or otherwise, communicate any willingness to provide consideration other than $10,000 under the Contract.

66.     On March 7, 2016, MNC signed the Contract with Colocation.

67.     The only reference to IPv4 addresses in the Contract is reproduced below:

> … Mitel hereby agrees to quit claim to INTELLECTUAL PROPERTY PURCHASER any of Mitel's right, title and interest in and to the Domain Name <Gandalf.ca> and the registration therefore, together with the goodwill of the business connected with and symbolized by such Domain Name and the associated IPv4 134.22.0.0/16 and any associated trade dress, or other intellectual property rights related thereto, to the extent any such rights exist.

68.     The Contract does not state that it assigns IPv4 addresses.

69.     The Contract does not state that it quit claims IPv4 addresses.

70.     The Contract does not define IPv4 addresses as being intellectual property rights.

71.     At the time of signing the Contract, MNC did not believe the Contract required an assignment or quit claim of IPv4 addresses.

72.     It was not MNC's intent to assign IPv4 addresses or to quit claim rights in them.

73.     MNC did not warrant or represent that it owned the IPv4 addresses referenced in the Contract.

74.     A review of the ARIN database reveals that the IPv4 addresses referenced in the Contract are not in MNC's name.

75.     On information and belief, Colocation was aware at all times that the IPv4 addresses referenced in the Contract were not in MNC's name.

76.     On information and belief, Kotler was aware at all times that the IPv4 addresses referenced in the Contract were not in MNC's name.

77.     Colocation's allegation that it would be assigned the IPv4 addresses referenced in the Contract was first communicated after the Contract was executed.

78.     The warranty section of the Contract has no reference to IPv4 addresses.

79.     Goodwill in a domain name does not include an assignment or quit claim of IPv4 addresses.

80.     After the Contract was signed, Colocation took the position that the Contract assigned to it ownership of the IPv4 addresses referenced in the Contract.

81.     The Contract's consideration of $10,000 is a fair price for the Domain Name.

82.     The IPv4 addresses referenced in the Contract are worth approximately $500,000-$1,000,000, or more.

83.     Before the Contract was signed, Colocation and Kotler concealed from MNC that Colocation wanted to obtain the IPv4 addresses referenced in the Contract.

84.     Before the Contract was signed, Kotler knew that the IPv4 addresses

Snell & Wilmer

L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

1    referenced in the Contract were valuable.

2        85.    Before the Contract was signed, Kotler knew that the IPv4 addresses

3    referenced in the Contract were worth more than $10,000.

4        86.    Before the Contract was signed, Colocation knew that the IPv4 addresses

5    referenced in the Contract were valuable.

6        87.    Before the Contract was signed, Colocation knew that the IPv4 addresses

7    referenced in the Contract were worth more than $10,000.

8                    **Kotler's Company – Dividend  Advisors L.L.C. ("Dividend")**

9        88.    Kotler formed a Delaware entity called Dividend Advisors, L.L.C. before

10    working for Colocation.

11        89.    Kotler formed Dividend at the suggestion of Adhoot.

12        90.    Adhoot provided Kotler with the name of a person in Delaware to help

13    Kotler form Dividend.

14        91.    Dividend is no longer a valid legal entity.

15        92.    Dividend never filed any tax returns.

16        93.    On information and belief, Dividend did not have a bank account separate

17    from Kotler.

18        94.    Kotler was paid directly by Colocation for his work, including for his

19    negotiations with MNC.

20        95.    When it existed, Dividend was the alter ego of Kotler.

21        96.    On information and belief, neither Kotler nor Dividend is or was a

22    registered investment advisor.

23                                **Escrow.com Transactions**

24        97.    Colocation initiated three transactions related to the Contract through

25    Escrow.com after the Contract was executed.

26        98.    MNC initiated three transactions related to the Contract through

27    Escrow.com after the Contract was executed.

28        99.    All of the transactions referenced in the preceding two paragraphs stated in

Snell & Wilmer

L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

the "Description" field that they were for a domain name transfer or a domain name assignment.

100.   None of the transactions referenced in paragraphs 97-98 stated in the "Description" field that they were for a transfer of rights in IPv4 addresses.

