1          **UNITED STATES DISTRICT COURT**

2          **FOR THE DISTRICT OF ARIZONA**

3                  _____

4

**Colocation America**                )
5  **Incorporated,**                       )
                                    )   No. **CV 17-0421-PHX-NVW**
6              Plaintiff,            )
                                    )
7          vs.                       )   Phoenix, Arizona
                                    )   November 1, 2017
8  **Mitel Networks Corporation,**     )   10:40 a.m.
                                    )
9              Defendant.            )
_____ )

10

          **BEFORE:   THE HONORABLE NEIL V. WAKE, JUDGE**

11

          **REPORTER'S TRANSCRIPT OF PROCEEDINGS**

12

                  (*Motion Hearing*)

13

**APPEARANCES:**
14  For the Plaintiff:
          TERESA H. FOSTER PLLC
15          By:  **Teresa H. Foster, Esq.**
          2400 East Arizona Biltmore Circle
16          Suite 1300
          Phoenix, Arizona 85016

17

For the Defendant:
18          SNELL & WILMER LLP
          By:  **David G. Barker, Esq.**
19          By:  **Jacob C. Jones, Esq.**
          One Arizona Center
20          400 East Van Buren Street, Suite 1900
          Phoenix, Arizona 85004

21

Official Court Reporter:
22  Laurie A. Adams, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
23  401 West Washington Street, Spc 43
Phoenix, Arizona 85003-2151
24  (602) 322-7256
Proceedings Reported by Stenographic Court Reporter
25  Transcript Prepared by Computer-Aided Transcription

P R O C E E D I N G S

THE COURTROOM DEPUTY:  This is matter Number CV 17-421, Colocation America, Incorporated, versus Mitel Networks Corporation, before the Court for oral argument.

Will the parties please announce for the record.

MS. FOSTER:  Yes.  Teresa Foster here on behalf of the plaintiff, Colocation.

MR. BARKER:  Good morning, Your Honor.  David Barker and Jacob Jones of Snell & Wilmer for the defendant and counterclaimant Mitel Networks Corporation.

THE COURT:  All right.  Good morning, counsel.

I want us to deal quickly with this motion to extend the schedule.  As I indicated in the deposition discussion we had last week, I don't just extend discovery schedules because somebody doesn't comply with the schedule.  I sanction people for that.  So that's not a universal statement, but it's a beginning point of analysis.  So that's why I thought I should get you in here to discuss this.

First, there's three pending motions.  I'm wondering if we can resolve one easily, and that is the plaintiff's motion to substitute parties, Document 42.  Is this going to be opposed?

MR. BARKER:  Your Honor, I believe our deadline to oppose it is November 9th.  And, frankly, I have not looked at the law yet on that motion.  I can't say that I have permission

10:40AM

10:41AM

10:41AM

10:41AM

10:42AM

1    from the client to --

2        THE COURT:  I just thought -- I didn't really think it

3    through.  I just thought it might be cut and dried.  So you can

4    file your response in due time.

5        MR. BARKER:  Thank you, Your Honor.                    10:42AM

6        THE COURT:  With respect to the motion to extend,

7    Document Number 40, in reviewing everything for this today, it

8    occurs to me that in practical terms, I mean, it's not the end

9    of the discussion, but in practical terms, that motion may

10   cease to matter depending on how I rule on the defendant's    10:43AM

11   motion to amend the schedule and to file an amended pleading,

12   Document Number 35.

13       Does anybody disagree with that initial practical

14   observation?

15       MR. BARKER:  I think if Your Honor is saying that if    10:43AM

16   you deny the motion to amend --

17       THE COURT:  Well, actually, no, if I grant the motion

18   to amend.

19       MR. BARKER:  I think we would need these additional

20   two depositions regardless.                                 10:43AM

21       THE COURT:  Well, if I grant a motion to amend, it

22   necessarily requires redoing the schedule.

23       MR. BARKER:  Understood, Your Honor.

24       THE COURT:  So it may make it not necessary to think

25   through the justification or lack of justification and all the  10:43AM

 1    details you present about the alleged misrepresentation about

 2    corporate officers and who to depose and all that.  It just may

 3    not matter, because if I'm going to allow an amended pleading

 4    you will end up doing that anyway plus whatever relates to the

 5    new allegations, which could be pretty substantial.            10:44AM

 6            MR. BARKER:  I believe that's correct, Your Honor.  I

 7    would still like to move the case on as quickly as we can.

 8            THE COURT:  So would I.

 9            MR. BARKER:  I understand.

10            THE COURT:  Ms. Foster, again, what's your response?   10:44AM

11            MS. FOSTER:  I agree with you, Your Honor.

12            THE COURT:  Okay.  Now, I was concerned on Document

13    Number 40, which is, I guess, replayed in your recently filed

14    notice of discovery dispute, Number 45.

15            MR. BARKER:  Your Honor, may I speak to that discovery  10:44AM

16    dispute?

17            THE COURT:  Yes.

18            MR. BARKER:  That's to preserve it in case you deny

19    the motion to extend.  I don't believe we need to address those

20    issues today.  We are still working on them, and I believe your 10:45AM

21    order on the motion to amend and the motion to extend will help

22    us resolve that dispute between the parties.

23            THE COURT:  Well, on the motion to extend, it really

24    -- on the one hand, the defendants are entitled to get that

25    discovery unless the plaintiffs get sanctioned for failure to,  10:45AM

1    in good faith, give discovery that made this delay necessary.

2            MR. BARKER:  Thank you, Your Honor.

3            THE COURT:  But I don't have to go into that

4    unpleasantness if I otherwise decide to allow the amended

5    pleading.                                                    10:45AM

6            MR. BARKER:  And the only point I will add there, Your

7    Honor, and it's relief that we think the Court could grant

8    today as well, but we're going to need to add Albert Ahdoot as

9    a party based on the alter ego issues that have come out in the

10   case.  And we could do that as a motion to join as another     10:46AM

11   amended pleading and would appreciate the Court's guidance on

12   how you would like us to approach that.

13           THE COURT:  Now, your original motion for amended

14   pleading, Document 35, that's where you wanted to sue Mr.

15   Allen, slash, Kotler, correct?                               10:46AM

16           MR. BARKER:  And add additional allegations for fraud,

17   fraud in the inducement, concealment, conspiracy, and aiding

18   and abetting as respect to Colocation and Mr. Kotler.  We did

19   not have at the time sufficient basis, we thought, to name Mr.

20   Ahdoot personally.  But we believe we have that now following  10:46AM

21   his deposition.

22           THE COURT:  Right now, I don't have a motion to amend

23   to sue him, but you are telling me that's what you want to do.

