# EXHIBIT A

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                  FOR THE DISTRICT OF ARIZONA

 3

 4

 5
                                          )
 6   COLOCATION AMERICA, INC.,            )
                                          )
 7                      Plaintiff,        )
                                          )
 8        vs.                             )  Case No.
                                          )  CV-17-00421-PHX-
 9   MITEL NETWORKS CORPORATION,          )  NVW
                                          )
10                      Defendant.        )
     _____)
11

12

13

14

15        VIDEOTAPED DEPOSITION OF COREY ALLEN KOTLER

16                    Los Angeles, California

17                  Thursday, September 7, 2017

18

19

20

21

22

23   Reported by:

24   Claudia Badano, CSR No. 8974

25   Job No. 2629
```

DepoTech
602.358.0225

```
 1              VIDEOGRAPHER:  The time is 11:54 a.m. and
 2   we're off the record.
 3                    (Recess taken.)
 4              VIDEOGRAPHER:  The time is 11:59 a.m. and
 5   we're back on the record.
 6   BY MR. ROGERS:
 7       Q.   We just got done talking about the fact that
 8   you are not a lawyer and you don't have a license --
 9       A.   Right.
10       Q.   -- to practice law.
11       A.   Correct.
12       Q.   And so did you draft a contract between MNC
13   and Colocation?
14       A.   No.  They sent it over to me.
15       Q.   And then what did you do with it?
16       A.   And I just made whatever adjustments.
17       Q.   How could you make them since you are not a
18   lawyer?
19       A.   Because, hey -- can I -- well, let me ask
20   you a question.  You are a lawyer.  Can't I just
21   theoretically write an agreement on a bar napkin and
22   if you signed it, it's an agreement.  It's America,
23   it's a free country; correct?
24       Q.   I'm not here to answer questions.
25       A.   Okay, well, I asked --
```

```
 1      Q.    Answer my question.
 2      A.    I answered your question.
 3      Q.    No, you didn't.  I asked you --
 4      A.    They sent me an agreement.  I made whatever
 5   changes.
 6      Q.    How did you know what changes to make?
 7      A.    Because I'm an intelligent guy.  I read it
 8   and whatever changes that needed to be made, we made.
 9      Q.    Who is the "we"?
10      A.    I showed it -- maybe I showed it to Albert.
11   I don't remember the details.  I have too many other
12   more important things on my mind to remember.  But if
13   I was working with Albert, they sent an agreement.
14   Whatever agreement -- whatever adjustments needed to
15   be changed were changed.
16      Q.    Were changed by whom?
17      A.    I put them in.  I consulted Albert because I
18   was working with Albert and I put them in.
19      Q.    Didn't Colocation have to authorize all of
20   your changes?
21      A.    Yeah.  Albert, Colocation, same thing.
22      Q.    So you would send them over to Albert to
23   take a look at?
24      A.    Yes.
25      Q.    And on some of those occasions -- some
```

1  occasions, Albert would modify the changes?
2     A.   He -- we discussed it and then we -- then I
3  put it in Word and I made the changes.
4     Q.   When you say put it in Word, the drafts that
5  were going back and forth were in Word already,
6  weren't they?
7     A.   Right, okay, if I want to be a stickler.
8  The changes -- look, you send me an agreement, that's
9  what negotiations are.  You are an attorney, you know
10 that.
11    Q.   Colocation had to authorize any changes --
12    A.   Right.
13    Q.   -- that were made?
14    A.   Yes.
15    Q.   Yes.  So I'm just trying -- I think you've
16 already explained the process which sounds simple
17 enough.
18    A.   Simple enough.
19    Q.   Okay.  So the agreement would come over to
20 you from MNC from Michelle Whittington?
21    A.   Right.
22    Q.   You would either make a change and send it
23 over to look at it or you would send it to Albert and
24 he would send it back to you and you would send it
25 back to MNC?

