UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

__________________

| | | |
|---|---|---|
| Colocation America Incorporated, | ) | |
| | ) | No. CV 17-0421-PHX-NVW |
| Plaintiff, | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | April 4, 2018 |
| Mitel Networks Corporation, | ) | 1:48 p.m. |
| Defendant. | ) | |

BEFORE: THE HONORABLE NEIL V. WAKE, JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

(*Hearing for Preliminary Discussion Re: Motion and Cross-Motion for Summary Judgment*)

APPEARANCES:

For the Plaintiff:
TERESA H. FOSTER PLLC
By: Teresa H. Foster, Esq.
2400 East Arizona Biltmore Circle
Suite 1300
Phoenix, Arizona 85016

For the Defendant:
SNELL & WILMER LLP
By: David E. Rogers, Esq.
One Arizona Center
400 East Van Buren Street, Suite 1900
Phoenix, Arizona 85004

Official Court Reporter:
Laurie A. Adams, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 43
Phoenix, Arizona 85003-2151
(602) 322-7256
Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

P R O C E E D I N G S

THE COURT: Please be seated.

THE COURTROOM DEPUTY: This is Case Number CV 17-421, Colocation America Corporation versus Mitel Networks Corporation, before the Court for an in-court hearing. 01:48PM

Would the parties please make announcements for the record.

MS. FOSTER: Theresa Foster on behalf of the plaintiff.

MR. ROGERS: Hello, Your Honor. Dave Rogers of Snell 01:48PM & Wilmer here on behalf of the defendant, Mitel Networks Corporation.

THE COURT: All right. Good afternoon. Sorry we're late but we're all here now.

And as I indicated, I don't intend to, and I do not 01:49PM think I can, prohibit anyone from filing a motion. But Judge Campbell tells me this has been productive in a couple of ways. He says it's not at all rare when people exchange these letters to have some discussion for one side or the other to narrow either their claims or the summary judgment motion. And 01:49PM discussion about the lay of the land without prejudging may be helpful as well.

I take it you both want to cross move on the one issue as to what the contract means. Correct?

MS. FOSTER: Correct, Your Honor. 01:50PM

THE COURT: And it seems like there is a course of negotiation here, and it's certainly not clear to me what this language means. It might become clear with evidence of industry usage and whatnot.

And I recollect, I think, Mr. Rogers, you had a smoking gun e-mail you were relying on. 01:50PM

MR. ROGERS: Well, the one we showed you, I don't expect you to remember all the way back from the last hearing, but yes. Essentially yes without me going into the details.

THE COURT: Is that the linchpin of your motion? 01:51PM

MR. ROGERS: No. Not at all the linchpin. It's just a piece of evidence and that would be parol evidence. We actually, we think that the contract is clear enough on its face for the Court to interpret it. But I just heard you say you don't think so. 01:51PM

THE COURT: Well, let me invite you both to give me the 25-word version why it's absolutely crystal clear it's your way, or as close to a short version. Ms. Foster.

MS. FOSTER: Yes, Your Honor. The defendant drafted the original draft of the contract. The plaintiff -- 01:51PM

THE COURT: But I'm looking at the language, the language that you are relying on as to --

MS. FOSTER: The plaintiff added the language, the associated IPv4 addresses to the draft contract. The defendant asked what is this so they knew that that was there. They went 01:52PM

ahead and signed the contract that included the IPv4 addresses.

THE COURT: Tell me, I'm not a tech guy. Tell me again what that means and why that encompasses all the addresses.

MS. FOSTER: The language of the contract itself references the domain name, the good will of the business as associated with that domain name and the associated IPv4 addresses. 01:52PM

THE COURT: What does that mean?

MS. FOSTER: IPv4, that 134.22.0.0, those are the addresses you can communicate with another computer on the address. Each particular computer is known by a special address and those are the addresses that we believe, plaintiff believed, they were purchasing from the defendant. 01:52PM

THE COURT: All right. Mr. Rogers, tell me why it's absolutely totally crystal clear your way. 01:52PM

MR. ROGERS: Okay. Number one, Your Honor, if you look at the contract language, if you are looking at the Paragraph A, just by the comma placeage, it starts out with a quit claim, and it lists three different things separated by commas: The domain name gandalf.ca the registration thereof, comma, together with the goodwill of the business connected with and symbolized by such domain name and the associated IPv4 and any associated trade dress, comma, or intellectual property rights related thereto, comma, to the extent any such rights 01:53PM 01:53PM

exist.

