David E. Rogers (#019274)
David G. Barker (#024657)
Jacob C. Jones (#029971)
SNELL & WILMER L.L.P.
One Arizona Center
400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
Telephone: 602.382.6000
Facsimile: 602.382.6070
E-Mail: drogers@swlaw.com
          dbarker@swlaw.com
          jcjones@swlaw.com

Attorneys for Defendant
Mitel Networks Corporation

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Colocation America, Inc., | No. CV-17-00421-PHX-NVW |
| Plaintiff, | **MITEL NETWORKS CORPORATION'S MOTION UNDER FED. R. CIV. P. 56 FOR SUMMARY JUDGMENT ON CONTRACT INTERPRETATION** |
| v. | |
| Mitel Networks Corporation, | |
| Defendant. | **Honorable Neil V. Wake** |

Mitel Networks Corporation ("MNC") moves for summary judgment and requests that the Court interpret the Domain Name Assignment Agreement ("Contract"), in relevant part, to be a quit claim of the domain name <gandalf.ca> ("Domain Name") and associated goodwill. MNC further moves the Court to enter judgment in its favor on all counts in Colocation's Complaint and to enter judgment in MNC's favor on Count One of MNC's Counterclaim (that Colocation breached the Contract), or alternatively on Count Two of MNC's Counterclaim (that the Contract is void or rescinded).

Contract interpretation is a matter of law, and MNC's construction is supported by at least the following: (1) the unambiguous language of the Contract recites only a quit claim of the Domain Name and associated goodwill, (2) the drafting history of the Contract (and removal of a comma between "Domain Name" and the phrase "and the associated IPv4 134.22.0.0.16") shows that only goodwill (if any) of IPv4 addresses was

quit claimed, (3) there is inadequate consideration for quit claiming 65,536 IPv4 addresses themselves, (4) all communications between MNC and Colocation prior to MNC accepting Colocation's offer, and prior to executing the Contract, referenced only the sale of rights in the Domain Name, and did not mention IPv4 addresses, (5) internal emails between Colocation's owner, broker, and attorney discussed how to "nebulously slip" IPv4 addresses into the Contract, and (6) an IPv4 assignment agreement prepared by Colocation in the same timeframe as the Contract specifically quit claimed (a) IPv4 addresses, (b) registrations of the IPv4 addresses, and (c) goodwill of the IPv4 addresses; in contrast, the Contract here has no quit claim of IPv4 addresses or their registrations.

## Memorandum of Points and Authorities

### I.  Legal Standard.

Summary judgment is to "dispose of factually unsupported claims" and is appropriate if the nonmoving party fails to make a showing sufficient to establish an element essential to its case, and on which it will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). The moving party bears the burden of demonstrating the absence of any genuine issue of material fact. *Id.* at 323. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Under Arizona law,[1] contract interpretation is a matter of law to be determined by the Court. *Hadley v. Sw. Properties, Inc.*, 116 Ariz. 503, 506 (1977). Accordingly, the Court can grant summary judgment based on its interpretation of the Contract as a matter of law. *McLane & McLane v. Prudential Ins. Co. of Am.*, 735 F.2d 1194, 1194 (9th Cir. 1984) (reversing and directing entry of summary judgment based on contract interpretation); *Held v. RiverSource Life Ins. Co.*, No. CV-12-1302-PHX-NVW, 2013 WL 4543891, at *6-10 (D. Ariz. Aug. 28, 2013) (granting summary judgment for defendants based on "[t]he threshold issue . . . of contract interpretation").

---

[1] Arizona law governs the Contract. Ex. 1 at 2 (citing Arizona law).

**Relevant Contract Interpretation Principles.**

"The primary and ultimate purpose of [contract] interpretation is to discover [the parties'] intent and to make it effective." *Taylor v. State Farm Mut. Auto. Ins. Co.*, 175 Ariz. 148, 152, (1993) (citing 3 Corbin § 572B, at 421 (1992 Supp.)). The Court ascertains the parties' intentions "as reflected by their language and in view of all the circumstances." *Smith v. Melson, Inc.*, 135 Ariz. 119, 121 (1983). The Court is required to review proffered extrinsic evidence to determine whether the contract language at issue is "reasonably susceptible" to the proponent's interpretation, and consider such evidence so long as it does not vary or contradict the contract language. *Taylor*, 175 Ariz. at 152-54 ("[A]lthough relevant, contract ambiguity is not the only lynchpin of a court's decision to admit parol evidence.").