101.   In March 2016, there was no reference in the Escrow.com General Escrow Instructions related to the Contract that referred to IPv4 transfers.

102.   Kotler had no role in dealing with Escrow.com.

### Further Communications on or After March 28, 2016

103.   On March 28, 2016, Samantha Walters, VP of Online Strategies for Colocation, wrote to Ms. Whittington in an email advising that $10,000 had been placed in escrow at Escrow.com, and provided the transaction number.

104.   On March 28, 2016, in the same email referenced in the preceding paragraph, Ms. Walters stated that "our next step is to transfer the IP range from Mitel to Colocation…"

105.   On March 28, 2016, Ms. Whittington replied to Ms. Walter's email, referenced in the preceding two paragraphs, advising Ms. Walters that there appeared to have been a miscommunication between the parties that would need to be resolved.

106.   On April 11, 2016, Ms. Whittington wrote another email to Ms. Walters stating that MNC had agreed only to the transfer of "the domain name and all goodwill associated thereof [sic.]"

### Additional Factual Allegations

107.   The Domain Name has not been transferred from MNC to Colocation and no monies have been exchanged between Colocation and MNC.

108.   Colocation served its Initial Disclosure on May 15, 2017, which listed "Corey Allen" of "Dividend Advisors" as a person with knowledge who could be contacted through Colocation's Arizona counsel of record in this action.

109.   Before serving the Initial Disclosure, Colocation knew "Corey Allen" was not the full legal name of the person who negotiated the Contract with MNC.

110.   Before serving the Initial Disclosure, Colocation's lawyers knew "Corey Allen" was not the full legal name of the person who negotiated the Contract with MNC.

111.   Before serving the Initial Disclosure, Colocation knew the person who negotiated the Contract with MNC was Kotler.

112.   Before serving the Initial Disclosure, Colocation's lawyers knew its agent who negotiated the Contract with MNC was Kotler.

113.   Before serving the Initial Disclosure, Colocation knew "Corey Allen" was not Kotler's stage name.

114.   Before serving the Initial Disclosure, Colocation's lawyers knew "Corey Allen" was not Kotler's stage name.

115.   Before serving the Initial Disclosure, Colocation knew that Kotler's address was not 433 North Camden Drive, Suite 970, Beverly Hills, California 90210.

116.   Before serving the Initial Disclosure, Colocation's lawyers knew that Kotler's address was not 433 North Camden Drive, Suite 970, Beverly Hills, California 90210.

117.   Before serving the Initial Disclosure, Colocation knew that Dividend was no longer an existing legal entity.

118.   Before serving the Initial Disclosure, Colocation's lawyers knew that Dividend was no longer an existing legal entity.

119.   Colocation's Amended and Restated Initial Disclosure was served on May 18, 2017, and disclosed the following address for "Corey Allen" and Dividend Advisors": 433 North Camden Drive, Suite 970, Beverly Hills, California 90210.

120.   Before serving the Amended and Restated Initial Disclosure, Colocation knew "Corey Allen" was not the full legal name of the person who negotiated the Contract with MNC.

121.   Before serving the Amended and Restated Initial Disclosure, Colocation's lawyers knew "Corey Allen" was not the full legal name of the person who negotiated the Contract with MNC.

Snell & Wilmer

L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

122.   Before serving the Amended and Restated Initial Disclosure, Colocation knew that the person who negotiated the Contract with MNC was Kotler.

123.   Before serving the Amended and Restated Initial Disclosure, Colocation's lawyers knew that the person who negotiated the Contract with MNC was Kotler.

124.   Before serving the Amended and Restated Initial Disclosure, Colocation knew that "Corey Allen" was not Kotler's stage name.

125.   Before serving the Amended and Restated Initial Disclosure, Colocation's lawyers knew that "Corey Allen" was not Kotler's stage name.

126.   Before serving the Amended and Restated Initial Disclosure, Colocation knew that Kotler's address was not 433 North Camden Drive, Suite 970, Beverly Hills, California 90210.