24           MR. BARKER:  And we would like your guidance on how

25   you would like us to approach that given that you are still    10:47AM

considering our initial motion to amend.

THE COURT:  Well, that motion is fully briefed, so perhaps it's more practical for us to discuss that.  Because as I said, if that's granted we're going to have to redo the schedule anyway, and you are going to get to do the discovery you want and it just moots the question of whether to extend the schedule for that second reason if we have to extend it more broadly.

MR. BARKER:  That's correct, Your Honor.

THE COURT:  So maybe I should think about that first, which means it is not exactly what I asked for this emergency hearing on, because I wanted to deal quickly with your later motion to extend.

MR. BARKER:  We appreciate that and are prepared to address the motion to amend.

THE COURT:  Well, let's do that then.  And I guess that's your motion, so why don't you come up to the podium.  The microphone is better there.  And the -- I guess there's two dimensions to this:  One is whether there's justification for erasing the slate, and I understand your argument about this.  This comes up with information you didn't get earlier.

But the plaintiff also challenges whether you can state a claim for some of that.  So I will hear that.

MR. BARKER:  Well, and, Your Honor, I have here -- and I have copy for the Court and for counsel -- a timeline of the

10:47AM

10:47AM

10:48AM

10:48AM

10:48AM

1    issues.  And I don't know that it's going to come up.  But may

2    I approach?

3            THE COURT:  You may.

4            Well, may real live transcript is not working but I'm

5    man enough to do it the old way.                              10:49AM

6            MR. BARKER:  Thank you, Your Honor.  I will speak

7    slowly.  Please ask me if you need me to repeat anything.

8            I have handed you a summary of the discovery timeline

9    in this case showing the compressed schedule we have dealt with

10   and Mitel's diligence throughout.                            10:49AM

11           When I read Colocation's opposition to our motion to

12   amend, they want to argue the merits of the case and they are

13   arguing that it's then futile for the Court to allow the --

14           THE COURT:  Well, that only works if, A, failure to

15   state a claim, or because this does come very late in the case,  10:49AM

16   maybe a motion to amend really doesn't look to that.  But it

17   maybe interplays with your diligence and promptness in

18   discovering this, becoming aware and moving on.

19           MR. BARKER:  We received Colocation's initial and then

20   amended initial disclosures in May of this year.  In those    10:50AM

21   disclosures, they listed a person named Corey Allen.  Corey

22   Allen, who as MNC understood it at the time, was Colocation's

23   agent in negotiating the contract at issue.  As you will see,

24   we issued subpoenas to Corey Allen and his company, Dividend

25   Advisors, on June 15th at the address listed in the Disclosure  10:50AM

1    Statement; found that that address was Paul Sigelman's office.

2    Paul Sigelman is Colocation's counsel.  And there was no person

3    named Corey Allen there, nor was his company Dividend Advisors

4    there.  We then issued additional subpoenas to building

5    management companies, other entities that appeared to be                    10:51AM

6    connected with Dividend Advisors to try to find out where this

7    company was.  And in the meantime while we were doing that,

8    through our own investigation, we discovered another person

9    named Corey Allen Kotler, which we have raised in our motion to

10   amend who is, in fact, as we now know it, an actor who had no              10:51AM

11   experience negotiating these contracts.  And this was a

12   surprise to us, and so we subpoenaed Mr. Kotler on July 25th

13   for a deposition that occurred on September 17th.

14        Our motion to amend, Your Honor, was filed on

15   September 21st, four days after that deposition.  We have acted            10:51AM

16   with diligence within the scope of discovery here, and we did

17   not know until that deposition, until we discovered that

18   Colocation had lied to us about who the agent was; that they

19   knew who he was before the contract was signed.  They knew who

20   he was when they served --                                                10:52AM

21        THE COURT:  How does it matter who the agent was?

22        MR. BARKER:  He's an actor who does underwear acting.

23   Had our client known this was the person they were negotiating

24   with -- now, remember, they didn't know Colocation.  This was a

25   blind transaction which is common for domain name purchases.              10:52AM

1   If you know the party buying it, the person selling it is

2   likely to bump up the price if they are a large company.  So

3   the fact of itself that an agent or a broker, as he called it,

4   was negotiating was not unexpected.  But had we known that not

5   only did we not know the name of this person but that he was          10:52AM

6   concealing who he really was, we would not have entered it.

7           And, Your Honor, this was attached to the filing, the

8   reply we submitted.

9           THE COURT:  When you said he was the agent, what does

10   that mean?  Does that mean he's really the principal?                10:52AM

11          MR. BARKER:  No, he's the agent.  So Colocation wanted

12   to buy the domain name at issue.  It worked through Paul

13   Sigelman to find Corey Allen Kotler, and Colocation asked

14   Kotler to reach out to my client, Mitel.

15          THE COURT:  As an agent.                                      10:53AM

16          MR. BARKER:  As an agent, Colocation being the

17   principal.

18          And Your Honor, when we deposed --

19          THE COURT:  Actually, again, I'm not asking you to

20   speculate, so don't.  But why do you think they approached him       10:53AM

21   to be the conduit for this overture?

22          MR. BARKER:  Why I think?

23          THE COURT:  Or --

24          MR. BARKER:  My assumption, what I understand from the

25   testimony, they needed somebody who could pull one over on          10:53AM

1    Mitel.  Because as we know it now, they claim that not only did

2    Mitel assign the domain name, which has some value, $10,000 is

3    what we agreed to sell it for, but now they are also claiming

4    we somehow agreed to give them these IPv4 addresses that are

5    probably worth over a million dollars for a $10,000 amount.          10:53AM

6    They needed an actor who could pull one over on our client.

7            THE COURT:  Pull what over?

8            MR. BARKER:  Convince them to sign a document that

9    they were then going to claim, that Colocation was then going

10   to claim assigned not only the domain name but the IPv4           10:54AM

11   address.  I have an e-mail here that illustrates this.

12           THE COURT:  I have read that.  I really want to avoid

13   getting into the deep merits of this.  But what you sold them

14   was not just a domain name.  You also sold the good will.

15           MR. BARKER:  Right.  Correct.                              10:54AM

16           THE COURT:  And intellectual property associated with

17   it.  You keep saying this is just a sale of the domain name.

18   It's not that.  So let's not -- don't distract me with that

19   false assertion anymore.

20           MR. BARKER:  Your Honor, and good will is a common        10:54AM

21   thing that goes along with trademark domain name assignments

22   and IP assignments.  IPv4 addresses are not good will.  They

23   are not intellectual property.  They are none of that.