```
 1   want to.
 2       Q.   Very simple question.  When you were -- when
 3   you received the draft agreement from MNC and you
 4   made modifications to the agreement, were those
 5   modifications always approved by Albert?
 6       A.   Yeah.
 7       Q.   Did Albert himself ever make some of the
 8   modifications?
 9       A.   Yeah.  We discussed them.  I did what he
10   told me he wanted done.  I always did what he told me
11   he wanted done.  I never did anything without
12   checking with Albert.
13       Q.   And you never did anything -- just go back
14   to what you said.  So you never did anything on your
15   own independently?
16       A.   I never made any decisions regarding Mitel
17   without checking with Albert.
18       Q.   What's a quit claim?
19       A.   A quit claim basically is where you agree
20   to -- how could I put it.  Basically where you agree
21   to give away whatever the -- whether it's a house or
22   whatever is in the -- like in the quit claim deed.
23            I'll make the analogy.  Let's say you agree
24   basically to sell to me with no -- no strings after
25   that.
```

1    Q.   Well, he used his last name.  That's the big
2  difference, isn't it?
3    A.   What about F?  F?
4    Q.   But he used his last name, didn't he?
5    A.   Is it against the law?  Is there a law that
6  says you can't just call yourself by part of your
7  name?  Check it out, let me know, and, you know, you
8  could always subpoena me back.  I could use $65.
9    Q.   When you did business with Colocation, you
10 went by Corey Kotler; correct?
11   A.   That just happened to be how we filled it
12 out.  We could draft a new -- we could draft a new
13 contract.  And you know what?  It has no -- it's
14 irrelevant.  It really -- you don't have leg to stand
15 with on this argument.  You are killing me now.  This
16 is the best they could do in law school?  This is not
17 a legitimate argument.  I was on the debate team in
18 school.  You would have lost this debate.  You are
19 breaking my heart now.  Come on, you've got to do
20 better.
21   Q.   The IP address -- the IPv4 address mentioned
22 in the contract, who located those?
23   A.   Albert.
24   Q.   And who instructed you to first contact MNC?
25   A.   Albert.

```
 1         THE WITNESS:  I'll keep going.  I'll keep
 2   going for another seven hours.  I don't care.
 3   BY MR. ROGERS:
 4       Q.   You'll have to come back tomorrow.
 5       A.   Depose me.  I could use the $65.  Because
 6   you are not a man of your word.  You are not keeping
 7   your promise.  He promised me I can say what I want,
 8   my narrative, and now he's not letting me do it.
 9       Q.   I did let you do it.
10       A.   When?
11       Q.   I just moved to strike it.
12       A.   Like, oh -- oh.  So you let me do it but now
13   you are going to strike it?  Just like she went and
14   she put the money in escrow and then she went back on
15   her word.
16       Q.   You already said you don't know anything
17   about the escrow.
18       A.   I heard that they put the money in the
19   escrow.
20       Q.   Did you communicate with Paul Sigelman about
21   the negotiations with MNC?
22       A.   I spoke to Albert and Albert spoke to Paul.
23   I would assume Albert spoke to Paul because it's his
24   counsel.
25       Q.   Did -- did Mr. Sigelman help you write any
```

```
 1   of the e-mails to MNC?
 2        A.   No.
 3        Q.   Do you know if he helped Albert write any of
 4   the e-mails?
 5        A.   I don't know.
 6        Q.   Did Albert forward you some of the e-mails
 7   to send to MNC?
 8        A.   Did Albert forward me any of the e-mails?
 9        Q.   That you sent on to MNC under your name?
10        A.   He told me what he wanted and then I was the
11   messenger and then I went back to MNC and I -- you
12   know, I expressed Albert's -- on Albert's behalf.
13        Q.   Do you know why Colocation didn't simply
14   contact MNC itself?
15        A.   He has other fish to fry.  This is just one
16   of his endeavors.
17        Q.   Is that what he told you?
18        A.   Yeah.  He's a busy dude.
19        Q.   But he has other people working at
20   Colocation; right?
21        A.   Yeah.
22        Q.   So why didn't -- again, going back to it,
23   why did Colocation hire you, if you know?
24        A.   If I'm not ...
25        Q.   Why did Colocation hire you to go out and
```

```
 1   STATE OF CALIFORNIA      )
 2   COUNTY OF LOS ANGELES    )  ss.
 3
 4           I, CLAUDIA BADANO, C.S.R. No. 8974, in and
 5   for the State of California, do hereby certify:
 6           That, prior to being examined, the witness
 7   named in the foregoing deposition was by me duly
 8   sworn to testify the truth, the whole truth and
 9   nothing but the truth;
10           That said deposition was taken down by me in
11   shorthand at the time and place therein named, and
12   thereafter reduced to typewriting under my direction,
13   and the same is a true, correct and complete
14   transcript of said proceedings;
15           I further certify that I am not interested
16   in the event of the action.
17           Witness my hand this 15th day of September,
18   2017.
19
20                    [signature: Claudia Badano]
21                    _____
                      Certified Shorthand
22                    Reporter for the
23                    State of California
24
25
```