Just looking at that language we think it's clear.

THE COURT: Again, I'm not seeing it. You are going to have to explain that for me in a more simple way because it says, "and the associated IPv4." 01:54PM

MR. ROGERS: Right. In that part of the sentence that's separated by -- if you look at the beginning of that part of the sentence, prior to "together with," there's a comma. And if you look at the end of that clause of the sentence, after "trade dress," there's a comma. 01:54PM

That one clause is all read together, I believe, and we have some -- we have English grammar books that confirm this -- that it all -- it's all the goodwill of the business connected and associated with, by -- excuse me -- the goodwill.

THE COURT: It says -- and forgive me. It says, 01:55PM quote, "And the goodwill of the business connected with it and symbolized by the domain name."

MR. ROGERS: Together with.

THE COURT: And the associated IPv4 and any associated trade dress. That's looks like goodwill and the IPv4. 01:55PM

MR. ROGERS: It would render the commas in the paragraph, it would read them out. That construction would read them out.

THE COURT: You are being too elliptical for me. You are going to have to walk me through your theory of commas. 01:55PM

MR. ROGERS: Commas are used in a sentence for lots of reasons. In this case the commas are used --

THE COURT: Which commas?

MR. ROGERS: Excuse me?

THE COURT: Which commas? 01:55PM

MR. ROGERS: Well, the first one which is after the word "thereof."

THE COURT: "Together with."

MR. ROGERS: Begins "together with." Okay. Then the next comma, which is after the word "dress." 01:56PM

THE COURT: The next comma is after the word "name."

MR. ROGERS: No, it's after the word "dress." You are looking at a draft, Your Honor.

THE COURT: I'm looking at the exhibit.

MR. ROGERS: Oh. Oh. 01:56PM

THE COURT: Attached by Ms. Foster.

MR. ROGERS: It's Exhibit 1 to our letter. What you are referring to is Exhibit --

THE COURT: She calls it Exhibit 1.

MR. ROGERS: Yeah. That's Exhibit 2. Yeah. That's Exhibit 2 to our letter. The actual executed agreement is Exhibit 1 and Exhibit 2 would go to parol evidence. 01:56PM

THE COURT: You are going too fast for me.

MR. ROGERS: Okay.

THE COURT: So Ms. Foster, this Exhibit 1 to yours, if 01:57PM

that's not the executed copy, what is it?

MS. FOSTER: Your Honor, that was a draft that was being exchanged. And the reason we have that attached is because that was where the plaintiff added that language concerning the IPv4 addresses and the defendant made the comment what is this.

01:57PM

THE COURT: You added it. All right. Okay. Now, let me go to the executed copy.

MR. ROGERS: That's Exhibit 1 to our letter, Your Honor.

01:58PM

THE COURT: All right. Now, walk me through your theory of commas again.

MR. ROGERS: Sure, Your Honor.

Okay. Commas are used to break, in this case, to break the sentence up into different sections.

01:59PM

THE COURT: Or to separate an enumeration.

MR. ROGERS: And if you look at the comma after "together," or excuse me, before the word "together," and read that entire section, and then there's a comma that stops that section after the word "dress." That entire section is modified. It's all goodwill. It's goodwill of the business connected with and symbolized by the domain name and the associated IPv4 and associated trade dress. Because to read all the conjunction the commas wouldn't make any sense.

01:59PM

THE COURT: So what you say it means is the goodwill

02:00PM

associated with the IPv4, correct?

MR. ROGERS: Correct. And I --

THE COURT: But not the IPv4.

MR. ROGERS: Themselves, that's correct.

THE COURT: Now this -- 02:00PM

MR. ROGERS: And not any associated trade dress because there's none of that, either. There's no trade dress either.

THE COURT: You know, I wondered about that, because I actually have some background in trade dress. I tried a 02:00PM six-week trade dress jury trial, and I couldn't figure out what the trade dress would be on IP. So anyway. . .

MR. ROGERS: But that's how we read it, Your Honor, and that's what MNC believed it to be.