Further, when the parties have different understandings of what the terms of the contract are, if the first party (here, Colocation) knows or has reason to believe that the second party (here, MNC) has a different understanding from the first party's understanding, the first party is bound by the second party's understanding. Restatement (Second) of Contracts ("Restatement") § 201(2) (1981); *Arizona v. Tohono O'odham Nation*, 944 F. Supp. 2d 748, 773 (D. Ariz. 2013), *aff'd*, 818 F.3d 549 (9th Cir. 2016) ("Section 201 provides a tool for determining whose meaning will prevail when . . . one party understands a term to mean something the term reasonably can be read to mean and the other party knows of the first party's understanding.").

## II.    Analysis.

**A.    MNC's Construction Is Consistent with the Contract as a Whole.**

   **(1)    The Quit Claim Section of the Contract Supports MNC's Construction.**

Paragraph A of the Contract states in relevant part:

> [Defendant] hereby agrees to **quit claim** to [Plaintiff] any of [Defendant's] right, title and interest in and to **the Domain Name** <gandalf.ca> and the registration thereof**, together with the goodwill of the business connected with and symbolized by such Domain Name and the associated IPv4 134.22.0.0/16 and any associated**

**trade dress,** or other intellectual property intellectual property [sic] rights relating thereto, **to the extent any such rights exist**.

Ex. 2 ¶ A (emphasis added).

Based on Paragraph A of the Contract: (a) The Contract is a "quit claim" of rights and not an assignment. (b) Paragraph A of the Contract is a single sentence that uses commas to break the sentence into the following three sections that are subject to the quit claim: (i) the Domain Name <gandalf.ca> and the registration thereof, (ii) together with the goodwill of the business connected with and symbolized by the Domain Name and the associated IPv4 134.22.0.0/16 and any associated trade dress, or[2] (iii) other intellectual property rights relating thereto.

Based on Standard English grammar rules, to the extent the quit claim of Paragraph A relates to IPv4 addresses, it is only a quit claim of goodwill (if any) in the IPv4 addresses associated[3] with the Domain Name. CJS CONTRACTS §306 ("In construing a contract, a court will follow elemental rules of grammar in order to ensure a reasonable application of the legal rules of construction."); Ex. 4A at MITEL002199 ("We use commas to separate a list of similar words or phrases."); Ex. 4B (commas are used "[t]o separate items . . . in a list of more than two.").

### (a) Including the Goodwill of the Business is a Standard Contract Provision.

Paragraph A of the Contract includes a standard goodwill provision that quit claims the *goodwill of the business connected with and symbolized by* a domain name, without disposing of other assets, such as IPv4 addresses or trade dress. *E & J Gallo Winery v. Gallo Cattle Co.*, 967 F. 2d 1280 (9th Cir. 1992) ("It is not necessary that the entire business or its tangible assets be transferred; it is the goodwill of the business that

---

[2] "'Or' may be read to mean 'and' when the context so indicates." *Willis v. United States,* 719 F.2d 608, 612 (2d Cir. 1983).

[3] None of the IPv4 addresses in the block 134.22.0.0/16 are associated with the Domain Name. *See* Ex. 3 (showing the Domain Name is associated with the addresses 54.236.82.34 and 54.200.36.149); *see also* Ex. 33 (describing Exhibits 3, 4A, 4B, 7, 19, 28, 29, 30, and 32).

must accompany the mark."); *Visa, U.S.A., Inc. v. Birmingham Tr. Nat. Bank*, 696 F.2d 1371, 1375 (Fed. Cir. 1982) (because goodwill may be valued separately from the physical assets of a company, "[i]t is not necessary that the entire business or its tangible assets be transferred" to a trademark assignee in order to find that the assignment included goodwill."); *Glamorene Products Corp. v. Procter & Gamble Co.*, 528 F.2d 894 (C.C.P.A. 1976) (BOUNCE BACK trademark assigned "together with the goodwill of the business" and the assignor "retained the tangible assets of its business"); *Hy-Cross Hatchery, Inc. v. Osborne*, 303 F.2d 947 (C.C.P.A. 1962) (transfer of egg hatchery trademark HY-CROSS "together with that part of the good will of the business connected with the use of an symbolized by the mark" was valid even though no eggs or chickens were transferred); *Money Store v. Harriscorp Finance, Inc.*, 689 F.2d 666 (7th Cir. 1982) (THE MONEY STORE trademark assigned to another, "together with the goodwill of the business symbolized by the mark," with no tangible assets of any kind).