127.   Before serving the Amended and Restated Initial Disclosure, Colocation's lawyers knew Kotler's address was not 433 North Camden Drive, Suite 970, Beverly Hills, California 90210.

128.   Before serving the Amended and Restated Initial Disclosure, Colocation knew that Dividend was no longer an existing legal entity.

129.   Before serving the Amended and Restated Initial Disclosure, Colocation's lawyers knew that Dividend was no longer an existing legal entity.

130.   Colocation's interrogatory responses identify "Corey Allen" as a person it expects to call at trial.

131.   Colocation's interrogatory responses do not identify Corey Kotler.

132.   Colocation's interrogatory responses do not include the name Kotler.

133.   Paul Sigelman, an attorney for Colocation, maintains an office at 433 North Camden Drive, Suite 970, Beverly Hills, California 90210.

134.   Sigelman has never represented Kotler as an attorney.

135.   Kotler's emails to MNC included the address of 433 North Camden Drive, Suite 970, Beverly Hills, California 90210.

136.   On June 15, 2017, a process server for MNC attempted to serve subpoenas

Snell & Wilmer

L.L.P.

LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

on "Corey Allen" and Dividend at 433 North Camden Drive, Suite 970, Beverly Hills, California 90210.

137.  On June 15, 2017, the process server took the subpoenas to 433 North Camden Drive, Suite 970, Beverly Hills California 90210, and a man identifying himself as "Rick" took the subpoenas.

138.  The man who identified himself as "Rick" in the preceding paragraph was Sigelman.

139.  Sigelman never contacted MNC about the subpoenas to "Corey Allen" and Dividend.

140.  On June 15, 2017, the process server noted that "Corey Allen" and Dividend were not listed on the door to Suite 970 as having an office there.

141.  "Corey Allen" and Dividend are not listed on the door to Suite 970 at 433 North Camden Drive, Suite 970, Beverly Hills California 90210.

142.  MGM Management Company ("MGM") manages the leases for Suite 970 of the building at 433 North Camden Drive, Beverly Hills, California 90210.

143.  On July 19, 2017, MNC served a subpoena on MGM.

144.  MGM stated that it had never heard of "Corey Allen" or Dividend.

145.  MGM confirmed that, according to its leasing records, "Corey Allen" and Dividend have never been tenants in Suite 970 of the building at 433 North Camden Drive.

146.  Kotler is listed as the registrant of the <dividendadvisors.com> domain name, with an email address coreykotler18k@aol.com, and a physical address 2385 Roscomore Road, Unit E11, Los Angeles, California 90077.

147.  Kotler is listed as the registrant of the <coreyallenkotler.com> domain name, with the same email address coreykotler18k@aol.com and the same physical address at 2385 Roscomore Road.

148.  Colocation provided none of the information in the preceding two paragraphs to MNC.

149. On July 25, 2017, MNC had Kotler served with subpoenas at 2385 Roscomore Road, Unit E11.

150. On July 25, 2017, the process server attempted to hand the subpoenas to Kotler, but Kotler refused to take them.

151. Kotler denied to the process server that his name was Corey Kotler.

152. The process server placed the subpoenas under the door of Unit E11, where Kotler lives.

153. Several days later, Sigelman contacted MNC about Kotler's compliance with the subpoenas.

154. Sigelman never informed MNC of "Corey Allen's" full name until after MNC served Kotler.

155. Neither Colocation nor any of its attorneys informed MNC of Kotler's full name until after Kotler was served.

156. Had MNC known it was negotiating a contract with an actor using a false name, it would neither have negotiated with Kotler nor entered into the Contract.

## COUNT ONE
### Breach of Contract by Colocation and Specific Performance

157. The Contract is an agreement for Colocation to pay MNC $10,000 for (a) the Domain Name, and (b) the goodwill of the business connected with and symbolized by the Domain Name and the associated IPv4 addresses and any associated trade dress, or other intellectual property rights relating thereto, to the extent any such rights exist.

158. The Contract does not require an assignment or quit claim of IPv4 addresses.

159. MNC substantially performed under the Contract.

160. MNC has not yet transferred the Domain Name to Colocation because Colocation has not yet requested transfer of the Domain Name.