24           THE COURT:  Let me jump ahead of the story.  This sure

25   looks like a case for parol evidence as to what those words      10:55AM

1  mean.  In any event, that's not before us today either, so

2  let's get back to the amendment.

3       MR. BARKER:  The fraud in the inducement allows us to

4  rescind the contract and be done with it.  That's what we now

5  know after we deposed Mr. Kotler.                           10:55AM

6       THE COURT:  What was the fraud in the inducement?

7       MR. BARKER:  He concealed that he was not using his

8  real name.  He concealed who he was.  And this was the only

9  person we were negotiating with.

10      THE COURT:  He disclosed that he was an agent.        10:55AM

11      MR. BARKER:  An agent of an unknown company.

12      THE COURT:  Well, there's an agent for a named

13 company, right?

14      MR. BARKER:  No.  We did not know the name of the

15 company.                                                    10:55AM

16      THE COURT:  Okay.  I didn't catch that in reading your

17 papers.

18      MR. BARKER:  And so we didn't know the name of the

19 company, and we now know we didn't even know the person we were

20 negotiating with.  And Mitel would not have entered the        10:55AM

21 contract had it known who Mr. Kotler was.  It was a material

22 concealment.

23      THE COURT:  Of course, they didn't know anything about

24 who he was, right?

25      MR. BARKER:  They knew the name he gave them and they   10:55AM

1    investigated that.

2         THE COURT:  But they didn't know if he was an

3    underwear model or a billionaire.  They didn't know and they

4    didn't care.  Right?

5         MR. BARKER:  They would have cared.  And Kotler agreed          10:56AM

6    at his deposition.  He said I used the fake name because I

7    didn't want them to Google me and find out who I was because

8    they wouldn't do business with me.  That is true.  We would

9    not have.  Fraud in the inducement voids this.

10        And the problem is, Your Honor, Mr. Sigelman and          10:56AM

11   Albert Ahdoot, the only real person associated with Colocation,

12   knew this.  And this was their plan before the contract was

13   signed in an e-mail that Colocation did not produce to us in

14   this litigation that we just found when we were looking through

15   a pile of documents that Mr. Kotler brought with him to his          10:56AM

16   deposition.

17        THE COURT:  Well, there's -- I think plaintiff does

18   have a point here.  I'm not sure how far it goes.  But this

19   issue about whether do you call it the misrepresentation or

20   concealment of the true identity of the, quote, buyer, it's          10:57AM

21   hard to see how that relates to the core dispute about the

22   meaning of the contract, the contract language, which I suspect

23   without ruling is going to delve into parol evidence.

24        MR. BARKER:  Of which we'll prove our side of the case

25   as well.  But, Your Honor, if there's fraud in the inducement          10:57AM

```
 1   there's no contract.  We don't even have to get into what it

 2   means.

 3           THE COURT:  Well, that comes back to whether the,

 4   quote, fraud, is material.

 5           Anyway, I'm not resolving that, because for purposes      10:57AM

 6   of amendment, I don't have to resolve that if it's, you know,

 7   if it states a claim.

 8           MR. BARKER:  Which we do, I submit, Your Honor.  If

 9   you are talking about a summary judgment question, I agree

10   that's a different story.  But we have certainly stated a claim   10:57AM

11   for fraud and concealment and the materiality of both.

12           THE COURT:  All right.  So now that was Mr. -- what

13   shall we call him, Mr. Kotler?

14           MR. BARKER:  Mr. Kotler.

15           THE COURT:  Kotler.  Now, walk me through again, you       10:58AM

16   have got to spell the other fellow's name.

17           MR. BARKER:  It's Albert, A-L-B-E-R-T, and his last

18   name is Ahdoot, A-H-D-O-O-T.

19           THE COURT:  Okay.  What do you -- you are telling me

20   you also want to amend to add a claim against him, correct?       10:58AM

21           MR. BARKER:  Right.

22           THE COURT:  Tell me what that claim is.  That's not

23   before me, but --

24           MR. BARKER:  It's going to be jointly with Colocation

25   on every claim we have against Colocation because he is           10:58AM
```

1    Colocation.

2            THE COURT:  As in piercing the corporate veil or what?

3            MR. BARKER:  We would name him personally in his

4    individual capacity as well and include allegations to pierce

5    the corporate veil.                                                    10:59AM

6            THE COURT:  Well, you know, alter ego, piercing the

7    corporate veil, sometimes they mean the same thing.  Sometimes

8    they don't mean exactly the same thing.  What do you mean?  How

9    do you get to Mr. Ahdoot personally with this contract in the

10   name of Colocation?                                                    10:59AM

11           MR. BARKER:  Well, and that's a different issue

12   because the contract is in the name of the party they now want

13   to change out of the litigation.  And that's another issue I

14   haven't thought through yet, because the contract's in the name

15   now, apparently, of this company that Mr. Ahdoot says is          10:59AM

16   fictitious.  I haven't thought through that issue yet.

17           But, Your Honor, they have filed corporate documents

18   with the State of Nevada for over a decade that include

19   material false statements.  This is a corporate formality.  So

20   I'm addressing the corporate formalities element of alter ego.    10:59AM

21   He testified there's never been a meeting of the board.

22           THE COURT:  Okay.  But is Mr. Ahdoot a shareholder or

23   the only shareholder, or what do you have information on?

24           MR. BARKER:  He's the only shareholder, the only

25   officer, the only director, the only one that ever has been.      11:00AM

1        THE COURT:  Doesn't matter whether he's the only

2   officer or director, but if he's the only shareholder and then

3   you attack the corporate formalities, you get to him.

4        MR. BARKER:  Right.  But he was materially involved

5   personally in the fraud at issue in this case, which is why he          11:00AM

6   would be an individual defendant as well.

7        THE COURT:  What was his personal involvement in the

8   fraud that you are going to allege?

9        MR. BARKER:  Everything we have alleged for Colocation

10  is what he did individually.                                            11:00AM

11       THE COURT:  Well, you are way too general for me.  I'm

12  a really empirical guy.  I want to know empirically what did he

13  do that you tie into legal liability?

14       MR. BARKER:  Our belief is, Your Honor, that he

15  approached Mr. Kotler, told him I need you to get the IPv4          11:00AM

16  addresses from Mitel.  But they can't know you are trying to do

17  that because they won't sell them.  I want you to make them

18  think you are just trying to buy a domain name and somehow

19  figure out how to squeeze in the IPv4 language into the

20  contract in a way that doesn't say Mitel is giving the IPv4.          11:01AM

21  And that's what this e-mail we now have says.  Mr. Kotler was

22  proposing --

23       THE COURT:  Now, e-mail is very cryptic.

24       MR. BARKER:  It's nebulous, as Mr. Kotler says.  And

25  we can provide the context to that which we have as well, Your          11:01AM

1    Honor.

2         THE COURT:  So you are saying that Mr. Ahdoot was a

3    direct actor party in an attempt to mislead Mitel as to what

4    exactly was being bought?