THE COURT: Now, what's the story about the appearing 02:01PM and disappearing comma?

MR. ROGERS: Just very quickly, the comma that you were just looking at in the draft agreement was in the draft and then it was removed.

THE COURT: No. The comma was inserted by the 02:01PM plaintiffs in their draft, and they also inserted the reference of the associated IPv4. Did that comma originate -- the comma after the word "name," did that originate from the plaintiff?

MR. ROGERS: I don't remember at this point, Your Honor. 02:01PM

THE COURT: Okay. And who's responsible for it disappearing?

MR. ROGERS: Plaintiff.

THE COURT: Plaintiff took it out. Is that right, Ms. Foster?

02:01PM

MS. FOSTER: Your Honor, I believe so. It did not come out in a redline draft, but it did come out in between the two drafts. It was there in the last draft and the document that was executed it was not there. We believe it was the plaintiff.

02:02PM

MR. ROGERS: Your Honor, let me just say I believe that's correct. I'm not positive the plaintiff took it out.

THE COURT: Let me read this again with the advantage of the deleted comma. Now I'm going to re-read, to myself, what it would have meant with the comma after "name" still there. I mean, it's not in the signed copy, but let me figure out what it would have meant.

02:03PM

Okay. I think I understand. Well, and again, Ms. Foster, granted, I limited you to three pages, so it's rather -- your letter is a bit elliptical.

02:04PM

What I'd like to ask, and you can say what you want, but I'd like to have you explain to me what is the either parol evidence or the course of negotiation that bears on this meaning, this issue? I'm going to ask you both that question.

MS. FOSTER: Starting with me?

02:05PM

THE COURT: Yes.

MS. FOSTER: Your Honor, the defendant's position is that they were transferring any goodwill associated with those addresses but not the addresses. The problem is two things: One, there is no goodwill associated with the addresses. Nobody knows what the addresses are in your computer; and, two, you don't transfer goodwill. 02:05PM

THE COURT: I'm sorry. I asked you what is the parol evidence. I previously asked you what your theory of the text is. Now I want to know what is the parol evidence, and that would include the course of negotiations that tends to show that this meant the IP addresses were going too. 02:05PM

MS. FOSTER: And those are attached to my letter, Your Honor. The first one is the draft of the contract that the defendant specifically added those addresses into the contract. And the second one is -- 02:05PM

THE COURT: That begs the question what it means, whether it's the goodwill of the address or the address. The fact you had it in sort of begs that question, doesn't answer the question. What other parol evidence or course of negotiation is there? 02:06PM

MS. FOSTER: That's the second exhibit attached to our letter, Your Honor. That's the Escrow.com instructions where the parties agreed, they both agreed they were transferring the domain name and the IPv4 addresses. 02:06PM

THE COURT: Point to me the relevant language. This is a one-page document, right?

MS. FOSTER: Yes. Are you looking at my letter of March 21?

THE COURT: I'm looking at the document you attached to it. 02:06PM

MS. FOSTER: Exhibit 2?

THE COURT: Yeah.

MS. FOSTER: Up on the top right, Your Honor, it's hard to read, but it says, "On March 25, both parties have accepted the offer awaiting buyer payment." And then in the middle towards the bottom it says, "When seller notifies Escrow.com that the gandalf.ca," which is the domain name, "and the IPv4 addresses have been transferred, Escrow.com will verify that the buyer is the registrant on both WHOIS. 02:06PM 02:07PM

THE COURT: And this is an escrow instruction?

MS. FOSTER: Correct, Your Honor.

THE COURT: Who wrote this?

MS. FOSTER: The seller would have written this and the seller would have -- that's my client, the plaintiff -- deposited the funds into escrow and then Escrow.com is the one who makes the notations on the right to show that both parties have accepted it. 02:07PM

THE COURT: This references the IPv4 netblocks. What does "netblocks" mean? 02:07PM

MS. FOSTER: That's the same block as the addresses, Your Honor. It's the same numbers that are there in the contract. It's a large block of addresses getting transferred.

THE COURT: It's just a jargon for a group of addresses, correct? 02:08PM

MS. FOSTER: Correct.

THE COURT: Right. Okay. I understand that.