### (b) If the Contract Meant to Quit Claim the IPv4 Addresses Themselves, It Would State That.

If the Contract were meant to transfer (or quit claim) the IPv4 addresses and their registrations, it would plainly and expressly state that just as it expressly quit claims (1) the Domain Name, (2) its registration, and (3) the goodwill of the business connected with any symbolized by the Domain Name. The Contract's quit claim provision related to the Domain Name expressly states: "quit claim . . . any of [Defendant's] right, title, and interest in and to the **Domain Name <gandalf.ca> and the registration thereof**, together with the goodwill of the business connected with and symbolized by such **Domain Name** . . . ." Ex. 2 ¶ A.

In contrast, the IPv4 addresses are referenced only once in the goodwill section of Paragraph A of the Contract. Ex. 2 ¶ A. The Contract has no quit claim of the IPv4 addresses themselves or their registrations, which would have been included if those were to be quit claimed. *See infra* at Section II, D, (3) at 13-14 (Colocation's proposed IPv4 agreement with JDA Software quit claims (1) the IPv4 addresses, (2) their

- 5 -

1  registrations, and (3) the goodwill of the business connected with and symbolized by the
2  IPv4 addresses).

3  **(2)    The Payment Section of the Contract Supports MNC's Construction.**

4  Paragraph B of the Contract is reproduced below:

> **Payment.**  The consideration (the "Consideration") to be paid by INTELLECTUAL PROPERTY PURCHASER shall be in the amount and through escrow as set forth in the standard Escrow.com instructions, **to be entered concurrent with this Agreement by the parties** and for the amount therein to be deposited by purchaser upon opening the escrow along with the escrow fees.  Within 1 business day after notification from Escrow.com that the purchase funds have been received from the INTELLECTUAL PROPERTY PURCHASER, **Mitel shall change the registered ownership of the Domain Name with a third-party registrar so that the "WHOIS" information will be registered to the INTELLECTUAL PROPERTY PURCHASER**, or agent of its choosing, **and transfer the Domain Name to a hosting service designated by the INTELLECTUAL PROPERTY PURCHASER and further execute any instrument of transfer may be required to effectuate the purchase of any of the quit intellectual property rights**.  Upon notice to Escrow.com of visible "Whois" registration and all related intellectual property transfer, the CONSIDERATION funds are to be released to Mitel by wire transfer as Mitel provides in the escrow instruction.

19  Ex. 2 ¶ B (emphasis added).  First, this Section references changing the registered owner
20  of, and transferring the Domain Name, but does not reference IPv4 addresses.  It would
21  expressly reference IPv4 addresses if the parties' true intent had been to change the owner
22  of, and transfer, 65,536 IPv4 addresses worth *at least* $320,000.[4]  Ex. 5 (Colocation
23  Admitting RFA Nos. 1-3, *i.e.* that Colocation paid $25,000 for 5,120 IPv4 addresses); *see*
24  *also* Ex. 6 at 48:8-11 (Colocation's principal acknowledging another transaction at $11
25  per IPv4 address[5]).  Second, this Section requires a "concurrent" purchase and transfer of

---

[4] MNC would present evidence that the value of the IPv4 addresses is about $1.6-$1.8 million if this issue were to go to trial.

[5] $11 per address multiplied by 65,534 addresses would be over $720,000.

- 6 -

the Domain Name and other "quit intellectual property rights."  MNC did not and does not have title to the IPv4 addresses, and could not have transferred them in March 2016.[6]  *See, e.g., Glickfeld v. Lerner*, 153 Cal. App. 2d 158, 161, (1957) (affirming judgment for defendants, noting that defendants "[did not] agree to sell any property which they did not own.")

### (3) The Obligation Section of the Contract Supports MNC's Construction.

Paragraph C of the Contract is reproduced below:

> **Mitel's Obligations.**  Mitel agrees to cooperate with INTELLECTUAL PROPERTY PURCHASER and to follow INTELLECTUAL PROPERTY PURCHASER'S reasonable instructions in order **to effectuate any transfer of the Domain Name or any intellectual property in a timely manner**. Specifically, upon receipt of the consideration, Mitel further agrees to prepare and transmit any necessary registration agreement or correspondence to authorize the transfers.