161. Colocation has taken the position that MNC must transfer IPv4 addresses before transferring the Domain Name.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

162. MNC has not received $10,000 from Colocation.

163. Colocation's contention that MNC is required to transfer IPv4 addresses to Colocation is an anticipatory breach of the Contract.

164. Colocation's failure to pay MNC $10,000 for the Domain Name and associated goodwill (if any) is a breach of the Contract.

165. MNC has been harmed by Colocation's breach in the amount of $10,000, plus costs, attorney fees, and interest accruing since Colocation's breach.

166. MNC is entitled to a payment from Colocation of $10,000 for the Domain Name and associated goodwill (if any).

167. MNC is entitled to an award of costs and attorney fees, including under A.R.S. §§ 12-341 and 12-341.01(A), and interest accruing since Colocation's breach.

## COUNT TWO (In the Alternative)
### Rescission or Avoidance of the Contract

168. MNC incorporates by reference the prior paragraphs of this Counterclaim as if fully set forth herein.

169. There was no meeting of the minds with respect to the subject matter of the Contract.

170. MNC had no reason to know that Colocation believed the Contract required a transfer or quit claim of the IPv4 addresses.

171. Colocation took the position immediately after the Contract was signed that the Contract does require a transfer or quit claim of the IPv4 addresses.

172. That the Contract did not require a transfer or quit claim of the IPv4 addresses is an essential term of the Contract.

173. Accordingly, the Contract is void, and MNC is entitled to rescind the Contract, because there was no meeting of the minds and therefore no contract was formed.

174. Alternatively, the Contract is void due to uncertainty, mistake, or fraud, as alleged herein, and MNC is entitled to rescind the Contract.

175.    To the extent that the Court interprets the Contract as requiring a transfer or quit claim of IPv4 addresses themselves, at least MNC was under the mistaken belief that the Contract did not require transfer of IPv4 addresses, but only a quit claim of any goodwill that MNC may or may not have had in such addresses associated with the domain name <Gandalf.ca>.

176.    MNC's belief was reasonable, Colocation knew of MNC's mistake and intended for MNC to be mistaken, and Colocation has relied on MNC's mistake to MNC's detriment.

177.    Enforcement of the Contract would be unconscionable because MNC would be required to transfer rights in IPv4 address that it currently is not capable of transferring through ARIN and Colocation would receive a windfall by receiving IPv4 addresses that are worth hundreds of thousands of dollars when it is required to pay only $10,000 under the Contract.

178.    Colocation's fraudulent misrepresentation and concealment caused the mistake.

### COUNT THREE
### Fraud: Intentional Misrepresentation and Concealment
### (against Colocation and Kotler)

179.    MNC incorporates by reference the prior paragraphs of this Counterclaim as if fully set forth herein.

180.    Kotler intentionally concealed information from MNC during negotiation of the Contract.

181.    Kotler intentionally misrepresented information to MNC during negotiation of the Contract.

182.    Colocation instructed Kotler to contact MNC.

183.    Kotler was Colocation's agent during the Contract negotiation.

184.    Kotler was Colocation's agent when the Contract was executed.

185.    Kotler had authority from Colocation to negotiate the Contract with MNC.

186.   Kotler is liable for misrepresentations he made to MNC.

187.   Kotler is liable for concealing information from MNC.

188.   Before the Contract was signed, Kotler knew MNC expected to only transfer the <Gandalf.ca> domain name and not any IPv4 addresses.

189.   Colocation intended to take the position, after the Contract was executed, that the Contract assigned rights to IPv4 addresses to Colocation.

190.   Kotler and Colocation intentionally concealed and/or misrepresented the information in the preceding paragraph from MNC.

191.   On information and belief, Colocation instructed Kotler to mislead MNC about Colocation's intent when negotiating the Contract.

192.   During the Contract negotiation, Kotler never used his last name "Kotler."

193.   During the Contract negotiation, MNC did not know that "Corey Allen" was not the name of the person with whom it was dealing.