5         MR. BARKER:  Yes, Your Honor.                              11:01AM

6         THE COURT:  Which would be, if true, an independent

7    basis for a personal liability.

8         MR. BARKER:  Yes, Your Honor.

9         THE COURT:  Above and beyond the failure to comply

10   with the corporate formalities.                                11:02AM

11        MR. BARKER:  Yes, Your Honor.

12        THE COURT:  I'm just restating this to see if I

13   understand what you are saying.

14        Okay.  Anything else you want to say on that?

15        MR. BARKER:  Only that it's been a frustrating case       11:02AM

16   dealing with the issues we have in terms of the disclosures and

17   the discovery.  And I apologize that we are not able to resolve

18   these amongst counsel, but, Your Honor, it has been a difficult

19   case.

20        THE COURT:  All right.  So I will -- I digress for a       11:02AM

21   moment, but remind me again, how much money are we fighting

22   over here?

23        MR. BARKER:  If the contract deals with the domain

24   name, that's the $10,000 price in the contract and Mitel was

25   ready to transfer the domain name.  If it deals with the IPv4   11:02AM

1    addresses, it's over a million dollars.

2         THE COURT:  Okay.  I much more enjoy fighting over

3    things that matter.

4         MR. BARKER:  I understand, Your Honor.  I understand.

5    And Colocation would have you believe this is a simple contract        11:03AM

6    case.  And I think that's what we thought at the scheduling

7    conference before we knew what had happened, what went on.

8         THE COURT:  Well, when I was in practice I didn't

9    fight over anything unless it was at least worth legal fees I

10   was charging.                                                         11:03AM

11        MR. BARKER:  Understood, Your Honor.

12        THE COURT:  Here, I deal with all kinds of fights that

13   are trivial.  Not quite trivial but not worth anyone's legal

14   fees.

15        MR. BARKER:  And as I said, if this were just about        11:03AM

16   the domain as Mitel thought, we would not be here.

17        THE COURT:  Okay.  All right.  Ms. Foster, I guess the

18   short of it is, again, we only have the motion fully briefed

19   and pending about adding Mr. Kotler and other related claims.

20   We don't have a motion or proposed complaint yet with respect        11:03AM

21   to Mr. Ahdoot.  But I guess let me hear from you, whatever you

22   want to say with respect to the Document Number 35, which is

23   the motion to amend both to add Mr. Kotler and other claims.

24   So that's fully briefed.  You don't have to say anything but

25   you are welcome to say anything you want.        11:04AM

1          MS. FOSTER:  But start with Kotler?

2          THE COURT:  By the way, where is it, you know, I have

3    been gone from law practice for 13 years, so there's law firms

4    I don't know anymore.  Who is the Erhart in your law firm?

5          MS. FOSTER:  Jeff Erhart.                                    11:04AM

6          THE COURT:  He and I go way back, way, way back.

7          MS. FOSTER:  He's a great guy.  He just does

8    transactional work now, no litigation.

9          THE COURT:  He is a great guy.  And he and I and some

10   other people left Jennings Strauss and Salmon in 1982 to start   11:05AM

11   a law firm.  He was the one associate.  And so I go way back

12   with him.  It's not going to help you.

13         MS. FOSTER:  But I will tell him you remember him.

14         THE COURT:  I have a lot of friends at Snell & Wilmer,

15   too, but they are the old guys.                                   11:05AM

16         Anyway, end of digression.  Go ahead.

17         MS. FOSTER:  About Mr. Kotler, there was a comment

18   here that defense counsel believes that he was brought in as an

19   actor to pull something over on defendants.  I'd like to point

20   out this contract was negotiated with defendant's in-house       11:05AM

21   counsel.  And the contract itself expressly referenced the IPv4

22   addresses.  And the escrow.com instructions that were executed

23   after the contract also represented the -- referenced the IPv4

24   addresses.

25         The contract itself was entered into with a disclosed      11:05AM

1  principal.  The contract itself that was drafted by Mitel

2  references who the parties were.  And this is where we started

3  off.  It references Mitel Networks Corporation as a seller and

4  Colocation America, Inc., a Nevada corporation, as the buyer.

5  Unfortunately, that was used in the California lawsuit, the

6  Canadian lawsuit, and was copied into our lawsuit.  And that is

7  not the actual corporate name.

8       But the agreement does disclose a principal.  It's not

9  a situation where Corey Allen Kotler was an undisclosed agent

10 or undisclosed principal.

11      THE COURT:  I did look at the agreement, but I didn't

12 read all of it.  So what is the disclosure on the face of the

13 agreement?

14      MS. FOSTER:  It says this agreement is made the 7th

15 day of March, 2016, by and between Mitel Networks Corporation

16 on behalf of itself and its subsidiaries, and goes on and says

17 Colocation America, Inc., a Nevada corporation with offices at

18 the offices listed.  And it defines Colocation America, Inc.,

19 as the intellectual property purchaser.

20      So Mr. Kotler was actually acting on behalf of a

21 disclosed principal.  And because he was acting on behalf of

22 disclosed principal, good or bad, that principal is responsible

23 for all of the actions of Mr. Kotler.  Because he was acting on

24 behalf of a disclosed principal, I don't see there's a reason

25 to bring him in as a party.

1          THE COURT:  Actually, there's more to it than that.

2     If the agent is involved in tort or fraud, the agent's

3     personally liable, too.

4          But go ahead.

5          MS. FOSTER:  And, Your Honor, we also had in our          11:07AM

6     motion to amend, there was two other issues raised.  One was

7     the timeliness of this.  The motion to amend was filed, and

8     there was allegations that they didn't know about a lot of this

9     stuff, but this stuff was available before.

10          THE COURT:  You know, I saw that in your briefs, but          11:07AM

11     I'm not worried about whether it's available.  I'm worried

12     about whether you told them straight out.  Where did you tell

13     them straight out?  The idea is, well, if they had done more

14     digging they could have figured it out.  That doesn't carry as

15     much weight with me especially when it appears to be undisputed          11:07AM

16     that your corporate filings were false and that you had given

17     the false information to them and they didn't find out about it

18     until the day before the deposition.

19          MS. FOSTER:  Actually, Your Honor, the corporate

20     agents were fictitious.  And we found out about that from the          11:08AM

21     defendant.  Granted, my client would have known about that.