Is there any other parol evidence that sheds light on this issue?

MS. FOSTER: No, Your Honor. 02:08PM

THE COURT: Okay. All right. Let me hear from you, Mr. Rogers.

MR. ROGERS: Okay, Your Honor. I will tell you as much as you would like to hear.

The parol evidence is listed in our letter. First, all of the e-mails negotiating the contract only referenced the sale of a domain name. None of them referenced the IPv4 addresses; none of our e-mails, none of their e-mails. 02:08PM

THE COURT: Okay.

MR. ROGERS: In the e-mail where we accepted the offer, Mitel's in-house counsel said we accept. Here's the agreement reflecting the deal. It was only for the sale of a domain name and it also included goodwill. 02:08PM

THE COURT: That was a pre-execution draft?

MR. ROGERS: Pre-execution draft. So again, our 02:09PM

e-mail was only for the sale of the domain name for $10,000. Then there's the e-mail you referenced earlier in this hearing about Colocation's internal e-mails talking about how to nebulously slip in reference to IPv4 addresses. When the reference to IPv4 addresses -- 02:09PM

THE COURT: Give me the chronology of that internal e-mail. Is that before or after your client sent the e-mail saying fine?

MR. ROGERS: I think it was before.

THE COURT: Okay. 02:09PM

MR. ROGERS: I think it was the day before or a few days before.

THE COURT: Okay. Please continue.

MR. ROGERS: Sure. When Colocation added reference to the IPv4 addresses into what we think is the goodwill section 02:10PM of the contract, there was no change to the consideration of $10,000.

THE COURT: Okay. But taking it back to the chronology, at what point -- was this after your client expressed the acceptance to the draft that did not include any 02:10PM references to IPv4s? At what point in time did they change?

MR. ROGERS: After we sent the draft.

THE COURT: Well, I'm referring to what you told me was an e-mail accepting and agreeing.

MR. ROGERS: Yes. It was after that. 02:10PM

THE COURT: It was after that?

MR. ROGERS: After that they put in reference to IPv4 addresses which we understood to be the goodwill, which is very common for the transfer of a domain name. And in the original agreement it talked about a transfer of the domain name and goodwill associated therewith. 02:11PM

THE COURT: So there was -- I understand. And please continue. I'm asking you for your parol evidence as to what the real understanding was, actual understanding, or your understanding that one party or the other should have known the other side had even if it's different from their own understanding. 02:11PM

MR. ROGERS: Sure. And then there was the edit, the comma removal that we just talked about, which put, we think, made goodwill modify that entire clause of the sentence. 02:11PM

THE COURT: The comma?

MR. ROGERS: The comma removed between domain name --

THE COURT: But that comma removed is key to your analysis, right?

MR. ROGERS: Yes. Parol evidence. Well -- 02:12PM

THE COURT: That's drafting history.

MR. ROGERS: Yeah.

THE COURT: I mean, with the comma after the word "name," the rest of the sentence is kind of garbled grammatically and punctuationally. But when you take a comma 02:12PM

out after "name" it does flow together better, I think. So I tried to nail the comma down. I mean, Ms. Foster has told us that they put the comma in, and they took it out. Is that consistent with the evidence?

MR. ROGERS: I don't remember. I don't think -- 02:12PM

MS. FOSTER: If I said that, Your Honor, that's not what I meant. I'm not sure if the comma was there before we put the addresses in. I don't know. For purpose's of today's hearing it was just an outline and I did not go back and look at what it was. They will show where it was. 02:12PM

THE COURT: Okay. But the removal of the comma after the word "name" was done by Colocation in a revised draft, correct? That's what I heard you to say.

MS. FOSTER: No. I don't know that, Your Honor. It did not -- the comma removal did not show up in any redline 02:13PM draft. It showed up in the final one that got signed.

THE COURT: And who prepared the final? Mr. Rogers, what's your answer to those questions, answers with evidence? And if the evidence doesn't give any answers, that's the answer. 02:13PM

MR. ROGERS: Well, we do know if we go back through the changes between the parties, I'm virtually sure we do know who added and took out commas and added and deleted all the information. I just don't have all that.

THE COURT: That's fine. I don't expect to have every 02:13PM

comma in mind. So I'm not saying it would be dispositive but it would be interesting.