Ex. 2 ¶ C (emphasis added).  This Section references a transfer of the Domain Name, but does not reference IPv4 addresses.  It would expressly reference IPv4 addresses if the parties' true intent had been to transfer 65,536 IPv4 addresses worth *at least* $320,000. Ex. 5; Ex. 6 at 48:8-11.

### (4) The Warranty Section of the Contract Supports MNC's Construction.

Paragraph D of the Contract is reproduced below:

> **Warranty.**  Mitel warrants and represents that: (i) it has the full power and lawful authority to enter into this quit claim assignment and **transfer the Domain Name**, and (ii) it is the **lawful owner of the Domain Name and any associated intellectual property rights**.

---

[6] The IPv4 addresses were owned by a company called "Gandalf."  Gandalf went bankrupt in 1999.  Its assets were transferred to a bankruptcy trustee.  A company that no longer exists, called Mitel Corporation, purchased assets of Gandalf from the bankruptcy trustee.  The documents related to the purchase do not include IPv4 addresses.  The assets of Mitel Corporation were eventually transferred to businesses that ultimately became MNC and Microsemi Ltd.  The documents related to those transfers do not include IPv4 addresses.  All of these documents were produced to Colocation during discovery.  Thus, the IPv4 addresses may be owned by (a) the bankruptcy trustee, (b) MNC, or (c) Microsemi.  The owner listed in the ARIN directory is still Gandalf.  Ex. 7.  MNC has never used, leased, sold or offered to sell, any of the IPv4 addresses at issue here.

1  Ex. 2 ¶ D (emphasis added).  This Section references transferring the Domain Name, but
2  does not reference IPv4 addresses.  It would expressly reference IPv4 addresses if the
3  parties' true intent had been to transfer 65,536 IPv4 addresses worth *at least* $320,000.
4  Ex. 5; Ex. 6 at 48:8-11.

### (5) IPv4 Addresses Are Not "Intellectual Property."

To the extent relevant, IPv4 addresses are not "other intellectual property rights" or "intellectual property."  Such an interpretation would render the Contract language indefinite because IPv4 addresses, "other intellectual property rights" and "intellectual property" are recited as being different.  *See, e.g.,* Ex. 2 ¶ A.  Additionally, IPv4 addresses identify the location (or address) of a physical device connected to the Internet, and are not intellectual property.  Ex. 8 ¶¶ 7-9, 11.

### B.  The Drafting History of the Contract Supports MNC's Interpretation.

In an edit to the Contract after Colocation added its reference to IPv4 addresses, *Colocation removed* a comma between "Domain Name" and the phrase "and the associated IPv4 134.22.0.0/16."  *Compare* Ex. 9 (February 26, 2016 Contract draft with the comma) and Ex. 10 (March 3, 2016 Contract draft with the comma) *with* Ex. 11 (March 7, 2016 Contract draft with comma removed) and Ex. 12 (March 10, 2016 version executed by Colocation and eventually executed by MNC (Ex. 2)).  Thus, Colocation edited the draft to create this single section:

> "together with the goodwill of the business connected with and symbolized by such Domain Name and the associated IPv4 134.22.0.0/16 and any associated trade dress . . ."

Ex. 2 ¶ A.

*Colocation's* removal of the comma clarified that the phrase "the associated IPv4 134.22.0.0/16" referred only to goodwill (if any).  *See supra* at Section II, A, (1) at 3-4.

### C.  The Consideration Supports MNC's Interpretation.

On February 18, 2016 and February 24, 2016, Colocation's broker (Kotler) emailed MNC about purchasing only the Domain Name (but not IPv4 addresses).  Ex. 13; Ex. 14. On February 24, 2016, MNC responded that "Mitel accepts the offer . . ." and attached an

- 8 -

agreement solely for sale of the Domain Name. Ex. 14. When Colocation added reference to the IPv4 addresses, it did *not* change the amount of the consideration. *Compare* Ex. 14 (first draft) *with* Ex. 9 (second draft).

MNC accepted an offer by Colocation to buy the Domain Name and goodwill for $10,000 (Ex. 14), which is reasonable for a quit claim of rights to the Domain Name and associated goodwill. However, $10,000 is insufficient, as a matter of law, for a quit claim of rights to 65,536 IPv4 addresses worth *at least* $320,000. Ex. 5; Ex. 6 at 48:8-11.; *Idearc Media, LLC v. Palmisano & Assocs., P.C.*, 929 F. Supp. 2d 939, 950 (D. Ariz. 2013) ($2,500 was insufficient consideration, as a matter of law, for assets including a telephone number that the transacting parties separately valued at $187,068); *Hall v. Read Dev., Inc.*, 229 Ariz. 277, 285 (Ct. App. 2012), *as amended* (Apr. 26, 2012) (rescission is generally justified where there is failure of consideration).