194.   During the Contract negotiation, MNC did not know that Kotler was misrepresenting his identity.

195.   During the Contract negotiation, MNC did not know that Kotler was concealing his identity.

196.   During the Contract negotiation, MNC did not know that Kotler was an actor.

197.   Kotler misrepresented to MNC that Kotler was a registered investment advisor.

198.   Kotler knew that he was not a registered investment advisor.

199.   Through his misrepresentations and concealment, Kotler intended to deceive MNC and induce it to negotiate with him.

200.   Through his misrepresentations and concealment, Kotler intended to deceive MNC and induce it to enter into the Contract.

201.   Kotler's misrepresentations and concealment were material, in that MNC would not have negotiated the Contract had it known the truth of Kotler's

4820-5247-2652

misrepresentations or of the information he concealed.

202.   Kotler's misrepresentations and concealment were material, in that MNC would not have entered into the Contract had it known the truth of Kotler's misrepresentations or of the information he concealed.

203.   Kotler's concealment of his true identity was material because Kotler was negotiating on behalf of a yet-unnamed company.

204.   Kotler's concealment of his true identity was material because had MNC known that it was negotiating with a person whose full name was being concealed, MNC would not have negotiated with him.

205.   Kotler's concealment of his true identity was material because had MNC known that it was negotiating with a person whose full name was being concealed, MNC would not have entered into the Contract.

206.   Kotler's concealment of his true identity was material because MNC would not negotiate with an actor with no experience in the Contract's subject matter, on behalf of a company whose identity MNC did not know.  Nor would MNC have executed such a contract.

207.   Kotler   and   Colocation   intended   that   MNC   act   on   Kotler's misrepresentations and concealment.

208.   MNC acted on Kotler's misrepresentations and concealment and negotiated and executed the Contract.

209.   MNC reasonably relied on Kotler's misrepresentations.

210.   MNC's reasonable reliance is supported by the Contract purchase price, which was a fair price for the domain name <Gandalf.ca>, but is not a fair price for rights to the IPv4 addresses referenced in the Contract.

211.   MNC's reasonable reliance is supported by the fact that ARIN does not list MNC as the owner of the IPv4 addresses referenced in the Contract (although MNC may have unperfected rights) and cannot currently transfer them.

212.   MNC has been injured by Kotler's misrepresentations and concealment in

4820-5247-2652

the amount of the Contract purchase price of $10,000.

213.   MNC may suffer further injury if MNC is required to assign or quit claim rights to the block of IPv4 addresses referenced in the Contract to Colocation, to the extent MNC has any rights, in which case MNC's damages could potentially be in the hundreds of thousands of dollars.

214.   Through his misrepresentations and concealment, Kotler fraudulently induced MNC to enter into the Contract.

215.   Because Kotler was Colocation's agent, Kotler and Colocation are jointly and severally liable for Kotler's misrepresentations and concealment.

216.   Because Kotler was Colocation's agent, MNC is entitled to rescind the Contract, and MNC seeks that relief from the Court.

217.   Because no money has been paid and the Domain Name has not been transferred, the Court need do nothing to restore the parties to the positions they held before the Contract was signed other than declaring the Contract void and awarding MNC its attorneys' fees.  To the extent MNC is required to tender anything, MNC is willing and prepared to tender.

218.   Kotler committed his aggravated and outrageous actions fraudulently and maliciously and in conscious disregard of MNC's rights, with evil mind, and with intent to injure MNC, and Kotler is liable for punitive damages.

219.   Colocation, as Kotler's principal, is jointly liable for punitive damages based on Kotler's conduct.

## COUNT FOUR
### Civil Conspiracy
### (against Colocation and Kotler)

220.   MNC incorporates by reference the prior paragraphs of this Counterclaim as if fully set forth herein.

221.   On information and belief, Colocation agreed with Kotler to fraudulently induce MNC to enter into the Contract by intentionally concealing and misrepresenting

information, as discussed above.

222.    On information and belief, Colocation agreed with Kotler to accomplish the unlawful purpose of depriving MNC of any rights to the IPv4 addresses referenced in the Contract through fraud and deceit.

223.    The Kotler Contract evidences Colocation's and Kotler's pre-Contract intent to attempt to acquire IPv4 addresses from MNC.