22     But we never provided that information to the defendants.  They

23     apparently had gone to the Nevada Secretary of State, pulled

24     that information, and then submitted to our office on September

25     15th requests for admissions, asking for requests for          11:08AM

1    admissions, identifying all of those corporate agents to say

2    they were fictitious.  So at least as of September 15th.

3           THE COURT:  Well, they didn't really know until you

4    admitted it.  So anyway, go ahead.

5           MS. FOSTER:  Okay.  Back with regards to the motion to       11:08AM

6    amend, Your Honor, with regards to Kotler, the claims they

7    have, they are always raising new claims against Colocation.

8    And there is an admitted contract in this case.  With regards

9    to the contract I believe some of the claims, the tort claims

10   that they are requesting, would be barred by the Economic Loss       11:09AM

11   Doctrine.

12          THE COURT:  You know, which I describe as the much

13   misunderstood Economic Loss Doctrine.  I'm real comfortable in

14   that area, so we don't need to talk about that further.

15          MS. FOSTER:  Let me talk about Albert himself.              11:09AM

16          THE COURT:  Torts do not cease to be torts merely

17   because they cause economic loss.  It's a metric or a measure

18   to determine whether the only tort is the failure to get the

19   benefit of the contract.  This doesn't look like that.  I get

20   these motions all the time where there's some torts that --        11:09AM

21   many torts that only cause economic loss.  There's no -- it's

22   just hugely misunderstood.

23          So anyway, go ahead.

24          MS. FOSTER:  I would like to address the issues about

25   Albert, because they have been raised.  I haven't seen the          11:09AM

1    motion to amend to add the claims against him, but I would like

2    to point out that Albert never had any direct dealings with

3    defendants until after the defendants had alleged the mistake.

4    The e-mail --

5              THE COURT:  Say that again.                                11:10AM

6              MS. FOSTER:  Albert, the owner of Colocation, did not

7    have any dealings directly with Mitel, the defendant, until

8    after Mitel had alleged the mistake.  All the communications

9    were between a Corey Kotler and the in-house counsel for the

10   defendant.  After the mistake was alleged there was a phone      11:10AM

11   call or something where Albert was on that.  But with regards

12   to the --

13             THE COURT:  Did he ever surface before that?

14             MS. FOSTER:  What do you mean by "surface."  He would

15   have signed the contract, Your Honor.                             11:10AM

16             THE COURT:  Was he the human being who signed that

17   contract?

18             MS. FOSTER:  Yes, he was.  If you look on Page 3 it

19   has his name, Albert Ahdoot, and it's dated 3-10-16.

20             THE COURT:  I don't have it.  It's in my pile of        11:10AM

21   papers.  But what's the capacity in which he signed?

22             MS. FOSTER:  You know what, Your Honor, it says slash

23   business.  I don't know what that means.  It has his name and

24   then a slash.

25             THE COURT:  Was that a signature block that somebody     11:10AM

1  signed for?

2          MS. FOSTER:  He signed the signature and then the name

3  where it's filled in, I don't know who filled in the name.  It

4  says "Albert A. Ahdoot slash business."

5          THE COURT:  It didn't say "Colocation, Inc. by"?                    11:11AM

6          MS. FOSTER:  Above it, yes, it says, "Colocation

7  America, Inc."

8          May I approach, Your Honor?

9          THE COURT:  No, just tell me.

10          MS. FOSTER:  Says, "Colocation America, Inc.," and        11:11AM

11  underneath that is a signature which is completely illegible,

12  and then it says name, Albert A. Ahdoot, slash business, and

13  then date, looks like 3-10-16.  So it did have Colocation

14  America, Inc. and then underneath it just has a name.  And same

15  thing for Mitel Networks, Your Honor.  It has Mitel Networks        11:11AM

16  was a name and underneath that it's got Greg Hiscook who signed

17  that.

18          THE COURT:  Say that, signed what?

19          MS. FOSTER:  Under Mitel Networks, it does have a name

20  Greg Hiscook, and his position was general counsel.                11:11AM

21          THE COURT:  That's not at all analogous to the bizarre

22  signature block for Colocation.

23          MS. FOSTER:  One more item, Your Honor.  They

24  mentioned this cryptic e-mail that was filed last night.  It's

25  from Corey Allen Kotler.  I don't know the context it was given        11:12AM

```
1   in.  And it does mention about passing something by or

2   whatever.  But the contract was drafted after the date of that

3   e-mail, and the contract expressly references the IPv4

4   addresses.  So it's not a situation where they were not

5   mentioned.                                                      11:12AM

6            THE COURT:  Is that in the contract?

7            MS. FOSTER:  Yes.

8            THE COURT:  You know, I looked at it.

9            MS. FOSTER:  It's under Paragraph A under the quit

10  claim where it says, "And the associated IPv4, 134.22.0.0/16.   11:12AM

11           THE COURT:  I want to look at that.  Where was it?

12           MS. FOSTER:  It's attached to the complaint.

13           THE COURT:  I don't have that here.  I have in front

14  of me the briefs we came here to talk about.

15           MS. FOSTER:  It's actually attached to plaintiffs      11:12AM

16  response to motion to extend, Your Honor, which was filed on

17  October 30th.  It's Exhibit D.

18           THE COURT:  I know.  I looked at it.  But yeah, here

19  it is.  So what are you telling me about this again?  This is

20  Paragraph A?                                                    11:13AM

21           MS. FOSTER:  Paragraph A, five lines from the bottom.

22           THE COURT:  Right.

23           MS. FOSTER:  If you look at one, two, three, four,

24  four lines from the top it identifies Colocation America, Inc.,

25  as the intellectual property purchaser.  And Page 3 has         11:13AM
```

1    Albert's signature.

2           THE COURT:  I know.  You said it expressly referenced

3    the IP addresses.  That's what I'm trying to --

4           MS. FOSTER:  It starts out -- the line starts out name

5    and the associated IPv4.                                          11:13AM

6           THE COURT:  So what do you make of that?

7           MS. FOSTER:  That is the one word that's in dispute in

8    this litigation, Your Honor, is whether or not the IPv4

9    134.22.0.0/16, that is the address, whether or not that address

10   was being sold.                                                   11:14AM

11          THE COURT:  I misunderstood you.  I thought you were

12   saying that the language here is somehow a slam dunk.  I didn't

13   think it was a slam dunk.

14          MS. FOSTER:  No.  No.  I'm sorry, Your Honor.  In the

15   e-mail that they reference, Corey made it sound like he wasn't   11:14AM

16   going to reference -- it's a very cryptic e-mail.  It makes it

17   sound like Corey was going to pull something over on the

18   defendant and not reference the IPv4 addresses.  I don't know

19   if Corey wrote that.  I don't know what the context was.  It

20   wasn't written by Albert.  But the context here does include     11:14AM

21   the references of the IPv4 addresses.