So, now, what other parol evidence do you have that you would rely on or course of negotiation?

MR. ROGERS: Okay. Shortly after this agreement was executed, Colocation negotiated another agreement to buy IPv4 addresses with JDA Software in Scottsdale. In that agreement, that agreement was never executed but Colocation has testified that, yes, they agreed to the terms, those terms. It's -- that agreement specifically states it is an assignment of IPv4 addresses and goodwill associated with the IPv4 addresses. It's not this murky adding into the middle of a paragraph which we think only means goodwill. And that's what we understood it to mean. This other document prepared virtually contemporaneously with our document expressly states it's assignment of this IPv4 address block and any associated -- any goodwill associated therewith. That type of language, it's --

THE COURT: You note that as an example of how they knew how to say exactly that, and they didn't think goodwill of an IP address was unintelligible. They drafted it for exactly that in a different contract.

MR. ROGERS: Right. They put it in exactly. And our argument would be following you only asked for what the evidence is, but if you want a $1.6 million asset, you are going to expressly state it. You are not going to try to, as

02:14PM 02:14PM 02:15PM 02:15PM 02:15PM

they would say, nebulously sneak it into the middle of the paragraph.

The escrow, okay, the Escrow.com document that Ms. Foster referred to and that they are really relying very heavily on now is complete inadmissible hearsay. So this is why I say that. We sent a subpoena duces tecum to Escrow.com last year when discovery opened. We got back the documents. We have an executed declaration from the custodian of records of Escrow.com. This document is not in Escrow.com's records. 02:16PM

THE COURT: So you're suggesting it's a fabricated document? 02:16PM

MR. ROGERS: Well, this is how this document came about. Has nothing to do with Ms. Foster. After we got the documents from Escrow.com and we got the document production from Colocation, we deposed Colocation's owner. During that deposition, I took the deposition, one of the things that we did was we walked him through all of Colocation's documents and also walked him through all of the Escrow.com documents and we showed that non of the Escrow.com documents in Escrow.com's possession have any reference whatsoever to IPv4 addresses. They only reference a transfer of a domain name. 02:17PM 02:17PM

Two or three days after his deposition, this document was produced to us. It's -- we don't have any record of it. Escrow.com has no record of it.

THE COURT: Who produced it to you? 02:17PM

MR. ROGERS: Colocation.

THE COURT: But not Escrow.com?

MR. ROGERS: Not Escrow.com. And it wasn't produced by Colocation prior to the deposition, or we pointed out to them all of the Escrow.com documents only talk about the assignment of a domain name. No reference at all to IPv4. 02:17PM

THE COURT: Are there escrow instructions that the parties executed?

MR. ROGERS: Well, the Escrow.com instructions.

THE COURT: Well, are there escrow instructions that both sides signed? 02:18PM

MR. ROGERS: No. It's a click. You click on it to accept it.

THE COURT: Okay. That makes things so murky. I like the olden days. You knew if something had been accepted. But in any event, you click on it in an online process. Is there any -- well, again, I'm only asking about evidence you have. 02:18PM

I'm just wanting to see if -- did your client click on this, this version of escrow instructions?

MR. ROGERS: To our knowledge. We don't have any record of this at all. 02:19PM

THE COURT: So did your client maintain records of this?

MR. ROGERS: I don't remember now. We produced everything a long time ago. 02:19PM

THE COURT: That's fine. I would think that any executed document or approved document would be copied and retained in the normal business practice for -- now maybe it wasn't, but --

MR. ROGERS: We don't have a copy of this, Your Honor. 02:19PM

THE COURT: I know.

MR. ROGERS: You are saying is there an actual thing that you know was the last one you clicked on? I don't know that we have that.

THE COURT: Okay. And so your people -- let's step 02:19PM back from this language here. And you have got other versions of the escrow agreement that do not have this language, right?

MR. ROGERS: That's correct.

THE COURT: And were those in your client's files? Maybe you already answered that, that you don't know. 02:20PM

MR. ROGERS: I think I have answered it by saying at this point I can't remember.

THE COURT: Okay. That's fine.