### D. The Parol Evidence Supports MNC's Interpretation.

Parol evidence need not be considered because the Contract is unambiguous. But, should parol evidence be considered, it supports MNC's interpretation. This is a timeline of relevant events.

| **Date** | **Event** |
|---|---|
| Prior to February 18, 2016 | Colocation hired broker Corey Kotler to acquire IPv4 addresses for Colocation. Ex. 6 at 42:17-43:3; 46:4-9, 48:20-49:7, 59:19-23. |
| Prior to February 18, 2016 | Colocation's owner identified the IPv4 block in the Contract. *Id.* at 34:5-37:4, 41:10-14. |
| Prior to February 18, 2016 | Colocation's owner instructed Kotler to contact MNC to acquire the IPv4 addresses. *Id.* at 46:3-12, 49:22-51:18, 55:3-9. |
| February 18 & 24, 2016 | Kotler contacted MNC to acquire the IPv4 addresses, but never mentioned IPv4 addresses during negotiations. He only mentioned acquiring rights to the Domain Name <gandalf.ca>. Ex. 13; Ex. 14; Ex. 15 (March 1, 2016 email from Corey Allen to MNC stating in part "here is the *domain name assignment* agreement in Word."); Ex. 6 at 69:12-18, 70:20-71:1, 71:18-72:9. |
| February 19, 2016 | In internal emails about negotiating the Contract with MNC, Colocation's owner stated to Kotler, "I would write it up for the |

| | | |
|---|---|---|
| | | domain and somehow slip in the IPv4." Colocation's agent, Kotler replied "Is there a way to slip it in nebulously?" Colocation's attorney, Paul Sigelman, was copied on these communications. Ex. 16. |
| | February 24, 2016 | MNC accepted Colocation's offer to sell the Domain Name for $10,000 and sent a draft agreement for only the acquisition of the Domain Name for $10,000. Ex. 14. |
| | February 26, 2016 | Colocation added a reference to the IPv4 addresses into the draft Contract. No change was made to the consideration of $10,000. Ex. 9. |
| | March 7, 2016 | A comma was removed after "Domain Name" and before the term "associated IPv4 addresses." *Compare* Ex. 9 (February 26, 2016 with the comma) and Ex. 10 (March 3, 2016 with the comma) *with* Ex. 11 (March 7, 2016, removing the comma) and Ex. 2 (executed version with no comma)). |
| | March 10, 2016 | The Contract was executed by Colocation on March 10, 2016 and was effective on March 7, 2016. Ex. 2 ¶ 1 and signature block. |
| | March 18-23, 2016 | The Contract was executed by MNC on March 18, 2016, after which MNC communicated directly with Colocation's personnel for the first time. No mention was made of IPv4 addresses. Ex. 17. In fact, Kotler introduced MNC to Colocation's representative by stating "Samantha will be further assisting you in the ***domain transfer*** process." *Id.* (emphasis added). |
| | March 24-25, 2016 | Colocation opened and cancelled five escrows with escrow.com for MNC to click for payment of the $10,000 under the Contract. None of those referenced IPv4 addresses. Ex. 18; Ex. 19. Each of these five transactions was entitled either "Domain Name Assignment – gandalf.ca" or "gandalf.ca Domain Name Transfer." Ex. 19. |
| | March 25, 2016 | Colocation opened a sixth escrow with escrow.com for MNC to click for payment of the $10,000 under the Contract. This escrow was entitled "Modified – Gandalf.ca Domain Name Assignment." Ex. 19 (Trans ID 847266). The records produced by escrow.com in this case do not show a reference to IPv4 addresses for that transaction. |
| | March 28, 2016 | MNC's representative explained to Colocation that there was obviously a misunderstanding about transferring the IPv4 addresses after Colocation requested that they be transferred. Ex. 20. |
| | March 30, 2016 | Corey Allen (i.e., Kotler) stated in an email to MNC that the domain and IP range are to be "transferred to the buyer as per the executed |