224.    Kotler never told MNC before the Contract was executed that Colocation wanted to acquire IPv4 addresses.

225.    Kotler attempted to acquire rights to IPv4 addresses from MNC through fraud and deceit, which were unlawful means.

226.    Kotler's and Colocation's conspiracy has directly and proximately caused harm and economic damages to MNC.

227.    Kotler and Colocation are liable to MNC for the harm and damages referenced in the preceding paragraph.

228.    Colocation, as the principal, is jointly liable for the harm and damages caused by its agent Kotler.

229.    Kotler and Colocation committed the aggravated and outrageous actions fraudulently and maliciously and in conscious disregard of MNC's rights, with evil mind, and with intent to injure MNC.

230.    Kotler and Colocation are liable to MNC for punitive damages.

231.    Colocation, as the principal, is liable for punitive damages based on Kotler's conduct.

## COUNT FIVE
### Aiding and Abetting
### (against Colocation)

232.    MNC incorporates by reference the prior paragraphs of this Counterclaim as if fully set forth herein.

233.    Kotler committed the torts alleged above.

234.   On information and belief, Colocation knew that Kotler was committing the alleged torts against MNC, including fraud, intentional misrepresentation, and fraudulent concealment.

235.   Colocation was aware of Kotler's duty to provide true and accurate information to MNC during negotiation of the Contract.

236.   On information and belief, Colocation substantially assisted or encouraged Kotler in committing the alleged torts and breaching his duty to MNC.

237.   Colocation's aiding and abetting has directly and proximately caused harm and economic damages to MNC.

238.   Colocation committed these aggravated and outrageous actions fraudulently and maliciously and in conscious disregard of MNC's rights, with evil mind, and with intent to injure MNC, and Colocation is thus liable for punitive damages.

## DEMAND FOR JURY TRIAL

MNC demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, MNC prays for the following relief:

1.   That Colocation's Complaint be dismissed with prejudice, and that judgment be entered in favor of MNC and against Colocation and Kotler.

2.   That the Court enter judgment on MNC's Counterclaim in favor of MNC and against Colocation and Kotler.

3.   That MNC be awarded damages for Colocation's breach of contract, and that Colocation be ordered to pay MNC $10,000 for the Domain Name and associated goodwill, but not the IPv4 addresses.

4.   Alternatively, a declaration that the Contract is void or rescinded.

5.   That MNC be awarded damages for Colocation's and Kotler's tortious actions.

6.   That MNC be awarded punitive damages for Colocation's and Kotler's tortious actions.

4820-5247-2652

1   7.   That Colocation be judged to be jointly liable for damages and punitive

2   damages caused by Kotler.

3   8.   That MNC recover its costs and attorney fees, including under A.R.S. §§ 12-

4   341 and 12-341.01(A), and pre- and post-judgment interest.

5   9.   That MNC be granted any further relief to which it is entitled, even if it has

6   not been demanded by MNC in its pleadings, in accordance with Rule 54(c) of the Federal

7   Rules of Civil Procedure.

8

9   DATED this 2nd day of November, 2017.

10   SNELL & WILMER L.L.P.

11

12   By:  s/ Jacob C. Jones

David E. Rogers (#19274)
David G. Barker (#024657)
Jacob C. Jones (#029971)
One Arizona Center
400 E. Van Buren, Suite 1900
Phoenix, Arizona  85004-2202
Telephone: 602.382.6000
Facsimile: 602.382.6070

Attorneys for Defendant
Mitel Networks Corporation

4820-5247-2652

**Certificate of Service**

I hereby certify that on November 2, 2017, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the CM/ECF registrants on record to:

Teresa H. Foster
Brier, Irish, Hubbard & Erhart, P.L.C.
2400 East Arizona Biltmore Circle
Suite 1300
Phoenix, AZ 85016
ctfiling@thfosterlaw.com

Paul Stephen Sigelman
Sigelman Law Corporation
433 N Camden Dr., Suite 970
Beverly Hills, CA 90210
paul@sigelmanlaw.com

Attorneys for Plaintiff

*s/ Jacob C. Jones*

4820-5247-2652