22          THE COURT:  Go ahead.

23          MS. FOSTER:  That's all I have, Your Honor.  Do you

24   have any questions?

25          THE COURT:  Well, yeah.  Let me think for a minute.       11:14AM

1    Well, you can sit down.  Not so much questions for you.

2         You don't need to reply, but you may.

3         MR. BARKER:  Only thing I want to say is that if I was

4    unclear about what I said about Colocation I want to make sure

5    I correct that.  He was not disclosed during the negotiations.     11:15AM

6    Yes, on the signature copy of the contract the name Colocation

7    was on it.

8         THE COURT:  And Mr. Ahdoot signed in an unknown

9    capacity?

10        MR. BARKER:  Well, it's what he calls business              11:15AM

11   development, which is what we saw him sign other documents as

12   even though we now know he's been the only CEO, treasurer,

13   secretary.

14        THE COURT:  Doesn't say he's an officer, director, or

15   anything.                                                        11:15AM

16        MR. BARKER:  Right.

17        THE COURT:  And now we're seeing this is morphing into

18   a lawsuit about broadly stated who were the officers and

19   directors.  And so this is like -- to have a signature block

20   like that is like, you know, when I was practicing law doing    11:15AM

21   this kind of work I used to tell my associates, it's so good

22   for business when people do things in a sloppy way.

23        MR. BARKER:  That's why we're here, Your Honor.

24        THE COURT:  Anyway.  So, I can't say that the proposed

25   amended complaint fails to state a claim.  It will depend on    11:16AM

1    facts and evidence as to whether this concealment or whatever

2    it is was material.  You can't say that in the abstract that it

3    was not.  And there's not indication here of culpable delay in

4    seeking this.  It surfaced later.  So I do think I need to

5    allow that amendment.                                              11:16AM

6          As I said before, that's going to render moot --

7    that's going to require redoing the schedules to deal with that

8    and it's going to render harmless what may or may not have been

9    culpable failure by the plaintiff to give timely accurate

10   discovery that prevented the defendant from doing the discovery   11:17AM

11   it wants.  I just don't have to decide that anymore because

12   we're going to need to -- I'm not suggesting we're going to

13   have lengthy extension but we're going to have to redo this to

14   allow for the new claims and for the new defendant.

15         I am really not disposed to grant leave to amend to        11:17AM

16   add Mr. Ahdoot as a party without seeing the pleading that

17   would be proposed against him.  So but if that pleading also is

18   sufficient to state a claim, I will be disposed to allow it.

19   I'm not going to be disposed to deny it on the basis of --

20   well, they will never be able to prove this.                      11:18AM

21         MR. BARKER:  We'll propose it to opposing counsel and

22   see if we can't work on a stipulation to get that pleading in

23   efficiently, Your Honor.

24         THE COURT:  Let's do that.

25         MR. BARKER:  May I say one other point?                     11:18AM

1          THE COURT:  Yes.

2          MR. BARKER:  On the harm for the discovery, we would

3     like permission to file a motion for fees.

4          THE COURT:  I thought about that, and I could do that.

5     What I would prefer to do is I will hold that in abeyance.  I          11:18AM

6     don't need to decide it yet.  But I will decide it at the end

7     of the case regardless of who is adjudicated to be the

8     prevailing party.

9          MR. BARKER:  So we should submit that at the end?

10          THE COURT:  Correct.  So it turns a whole lot of time          11:18AM

11     and effort to do it right now, but at the back end I often have

12     attorney's fees issues anyway so it's much more efficient to do

13     it that way.  And your client will not be at a hardship in

14     failing to collect that money right now.

15          MR. BARKER:  Thank you, Your Honor.          11:19AM

16          THE COURT:  So let's think about the practicalities.

17     Well, first, the defendant's motion to amend and to amend to

18     add new counter defendant, Document Number 35, is granted.  The

19     defendant's motion to extend discovery and extend dispositive

20     motion deadline, Document Number 40, is denied without          11:20AM

21     prejudice as now moot because extensions will be granted as

22     necessary in light of the granting of Document Number 35.

23          I would like you to follow up to see if you can

24     propose, first of all, this -- I'd like the defendants to draft

25     their proposed additional pleading as against Mr. Ahdoot to see          11:21AM

1   if the other side will, in light of the general direction I

2   have given, whether they will not oppose it on the -- the only

3   way to impose it would be if it fails to state a claim, so you

4   are welcome to fight that battle.  But I'd like to have that

5   teed up.  So could we set a time by which time you will have it      11:21AM

6   to Ms. Foster and she can make a decision whether to

7   acknowledge it states a claim, or --

8           MR. BARKER:  Your Honor, two weeks.

9           THE COURT:  Two weeks would be fine.

10          So it is ordered that -- first of all, the defendant      11:21AM

11  draft and submit to the plaintiff the proposed amended

12  counterclaim and any amended claims that relate to it

13  concerning counterclaim against Mr. Ahdoot by November 14, and

14  that plaintiffs advise the defendant within seven days,

15  November 22, whether they will oppose that or not.  If they do      11:22AM

16  oppose it, plaintiff must file a further motion to amend with

17  respect to that.

18          Now, what else mechanically do we need to address?

19          MS. FOSTER:  Your Honor, would it be put on hold for

20  our answer to the amended complaint so we don't need to do that      11:23AM

21  twice?

22          THE COURT:  Certainly.  It is further ordered that the

23  plaintiff need not reply to either the first amended

24  counterclaim or the potential additional counterclaim until

25  both have been resolved as whether they are before the Court.      11:23AM

1        MR. BARKER:  Would Your Honor like to set a deadline

2   for us to personally serve Mr. Kotler?  We will attempt to do

3   that right away.

4        THE COURT:  Yeah.  Good point.  You know, it might

5   make sense not to serve that until you resolve the additional          11:23AM

6   counterclaim as well.  Because it might be -- when you write

7   that, there might be some interaction there.  Well, actually,

8   maybe I'm being too cautious.  Maybe we should just go ahead

9   and serve him.

10       MR. BARKER:  Yes, Your Honor.  We will do that.                    11:24AM

11       THE COURT:  Then we'll set a deadline.  The

12  defendant's time to serve the additional counterclaim against

13  Mr. Kotler is accelerated to November 30th.  That gives you a

14  month.