Now, obviously, these escrow instructions apparently went through some iterations. Does the evidence tell us who 02:20PM was drafting the language in the escrow instruction? Was it the escrow agent? Was it Colocation? Was it Mitel? Do we know who was drafting language? Because a lot of times it's done by the escrow agent.

MR. ROGERS: It was not Mitel. That I do know. For 02:21PM

this document, that Colocation is relying on, they have testified that Colocation's owner wrote in the language.

THE COURT: So this language that Ms. Foster is relying on, Colocation people wrote it in?

MR. ROGERS: Correct. 02:21PM

THE COURT: And we don't have, or we don't know, or the evidence doesn't show whether or not Mitel ever clicked on, slash, signed this draft?

MR. ROGERS: That's right.

THE COURT: Okay. Is there any other parol evidence? 02:21PM
Or now, actually, I would like to have a better understanding of the course of negotiations. Now, Mr. Rogers, I think I understand what you said, that the actual dickering, was only about the domain name?

MR. ROGERS: Correct. 02:22PM

THE COURT: But at some point this came up and Ms. Foster says it was inserted, and one of your people said what's that.

MR. ROGERS: That's correct.

THE COURT: Tell me your version of that, what your 02:22PM
evidence shows on that.

MR. ROGERS: What the evidence shows is that we -- the person that was negotiating the agreement on behalf of Mitel checked into the IPv4s. We knew at the time the contract was executed that we did not have title to the IPv4s, and we also 02:22PM

knew when the contract was executed -- well, I think that we knew, there were much -- I think we knew they were much more valuable than $10,000. But it was our understanding, which is typical in a domain name assignment or transfer, even a quit claim, it was part of the entire group of goodwill that could be associated with the domain name. 02:23PM

THE COURT: Again, the critical inquiry here, I think, is was it just buying the goodwill associated with that or was it buying the domain names, I mean, the IPv4 addresses? And what was the testimony about discussion on that? It doesn't 02:23PM answer the question to say, you knew at the time you didn't own the addresses because you can contract to sell the Brooklyn Bridge and if you later acquire it it's enforceable. Otherwise you are in a breach of contract to sell something you don't own. But the fact that you didn't own it doesn't necessarily 02:23PM dispose of it.

So what is the evidence? What was the testimony that was communicated, if anything, by the other side in response to the question of "What's this?"

MR. ROGERS: Between the parties, I think the 02:24PM communications were just the changes to the agreements, the agreement.

THE COURT: Ms. Foster is telling me there was some oral discussion to the effect of "what's this," and something was said about that. Is that right, Ms. Foster? 02:24PM

MS. FOSTER: No, Your Honor. We agree on that. Although defendant internally had discussions with her office about what this is, the only thing my client saw was a comment that said, "What is this," and there was no discussions between the plaintiff and the defendant. 02:24PM

THE COURT: All right. That enlightens me. So there was no oral discussion other than -- was there a note on a draft, what's this comma?

MS. FOSTER: No, Your Honor. The "what's this" related to the IPv4 addresses. 02:24PM

THE COURT: The "what's this," where does that show up?

MS. FOSTER: It's Exhibit 1 to our letter.

THE COURT: Was it a mutually communicated document or just an internal document to one side? 02:25PM

MS. FOSTER: It was mutually communicated. What happened is the defendant drafted a contract for the transfer of the domain name. The plaintiff came in and changed it to a quit claim because nobody knew about the location of the IPv4 addresses, added the language about the IPv4 addresses and the 02:25PM e-mail came back and said, "What is this?" For unknown reasons the plaintiff and defendant never discussed the comment.

THE COURT: So there was no follow-up on that?

MS. FOSTER: Correct.

THE COURT: Well, anything else, Mr. Rogers? 02:25PM

MR. ROGERS: The only other thing --

THE COURT: Again, I think you have told me, and I think perhaps hearing this confirmed by Ms. Foster, there was never any express written or oral negotiation about including the IPv4 addresses? 02:25PM

MR. ROGERS: That's correct.

THE COURT: Okay. This is really helpful. I get these really complicated summary judgment motions on business deals that went awry. And if I have to read these motions, this is very helpful to have this from both of you. 02:26PM

So, Ms. Foster, again, I was misunderstood, because I was reading Exhibit 1 to your letter. But that was not what I should have been reading. And when I looked at the signed agreement, so you know, I just -- what we have here is a situation in which there is no express oral discussion about 02:27PM the IPv4 addresses being included. The case rests on just this language in the text. Is that right, Ms. Foster?