|  |  |
|---|---|
|  | agreement/escrow." Ex. 21. Kotler had nothing to do with the escrow. |
| March 31-April 15, 2016 | MNC communicated with Colocation and explained that there was a mistake and that MNC was willing to transfer the Domain Name as was agreed upon. Ex. 20; Ex. 21; Ex. 22. |
| April 6 & 12, 2016 | Corey Allen (i.e., Kotler) stated that MNC must transfer the Gandalf.ca domain name and the "the associated IPv4 134.22.0.0/16." Ex. 22; Ex. 23. |
| May 1, 2016 | Colocation negotiated an agreement with JDA Software to acquire IPv4 addresses. That agreement did not mention a domain name or trade dress, and (unlike the Contract attached as Exhibit 2) expressly stated that it was for a transfer of rights in IPv4 addresses, their registrations, and goodwill connected to the business associated with and symbolized by the IPv4 addresses. Ex. 24. |
| May 14, 2017 | On May 14, 2017, about 1 year, 2 months after the Contract was executed, an email was sent from escrow.com to Colocation and MNC inquiring about the status of the open escrow. Ex. 25. The email made no mention of IPv4 addresses. *Id.* No reason was provided as to why a follow-up email would be sent 1 year and 2 months after an escrow was opened, with no intervening email. |
| June 16, 2017 | On June 16, 2017, about 1 year, 3 months after the Contract was negotiated, two emails were sent about 1 hour apart, i.e., at 1:48 pm and 2:35:05 pm, by escrow.com that included specific reference to the Domain Name and IPv4 addresses. Ex. 26; Ex. 27. One of the emails includes the following statement: "Created: 16 June 2017 12:48 pm"; updated 16 June 2017 12:48 pm." Ex. 27. This language is not in the other escrow.com emails and appears to be a record that was created/updated on June 16, 2017. This same email states that a resolution is due 5 days later or by June 21, 2017 at 12:48 pm. *Id.* |
| July-August, 2017 | Escrow.com complied with MNC's subpoena duces tecum attached as Ex. 28 and provided all records in its possession related to the transaction between Colocation and MNC. Ex. 29 (custodian of records declaration indicating all responsive records were produced). Other records for Colocation that involved the transfer of IPv4 addresses expressly state that they are for IPv4 address transfers. Ex. 30 ("Sale of /20, /22 . . ."). Other escrow.com records for IPv4 address transfers also expressly refer to IPv4 addresses. *Id.* ("Transfer of 97.64.72.0/22 and 69.194.0.0/22" and "Transfer of 97.64.96.0/22 and 69.194.0.0/22"). |

| | |
|---|---|
| August 22, 2017 | The 30(b)(6) deposition of Colocation was taken. Colocation's owner and 30(b)(6) witness was shown the escrow.com documents related to the escrows opened by Colocation in March of 2016. None of the contemporaneous escrow transaction records mentioned IPv4 addresses. Ex. 6 at 94:5-7, 95:21-97:5, 98:22-101:8, 101:23-102:1, 102:12-106:22, 107:9-109:3, 110:18-111:10. |
| August 24, 2017 | Colocation first produced the document attached as Exhibit 31 two days after the 30(b)(6) deposition of Colocation. Exhibit 31 had not previously been produced by Colocation and was not produced by escrow.com. (By attaching Exhibit 31, MNC does not concede that it is admissible for any purpose other than to support this statement). |

**(1) The Parties' Communications Pre-Acceptance Did Not Mention IPv4 Addresses.**

The communications between the parties before and when MNC accepted Colocation's offer did not reference IPv4 addresses, but only the sale of the Domain Name for $10,000. Ex. 13; Ex. 14. The parties' further communications prior to complete execution of the Contract on March 18, 2016 did not reference IPv4 addresses. Ex. 9; Ex. 10; Ex. 11; Ex. 12; Ex. 15. The only reference to IPv4 addresses during this time was in Paragraph A of Contract drafts. *Id.*

**(2) Colocation's "Slip it in Nebulously" Email String.**

On February 19, 2016, after MNC responded to Colocation's inquiry about purchasing the Domain Name, Colocation's owner stated in an internal email to his broker, Kotler, "I would write it up for the domain and somehow slip in the IPv4." Kotler replied, "Is there a way to slip it in nebulously?" Ex. 16. Then Colocation went about doing just that, i.e., "nebulously" slipping in a reference to IPv4 addresses so it could argue in court that it acquired an asset forth at least $320,000 for $10,000. "Nebulous" means "indefinite," "unclear," "vague," or "obscure." Ex. 32.