15       MR. BARKER:  Your Honor, given Mr. Sigelman's, who is            11:24AM

16  counsel of record in this case, his personal relationship with

17  Mr. Kotler, may we avoid the cost of a process server by

18  getting Mr. Sigelman to cooperate?

19       THE COURT:  You don't need the leave of the Court to

20  do that.                                                                11:24AM

21       MR. BARKER:  I understand.  I don't know that he will

22  agree.

23       THE COURT:  I don't understand what you are asking

24  then.

25       MR. BARKER:  To get Mr.  -- well, it has been                     11:24AM

1  expensive in this case to try to find Mr. Kotler, and I think

2  it will be expensive again and I would like to defray that.

3          THE COURT:  Do you not have a location for him?

4          MR. BARKER:  We have his home address, yes, Your

5  Honor.  But a process server in California.                    11:24AM

6          THE COURT:  Why not send a process server?  Mr.

7  Sigelman isn't going to do you any favors.

8          MR. BARKER:  Just the additional cost.

9          THE COURT:  What are you asking to do?  I don't

10  understand.  You can send him a letter asking if he will accept   11:25AM

11  process as attorney for them, and if you don't have an answer

12  in five days you need to serve process.

13          MR. BARKER:  We will just proceed with the process

14  server.  My client is frustrated with the expenses incurred in

15  discovery and serving and chasing Mr. Kotler.  And I spoke       11:25AM

16  without a clear request of what I could ask the Court to do and

17  it sounds like maybe there isn't anything at this point.

18          THE COURT:  Again, the silver lining here is you are

19  fighting over a million dollars.

20          MR. BARKER:  Understood, Your Honor.                   11:25AM

21          THE COURT:  Anything else?

22          MS. FOSTER:  Not on behalf of plaintiff, Your Honor.

23          MR. BARKER:  No, thank you, Your Honor.

24          THE COURT:  Very well then.

25          MR. BARKER:  I'm sorry.  Mr. Jones reminded me, the     11:25AM

UNITED STATES DISTRICT COURT

1  document we filed on the written discovery dispute was a

2  placeholder.  I believe we will be back here in front of you

3  because they are not going to produce Colocation's tax returns

4  that he testified about.

5          THE COURT:  That's right.  We can address that now.          11:26AM

6  Let me see.

7          MR. BARKER:  Document 45, Your Honor.

8          MS. FOSTER:  It's nice and short.

9          THE COURT:  So I typically rule on those immediately

10 or we can have a discussion right now.  So let's resolve that          11:26AM

11 if we can.

12         I did -- you know, I was a little late here because I

13 was reading the papers that you just filed yesterday.  But I

14 left that on my desk.  Tell me again what it is that you are

15 asking for.                                                           11:26AM

16         MR. BARKER:  The tax returns.  So I'm just going to --

17 may I approach?

18         THE COURT:  Uh-huh.

19         MR. BARKER:  Five of them with the exhibits.

20         THE COURT:  All right.                                        11:27AM

21         MR. BARKER:  And the only issue is in the first

22 paragraph here starting at Line 18, records of payments from

23 Colocation to Albert Ahdoot.  He testified he didn't remember

24 his salary at his deposition.

25         THE COURT:  What does that go to?                             11:27AM

1        MR. BARKER:  Pardon me?

2        THE COURT:  What does that tend to show?

3        MR. BARKER:  It would show, what we believe, when we

4    see bank statements, we're going to see there's one account.

5    We're going to see there's co-mingling, which is part of our      11:27AM

6    alter ego issue that we're trying to prove here.  And the

7    number two is along the same lines, unredacted monthly bank

8    statements.

9        THE COURT:  Well, let's talk about them one at a time.

10       MR. BARKER:  Sure.                                            11:27AM

11       THE COURT:  You just want all payments whether you

12   call it salary or dividends or whatever, and you believe --

13   well, I think it's undisputed he's the only shareholder,

14   correct?

15       And why -- and that would go to certainly the              11:28AM

16   possibility of co-mingling.  But that also could play with the

17   disregard of corporate formalities --

18       MR. BARKER:  Yes, Your Honor.

19       THE COURT:  -- with respect to liability for piercing.

20       MR. BARKER:  Yes, Your Honor.  We believe that the        11:28AM

21   checks that he's testified have been issued and the bank

22   statements are going to show that there is substantial

23   co-mingling.

24       THE COURT:  Ms. Foster, what's wrong with this?  This

25   is all highly sensitive and subject to a protective order.      11:28AM

1          MR. BARKER:  Which we have in the case.

2          THE COURT:  What's wrong with that discovery?

3          MS. FOSTER:  Your Honor, we agreed to provide redacted

4     bank statements and tax returns because I believe when we were

5     having the discussion the only issue was whether or not          11:28AM

6     Colocation maintains separate bank accounts, which it does, and

7     whether Colocation filed tax returns, which it did.

8          THE COURT:  I'm not talking about tax returns yet.

9          MS. FOSTER:  Okay.  My understanding they just wanted

10    confirmation that Colocation had maintained separate bank         11:29AM

11    accounts.

12         THE COURT:  Now they are asking for more than that.

13         MR. BARKER:  We don't know.  She didn't clarify what

14    redacted meant.  If she's going to redact the whole bank

15    account number, that doesn't work.  So if we're going to see      11:29AM

16    enough information sufficient to establish which accounts are

17    being used.

18         THE COURT:  If it's all under protective order why

19    does anything need to be redacted?

20         MR. BARKER:  I don't think it does need to be               11:29AM

21    redacted, Your Honor.

22         MS. FOSTER:  Your Honor, it does not need to be

23    redacted.

24         THE COURT:  Very well then.  I will grant that request

25    for discovery.  Now let's talk about, well, part of Number 2 is   11:29AM

```
 1    the same but then you ask for tax returns.  That's a whole
 2    different issue.
 3            MR. BARKER:  Mr. Ahdoot testified that he has filed
 4    tax returns in Nevada and with the federal government every
 5    year that Colocation has been in existence.  I don't believe
 6    him.
 7            THE COURT:  How does it matter?
 8            MR. BARKER:  It goes to his credibility at least, Your
 9    Honor.  And he operates in California and has never filed a tax
10    return in California apparently.
11            THE COURT:  Now, credibility isn't enough basis to get
12    tax returns.  There has to be no other reasonable basis to get
13    the information, and if, in fact, you are going to get the
14    documentation I just granted that's going to show you what
15    compensation or monies of any character that he took out, that
16    may or may not strengthen your piercing claim.  But filing --
17    so what if he didn't pay his taxes?
18            MR. BARKER:  What else is a better way to show that
19    you were complying with corporate formalities than complying
20    with the federal and state tax laws?
21            THE COURT:  That's personal taxes.  If you are talking
22    about corporate tax returns maybe we can talk about that.
23            MR. BARKER:  And, Your Honor, we asked for
24    Colocation's unredacted monthly bank statements and unredacted
25    federal and state tax returns.
```

11:30AM

11:30AM

11:30AM

11:30AM

11:30AM

11:31AM

1          THE COURT:  I'm sorry.  I thought you were asking

2     for -- oh.  You are right.  You are not asking for his personal

3     tax returns.