MS. FOSTER: And the versions of the contract that went back and forth.

THE COURT: Well, I'm thinking this is like a year and 02:28PM a half ago I did a long, extremely complicated insurance case involving millions of dollars and four years of policy and two different levels of policy, which I granted summary judgment for the insurer. And I just got a memo this morning affirming my decision on that. 02:28PM

MS. FOSTER: Congratulations.

THE COURT: Well, I am happy of that only because I don't have to try that case now. But it was exactly that. There was no negotiation whatever. There was both, sides admitted, no course of dealing, no negotiations, nothing oral, nothing in writing. The whole case turned on policy language and nothing more. It's looking to me like this is breaking down that way, too. Actually, that's not quite right because the course of negotiation could be relevant and admissible if there was a lot of, as there was, a lot of back and forth and silence on this. In the case I just referring to, there was nothing going on except the City of Phoenix was buying insurance and no letters, no -- it was we want this kind of insurance and they got it.

So I'm not saying that that the course of negotiations could have probative value, but it looks like the plaintiff's case rests only on the language. I'm not trying to put any words in anybody's mouth. I'm just trying to get an understanding.

So Ms. Foster, again, I'm trying to summarize what I think we have talked through here, that your case, I understand your case about the language, but you don't have anything else. You don't have any oral discussion or history of negotiation to suggest anything that might be admissible to give meaning to that language?

02:29PM 02:29PM 02:29PM 02:30PM 02:30PM

MS. FOSTER: No oral discussions, Your Honor.

THE COURT: But I think Mr. Rogers does, the fact that there was an extended negotiation with drafts and there was nothing about this I think -- I'm not prejudging anything. I get a lot of these cases. This is the kind of case I used to litigate. So I think he probably could get that in. 02:31PM

So if your case turns solely on the language, you know, Mr. Rogers, if you are going to be filing a motion and there is no -- the only extraneous evidence that would cover both parol evidence and course of negotiation is yours, I think we're going to be fighting over the language. So if you are going to be filing that motion there's no reason for Ms. Foster not to cross move on the same thing. It's really the same brief she's going to file either way, whether it's for her motion or responding to yours. 02:31PM 02:32PM

So all right. I'm satisfied, A, there is a point to these motions. So there is something else that -- two other things I want to talk about. Some of the judges, I think most of us, are conducting an experiment, a procedural experiment with authorization under a general order signed by the chief judge about our procedure of separate Statements of Fact in support of Motions For Summary Judgment. There is a lot of dissatisfaction with that, that I -- in 2012 we did a significant rewrite of the local rule that was supposed to tell the lawyers to stop doing what most of them were doing, which 02:32PM 02:33PM

is only give us the facts that the case turns on. Don't give us the background facts. And you can't do a reply to a response either. But nobody has picked up on it. We're getting 40 pages of separate Statements of Fact. So we are concerned that it is greatly running up the expense of summary judgment motions. It's burdening both sides and burdening the Court and not very helpful. 02:33PM

So I haven't entered it in your case yet. Have either of you written any motions yet or are you just talking about it? 02:34PM

MS. FOSTER: Your Honor, we're just talking about it because at the last hearing you mentioned you were going to let us know if you thought it would be futile.

THE COURT: If you already wrote the motion I wouldn't. So I will enter the order I will dispense with the separate Statement of Facts. You still have to state in your brief every fact, the facts upon which you are entitled to judgment with full record cites. And everything has to be in the record. If it's not already available you need to supply it to us. 02:34PM 02:34PM

And by the way, when this is all done, I'm going to invite your comments as to whether you think that was a good idea or not because the whole point of this is this is an experiment.

MR. ROGERS: So what Your Honor is saying, so if we 02:35PM

file a motion, we would just have the exhibits attached to the motion?

THE COURT: Correct.

MR. ROGERS: Okay.

THE COURT: Correct. So I will get that out shortly. 02:35PM

I don't believe in simultaneous cross motions. I want to have them sequenced. So let's talk about -- and everybody gets two briefs. So who should go first? I'm thinking in terms of what sets this up better for the plaintiff or the defendant to move forward. I don't know. I just -- I just 02:36PM want to have an orderly presentation that's sensible for you and easier for me.