Under Arizona law, "[w]hen the meaning of a contractual provision remains unclear after consideration of the parties' intentions, 'a secondary rule of construction requires the provision to be construed against the drafter.'" *Town of Marana v. Pima Cty.*, 230 Ariz. 142, 147 (Ct. App. 2012). Here, it is undisputed that (1) Colocation drafted the

language about IPv4 addresses and (2) Colocation deleted the comma in that same provision. As a result, this secondary rule of construction requires that the IPv4 address provision be construed against Colocation. *Id.* Section 206 of the Restatement also supports adopting MNC's interpretation because Colocation deliberately intended for the meaning of the quit claim provision to be "nebulous," *i.e.* obscure (Ex. 32):

> Indeed, he [the drafter, *i.e.* Colocation in this instance] may leave meaning ***deliberately obscure***, intending to decide at a later date what meaning to assert. In cases of doubt, therefore, so long as other factors are not decisive, ***there is substantial reason for preferring the meaning of the other party***.

Restatement § 206 at cmt. a. There is no genuine dispute that deliberate obscurity was Colocation's goal, because its owner, broker, and attorney discussed internally how to "slip in nebulously" a reference to IPv4 addresses in a domain name sale agreement. Ex. 16.

**(3)  Colocation's Other IPv4 Address Agreement Expressly Transfers IPv4 Addresses, Their Registrations, and Goodwill.**

Shortly after Colocation and MNC entered into the Contract, Colocation prepared another agreement to acquire IPv4 addresses from JDA Software, Inc. Ex. 24. That agreement did not mention a domain name or trade dress, and (unlike the present Contract) expressly stated that it was for a quit claim of rights in (1) IPv4 addresses, (2) their registrations, and (3) the goodwill of the business connected with and symbolized by the IPv4 addresses:

> A.   Quit Claim. For good and valuable consideration, payable as more particularly described herein, JDA SOFWARE COMPANY, INC hereby **agrees to <u>quit claim the /16[7] and the registration thereof, together with the goodwill of the business connected with and symbolized by such and the associated IP (INTERNET PROTOCOL) /16</u>**. The quit claim transfer and assignment shall take effect as set forth herein upon

---

[7] "/16" is a reference to a block, or range, of IPv4 addresses. *See, e.g.,* Ex. 24 at 1 ("a /16 internet protocol block"), 2 ("/16 IP (INTERNET PROTOCOL) block").

- 13 -

> COLOCATION AMERICA, INC. making the payment as provided for herein.

Ex. 24 ¶ A. The rest of the JDA agreement is consistent with a quit claim of rights in IPv4 addresses themselves and their registration. Paragraph B (Payment) recites changing the registered owner of the IPv4 addresses. *Id.* Paragraph C (Obligations) references transferring IPv4 addresses. *Id.* Paragraph D (Warranty) references the authority to transfer IPv4 addresses. *Id.* Paragraph E states that the IPv4 addresses cannot be used to disparage the seller (JDA). *Id.*

The Contract here, however, has no such provisions. It only quit claims the goodwill of IPv4 addresses, and not the IPv4 addresses themselves or their registrations. Ex. 2 ¶¶ A-D; *supra* at Section II, A, (1)-(4), at 3-8.

### III. Conclusion.

The Contract should be interpreted, in relevant part, to be a quit claim of the Domain Name and associated goodwill. This interpretation is supported by the Contract language, the drafting history, the consideration, and the parol evidence. The Court should enter summary judgment in favor of MNC on all of Colocation's counts, and on either Count One or Count Two of MNC's counterclaim.

DATED this 25th day of April, 2018.

SNELL & WILMER L.L.P.

By: *s/ Jacob C. Jones*
David E. Rogers
David G. Barker
Jacob C. Jones
One Arizona Center
400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202

Attorneys for Mitel Networks Corporation

**CERTIFICATE OF SERVICE**

I hereby certify that on April 25, 2018, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Teresa H. Foster, Esq.
Brier, Irish, Hubbard & Erhart, P.L.C.
2400 East Arizona Biltmore Circle
Suite 1300
Phoenix, AZ 85016
ctfilings@thfosterlaw.com

Paul Stephen Sigelman
Sigelman Law Corporation
433 N Camden Dr., Suite 970
Beverly Hills, CA 90210
paul@sigelmanlaw.com

Attorneys for Colocation

s/ *Jacob C. Jones*