4          MR. BARKER:  Correct, Your Honor.

5          THE COURT:  Okay.  That I was concerned about.                    11:31AM

6          Well, I have got to think that through.  Ms. Foster,

7     tell me why that should not be produceable.

8          MS. FOSTER:  Well, because now, in light of your

9     ruling a moment ago, they are going to have all of the bank

10    statements to see all the income that came in, all the expenses   11:31AM

11    that came out.  We have agreed to provide redacted ones just to

12    show that the tax returns were, in fact, filed.  All I'm asking

13    to redact is the financial information because they are going

14    to have that information elsewhere anyway, Your Honor.

15         THE COURT:  I think that's sufficient.  The case law       11:31AM

16    on tax returns is there has to be no other reasonable way to

17    get the information.  And if the information was that it was

18    filed, period, the redacted forms will show that.  If the real

19    information of interest is the economic actions and substance

20    of the relationship between Mr. Ahdoot and the corporation, you  11:32AM

21    will be getting that under the financial records I have just

22    ordered produced.

23         So let me --

24         MR. BARKER:  May we --

25         THE COURT:  Yes.  Go ahead.                                  11:32AM

1          MR. BARKER:  We believe that the schedule is

2     irrelevant.  We don't need to see the numbers.  They may redact

3     the numbers.  But we want to see the entire returns but they

4     can redact the numbers on the schedules.  I think all of

5     that --                                                        11:32AM

6          THE COURT:  Give me something specific as to why that

7     is needed.

8          MR. BARKER:  I can't right now.

9          THE COURT:  Tell you what.  I will stand by the

10    ruling.  Let me deliver a clear ruling for the clerk.          11:32AM

11         With respect to the discovery dispute, Document 45, it

12    is ordered that plaintiff produce the, quote, "records of

13    payments from Colocation to Albert Ahdoot."  It is further

14    ordered that Colocation produce only -- well, I'm sorry.  Go

15    back.  Produce the records of payments and the unredacted       11:33AM

16    monthly bank statements.

17         It is further ordered that Colocation produce only the

18    redacted cover sheets of federal and state income tax returns

19    showing that such returns were filed.  And the request for

20    further discovery in that respect is denied.                   11:34AM

21         MR. BARKER:  Thank you, Your Honor.

22         THE COURT:  I think we're done with everything now.

23    Well, we're done with everything that's in front of me now.

24         So now, also, there is one more thing.  Soon as we

25    know whether we have -- first we're going to have a fight over  11:34AM

1    additional counterclaim against Mr. Ahdoot, we need to address

2    an amended schedule.  First of all, we're going to have to have

3    what amounts to another scheduling conference in light of the

4    new allegations, the new discovery needed by that.

5          So I think the thing to do, as soon as we know,    11:34AM

6    whether by agreement or my ruling the pleading, either in part

7    or in whole against Mr. Ahdoot is allowed, then we need to set

8    a prompt further scheduling conference to address the way we

9    would for anything but only the new stuff.  I'm not

10    contemplating it's going to take a lot of time.  But I'm going    11:35AM

11    to want you all to dialogue and see what you can agree and

12    disagree on and give me a report on that.  And we'll address

13    that.  I think we can do that very quickly once we know --

14    actually, that will be after we have the replies to the

15    counterclaims filed.  So we'll wait for those replies to come    11:35AM

16    in and then we'll schedule that.

17          Okay.  Now I think that is everything.  Counsel, is

18    there anything else we can address now?

19          MR. BARKER:  Nothing from Mitel, Your Honor.

20          MS. FOSTER:  Nothing on behalf of plaintiff.    11:35AM

21          THE COURT:  All right.  Well, so Mr. Barker, Joel

22    Hoxie was my neighbor three doors down.

23          MR. BARKER:  He's my neighbor in the office right now,

24    Your Honor.

25          THE COURT:  Then he upgraded.  He moved to a much    11:36AM

1   nicer place and left me behind.

2           MR. BARKER:  May I ask one point of clarification on

3   this?

4           THE COURT:  You may.

5           MR. BARKER:  Would you like us -- yes.  We need to          11:36AM

6   file our amended pleading so we can serve it on Mr. Kotler.  I

7   was wondering if you wanted us to file that now, but I think I

8   answered my own question.

9           THE COURT:  Well, I had worried about -- no, I think

10  it does make sense to file it now get the service going           11:36AM

11  especially since you are having difficulty.  If you think that

12  you -- well, actually --

13          MR. BARKER:  I agree.

14          THE COURT:  You should know very quickly whether your

15  drafting for an additional counterclaim against Mr. Ahdoot       11:36AM

16  would impact on your pleadings with respect to Mr. Kotler.  And

17  if you decide that would happen you might want to hold back.

18  But you should know in a week or so whether you are going to do

19  that, so I leave it to you.  I do agree it's a good idea if you

20  are going to go with that counterclaim, file it and get your      11:37AM

21  process servers going.

22          MR. BARKER:  Yes, Your Honor.

23          THE COURT:  And well, you know, who cares about the --

24  you know, under the rules, you can tender an acceptance.  If

25  they don't you recover your service of process fees.  And I do    11:37AM

```
1    order those fees immediately.

2            MR. BARKER:  We will ask Mr. Sigelman to work with Mr.

3    Kotler to accept service, Your Honor.

4            THE COURT:  You have to comply with the rule.

5            Very well then.  We'll be adjourned.                    11:37AM

6            (Proceeding concluded at 11:37 a.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1

2

3                    C E R T I F I C A T E

4

5          I, LAURIE A. ADAMS, do hereby certify that I am duly

6  appointed and qualified to act as Official Court Reporter for

7  the United States District Court for the District of Arizona.

8          I FURTHER CERTIFY that the foregoing pages constitute

9  a full, true, and accurate transcript of all of that portion of

10  the proceedings contained herein, had in the above-entitled

11  cause on the date specified therein, and that said transcript

12  was prepared under my direction and control.

13          DATED at Phoenix, Arizona, this 8th day of November,

14  2017.

15

16                              s/Laurie A. Adams

17                              _____
                                Laurie A. Adams, RMR, CRR

18

19

20

21

22

23

24

25