MS. FOSTER: Your Honor, I don't think it makes a difference who goes first. I just want to go back on the Statement of Facts. I like the idea of not doing a separate 02:36PM Statement of Facts but how are you going to know if there's ones we dispute or don't dispute?

THE COURT: You have to say it in your brief.

MS. FOSTER: Okay.

THE COURT: And you have to point to the evidence. 02:36PM That might be an affidavit or, you know, if it's deposition excerpts you need to give those to us as well.

MR. ROGERS: If we're --

THE COURT: Yes. Go ahead.

MR. ROGERS: I was going to say we can go first. 02:36PM

That's fine.

THE COURT: I think it actually, as I think it through, probably makes more sense for you to go first, because you will be telling a broader story of the history of negotiation that sets it in an easier context for Ms. Foster to respond to with none of that matters if she wins because of the language alone. So I think you should go first. 02:37PM

Now, I have this set for trial, I think, on August 6th. Let's -- we need to have this briefed in time so, A, I can rule on them; and B, if I decide oral argument is helpful we can do it in time to forestall a lot of costly trial preparation if I grant the motion, which means I'd like to set a schedule for briefing of cross-motions and the faster the better. 02:38PM

So, Mr. Rogers, how quickly can you get this motion filed? 02:39PM

MR. ROGERS: How about if we file by -- today's the 4th. How about if we file on the 25th?

THE COURT: April 25th. All right. That's three weeks. 02:39PM

All right. I will set plaintiff's Motion for Summary Judgment is due by April 25th. And how about for your response and cross-motion, we're going to have to have four levels of briefing here to be fair to everybody.

MS. FOSTER: We could do it three weeks later on May 02:40PM

16th.

THE COURT: What time?

MS. FOSTER: May 16, three weeks later.

THE COURT: All right. We'll set May 16 for the plaintiff's response and cross-motion. And you each get a reply.

02:40PM

MR. ROGERS: How about May 25th for our reply?

THE COURT: All right. That's fine. May 25th for defendant's reply.

MS. FOSTER: June 6th for our reply.

02:40PM

THE COURT: I'm largely going to be out in the month of June. So I had been hoping I could get this wrapped up with the least -- some days I could work on it and not have to wait until July to rule on it. And I have two jury trials in July, one on July 5th and another one I think on the 16th. So that's a bad time for me.

02:41PM

MS. FOSTER: Is the 20th a holiday?

THE COURT: 20th of what?

MS. FOSTER: Of May?

THE COURT: No, it's not. I'm sorry. 20th of May is Sunday.

02:41PM

MS. FOSTER: We'll do our reply on May 29, Your Honor. Will that help?

THE COURT: That will help. Thank you.

And you know, your reply will just be limited to your

02:41PM

cross-motion. And contrary to popular belief, it doesn't help to repeat things. If you have already said it in your other brief you don't have to say it again.

All right. My usual practice is I read the briefs. If I think oral argument will be helpful to me, I will call you to schedule it. And, A, it saves you your client's money if I don't think oral argument is going to be productive; and B, I can move faster that way.

02:42PM

However, and I just can't say whether -- I think this might be straightforward enough I can rule on it and say whether we have a trial on it or not. But what I do is if I decide I do want to do that, I will call you and ask you to make accommodation to come in quickly.

02:42PM

So all right. I think that covers it. And I'm going to tell Judge Campbell this is a great idea, because I have an understanding and overview now that I did not before and it will make it much easier to read your briefs.

02:43PM

MS. FOSTER: I think it is helpful for the parties too, Your Honor.

THE COURT: Anything else, counsel, before we break?

02:43PM

MS. FOSTER: Not on behalf of plaintiff.

MR. ROGERS: Nothing further from defendant.

THE COURT: We'll be adjourned. Thank you.

(Proceeding concluded at 2:43 p.m.)

**C E R T I F I C A T E**

I, LAURIE A. ADAMS, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED at Phoenix, Arizona, this 11th day of April, 2018.

s/Laurie A. Adams

Laurie A. Adams, RMR, CRR