# EXHIBIT 1

**BRIER, IRISH, HUBBARD & ERHART**, P.L.C.
2400 EAST ARIZONA BILTMORE CIRCLE, SUITE 1300
PHOENIX, ARIZONA 85016
PHONE: (602) 522-3940
FAX: (602) 522-3945

Teresa H. Foster
Of Counsel
Direct Phone: (602) 515-0154
E-Mail: tfoster@bihlaw.com

March 21, 2018

<u>VIA EMAIL</u>
David Barker (dbarker@swlaw.com)
Dave Rogers (drogers@swlaw.com)

> Re:   *Statement of Basis for Motion for Summary Judgment*

Dear David & Dave:

Pursuant to the Court's Order entered on February 28, 2018, Plaintiff submits the following statement of the basis for a motion for summary judgment. This is a simple breach of contract case and the undisputed facts confirm that Defendant agreed to transfer the IPv4 addresses in both the Agreement and the subsequent escrow instructions. Defendant did not allege any "mistake" until a third-party offered to pay 15 to 20 times the amount of the purchase price set forth in the Agreement.

## I.   FACTS

Defendant's in-house counsel prepared initial draft of Agreement.

Plaintiff's agent added IPv4 addresses language into Agreement.

Defendant's counsel sent back redlined Agreement with question "***What is this?***" about the IPv4 addresses language. See <u>Exhibit 1</u>.

Defendant's counsel discussed the IPv4 addresses with her in-house intellectual property people.

Defendant's counsel discussed the Agreement (with the IPv4 addresses language included) with Defendant's President prior to execution of the Agreement.

Defendant's President executed the short 3-page Agreement with the IPv4 addresses language included.

The escrow instructions also included an express transfer of IPv4 addresses. Escrows were cancelled and reopened (for unrelated reasons) but ultimately included a transfer of the IPv4 addresses. See <u>Exhibit 2</u>.

BRIER, IRISH, HUBBARD & ERHART, P.L.C.
March 21, 2018
Page 2

$10,000 purchase price was deposited into escrow. Plaintiff based the amount of the purchase price on the "quit claim" nature of the transaction (because Defendant was uncertain whether it actually owned the IPv4 addresses).

Prior to closing, a third party offered to buy the IPv4 addresses for somewhere in the range between $150,000 and $200,000. See Exhibit 3.

After the new offer, Defendant alleged a mistake concerning the IPv4 addresses. See Exhibit 4.

## II.    LAW

The depositions of the parties have been completed. The documents confirm that Defendant was aware of the IPv4 addresses language added to the Agreement (asking "*What is this?*"), the language was included in the Agreement at the time of execution, and was also included in the subsequent escrow instructions approved by Defendant. Defendant claims mistake, despite clear facts supporting its full understanding of the Agreement it entered, and the mistake, if any, as to value after entering the Agreement and once ownership was confirmed, was a risk voluntarily assumed by Defendant and not grounds to rescind the Agreement.

It was not until after the execution of the Agreement and approval of escrow instructions that Defendant asserted a "mistake." This occurred after Defendant determined that it did in fact own the IPv4 block and/or it has a value far higher than it thought at the time of signing the Agreement. Defendant then refused to honor the deal. It is settled under Arizona law that a party bears the risk of mistake when they are aware at the time the contract is made that they have only limited knowledge to the facts to which the mistake relates, but treats that knowledge sufficient, so that the conscious ignorance does not excuse them from a contract made. See *Nelson v. Rice,* 198 Ariz. 563, 566, 12 P. 3d 238, 241 (2000).

Sincerely,

Teresa H. Foster
Of Counsel

THF:ss
Attachments
Cc:    Honorable Neil Wake (wake_chambers@azd.uscourts.gov)

# EXHIBIT 2

## DOMAIN NAME ASSIGNMENT AGREEMENT

THIS AGREEMENT is made this 7th day of March, 2016 ("the Agreement"), by and between MITEL NETWORKS CORPORATION, on behalf of itself and its subsidiaries, a Canadian corporation with offices at 350 Legget Drive, Ottawa, Ontario, Canada K2K2W7 ("Mitel") and Colocation America, Inc., a Nevada Corporation with offices at 9360 W Flamingo Rd, Suite 110-178, Las Vegas, NV 89147 ("INTELLECTUAL PROPERTY PURCHASER").

**WHEREAS**, Dividend Advisors LLC has introduced the INTELLECTUAL PROPERTY PURCHASER to intangible rights which may be claimed as a result of a prior bankruptcy proceeding, including domain name and related intellectual property.

**WHEREAS**, Mitel hereby agrees to quit claim, transfer and assign, and INTELLECTUAL PROPERTY PURCHASER hereby agrees to purchase the domain name <gandalf.ca> (the "Domain Name") and related rights, subject to the terms and conditions of this Agreement.

**NOW, THEREFORE**, in consideration of the promises and agreements set forth herein, the parties, each intending to be legally bound hereby, do promise and agree as follows:

**A. Quit Claim**. For good and valuable consideration, payable as more particularly described herein, Mitel hereby agrees to quit claim to INTELLECTUAL PROPERTY PURCHASER any of Mitel's right, title and interest in and to the Domain Name <gandalf.ca> and the registration thereof, together with the goodwill of the business connected with and symbolized by such Domain Name and the associated IPv4 134.22.0.0/16 and any associated trade dress, or other intellectual property intellectual property rights relating thereto, to the extent any such rights exist. The quit claim transfer and assignment shall take effect as set forth herein upon INTELLECTUAL PROPERTY PURCHASER'S making the payment as provided for herein.

1



MITEL000021

**B. Payment.** The consideration (the "Consideration") to be paid by INTELLECTUAL PROPERTY PURCHASER shall be in the amount and through escrow as set forth in the standard Escrow.com instructions, to be entered concurrent with this Agreement by the parties and for the amount therein to be deposited by purchaser upon opening the escrow along with the escrow fees. Within 1 business day after notification from Escrow.com that the purchase funds have been received from the INTELLECTUAL PROPERTY PURCHASER, Mitel shall change the registered ownership of the Domain Name with a third-party registrar so that the "WHOIS" information will be registered to the INTELLECTUAL PROPERTY PURCHASER, or agent of its choosing, and transfer the Domain Name to a hosting service designated by the INTELLECTUAL PROPERTY PURCHASER and further execute any instrument of transfer may be required to effectuate the purchase of any of the quit intellectual property rights. Upon notice to Escrow.com of visible "Whois" registration and all related intellectual property transfer, the CONSIDERATION funds are to be released to Mitel by wire transfer as Mitel provides in the escrow instruction.

**C. Mitel's Obligations.** Mitel agrees to cooperate with INTELLECTUAL PROPERTY PURCHASER and to follow INTELLECTUAL PROPERTY PURCHASER'S reasonable instructions in order to effectuate any transfer of the Domain Name or any intellectual property in a timely manner. Specifically, upon receipt of the consideration, Mitel further agrees to prepare and transmit any necessary registration agreement or correspondence to authorize the transfers.

**D. Warranty.** Mitel warrants and represents that: (i) it has the full power and lawful authority to enter into this quit claim assignment and transfer the Domain Name, and (ii) it is the lawful owner of the Domain Name and any associated intellectual property rights.

**E. INTELLECTUAL PROPERY PURCHASER Obligations.** INTELLECTUAL PROPERTY PURCHASER agrees not to: use the Domain Name or any resulting website: (i) to disparage Mitel in any way; (ii) and disclose the material terms of

2



MITEL000022

this Agreement, such as the Consideration, however either party may disclose the existence of the Agreement.

**F. Entire Agreement.** This Agreement embodies the entire understanding of the parties with respect to the subject matter hereof, and merges all prior discussions between them, and neither of the parties shall be bound by any conditions, definitions, warranties, understandings, or representations with respect to the subject matter hereof other than as expressly provided herein. No oral explanation or oral information by either party hereto shall alter the meaning or interpretation of this Agreement.

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be made and executed on the date signed by Mitel below ("Effective Date").

MITEL NETWORKS CORPORATION

Name: Greg Hiscock

Position: General Counsel. Corporate Secretary

Date: March 15/16

COLOCATION AMERICA, INC?

Name: Albert A Ahdoot / Busines

Date: 3/10/16

3

MITEL000023

## SCHEDULE A TO
## DOMAIN NAME ASSIGNMENT AGREEMENT

## INCOMING WIRE TRANSFER

Please ensure all funds in are paid in favor of **Mitel Networks Corporation** as per instructions below:

**RECEIVING BANK / INSTITUTION**
Name:
Branch:
Address:

**BANK OF NOVA SCOTIA**
**Toronto BSC (Servicing Transit)**
**20 Queen St W 4th Floor**
**Toronto, Ontario**
**M5H 3R3**
**CANADA**

SWIFT BIC:

ABA Routing #:

**BENEFICIARY**
Name:
Address:

**MITEL NETWORKS CORPORATION**
**350 Legget Drive**
**Ottawa, Ontario**
**K2K 2W7**
**CANADA**

Branch Transit:
Inst. number:
Account number
Currency code:

Global Treasury & Risk Management Operations
**Tel:**            (613) 592-2122         x: 71823 or 74433

**Fax:**                                          (613) 592-4784
@                                                 treasury@mitel.com

4

MITEL000024

# EXHIBIT 3



Français (?LANG=fr)

» Search WHOIS

## WHOIS search results

| | |
|---|---|
| **Domain name:** | gandalf.ca |
| **Domain name status:** | registered |
| **Creation date:** | 2000/10/06 |
| **Expiry date:** | 2019/12/14 |
| **Updated date:** | 2017/09/07 |
| **DNSSEC:** | Unsigned |
| | |
| **Registrar name:** | MarkMonitor International Canada Ltd. |
| **Registrar number:** | 5000040 |
| | |
| **Registrant name:** | Mitel Networks Corporation - TMA431328 |

**Administrative contact**

| | |
|---|---|
| **Name:** | Paulo Ferreira |
| **Postal address:** | 350 LEGGET DRIVE<br>KANATA ON K2K2W7 Canada |
| **Phone:** | +1.9057604172 |
| **Fax:** | |
| **Email:** | dns_admin@mitel.com |

**Technical contact**

| | |
|---|---|
| **Name:** | Paulo Ferreira |
| **Postal address:** | 350 LEGGET DRIVE<br>KANATA ON K2K2W7 Canada |
| **Phone:** | +1.9057604172 |
| **Fax:** | |
| **Email:** | dns_admin@mitel.com |

**Name servers**

| | |
|---|---|
| **DNS 1 hostname:** | dns.internic.ca 54.236.82.34 |
| **DNS 2 hostname:** | dns2.internic.ca 54.200.36.149 |
| **DNS 3 hostname:** | |
| **DNS 4 hostname:** | |
| **DNS 5 hostname:** | |
| **DNS 6 hostname:** | |
| **DNS 7 hostname:** | |
| **DNS 8 hostname:** | |
| **DNS 9 hostname:** | |

MITEL002169



**DNS 10 hostname:**
DNS 11 hostname:
DNS 12 hostname:
DNS 13 hostname:

(http://cira.ca)

---

## Search WHOIS

**Domain name:**    | WHOIS Search |        | Search WHOIS |

(e.g. *cira.ca*)

By accessing and using CIRA's website you agree that you have read, understood, and consent to the terms and conditions for
the use of CIRA's website, as set out in the Website Terms of Use (http://www.cira.ca/website-terms-of-use) and Privacy Policy
(http://www.cira.ca/privacy/policy.html).

**MITEL002170**

# EXHIBIT 4A

Punctuation - English Grammar Today - Cambridge Dictionary



# Punctuation

## from English Grammar Today

The most common punctuation marks in English are: capital letters and full stops, question marks, commas, colons and semi-colons, exclamation marks and quotation marks.

In speaking, we use pauses and the pitch of the voice to make what we say clear. Punctuation plays a similar role in writing, making it easier to read.

Punctuation consists of both rules and conventions. There are rules of punctuation that have to be followed; but there are also punctuation conventions that give writers greater choice.

### Punctuation: capital letters (B, D) and full stops (.)

We use capital letters to mark the beginning of a sentence and we use full stops to mark the end of a sentence:

*We went to France last summer. We were really surprised that it was so easy to travel on the motorways.*

*The Football World Cup takes place every four years. The next World Cup will be held in South Africa. In 2006 it was held in Germany.*

We also use capital letters at the beginning of proper nouns. Proper nouns include personal names (including titles before names), nationalities and languages, days of the week and months of the year, public holidays as well as geographical places:

*Dr David James is the consultant at Leeds City Hospital.*

*They are planning a long holiday in New Zealand.*

*Can she speak Japanese?*

*The next meeting of the group will take place on Thursday.*

*What plans do you have for Chinese New Year?*

MITEL002197

Punctuation - English Grammar Today - Cambridge Dictionary

## Punctuation: commas (,)

We use commas to separate a list of similar words or phrases:

*It's important to write in clear, simple, accurate words.*

*They were more friendly, more talkative, more open than last time we met them.*

We do not normally use a comma before *and* at the end of a list of single words:

*They travelled through Bulgaria, Slovakia, the Czech Republic and Poland.*

American English does use a comma in lists before *and*:

*We took bread, cheese, and fruit with us.*

We use commas to separate words or phrases that mark where the voice would pause slightly:

*I can't tell you now. However, all will be revealed tomorrow at midday.*

*We had, in fact, lost all of our money.*

*James, our guide, will accompany you on the boat across to the island.*

Separating clauses with commas

When main clauses are separated by *and, or, but*, we don't normally use a comma if the clauses have the same subject. However, we sometimes use commas if the clauses have different subjects:

*They were very friendly and invited us to their villa in Portugal.* (same subject)

*Footballers these days earn more money but they are fitter and play many more matches.* (same subject)

*It was an expensive hotel in the centre of Stockholm, but we decided it was worth the money.* (different subjects)

When a subordinate clause comes before the main clause, we commonly use a comma to separate the clauses. However, we do not always do this in short sentences:

*If you get lost in the city centre, please don't hesitate to text us or phone us.*

*If you get lost just phone us.*

When we use subordinate or non-finite comment clauses to give further details or more information, we commonly use commas to separate the clauses:

*You do need to wear a darker jacket, if I may say so.*

*To be honest, I thought they were very very rude.*

MITEL002199

Punctuation - English Grammar Today - Cambridge Dictionary

Commas and relative clauses

We use commas to mark non-defining clauses. Such clauses normally add extra, non-essential information about the noun or noun phrase:

*The ambulance, which arrived after just five minutes, took three people to the hospital immediately.*

*Hong Kong, where the first ASEAN meeting was held, is a very different city now.*

The same is true for non-finite clauses:

*The storm, lasting as it did for several days, caused serious damage to villages near the coast.*

**Warning:**

We don't use commas to mark defining clauses:

*Barcelona was the Spanish city that was selected for the Olympic Games.*

Not: ... ~~the Spanish city, that was selected~~ ...

**See also:**
   **Clauses**


Commas and speech forms

We commonly separate tags and *yes-no* responses with commas:

*They are going to the party, aren't they?*

*No, thank you. I've already eaten too much.*

We also usually separate vocatives, discourse markers and interjections with commas:

*Open the door for them, **Kayleigh**, can you. Thanks.* (vocative)

***Well**, what do you think we should do about it?* (discourse marker)

***Wow**, that sounds really exciting.* (interjection)

We use commas to show that direct speech is following or has just occurred:

*He said in his opening speech. 'Now is the time to plan for the future.'* (or *He said in his opening speech: 'Now is the time to plan for the future.'*)

When the direct speech is first, we use a comma before the closing of the quotation marks:

*'We don't want to go on holiday to the same place every year,' he said impatiently.*

**See also:**
   **Reported speech**

MITEL002200

# EXHIBIT 4B

# GARNER'S DICTIONARY OF LEGAL USAGE

## THIRD EDITION

### Bryan A. Garner

with a foreword by Judge Thomas M. Reavley

MITEL002194

# OXFORD
UNIVERSITY PRESS

Oxford University Press, Inc., publishes works that further
Oxford University's objective of excellence
in research, scholarship, and education.

Oxford New York
Auckland  Cape Town  Dar es Salaam  Hong Kong  Karachi
Kuala Lumpur  Madrid  Melbourne  Mexico City  Nairobi
New Delhi  Shanghai  Taipei  Toronto

With offices in
Argentina  Austria  Brazil  Chile  Czech Republic  France  Greece
Guatemala  Hungary  Italy  Japan  Poland  Portugal  Singapore
South Korea  Switzerland  Thailand  Turkey  Ukraine  Vietnam

Copyright © 1987, 1995, 2011 by Bryan A. Garner

Published by Oxford University Press, Inc.
198 Madison Avenue, New York, NY 10016
www.oup.com

Oxford is a registered trademark of Oxford University Press

All rights reserved. No part of this publication may be reproduced,
stored in a retrieval system, or transmitted, in any form or by any means,
electronic, mechanical, photocopying, recording, or otherwise,
without the prior permission of Oxford University Press.

Library of Congress Cataloguing-in-Publication Data

Garner, Bryan A.

Garner's Dictionary of Legal Usage / Bryan A. Garner. — 3d ed.

p. cm.

Rev. ed. of: A dictionary of modern legal usage / Bryan A. Garner. 2d ed. 1995.

Includes bibliographical references and index.

ISBN 978-0-19-538420-8

1. Law—United States—Terminology. 2. Law—United States—Language. 3. Legal composition.
4. English language—Usage—Dictionaries. I. Title. II. Title: Garner's dictionary of legal usage.

KF156.G367 2011

340.03—dc22

2011004242

1 2 3 4 5 6 7 8 9

Printed in the United States of America
on acid-free paper

MITEL002195

of one or more elements and the contracting of the remaining elements into a meaningful expression <we will = we'll> <department = dep't> <2011 = '11>.

On the misuse of an apostrophe to denote a plural, see PLURALS (F).

**C. The Colon [:].** This mark may link two grammatically complete clauses by indicating a step forward from the first to the second: the step may be from an introduction to a main theme, from a cause to an effect, from a general statement to a particular instance, or from a premise to a conclusion. E.g.: "The remedy is simple[:] the United States Supreme Court can eliminate the conflict by simply taking up an appropriate case for review." *Kidwell v. State*, 696 So.2d 399, 405 (Fla. Dist. Ct. App. 1997). The colon is also used, and perhaps more commonly, to introduce a list of items, often after expressions such as "for example"; "namely"; "the following"; "as follows"; and "including." E.g.: "The following Judges were present[:] Judge J. Fritz Thompson, Richard V. Evans, E.M. Creel, Robert J. Wheeler, C.B. Smith, John Denson, J. Edgar Bowron, Gardner Goodwyn (from Bessemer), J.Q. Smith, and Leigh M. Clark." *Hale v. State*, 186 So. 163, 165 (Ala. 1939).

**D. The Comma [,].** This is the least emphatic mark of punctuation, and the one used in the greatest variety of circumstances.

1. To separate adjectives that each qualify a noun in the same way <a cautious[,] reserved person>. E.g.:

   - "Is there to be one standard for the old, repulsive laws that preferred whites over blacks, and a *different, more forgiving* standard for new laws that give blacks special benefits in the name of historical redress?" Linda Greenhouse, *Signal on Job Rights*, N.Y. Times, 25 Jan. 1989, at 1.

   - "It almost goes without saying that the job of the president of the L.I.R.R. is not a weekday warrior's position—it is not a *five-days-a-week, 9-to-5* job." Matthew L. Wald, *Senator Assails L.I.R.R. Chief as Out of Touch*, N.Y. Times, 21 Apr. 1994, at B6.

   But when adjectives qualify the noun in different ways, or when one adjective qualifies a noun phrase containing another adjective, no comma is used—e.g.: "a distinguished [no comma] foreign journalist"; "a bright [no comma] red tie." E.g.: "I could quote dozens of similar remarks by *eminent, legal scholars* [read *eminent legal scholars*] and lawyers." Jerome Frank, *Courts on Trial* 61 (1949).

2. To separate items (including the last from the penultimate) in a list of more than two—e.g.: "the defendants, the third-party defendants[,] and the counterdefendants." The question whether to include the serial comma has sparked many arguments in law offices and judges' chambers. It is easily answered in favor of including the final comma, for its omission may cause ambiguities, whereas its inclusion never will—e.g.: "A and B, C and D, E and F[,] and G and H." When the members are

compound, calling for *and* within themselves, clarity demands the final comma. See ENUMERATIONS (B).

3. To separate coordinated main clauses—e.g.: "Cars will turn here[,] and coaches will go straight." There are two exceptions: first, when the main clauses are closely linked (e.g., "Do as I tell you [no comma] and you will not regret it."); and second, when the subject of the second independent clause, being the same as in the first, is not repeated (e.g., "Remedies that prevent harm altogether are often better for plaintiffs [no comma] and are always closer to the ideal of corrective justice." Douglas Laycock, *The Death of the Irreparable Injury Rule* 4 (1991)).

4. To mark the beginning and ending of a parenthetical word or phrase <I am sure[,] however[,] that it will not happen> <Fred[,] who is bald[,] complained of the cold>.

   Some writers mistakenly omit the second comma—e.g.:

   - "Scienter, or knowledge of the falsity of representation[,] is required." William F. Walsh, *A Treatise on Equity* 490 (1930).
   - "Mr. Rifkin's lawyer, John Lawrence[,] insisted that Mr. Rifkin did not know what he was doing and often drove around in a haze after strangling victims." John T. McQuiston, *Rifkin Guilty of Murder as Long Island Jury Rejects Insanity Defense*, N.Y. Times, 10 May 1994, at A16.

   Still others leave out both commas, often creating a MISCUE: "Such warrantor must as a minimum remedy such consumer product within a reasonable time and without charge." 15 U.S.C. § 2304(a)(1) (1988). (A comma is needed after *must* and after *minimum*; otherwise, one reads *as a minimum remedy* as a single phrase.)

   Note that with restrictive clauses—that is, those that are necessary to define the antecedent or to limit it—*no* commas are used. E.g.: "Men [no comma] who are bald [no comma] should wear hats." / "Facts [no comma] not unlike those found in this record [no comma] were considered in that case." See **that & which.**

5. To separate a participial or verbless clause, a salutation, or a vocative—e.g.: "Having had breakfast[,] I went for a walk." / "The sermon *over* [or *being over*], the congregation filed out." / "Fellow lawyers[,] the bar must unite in seeking reform of the system of electing judges." (N.B.: Not "The sermon[,] being over[,] . . ."; and no comma with restrictive expressions like "My friend Judge Smith" or "my son John.")

6. To separate a phrase or subordinate clause from the main clause so as to avoid misunderstanding. E.g.: "In the valley below[,] the villages looked very small." / "In 1982[,] 1918 seemed like the distant past." (N.B.: A comma should not be used to separate a phrasal subject from its predicate, or a verb from an object that is a clause. E.g.: "A car with

# EXHIBIT 5

1  David E. Rogers (#019274)
   David G. Barker (#024657)
2  Jacob C. Jones (#029971)
   SNELL & WILMER L.L.P.
3  One Arizona Center
   400 E. Van Buren, Suite 1900
4  Phoenix, Arizona  85004-2202
   Telephone:  602.382.6000
5  Facsimile:  602.382.6070
   E-Mail: drogers@swlaw.com
6          dbarker@swlaw.com
           jcjones@swlaw.com
7
   *Attorneys for Defendant*
8  *Mitel Networks Corporation*

9              IN THE UNITED STATES DISTRICT COURT

10                 FOR THE DISTRICT OF ARIZONA

11  Colocation America, Inc.,

12             Plaintiff,                      No. CV-17-00421-PHX-NVW

13       v.                                    **Mitel Networks Corporation's First
                                               Set of Requests for Admission to
14  Mitel Networks Corporation,                Colocation America, Inc. (Nos. 1–35 )**

15             Defendant.                       AND COLOCATION'S ANSWERS
                                                THERETO
16

17  **TO:   COLOCATION AMERICA, INC. AND ITS ATTORNEYS OF RECORD:**

18        Pursuant to Rules 26, and 36, Federal Rules of Civil Procedure, Defendant Mitel

19  Networks Corporation requests that Plaintiff Colocation America, Inc., serve written

20  responses to the requests for admission below, and admit or deny the truth of the matters

21  asked, within thirty days of service.  Any request for admission not admitted or denied

22  within thirty days of service may be deemed admitted.

23                           **INSTRUCTIONS FOR USE**

24        1.    A denial shall fairly meet the substance of the request, and when good faith

25  requires that an answer to a requested admission be qualified or denied only in part, the

26  answer shall specify so much as is true and qualify or deny the remainder.  You may not

27  give lack of information or knowledge as a reason for failure to admit or deny unless you

28  have made a reasonable inquiry and the information is unknown or not readily obtainable.

1  production in which any conjunction or disjunction appears.

2       13.   "Person" means an individual, firm, corporation, association, organization

3  or any other entity.  All references to persons or entities also include all persons and

4  entities acting on his, her, their or its behalf.

5       14.   The term "including" is not limiting and means "including, without

6  limitation."

7

8

9  **REQUESTS FOR ADMISSION**

10

11  **REQUEST FOR ADMISSION NO. 1:**

12      With reference to MITEL001687, admit that the "Net Range" 74.114.116.0 –

13  74.114.119.255 includes 1,024 individual IPv4 addresses.

14  **ANSWER:**

15       X    Admit               Deny

16

17

18

19

20  **REQUEST FOR ADMISSION NO. 2:**

21      With reference to MITEL001688, admit that the "Net Range" 67.219.16.0 –

22  67.219.31.255 includes 4,096 individual IPv4 addresses.

23  **ANSWER:**

24       X    Admit               Deny

25

26

27

28

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

**REQUEST FOR ADMISSION NO. 3:**

With reference to MITEL001671 and MITEL001687-MITEL001688, admit that Colocation paid $25,000 in connection with Escrow.com "Transaction 1065206 (Escrow 577160)."

**ANSWER:**

    X     Admit                _____ Deny

**REQUEST FOR ADMISSION NO. 4:**

With reference to MITEL000021, admit that the IPv4 block designated by 134.22.0.0/16 includes 65,536 individual IPv4 addresses.

**ANSWER:**

    X     Admit                _____ Deny

**REQUEST FOR ADMISSION NO. 5:**

Admit that "Corey Allen" is not Kotler's full legal name.

**ANSWER:**

_____ Admit              X     Deny

**REQUEST FOR ADMISSION NO. 6:**

Admit that Colocation knew, before Kotler contacted MNC, that "Corey Allen" was not Kotler's full legal name.

**ANSWER:**

_____ Admit              X     Deny

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

COLOCATION'S ANSWERS TO REQUESTS FOR ADMISSIONS

(Nos. 1 – 35)

DATED:  October 16, 2017.

BRIER, IRISH, HUBBARD & ERHART, P.L.C.

Teresa H. Foster, Of Counsel
2400 E. Arizona Biltmore Circle, Ste 1300
Phoenix, AZ 85016
Attorneys for Plaintiff

CERTIFICATE OF SERVICE

ORIGINAL mailed this 16th day of October, 2017, to:

David E. Rogers
David G. Barker
Jacob C. Jones
SNELL & WILMER, LLP
One Arizona Center
400 E. Van Buren, Suite 1900
Phoenix, AZ 85004-2202

VERIFICATION

Albert Ahdoot, upon oath states:

I am the President of Plaintiff in this matter and have reviewed Plaintiff's Responses to Second Request for Production of Documents, First Set of Request for Admissions, and Second Set of Interrogatories. I declare under penalty of perjury that the information contained therein is true and correct to the best of my knowledge, information and belief.

DATED: October 16, 2017.

Albert Ahdoot

**Transaction 1065206 (Escrow 577160)**

| | |
|---|---|
| **Description** | Sale of /20, /22 & 2 x ASNs |
| **Status** | Transaction Closed. Buyer Accepts |
| **Created** | 2016-08-12 12:21:24 |
| **Total Value** | 25000.00 USD |
| **Buyer** | 984834 (albert@colocationamerica.com) |
| **Seller** | 1036631 (vincent@dp5.com) |

**Transaction History**

| Date | Status | Message | Cust ID | IP |
|---|---|---|---|---|
| 2016-08-12 12:21:25 | Buyer Initiate | Buyer initiates the transaction | 984834 | 24.24.222.72 |
| 2016-08-13 07:23:55 | SellerInitiate | Seller has agreed to the terms of this transaction. | 1036631 | 52.52.8.121 |
| 2016-08-13 07:23:55 | BothAccept | Both parties have accepted the offer, awaiting buyer payment. | 1036631 | 52.52.8.121 |
| 2016-08-15 08:18:58 | sellersettlemen | seller selected ACH as a settlement method to TD Bank, Account Number *******7773 | 1036631 | 108.53.167.215 |
| 2016-08-16 16:09:53 | PaymentApproved | Escrow.com approves payment. | | |
| 2017-01-27 12:42:42 | delivery | Seller acknowledges the delivery for milestone(s) #1. | 1036631 | 108.53.167.215 |
| 2017-01-27 12:52:07 | BuyerReceMiles | Buyer confirms receipt of milestone #1 | 984834 | 24.24.222.72 |
| 2017-01-27 12:53:21 | BuyerAcceMiles | Buyer accepts milestone(s) #1 | 984834 | 24.24.222.72 |
| 2017-01-27 12:53:34 | STclosedAllAcc | Milestone transaction closed,Buyer accepted all milestones | 984834 | 24.24.222.72 |
| 2017-01-30 12:16:43 | BothAccept | 24h sent | | |
| 2017-02-01 14:34:54 | ClosingStmt | Funds disbursed. Final closing statements sent to both parties. | | |
| 2017-02-01 14:35:03 | BothAccept | WFACH | | |
| 2017-02-01 22:32:11 | BothAccept | reviewed | | |

CONFIDENTIAL

MITEL001671

# RE: #1065206-577160 Sale of /20, /22 & 2 x ASNs

---

email: "Albert@colocationamerica.com Albert     **Friday, January 20, 2017 at 12:29:07 PM Pacific Standard Time**
(Colocation America)"
To: email: "support@escrow.com" , email: "vincent@dp5.com"

Thank you so much for your email.
We should close escrow by next week.
Will keep you posted on progress.

Thank you,

Albert Ahdoot
Director of Business Development

Colocation | Dedicated Server | About Us
Office: 800-296-8915 x12 | Cell: 310-717-9137

-----Original Message-----
From: support@escrow.com [mailto:support@escrow.com]
Sent: Friday, January 20, 2017 12:20 PM
To: vincent@dp5.com; albert@colocationamerica.com
Subject: #1065206-577160 Sale of /20, /22 & 2 x ASNs

Dear Buyer and Seller,

Please reply to all in this email with the status of this transaction.

If we may be of assistance in any way please let us know. Thank you for using Escrow.com.

Escrow.com Customer Support
180 Montgomery St, Suite 650
San Francisco, CA  94104

Toll Free 888.511.8600, U.S. and Canada
International 1.415.801.2270

```
Network
Net Range      74.114.116.0 - 74.114.119.255
CIDR     74.114.116.0/22
Name     LITHIX
Handle   NET-74-114-116-0-1
Parent   NET74 (NET-74-0-0-0-0)
Net Type       Direct Allocation
Origin AS
Organization   Lithix (JASON-12)
Registration Date    2009-06-02
Last Updated   2012-02-24
Comments       ADMIN1638-ARIN
```

MITEL001687

```
RESTful Link     https://whois.arin.net/rest/net/NET-74-114-116-0-1
See Also         Related POC records.
See Also         Related organization's POC records.
See Also         Related delegations.



Network
Net Range     67.219.16.0 - 67.219.31.255
CIDR     67.219.16.0/20
Name     CAC-BLOCK15
Handle   NET-67-219-16-0-1
Parent   NET67 (NET-67-0-0-0-0)
Net Type         Direct Allocation
Origin AS
Organization     Colocation America Corporation (CAC-89)
Registration Date       2016-12-08
Last Updated     2016-12-08
Comments
RESTful Link     https://whois.arin.net/rest/net/NET-67-219-16-0-1
See Also         Related POC records.
See Also         Related organization's POC records.
See Also         Related delegations.
```

MITEL001688

# EXHIBIT 6

**Albert Ahdoot**

**Date: August 22, 2017**

COLOCATION AMERICA

vs

MITEL NETWORKS



40 N. Central Ave #1400
Phoenix, AZ 85004
602-358-0225

```
 1

 2              IN THE UNITED STATES DISTRICT COURT

 3                 FOR THE DISTRICT OF ARIZONA

 4

 5   COLOCATION AMERICA, INC.,        )
                                      )
 6                    Plaintiff,      )
                                      )
 7        vs.                         )   No. CV-17-00421-
                                      )       PHX-NVW
 8   MITEL NETWORKS CORPORATION,      )
                                      )
 9                    Defendant.      )
     _____)
10

11

12        DEPOSITION OF ALBERT ARASH AHDOOT, a witness

13        herein, noticed by Snell & Wilmer L.L.P.,

14        taken at 350 South Grand, Los Angeles,

15        California, at 10:02 a.m., on Tuesday,

16        August 22, 2017, before Diane M. Lytle,

17        CSR 8606.

18

19

20

21

22

23

24

25
```

COLOCATION AMERICA vs MITEL NETWORKS                                    Deposition of Albert Ahdoot

Page 34

1    A.  I looked at pretty much the documents
2    that were given to me or I'd actually seen.
3       Q.  Uh-huh.
4       And -- I'll move on.
5       How did you become aware of the IPv4 block
6    that's mentioned in the contract?  And, again,
7    when I say, "contract," I mean the contract
8    between Colocation and MNC?
9       A.  By scanning the Internet.
10      Q.  Explain.
11      A.  Sure.  There's IPs that are allocated on
12   the Internet.  So we scan the Internet to see what
13   IPs were allocated, and we found this particular
14   IP.
15      Q.  When you say, "scan the Internet," what
16   exactly are you scanning?
17      A.  If I could explain it in other terms.
18   It's like scanning all the phone numbers that are
19   given out in Los Angeles, for example.
20      So all the 310 numbers, all the 213 numbers,
21   all the 818 numbers.  So there's so many IPs that
22   are allocated.  So we looked at what was allocated
23   in Northern -- I guess from U.S. and Canada, and
24   we ran into Mitel's IPs.
25      Q.  And the -- Again, when you say that you

Page 35

1    scanned, is there a particular site that you go on
2    to scan for them?
3       A.  There's a list of all the IPs that are
4    allocated on the Internet.  So we just looked it
5    over, and we went through them one by one.  So we
6    scanned the whole IP tables.
7       Q.  And when you say, "on the Internet,"
8    where on the Internet?  What site has that
9    information?
10      A.  ARIN.
11      Q.  The ARIN site?
12      A.  American Registry for Internet Numbers.
13      Q.  And how -- when you -- when you see
14   the -- the blocks that are listed by ARIN, how do
15   you know if those blocks are in use or not in use?
16      A.  You can ping them to see if they're
17   announced.
18      Q.  And so -- Okay.
19      Again, bring me down to lay terms, please.
20      A.  Sure.  It's like calling the phone number
21   to see if it's -- if someone -- if it rings to
22   someone or if it just rings.  So it was just there
23   and it wasn't being used.
24      Q.  And when -- when you ping them, do you
25   type in the Internet address into your computer to

Page 36

1    see if it actually lands on a web site?  Is that
2    how it's done?
3       A.  If it's live, basically.  You ping it to
4    see if it's live.  It's literally like poking
5    someone to see if they giggle.  So if it's up,
6    they're going to giggle.  If not, they're not.
7       Q.  And how -- how do you do -- I don't
8    understand.  I'm just asking you.
9       How do you do the poke?  What exactly do you
10   do on your computer?
11      A.  You go on a DOS command prompt, and you
12   put in the IP, and you ping it.
13      Q.  And if it's not being used, what do you
14   get back?
15      A.  It won't reply back.  And if it's being
16   used, it will reply back.
17      Q.  I see.
18      And so that's how you -- that's how you
19   located the IPv4 block.
20      Do you remember when that was done?
21      Let me -- let me ask it in an easier way.
22      That was done before MNC was contacted by
23   Corey Allen and Dividend Advisors; correct?
24      A.  Correct.
25      Q.  And who is the person who actually

Page 37

1    located the block?
2       A.  I believe I was.  I located it.
3       Q.  Did you also do the ping?
4       A.  I did.
5       Q.  Did someone from Colocation investigate
6    the bankruptcy of Gandalf Technologies in 1997?
7       A.  I believe I did.
8       Q.  How did you go about doing that?
9       A.  Just looked online.
10      Q.  And what did you find out?
11      A.  That Gandalf was purchased by Mitel.
12      Q.  And when you looked at the ARIN
13   information for the block of IPv4 addresses that
14   are at issue in this dispute, who does ARIN list
15   as the owner of that block?
16      A.  I believe Gandalf owned by Mitel.  So
17   both Gandalf and Mitel.
18      Q.  Are you aware now that the Mitel that
19   bought the Gandalf assets is not Mitel Networks
20   Corporation?
21      A.  I -- I know it's Mitel.  So I don't know
22   if it's Mitel this or Mitel that, so --
23      Q.  Yeah.
24      So you're not aware that the company that
25   bought the Gandalf assets out of bankruptcy was

Page 38

1   actually Mitel Corporation?
2       A.  They're all the same to me.  It's Mitel,
3   I think, that did it.
4       Q.  And you're not aware, then, that Mitel
5   Corporation actually became a company which is now
6   called Microsemi Corporation?
7       A.  I don't.
8       Q.  So you're not aware that the company
9   Mitel Corporation that bought assets of Gandalf is
10  not Mitel Networks Corporation, your lawyers
11  haven't told you that?
12      A.  From what I know, Mitel bought Gandalf.
13  That's what I do recall.
14      Q.  But you don't -- But nobody's told you
15  that the entity Mitel Corporation --
16      A.  Uh-huh.
17      Q.  -- that bought assets, didn't buy
18  Gandalf, is not Mitel Networks Corporation, it's
19  actually a business -- it's become a business now
20  called Microsemi?
21      A.  From what I recall on my research and
22  what I know as of today, Mitel owns Gandalf, so --
23      Q.  Well, how -- how did you come to the
24  conclusion that MNC owns Gandalf?
25      A.  My research online.

Page 39

1       Q.  Did you consult with a lawyer about that?
2       A.  Not at the time, no.
3       Q.  And have you consulted with a -- not
4   asking you what was said, have you consulted with
5   a lawyer about it since?
6       A.  Since the lawsuit, yeah.  I mean, we've
7   been going back and forth --
8       Q.  Uh-huh.
9       A.  -- so --
10      Q.  And is it -- And have you done -- have
11  you or has anyone -- Do you have any in-house
12  attorneys at Colocation?
13      A.  We do not.
14      Q.  Have you or anyone else at Colocation
15  done any further research to determine what the
16  chain of ownership of those IPv4 addresses that
17  are at issue is?
18      A.  After the lawsuit or before the lawsuit?
19      Q.  Other than the -- other than the research
20  that you just told me that you did online way
21  back --
22      A.  Sure.
23      Q.  -- again.
24      A.  So we did the research.
25      Q.  And when you said, "we did the research,"

Page 40

1   that was before having Corey Allen Kotler contact
2   MNC; correct?
3       A.  Correct.
4       Q.  Have you done any research on this issue
5   since then?  And by "this issue," what I mean is
6   the chain of ownership of those IPv4 addresses.
7       A.  And as far as the ownership is concerned,
8   as far as ARIN is concerned, Gandalf is owned by
9   Mitel.  That's the only research that I could
10  recall.
11      Q.  And that's your recollection of what you
12  saw on ARIN?
13      A.  Correct.
14      Q.  If that information was wrong, would it
15  have changed what you did back then?  And when I
16  say, "what you did," the whole chain of events,
17  having Corey Allen Kotler contact MNC.
18      A.  Well, Michelle confirmed that they owned
19  the domain and the IPs that went along with it.
20  So when you say has it changed, Mitel did confirm
21  they own the IPs and the domain.  So when you say
22  has it changed, no.
23      Q.  When you say, "Michelle," Michelle who?
24      A.  Whitting-- You said the last name.
25  Whittingham?

Page 41

1       Q.  Whittington?
2       A.  Whittington.  I apologize.
3       Q.  Yeah.
4       Where did she confirm that?
5       A.  In the contract.
6       Q.  So it's your belief that that's confirmed
7   in the contract?
8       A.  Yes.
9       Q.  Okay.
10      After you located this IPv4 block and pinged
11  it, you've already said that you asked Corey Allen
12  Kotler to negotiate a deal to acquire it from
13  Mitel; correct?
14      A.  Correct.
15      Q.  How did you -- how did you -- Let's go
16  back.
17      Who introduced you to Corey Allen Kotler?
18      A.  Mr. Sigelman.
19      Q.  And when was that?
20      A.  I don't know the exact date.
21      Q.  Did you -- did you know him before
22  this -- Did you know him before finding out about
23  the block of IPv4 addresses?
24      A.  I did not, no.
25      Q.  And so this isn't attorney-client

COLOCATION AMERICA vs MITEL NETWORKS

Page 42

1 privileged information, how did -- why did
2 Mr. Sigelman introduce you to Corey Allen Kotler?
3    A. I believe Mr. Sigelman's friend is
4 friends with Mr. Corey Kotler. So they were in
5 his office, and I guess Corey was looking for a --
6 I guess job.
7    So Paul said, "Can you give him something to
8 do?"
9    So we had this project where we just wanted
10 someone to reach out on our behalf, and we hired
11 him.
12    Q. And do you know who the friend was that
13 knew Corey Allen Kotler?
14    A. Sure. Mr. Jack Heller.
15    Q. Is Jack Heller also a lawyer?
16    A. I don't think so. No, he's not.
17    Q. Did you meet Corey Allen Kotler?
18    A. He came to our office, yes.
19    Q. And was that before he contacted MNC?
20    A. Yes.
21    Q. And what did you two talk about?
22    A. The project of looking for IP addresses
23 that we're looking to get.
24    Q. And?
25    A. And he said he'll gladly make the calls

Page 43

1 and contacts and put it all together.
2    Q. So you hired Corey Allen Kotler?
3    A. I did.
4    Q. Did you tell Mr. Kotler not to use his
5 real name when communicating with MNC?
6    A. No.
7    Q. Do you know if anybody instructed him to?
8    A. I can't speak on his behalf. Whatever
9 name he uses, I'm sure is his name, so he used his
10 name.
11    Q. Corey Allen isn't his name, though.
12    A. I'm not going to argue with that. I have
13 no idea. I mean, I use Albert or Albert Ahdoot or
14 Arash Ahdoot, so --
15    Q. Uh-huh.
16    But you use your last name, because that's
17 your legal name?
18    A. Sure.
19    Q. So you didn't instruct him to use a fake
20 name when representing Colocation?
21    A. I instructed him to represent -- to find
22 these IP addresses and find a contact that they
23 belonged to.
24    Q. Well, you already -- you already had that
25 information, though; correct?

Page 44

1    A. Right.
2    Q. You gave him that information?
3    A. Correct.
4    Q. Who found -- Who was the person who found
5 the first contact at MNC to send the first email
6 to?
7    A. Corey Allen.
8    Q. Do you know how he found that name?
9    A. By looking up the IP address.
10    Q. Explain.
11    A. Sure.
12    IP address was in the name of Gandalf owned
13 by Mitel. So I'm sure he looked up Mitel and he
14 found someone within Mitel that could assist him.
15    Q. Is -- is Corey Allen Kotler an employee
16 of Colocation?
17    A. No.
18    Q. Has he ever been?
19    A. No.
20    Q. But he acted as Colocation's broker to
21 negotiate the contract; correct?
22    A. Correct.
23    Q. When Corey Allen emailed you about
24 things -- When Corey Allen Kotler emailed you
25 about things, did he use his real name, or did he

Page 45

1 use Corey Allen?
2    A. When he contacted me via his email?
3    Q. Yes.
4    A. I don't know the name on -- whether
5 it was Corey Allen or Corey Allen Kotler. So
6 whatever his name was on the email, that's what he
7 used.
8    Q. Did -- did -- did Corey Allen Kotler
9 email you regarding anything other than the
10 contract?
11    A. What do you mean, "anything other than
12 the contract"?
13    Q. Anything other than the contract.
14    A. Contract for Mitel?
15    Q. Correct.
16    A. Yeah. Other IPs that he found.
17    Q. And tell me about that.
18    What other IPs did he find?
19    A. Well, he would find the contacts of the
20 owners or validate them and just contact them back
21 and forth.
22    So he would just run them by me, saying, "I
23 found so and so IP. I found the contact, and now
24 I'm trying to find the person who's the
25 decision-maker to sell the IPs." And that's

COLOCATION AMERICA vs MITEL NETWORKS

Page 46

1 pretty much -- That was our weekly or daily
2 conversation.
3    Q. Uh-huh.
4    **And were there other times where you**
5 **instructed him to go ahead and try to make a deal**
6 **to get the IPs --**
7    A. Yes.
8    **Q. -- the IP addresses?**
9    A. That's what he was hired to do.
10    Q. And these are just IPv4 addresses;
11 correct?
12    A. These were IPv4 addresses, correct.
13    Q. Because IPv6 addresses don't have any
14 real value, do they?
15    A. Of course they do.
16    Q. But not much.
17    A. Supply and demand.
18    Q. Right.
19    And so the supply and demand for IPv4s makes
20 the price much higher; correct?
21    A. Make the price -- Price to who?
22    Q. To anyone. To anyone that needs them.
23    A. Yes and no. I mean, you can get IPs from
24 ARIN directly --
25    Q. But you have to wait --

Page 47

1    A. -- so it's free.
2    Q. Right, but you have to wait for a long
3 time.
4    A. You have to wait as of last year just
5 because they are on limited supply of giving out
6 IPs.
7    Q. And that's because there are no new IPv4
8 addresses being created, are there?
9    A. Right.
10    Q. There are only about -- I think it's
11 4.3 billion total IPv4 addresses; isn't that
12 correct?
13    A. I think so, that's correct.
14    Q. And they've all been allocated at one
15 point or another, so the only ones ARIN has are
16 the ones that are given back to; isn't that
17 correct?
18    A. No. ARIN also has a reserve besides
19 what's being given back to them.
20    Q. And in order to get IPv4 addresses for
21 ARIN, you have to put in a request and put in a
22 business purpose for it; correct?
23    A. That's how it is from day one. When you
24 do become an ISP, an Internet service provider,
25 you register. You put in a request saying, "Hey,

Page 48

1 I need IPs," and they allocate them to you.
2    Q. Uh-huh.
3    But you don't automatically get a block of
4 100,000 from ARIN?
5    A. You have to justify what you need.
6    Q. And ARIN also has to have it.
7    A. Correct.
8    **Q. Are you aware that in 2011, Microsoft**
9 **bought the Nortel IPv4 addresses out of bankruptcy**
10 **for $11 each?**
11    **A. I am, yeah.**
12    Q. Did you do any research on Corey Allen
13 Kotler before you engaged him as a broker?
14    A. Research how?
15    Q. Any kind of research.
16    A. Not really.
17    Q. What -- what did you know about him?
18    A. He's looking for a job or a gig, so we
19 brought him on board.
20    **Q. Did -- did he know anything about IPv4**
21 **addresses?**
22    **A. No. I had to teach him what it is.**
23    **Q. Is it safe to say that Corey Allen Kotler**
24 **did what you instructed him to?**
25    **A. Yes and no. I mean --**

Page 49

1    **Q. What's the yes, and what's the no?**
2    **A. The yes is, he was supposed to make phone**
3 **calls and find the right contact to put us in**
4 **touch with them, basically.**
5    **And the no, he didn't know anything about**
6 **IPv4 addresses, so I had to teach him exactly what**
7 **they were.**
8    **Q. You've seen the communications between**
9 Corey Allen because that was the name he used --
10    A. Sure.
11    Q. -- and MNC; correct?
12    A. Correct.
13    Q. Is there anything in those communications
14 that was against your wishes?
15    A. He was negotiating a contract with them
16 so when you say against my wishes --
17    Q. Right.
18    Did -- did he do anything in those
19 communications -- You were aware of those
20 communications?
21    A. Sure.
22    **Q. So there was nothing in those**
23    **communications that you disapproved of from Corey**
24    **Allen?**
25    **A. Nothing illegal, as far as I'm concerned.**

Page 50

1   He was negotiating contract.
2       Q. On behalf of Colocation?
3       A. On behalf of himself, on behalf of
4   Colocation, correct.
5       Q. And per your instructions; correct?
6       A. When you say per my instructions, again,
7   we gave him a list, and he was supposed to find
8   the actual people that own them, and he was
9   supposed to negotiate a contract to buy the
10  assets, including the IPv4 address.
11      Q. Well, let's talk specifically, though,
12  about MNC.
13      A. Sure.
14      Q. You had already located the IPv4 block,
15  you've stated that; correct?
16      A. Correct.
17      Q. And you'd already pinged it; correct?
18      A. Correct.
19      Q. And you told Corey Allen Kotler to try
20  and negotiate a deal to get that block; correct?
21      A. We told him to reach out to find the
22  person who's responsible for selling the assets,
23  being the domain and the IPv4 in this case, and he
24  reached out and he negotiated the contract,
25  correct.

Page 51

1       Q. And you saw the communications back and
2   forth between him and MNC; correct?
3       A. He would forward me the communication,
4   that's correct, yes.
5       Q. I think you already answered this, but
6   Corey Allen or Corey Allen Kotler had never acted
7   as a broker for Colocation before negotiating the
8   deal with MNC, did he?
9       A. That is correct.
10      Q. And you said he has acted as a broker
11  since then for Colocation; is that correct?
12      A. For this project, yes.
13      Q. Okay.
14      You said that he also was given the
15  assignment of -- of looking for or trying to
16  negotiate deals for other IPv4 blocks; is that
17  correct?
18      A. That is correct.
19      Q. Has he, in fact, negotiated any other
20  deals?
21      A. That he was successful, no. We're still
22  going back and forth.
23      Q. What name is he using to try to negotiate
24  those deals?
25      A. I have no idea.

Page 52

1       Q. You just -- You said that you've seen the
2   communications.
3       A. Sure, if I can look at the emails that he
4   sent to me by Corey Allen or Corey Kotler Allen.
5       Q. Well, the reason you can't see them is
6   because you haven't produced them to us.
7       A. I produced everything that was asked to
8   be produced.
9       Q. Uh-huh.
10      So you don't know if with other people, if
11  he's using his full legal name, which is the last
12  name Kotler, or if he's just using Corey Allen?
13      A. If you look at his email header, whatever
14  comes up under that account, that's what he uses.
15  Again, I can't speak on his behalf.
16      Q. How many times have you met Corey Allen
17  Kotler?
18      A. Ten times.
19      Q. When was the first time?
20      A. When he was introduced.
21      Q. And that was, again, before he contacted
22  MNC; correct?
23      A. That is correct.
24      Q. When was the last time you met with him?
25      A. I want to say last year, 2016, probably.

Page 53

1       Q. And when was the last time you
2   communicated with him?
3       A. Around the same time.
4       Q. You haven't communicated with him for
5   eight months?
6       A. Sounds about right.
7       Q. Why not?
8       A. His project was done and over with, so we
9   shook his hand and said, "Thank you," and that was
10  it.
11      Q. Aren't you still looking for blocks of
12  IPv4 addresses?
13      A. We are, but his job was over, his task
14  was done and over with.
15      Q. Why aren't you using him anymore?
16      A. We're not. I don't know.
17      Q. There must be a business reason or a
18  personal reason or something.
19      A. No personal, no business reason. His
20  project was for X amount of months and the project
21  was done, his time, and that's it.
22      Q. Did this litigation have something to do
23  with not using him any longer?
24      A. Not at all.
25      Q. Did he not want to work for Colocation

Page 54

1 any longer?
2     A.  No.  His contract was over and that was
3 it.  We told him --
4     Q.  No, I'm just asking, did he not want to
5 work for Colocation any longer?
6     A.  I don't think he has any reason not to.
7 He, I'm sure, wanted to continue, but we only
8 wanted to try him for so many months.
9     Q.  How did you terminate him?  How did you
10 terminate the contract?
11     A.  Told him, I'm sure, via email, saying,
12 "Thank you so much, it's been a pleasure, and
13 we're done."
14     Q.  Did he respond --
15     A.  I don't know.
16     Q.  -- that you recall?
17     Who would have sent him that email?
18     A.  I probably have.
19     Q.  And do you recall him responding, asking
20 for more work?
21     A.  I don't recall.  I'm sure he was happy at
22 the time and said thank you.
23     Q.  But you don't recall?
24     A.  No.  A lot of emails every day.  I don't
25 recall.

Page 55

1     Q.  You said you met with him about
2 ten times.
3     Every time you met with him, did you talk
4 about acquiring IPv4 blocks?  Was that the basic
5 discussion that you had?
6     A.  We talked to him about his projects
7 that's going on.  The project was to acquire IPv4
8 addresses, correct.
9     Not to be rude, if I may take --
10     MR. ROGERS:  Sure.
11     THE WITNESS:  -- that break.  It's been an
12 hour.
13     MR. ROGERS:  Please.  We'll take a break.
14     We're off the record.
15     THE VIDEOGRAPHER:  Off the record at
16 10:58 a.m.
17     (A recess is taken.)
18     THE VIDEOGRAPHER:  Okay.  We are back on
19 record at 11:11 a.m.
20     MR. ROGERS:
21     Q.  When did you first learn of Dividend
22 Advisors, LLC?
23     A.  When we signed a contract with them.
24     Q.  Are you aware if Dividend Advisors, LLC
25 is a real business?

Page 56

1     A.  It is.  It's a Delaware corporation.
2     Q.  And how do you know that?
3     A.  I looked it up.
4     Q.  When was it -- Well, it's an LLC.
5     When was it formed, do you recall?
6     A.  I have no idea.
7     Q.  Do you recall who the owner or the member
8 is?
9     A.  Corey Kotler Allen.
10     Q.  Corey Allen Kotler?
11     A.  Corey Allen Kotler.
12     Q.  Are you aware that Corey Allen has the
13 same business address as Paul Sigelman?
14     A.  I am.
15     Q.  Do you know why that is?
16     A.  I have no idea.
17     Q.  Are you aware that Dividend Advisors has
18 the same business address as Paul Sigelman?
19     A.  I am.
20     Q.  Do you know why that is?
21     A.  No idea.
22     Q.  You mentioned before that Mr. Sigelman
23 introduced you to Corey Allen Kotler; correct?
24     A.  Sure.
25     Q.  Are you aware of any business

Page 57

1 relationship between Paul Sigelman and Corey Allen
2 Kotler?
3     A.  There isn't any.
4     Q.  How do you know?
5     A.  Because I asked Paul.
6     Q.  When?
7     A.  When he introduced us to Mr. Corey Allen.
8     Q.  So at that time, he said that there was
9 not?
10     A.  Correct.
11     Q.  And have you checked with him since?
12     A.  I have.
13     Q.  When?
14     A.  A couple months back.
15     Q.  And his answer was?
16     A.  Same.
17     Q.  Is there any business arrangement between
18 Dividend Advisors and Paul Sigelman?
19     A.  Not that I'm aware of.
20     Q.  Have you ever asked Mr. Sigelman about
21 that?
22     A.  I have.
23     Q.  And when did you first ask him?
24     A.  I don't know.  Month or two ago.  And he
25 said, no, there is no business among the two.

COLOCATION AMERICA vs MITEL NETWORKS                                    Deposition of Albert Ahdoot

Page 58

1      Q. And do you know, has there ever been --
2  has Mr. Sigelman told you, has there ever been a
3  business connection between Dividend Advisors and
4  himself?
5      A. I don't think so.
6      Q. But you don't know for sure?
7      A. I can't speak on Paul's behalf, but I'm
8  99.9 percent positive that there is no business
9  relationship between Corey Allen Kotler and Paul
10  Sigelman.
11      Q. I'm talking about Dividend Advisors.
12      A. Or Dividend Advisors.
13      Q. And you're 99.9 percent positive because
14  of what?
15      A. Because I asked Paul.
16      Q. But you said you only asked him about
17  Dividend Advisors a few months ago.
18      A. Right.
19      I said, "Was there" -- "Is there any
20  relationship?"
21      And he said, "No."
22      MR. SIGELMAN: Let's go off the record.
23      THE VIDEOGRAPHER: Off record at 11:15 a.m.
24      (Michelle Whittington now joins the
25  proceedings via phone.)

Page 59

1      THE VIDEOGRAPHER: Okay. Back on record at
2  11:17 a.m.
3      MR. ROGERS:
4      Q. Why didn't Colocation contact -- I'm
5  going to go back.
6      You said before that Corey Allen Kotler
7  worked on negotiating other contracts between
8  Colocation and different companies; correct?
9      A. Correct.
10      Q. Were -- You may have said this already,
11  but I just want to ask, did any of those contracts
12  come to fruition?
13      A. Meaning close?
14      Q. Yes.
15      A. No.
16      Q. And were they -- were they all for IP4
17  addresses -- IPv4 addresses?
18      A. Correct.
19      Q. Why didn't Colocation contact MNC
20  directly?
21      A. Because we hired Corey Allen to do it.
22      Q. Why didn't you contact MNC directly?
23      A. Because we hired him to do it for us.
24      Q. Yeah, but why did you hire him instead of
25  contacting MNC directly?

Page 60

1      A. Because he was supposed to find the right
2  person of contact, negotiate the contract and
3  bring it to us. That was his job.
4      Q. And you're not using him for that now;
5  correct?
6      A. Correct.
7      Q. And is -- MNC is contacting people
8  directly; right?
9      A. What do you mean, is MNC contacting
10  people directly?
11      Q. MNC. How is MNC -- You said before that
12  MNC is still looking to acquire IPv4 blocks;
13  correct? I thought you said that.
14      A. MNC being --
15      Q. Excuse me.
16      A. -- Mitel or --
17      Q. Excuse me. Excuse me.
18      That Colocation is still hoping to acquire
19  IPv4 blocks; correct?
20      A. Sure.
21      Q. And who's making the contacts for
22  Colocation to acquire those blocks?
23      A. He hired a couple other people, companies
24  do that for us.
25      Q. When you say, "he," who?

Page 61

1      A. I went ahead and hired two other people
2  to contact other companies for IPs.
3      Q. And what people did you hire?
4      A. William Jenson is one of them. That's --
5  So he looks for companies that have excess IPv4
6  that they want to sell, basically.
7      Q. And who else?
8      A. I'm trying to remember who else. Let's
9  just -- William Jenson, that's the main contact.
10      Q. And why are you now using William Jenson
11  instead of Corey Allen or Corey Allen Kotler?
12      A. He has a -- he has a lot of knowledge in
13  the industry. So he's also head of our abuse
14  desk. So he knows a lot of different ISPs and
15  whatnot. So he reaches out to different ISPs.
16      Q. You said that he's the head of your
17  abuse --
18      A. Department, correct.
19      Q. -- department.
20      So he's an employee of Colocation?
21      A. He's a 1099, not an employee.
22      Q. 1099 meaning he's an independent
23  contractor?
24      A. Correct.
25      Q. And has he been successful in closing any

COLOCATION AMERICA vs MITEL NETWORKS

Page 66

1    MR. ROGERS:
2        Q. And just take a look at that, please, and
3    look at the topics. We've already been discussing
4    them.
5        But you understand that you're here today to
6    testify on behalf of Colocation America, Inc.;
7    correct?
8        A. Correct.
9        Q. And you have knowledge of the topics for
10   examination that begin on page 3; correct?
11       A. Correct.
12       Q. We're done with that one.
13       I'd like to have marked as Exhibit 3 a
14   document bearing production number -1, and this is
15   produced by Colocation.
16       (Whereupon the document referred to is marked by
17   the reporter as Exhibit 3 for identification.)
18       MR. ROGERS:
19       Q. And take your time and look at this,
20   Mr. Ahdoot.
21       A. Okay.
22       Q. This is a communication from Corey Allen
23   to Paulo Ferreira of Mitel; correct?
24       A. Correct.
25       Q. And it's dated February 17th, 2016;

Page 67

1    correct?
2        A. Correct.
3        Q. There's no reference in this email to
4    IPv4 addresses, is there?
5        A. Not that I see.
6        Q. And there's no explanation about Corey
7    Allen actually being Corey Allen Kotler, is there?
8        A. I'm sorry. One more time.
9        Q. There's no explanation in here that Corey
10   Allen is really Corey Allen Kotler, is there?
11       A. Well, it says, "Corey Allen, Principal
12   Advisor, Dividend Advisors."
13       Q. Right. Let's go back to my question.
14       There's no explanation in here that Corey
15   Allen's real name is Corey Allen Kotler, is there?
16       A. It doesn't say, "Kotler," if that's what
17   you're asking. It says, "Corey Allen."
18       Q. And do you remember, did you review this
19   before it was sent?
20       A. Probably not.
21       Q. And, to your knowledge, no lawyer
22   reviewed this before it was sent?
23       A. Correct.
24       Q. Did you discuss this before it was sent?
25       A. No. These are just initial emails I'm

Page 68

1    sure he sent out to find the actual person.
2        Q. And, to your knowledge, the person who
3    sent this was Corey Allen Kotler?
4        A. That's correct.
5        Q. Do you know for a fact that it was Corey
6    Allen Kotler?
7        A. Yes.
8        Q. How come?
9        A. Company name, Dividend Advisors.
10       Q. Sure, but anybody could go onto --
11       A. Again, I can't speak on his behalf. So
12   it says, "Corey Allen" on top. So it is Corey
13   Allen Kotler.
14       Q. Right.
15       And Paul Sigelman didn't send this?
16       A. No. It says, "Corey Allen."
17       Q. But you don't know who really uses this
18   email account and sent this?
19       A. It says, "From: Corey Allen."
20       Q. Let's go on. Mark as Exhibit 4 a
21   document bearing production number -2, also
22   produced by Colocation.
23       (Whereupon the document referred to is marked by
24   the reporter as Exhibit 4 for identification.)
25       MR. ROGERS:

Page 69

1        Q. And this is just a responsive email from
2    Mitel to Corey Allen's first communication;
3    correct?
4        A. That's what it seems like, correct.
5        Q. Okay.
6        I'd like to have marked as Exhibit 5 a
7    document bearing production number -3, also
8    produced by Colocation.
9        (Whereupon the document referred to is marked by
10   the reporter as Exhibit 5 for identification.)
11       MR. ROGERS:
12       Q. And this is an email from Corey Allen
13   back to Jamshid at Mitel dated February 19th,
14   2016; correct?
15       A. Correct.
16       Q. And there's no mention of IPv4 addresses
17   in this either, is there?
18       A. No. I think he's still looking for the
19   right person.
20       Q. How do you know that? Where does it say
21   it in this email?
22       A. It's in the previous email. It says, "I
23   got your voice mail. Will have to discuss with
24   our legal department and ask someone from legal to
25   contact you." That's Exhibit 4, to be exact.

70..73

COLOCATION AMERICA vs MITEL NETWORKS                    Deposition of Albert Ahdoot

Page 70

1     Q.  I'd like to have marked as Exhibit 6 a
2  document bearing production number -4, which is an
3  email from Michelle Whittington to Corey Allen.
4     (Whereupon the document referred to is marked by
5  the reporter as Exhibit 6 for identification.)
6     MR. ROGERS:
7     Q.  And Ms. Whittington states, "As
8  Intellectual Property Counsel for Mitel, I have
9  been asked to respond to your email request
10  regarding the (gandalf.ca) domain name.  Can we
11  set a time to discuss your offer?"
12     Did I read that correctly?
13     A.  Correct.
14     Q.  Okay.  We're done with that one.
15     We're marking as Exhibit 7 a document bearing
16  production number -5, also produced by Colocation.
17     (Whereupon the document referred to is marked by
18  the reporter as Exhibit 7 for identification.)
19     MR. ROGERS:
20     Q.  This is a message from Corey Allen to
21  Michelle Whittington.  And in the "Subject," it
22  has "Attention: Michelle Whittington Regarding:
23  Gandalf.ca."
24     There's no reference to IPv4 addresses in
25  this either, is there?

Page 71

1     A.  Not at this time, no.
2     Q.  I'd like to have marked as Exhibit 8 a
3  document bearing production number -6, also
4  produced by Colocation.
5     (Whereupon the document referred to is marked by
6  the reporter as Exhibit 8 for identification.)
7     MR. ROGERS:
8     Q.  And this is an email from Michelle
9  Whittington to Corey Allen stating that she will
10  present Mr. Allen's offer to Mitel management; is
11  that correct?
12     A.  Correct.
13     Q.  I'd like to have marked as Exhibit 9 a
14  document bearing production number -7.
15     (Whereupon the document referred to is marked by
16  the reporter as Exhibit 9 for identification.)
17     MR. ROGERS:
18     Q.  This is an email from Michelle
19  Whittington to Corey Allen, dated February 24,
20  2016.  Again, in the "Subject," it's "Attention:
21  Michelle Whittington Regarding: Gandalf.ca."
22     And in the first line, she says to Corey
23  Allen, "Mitel accepts the offer and provides a
24  draft Domain Name Assignment Agreement
25  for...review."

Page 72

1     She goes on to say, "Please insert the
2  purchasers information where indicated in the
3  attached draft and return to me.  If you have any
4  further edits, please redline and return to me";
5  is that correct?
6     A.  Correct.
7     Q.  There's no mention in here about IPv4
8  addresses, is there?
9     A.  Not yet, nope.
10     Q.  I'd like to have marked as Exhibit 10 the
11  draft Domain Name Assignment Agreement that was
12  sent along with Exhibit 9.
13     (Whereupon the document referred to is marked by
14  the reporter as Exhibit 10 for identification.)
15     THE WITNESS:  You gave me two pieces of
16  paper.
17     MR. ROGERS:  Okay.  Give me one back.
18     THE WITNESS:  Okay.
19     Amber alert.
20     MR. ROGERS:
21     Q.  This is the Domain Name Assignment
22  Agreement that was sent along with the email
23  marked as Exhibit 9.
24     This doesn't reference IPv4 addresses at all,
25  does it?

Page 73

1     A.  Not yet, nope.
2     Q.  How many domain addresses -- How many
3  domain names does Colocation own?
4     A.  Less than 500.
5     Q.  How many does it -- how many does it use?
6     A.  Probably, like, 300.
7     Q.  And when you say -- When it uses them,
8  does it use it -- use them for its customers?
9     A.  For ourselves and our customers, correct.
10     Q.  How many does Colocation use?
11     A.  A handful.  I don't know offhand.
12     Q.  And that's just -- You use a domain name
13  for the same purpose that any company would use a
14  domain name; correct?
15     A.  Correct.
16     Q.  And when you say, "a handful," why do you
17  use more than one?
18     A.  We optimize for different keywords.
19     Q.  Are most of the domain names that you
20  have, are they parked?
21     A.  Are they parked?  Some of them are and
22  some of them are not, sure.
23     Q.  Well, how -- roughly.
24     A.  I honestly don't know.  I'm not in front
25  of our domain --

COLOCATION AMERICA vs MITEL NETWORKS

Page 94

1   general counsel, corporate secretary.
2       Q. Uh-huh. Okay.
3       You can put that down for now. We may come
4   back to it, though. Okay.
5       I'd like to have marked as Exhibit 21
6   documents that were produced by Escrow.com in
7   response to a subpoena in this case.
8       (Whereupon the document referred to is marked by
9   the reporter as Exhibit 21 for identification.)
10      MR. ROGERS: Can we go off the record for a
11  minute.
12      THE VIDEOGRAPHER: End of media one. Off the
13  record at 12:05 p.m.
14      (A recess is taken.)
15      THE VIDEOGRAPHER: Start of media two. Back
16  on record at 12:21 p.m.
17      MR. ROGERS:
18      Q. Okay.
19      Mr. Ahdoot, we're looking at Exhibit 21.
20      Do you have that in front of you?
21      A. Sure.
22      Q. What is Escrow.com?
23      A. It's a go-between a buyer and a seller.
24      Q. Explain.
25      It's -- it's an escrow account where you can

Page 95

1   put money; correct?
2       A. Pretty much.
3       Q. And then Escrow.com releases it to a
4   party when what?
5       A. The transaction is completed.
6       Q. And who's the one who determines when the
7   transaction is completed? Is it the buyer or the
8   seller?
9       A. Both parties have to agree.
10      Q. Why did you use Escrow.com for the
11  transaction with MNC?
12      A. Just did. Wasn't -- Easy online
13  transaction.
14      Q. Has Colocation used Escrow.com in the
15  past?
16      A. We have.
17      Q. Do you still use them?
18      A. We do.
19      Q. Could you turn to the page that's marked
20  -1661.
21      And just for housekeeping purposes, let the
22  record reflect that this document bears production
23  numbers MITEL -1658 through MITEL -1705. Okay.
24      On page -1661, it identifies the customer
25  number of Colocation as being 984834; is that

Page 96

1   correct?
2       A. Sure, that's what I see.
3       Q. Okay.
4       Let's turn to page -1664.
5       A. Okay.
6       Q. And this page is entitled "Transaction
7   Summary."
8       And if you look at the line right beneath
9   "Transaction Summary," it says "Transactions with
10  984834 as the buyer"; correct?
11      A. I do, yeah.
12      Q. And the first 1, 2, 3, 4, 5 -- 6
13  transactions here list the seller as
14  Michelle.Whittington@mitel.com; correct?
15      A. Sure.
16      Q. And they also list -- It also lists the
17  value for each one of these as $10,000; correct?
18      A. Correct.
19      Q. And it also has the status of five of
20  those transactions as canceled and one as "service
21  TransOpen"; correct?
22      A. Sure.
23      Q. And under the "Description," in each one
24  of these, it only refers to a domain name
25  assignment of Gandalf.ca; correct?

Page 97

1       A. That's the description, correct.
2       Q. Right.
3       There's no mention in the description of IPv4
4   addresses, is there?
5       A. Not in the description of a title, no.
6       Q. And just curious, do you know what --
7   what's the very last entry on here which has a
8   seller as Vincent -- it says, "Sales of/20."
9       Is that the sale of IPv4s?
10      A. Correct.
11      Q. And that's the one -- I'll just make it
12  for the record, that's -- we're on page -1664 and
13  it's the very last row in the chart, and the
14  seller email is Vincent@dp5.com, and the value of
15  that is $25,000; correct?
16      A. Correct.
17      Q. How many IPv4s are in that block?
18      A. In which block?
19      Q. The block that's on the -- If you can
20  tell by looking at it, that's on the last row of
21  the chart in -- on page -1664.
22      A. Give me one second. It's been a while.
23      Q. Let me ask you this question before you
24  go into that, can you tell how many there are by
25  the description here?

COLOCATION AMERICA vs MITEL NETWORKS

Page 98

1    A. Sure, yes.
2    Q. Doesn't this mean 44, there are 44 IPv4s?
3    A. No.
4    There's a special chart to it. Just -- It's
5  a different breakdown of IP addresses and also two
6  ASN numbers.
7    Q. And what's an ASN number?
8    A. That's your -- How do I explain this?
9  That's, like, your bar number with the state bar.
10    So ASN is what you register as an ISP to the
11  American Registry for Internet Numbers.
12    Q. That's good enough.
13    A. Okay.
14    Took a while, but --
15    Q. So can you -- can you tell or would it
16  take more research to determine how many IPv4s
17  were involved in this transaction?
18    A. I'd have to look into it, but the ASNs
19  are also involved. And this was a fellow ISP that
20  was going out of business that just wanted to go
21  ahead and sell off the assets and take off.
22    Q. And let's go -- turn to the page marked
23  MITEL -1665.
24    A. Okay.
25    Q. And in here, the description of the

Page 99

1  transaction is "Domain Name Assignment -
2  Gandalf.ca"; correct?
3    A. Which line are you looking at?
4    Q. The very first row in the very first
5  chart.
6    A. Says, "Domain Name Assignment."
7    Q. Correct.
8    Hyphen, "Gandalf.ca"; correct?
9    A. Correct.
10    Q. And then if we look down in the second
11  chart, in the second row under "Message," it
12  states, "Note: Domain name transfer only. No
13  content, software, adsense or income generating
14  accounts included"; correct?
15    A. Correct.
16    And if you also look at "Status," it says,
17  "Transaction Canceled." So we didn't agree on
18  this.
19    Q. Well, hold on because let's -- let me ask
20  you -- I'll ask the question first.
21    A. Sure.
22    Q. There's no mention anywhere in this
23  record of IPv4 addresses, is there?
24    A. No. At the same time, it does state,
25  "This transaction has been canceled by the Buyer,"

Page 100

1  which is Colocation America, for the following
2  reasons, "Correction."
3    Q. Doesn't say what the correction is, does
4  it?
5    A. No. It's a brief description of the
6  message.
7    Q. Let's go to the very next transaction.
8    A. Sure.
9    Q. Let me just take a look at it. Yeah,
10  let's go to the next transaction.
11    The "Description" of this in the very top row
12  of the first column -- first chart is "Domain Name
13  Assignment - Gandalf.ca"; correct?
14    A. Sure.
15    Q. And there's no mention at all in this
16  transaction about IPv4 addresses either, is there?
17    A. Well, except on the bottom says it was
18  canceled.
19    Q. But that's not a mention of an IPv4
20  address, is it?
21    A. You're looking at a brief description of
22  the message. And, also, you're looking at the
23  subject line. No, just says, "Domain" --
24    Q. You've -- you've already said -- You've
25  already testified previously that the Escrow.com

Page 101

1  record would -- had the IPv4 addresses in it, so
2  we're going over it to see if they really do.
3    A. I haven't changed it, but you're talking
4  a short message compared to the full description.
5  So the full description is not here.
6    Q. So -- so you -- This is what Escrow.com
7  has in its records.
8    A. I get that, but --
9    Q. And you didn't produce any -- And
10  Colocation hasn't produced anything different than
11  this.
12    Is there something that Colocation has not
13  produced?
14    A. We can log into our account and look at
15  the exact message. This is just a short
16  description of the message, which, again, was
17  canceled. So if you want to go to the actual
18  escrow that's still open, we can also go there.
19    Q. We'll get there.
20    A. Sure.
21    Q. The -- And this was canceled.
22    A. Uh-huh.
23    Q. Why -- You know, if you wanted -- When --
24  when Michelle Whittington would have gone into
25  here, she would see this record; correct?

COLOCATION AMERICA vs MITEL NETWORKS

Page 102

1    A.  Sure.
2        Q.  So isn't this just part and parcel of
3    what we've already seen, that you deliberately
4    didn't want her to know or MNC to know that you
5    were trying to get the IPv4 addresses?
6        A.  We already had a signed contract
7    including the IPv4.  These transactions --
8        Q.  Then why didn't you put them in these
9    records?
10       A.  Well, if you do look at the corrected
11   one, I mean --
12       Q.  Well, let's just keep walking through
13   them.
14       A.  Sure.
15       Q.  How -- how come they weren't in these
16   first two?
17       A.  As you can see, it says, "Correction" on
18   page -1665, so --
19       Q.  Thank you.
20       How come they weren't in the first -- How
21   come neither one of these transactions have any
22   reference to the IPv4 addresses?
23       A.  Well, you're referencing a very short
24   message, not the entire thing.  And, obviously, we
25   didn't do it correctly, we didn't set it up

Page 103

1    correctly.
2        Q.  Well -- Okay.
3        Which is it, that it was canceled because it
4    wasn't correct, or that it is correct and we're
5    just not seeing the whole thing?
6        A.  It wasn't correct, hence, it was
7    canceled.
8        Q.  And you were the one that set this up;
9    correct?
10       A.  Correct.
11       Q.  Let's go on to the next one.
12       A.  Sure.
13       Q.  Again, in this transaction, in the very
14   first chart in the row titled "Description," it
15   states, "gandalf.ca Domain Name Transfer";
16   correct?
17       A.  Sure.
18       Q.  No mention at all of IPv4 addresses?
19       A.  That's just a subject.  It has nothing to
20   do with what's in the body of the transaction.
21       Q.  Let's go down to the "Transaction
22   History."
23       A.  Uh-huh.
24       Q.  In the second row, it states, "Domain --
25   "Note:  Domain name transfer only.  No content,

Page 104

1    software, adsense or income generating accounts
2    included"; correct?
3        A.  I see that, sure.
4        That's also --
5        Q.  There's no mention --
6        A.  -- what's in the contract, I agree.
7        Q.  So you're saying this reflects exactly
8    what there is -- what's in the contract?
9        A.  Not exactly.  Again, it's a short message
10   within the transaction.
11       Q.  Well, what does this have to do with the
12   contract?
13       A.  Well, in the contract, if I'm not
14   mistaken, it also said no income or adsense is
15   included.  So -- so we -- on this one, the seller
16   initiated it.
17       On the previous two, the buyer, being
18   Colocation America, initiated it.  And as you can
19   see, modifications made, canceled.
20       Q.  Uh-huh.
21       A.  So the seller went ahead and canceled.
22   The first two, we made it, we canceled it.  The
23   third one, it looks like Mitel went ahead and set
24   it up, and they canceled it, and we're off to the
25   fourth one now.

Page 105

1        Q.  There's no reference whatsoever in
2    this -- Before we move on to the fourth one,
3    there's no reference whatsoever in this one about
4    IPv4 addresses, is there?
5        A.  Well, you're showing me the short
6    message, not the entire escrows.  So what this --
7        Q.  I know, but we -- we already went through
8    that, didn't we?
9        A.  We did.
10       Q.  You -- You're not sure if they're in
11   here -- If they were in here --
12       A.  Uh-huh.
13       Q.  -- if they were in the entire message,
14   then why did you cancel the transaction?
15       A.  If they were in the entire message --
16   First of all, we didn't cancel this transaction.
17   This was canceled by Mitel.
18       Q.  It says, "This transaction has been
19   canceled by the Buyer."
20       A.  Well, okay.  My mistake.  Give me one
21   second.
22       Q.  So why would you cancel it if it was
23   correct?
24       A.  Well, I never said it was correct.  I
25   said it was partially what was in the contract.

Page 106

1    What Escrow.com wanted was the actual
2  contract so they can put the whole verbiage in
3  Escrow.com.
4    Q.  Why was this -- why was this canceled?
5    A.  We canceled it, again, as per
6  instructions from Escrow.com.
7    Q.  Okay.
8    Now, let's look at the -- the next one.
9    A.  Sure.
10    Q.  Okay.
11    Again, in the first chart, the first row, it
12  states, "Description," "Modified - Gandalf.ca
13  Domain Name Transfer"; correct?
14    A.  Correct, I see that.
15    Q.  And there's no mention at all in here
16  about the transfer of IPv4 addresses, is there?
17    A.  But, again, that's the subject line
18  description.  You haven't produced what's the
19  entire, whole message.
20    Q.  We've produced everything that Escrow.com
21  has and you haven't produced anything.
22    A.  Okay.
23    This is a short version of what Escrow.com
24  has given you.  I can easily produce our user
25  name, password, account still open with the entire

Page 107

1  description, which was a cut-and-paste of the
2  contract and the contract attached to this Escrow
3  Number 847266.
4    Q.  Uh-huh.
5    Well, you can just go in there now and
6  repopulate the whole thing, too.
7    A.  No, you can't, because both parties get
8  to see it.
9    Q.  Let's go to the next transaction.
10    In the "Description," in the chart at the top
11  of the page, first row, it states, "gandalf.ca
12  Domain Name Transfer"; correct?
13    A.  Which transaction?  What page are you
14  looking at?
15    Q.  This is page -1669.
16    A.  -1669.  I see that.
17    Q.  And if we look at the second chart in the
18  second row, it states, "Note:  Domain name
19  transfer only," period.  "No content, software,
20  adsense or income generating accounts included,"
21  period.
22    Did I read that correctly?
23    A.  That's correct.
24    Q.  There's no mention whatsoever in here
25  about IPv4 addresses, is there?

Page 108

1    A.  Again, that's a short note of the
2  message.
3    Q.  Let's go to the next transaction, -1670.
4    Again, on the chart at the top of the page,
5  the first row, "Description," it states,
6  "gandalf.ca Domain Name Transfer"; correct?
7    A.  Yep, I see that.
8    Q.  And in the second chart, second row, it
9  states, "Note:  Domain name transfer only,"
10  period.  "No content, software, adsense or income
11  generating accounts included," period; correct?
12    A.  I see that.
13    Q.  There's no mention whatsoever on this
14  page about IPv4 addresses, is there?
15    A.  Again, that's a short note.  It doesn't
16  reflect what exactly we put into --
17    Q.  But you have --
18    A.  -- Escrow.com.
19    Q.  You have -- you have no evidence of that,
20  but that's -- that's okay.
21    A.  Well, Escrow.com does and so do we, of
22  course we do.
23    Q.  We -- we subpoenaed Escrow.com, and they
24  sent this to us.
25    A.  They sent you --

Page 109

1    Q.  Do you -- you have information that you
2  have not produced in this case?
3    A.  No, we produced everything, but --
4    Q.  Okay.  Thank you.
5    A.  You guys are producing short note, not
6  what's the -- entirely within Escrow.com.
7    Q.  Why did you cancel -- Let's go back to
8  -1669.
9    Why did you cancel that transaction?
10    A.  Right on the bottom says, "Not the right
11  one."
12    Q.  Which means what?
13    A.  Meaning it was not correct, so we
14  canceled it and we made sure --
15    Q.  What wasn't correct about it?
16    THE REPORTER:  Hold on a second.
17    MR. ROGERS:  Sorry, we're talking over each
18  other.  My fault.  It was my fault.
19    THE REPORTER:  "It was not correct, so we
20  canceled it" --
21    THE WITNESS:  So on the end of page -1669,
22  transaction was done at 13:51:31.  "Transaction
23  has been canceled by the Buyer with the following
24  reason:  Not the right one."  There you go.
25    MR. ROGERS:

Page 110

1    Q. And what does "Not the right one" mean?
2    A. Meaning not everything was included
3 within Escrow.com.
4    Escrow.com at one point came back saying, "We
5 do need to see your contract so we can put every
6 clause in Escrow.com."
7    Q. Okay.
8    So what wasn't included in this?  And I'm
9 still on -1669.
10    A. But, again, I have a short note in front
11 of me.  I -- So the whole thing was -- is not here
12 for me to reference.
13    Q. But you're the one -- The buyer canceled
14 this transaction.
15    A. Correct.
16    Q. Escrow.com didn't cancel the transaction.
17    A. Correct.
18    Q. For all of these that have been canceled,
19 the buyer canceled them; correct?
20    A. That's correct, because it wasn't the
21 right one, so --
22    Q. What does that mean?
23    A. Meaning Escrow.com wanted us to write
24 everything in Escrow.com, as far as a description
25 of what we are exactly buying.

Page 111

1    Q. So what was not in the description?
2    A. Well, again, I don't have the entire
3 description so I can reference.  So I'm sure some
4 points were in there including software, adsense,
5 income.  We were just buying the domain name and
6 the IPv4.
7    Q. Well, then why would it say, "Domain name
8 transfer only"?
9    A. That's the subject of it.  There's
10 nothing to do with the description.
11    Q. And on -1670, again, we've talked about
12 that, this was also canceled by Colocation.
13    Again, it says, "Not the right one"; correct?
14    A. Give me one second.
15    That's correct.
16    Q. And if we go over to -1671, this is a
17 different transaction altogether; correct?
18    A. Correct.
19    As you can see, actually, in the "Message,"
20 there's a milestone.  So this is what they were
21 looking for.
22    So that's what's typically supposed to go to
23 Escrow.com, and I would state, "Buyer initiates
24 the transaction," seller has to agree, "Both
25 parties have accepted the offer."  Then seller

Page 112

1 ACHs the amount.  Then Escrow.com has to approve
2 it.
3    Q. Uh-huh.
4    A. So there's a whole series of milestone
5 that you have to go through within Escrow.com for
6 them to approve the transaction.
7    Q. Sure.
8    And Colo- -- But Colocation populated these
9 fields for the transaction with MNC.
10    A. That's not true.  Both sides have to
11 populate it.
12    Q. Which -- Okay.  Let's go back to it.
13    A. Sure.
14    Q. Which -- Well, let's start working
15 backwards.
16    A. Uh-huh.
17    Q. -1670.
18    A. Sure.
19    Q. What in this -- What on this page did MNC
20 put in?
21    A. "Seller initiates," "Sellerinitiate."  So
22 it says who put in what.  So seller initiated it.
23    Then if you look at the previous
24 transactions, buyers initiated it.
25    So some of the things we put in there, I

Page 113

1 guess she didn't agree on, some of the things that
2 we put in there.
3    Q. Well, it's obvious, then, if that's -- if
4 that's correct, that the seller specifically put
5 in "Domain name transfer only"; correct?
6    A. Seller also changed her mind many times,
7 as you can see here where she --
8    Q. Hold on.  This is after the agreement was
9 signed; right?
10    A. Correct, and we just opened up escrow at
11 this point.
12    Q. Yeah.
13    And this -- If what you're saying is correct,
14 that the seller put this in, "Domain name transfer
15 only," that would show that that's what MNC
16 thought the contract meant; correct?
17    A. Well, the contract was already signed.
18 This is -- Escrow.com is just a go-between the
19 seller and the buyer where the contract has to be
20 put in line by line.
21    So if there's any sort of a dispute as far as
22 payment or "Hey, you didn't transfer it
23 correctly," or "This thing didn't happen," you can
24 go back to escrow and say, "Well, out of the four
25 things per se that has to be transferred, only two

COLOCATION AMERICA vs MITEL NETWORKS                    Deposition of Albert Ahdoot

Page 170

1        I, Diane M. Lytle, CSR 8606, do hereby
declare:

2

3        That, prior to being examined, the witness
named in the foregoing deposition was by me duly
sworn pursuant to Section 30(f)(1) of the Federal

4   Rules of Civil Procedure and the deposition is a
true record of the testimony given by the witness.

5

6        That said deposition was taken down by me in
shorthand at the time and place therein named and
thereafter reduced to text under my direction.

7

8        _____ That the witness was requested to
review the transcript and make any changes to
the transcript as a result of that review

9   pursuant to Section 30(e) of the Federal
Rules of Civil Procedure.

10

11        _____ No changes have been provided by the
                witness during the period allowed.

12        _____ The changes made by the witness are
                appended to the transcript.

13

14        _____ No request was made that the
transcript be reviewed pursuant to Section 30(e)
of the Federal Rules of Civil Procedure.

15

16        I further declare that I have no interest in
the event of the action.

17        I declare under penalty of perjury under the
laws of the United States of America that the

18   foregoing is true and correct.

19        WITNESS my hand this 1st day of

20   September, 2017.

21

22   Diane M. Lytle, CSR 8606

23

24

25

# EXHIBIT 7

**WHOIS-RWS**

**Network**

| | |
|---|---|
| Net Range | 134.22.0.0 - 134.22.255.255 |
| CIDR | 134.22.0.0/16 |
| Name | GANDALF |
| Handle | NET-134-22-0-0-1 |
| Parent | NET134 (NET-134-0-0-0-0) |
| Net Type | Direct Assignment |
| Origin AS | |
| Organization | Gandalf Technologies Inc. (GANDAL) |
| Registration Date | 1989-04-14 |
| Last Updated | 2016-06-07 |
| Comments | |
| RESTful Link | https://whois.arin.net/rest/net/NET-134-22-0-0-1 |
| See Also | Related organization's POC records. |
| See Also | Related delegations. |

**Organization**

| | |
|---|---|
| Name | Gandalf Technologies Inc. |
| Handle | GANDAL |
| Street | 130 Colonnade Road South |
| City | Nepean |
| State/Province | ON |
| Postal Code | K2E-1B6 |
| Country | CA |
| Registration Date | |
| Last Updated | 2016-04-08 |
| Comments | |
| RESTful Link | https://whois.arin.net/rest/org/GANDAL |

| Function | Point of Contact |
|---|---|
| Admin | CKN23-ARIN (CKN23-ARIN) |
| Abuse | TE157-ARIN (TE157-ARIN) |
| Tech | CKN23-ARIN (CKN23-ARIN) |

Point of Contact

068

| Note | ARIN has attempted to validate the data for this POC, but has received no response from the POC since 2016-11-19 |
|---|---|
| Name | No , Contact Known |
| Handle | CKN23-ARIN |
| Company | |
| Street | 123 Main St |
| City | Anytown |
| State/Province | VA |
| Postal Code | 20151 |
| Country | US |
| Registration Date | 2011-02-18 |
| Last Updated | 2015-11-20 |
| Comments | There is no known POC for this organization. This is a placeholder record. Please contact hostmaster@arin.net if you can provide contact information for this record. |
| Phone | +1-800-555-1234 (Office) |
| Email | nobody@example.com |
| RESTful Link | https://whois.arin.net/rest/poc/CKN23-ARIN |

### Point of Contact

| Name | EL Hassani , Tarek R |
|---|---|
| Handle | TE157-ARIN |
| Company | Gandalf, Division of Mitel |
| Street | 3026 Solandt Road |
| City | Kanata |
| State/Province | ON |
| Postal Code | K2K 2A5 |
| Country | CA |
| Registration Date | 1996-01-25 |
| Last Updated | 2010-06-21 |
| Comments | |
| Phone | +1-613-592-3636 (Office)<br>+1-613-592-6312 (Fax) |
| Email | admin@gandalf.ca |
| RESTful Link | https://whois.arin.net/rest/poc/TE157-ARIN |

069

EXHIBIT 8

<u>**Declaration of Michelle R. Whittington**</u>

I, Michelle R. Whittington, declare as follows:

1.       I have personal knowledge of the facts herein.

2.       I hold an Electrical Engineering degree from the University of Utah, from which I graduated in 1996.  I have a J.D. and MIP (Master in Intellectual property) degree from the University of New Hampshire, from which I graduated in 1999.

3.       I am licensed to practice law in Arizona.  My Arizona State Bar Registration Number is 020262.  I am registered to practice in the United States Patent and Trademark Office ("USPTO").  My USPTO registration number is 43,844.

4.       I was an associate attorney at Snell and Wilmer L.L.P. in its intellectual property practice group from June of 1999 until March of 2003.

5.       I am the in-house Intellectual Property Counsel for Mitel Networks Corporation ("MNC"), and have held this position since March of 2003.

6.       I studied intellectual property in law school.  I have practiced intellectual property law, including patent law, trademark law, trade secret law, and copyright law since 1999.  I am knowledgeable about intellectual property law, including patent law, trademark law (including the law governing domain names), trade secret law, and copyright law.

7.       "Intellectual property" is a result of human creativity and defines rights to something a person developed in his or her mind using creativity.  Examples of intellectual property are inventions, product designs, paintings, books, sculptures, logos, and trademarks.

8.       Intellectual property rights can be enforced against infringers.  To enforce intellectual property rights, the rights must be valid and their scope must be sufficient for there to be infringement.

9.       I am aware that IPv4 addresses have been in use since 1983.  An IPv4 address is basically a numerical label that is the electronic address of a device (such as a server) on the Internet.

1

4815-0670-4483.1

10.    There are a fixed number of IPv4 addresses – approximately 4.3 billion.

11.    IPv4 addresses are not intellectual property.  They are assigned to a device on the Internet and are not developed using creativity.  To my knowledge, there is no mechanism to determine the validity or scope of an IPv4 address, and an IPv4 address cannot be infringed.

12.    IPv4 addresses have never been included as intellectual property in any document I have prepared or reviewed.

13.    IPv4 addresses have never been included in any list of intellectual property prepared or reviewed by me regarding the transfer of assets.

14.    IPv4 addresses were never discussed in any of my intellectual property classes in law school or in any CLE class about intellectual property I have attended.

15.    A Domain Name is intellectual property because it is a name selected based on a person's creativity.  Domain Names can be protected under trademark law.

I declare under penalty of perjury that the foregoing is true and correct.

4/25/18
Date

_____
Michelle R. Whittington

2

EXHIBIT 9

| | |
|---|---|
| **From:** | Corey Allen |
| **To:** | Michelle Whittington |
| **Sent:** | 2/26/2016 6:40:34 PM |
| **Subject:** | Attn: Michelle Whittington Re: Revised domain assignment |
| **Attachments:** | DOMAIN NAME ASSIGNMENT AGREEMENT.pdf |

Dear Ms. Whittington,

            Here is the revised domain assignment, which the purchaser, Colocation America, will sign and open escrow (which it is advised to use for internet transactions) and at the same time make the $10,000 deposit. The company recognizes that you may or may not have rights as a result of the old bankruptcy proceedings but is willing to go forward on quit claim basis.

Sincerely,

Corey Allen
Principal Advisor
Dividend Advisors, LLC.
433 North Camden Drive Suite 970
Beverly Hills, California 90210
Phone: (310) 962-5602
www.DividendAdvisors.com
email: Corey.Allen@DividendAdvisors.com

## DOMAIN NAME ASSIGNMENT AGREEMENT

THIS AGREEMENT is made this [Date] ("the Agreement"), by and between MITEL NETWORKS CORPORATION, on behalf of itself and its subsidiaries, a Canadian corporation with offices at 350 Legget Drive, Ottawa, Ontario, Canada K2K2W7 ("Mitel") and Colocation America, Inc., a Nevada Corporation with offices at 9360 W Flamingo Rd, Suite 110-178, Las Vegas, NV 89147 ("INTELLECTUAL PROPERTY PURCHASER").

**WHEREAS**, Dividend Advisors LLC has introduced the INTELLECTUAL PROPERTY PURCHASER to intangible rights which may be claimed as a result of a prior bankruptcy proceeding, including domain name and related intellectual property.

**WHEREAS**, Mitel hereby agrees to quit claim, transfer and assign, and INTELLECTUAL PROPERTY PURCHASER hereby agrees to purchase the domain name <gandalf.ca> (the "Domain Name") and related rights subject to the terms and conditions of this Agreement.

**NOW, THEREFORE**, in consideration of the promises and agreements set forth herein, the parties, each intending to be legally bound hereby, do promise and agree as follows:

**A. Assignment of Domain Name**. For good and valuable consideration, payable as more particularly described herein, Mitel hereby agrees to quit claim to INTELLECTUAL PROPERTY PURCHASER any of Mitel's right, title and interest in and to the Domain Name <gandalf.ca> and the registration thereof, together with the goodwill of the business connected with and symbolized by such Domain Name, and the associated IPv4 134.22.0.0/16 and any associated trade dress, or other intellectual property intellectual property rights relating thereto, to the extent any such rights exist.  The quit claim transfer and assignment shall take effect as set forth herein upon INTELLECTUAL PROPERTY PURCHASER'S making the payment as provided for herein.

1

MITEL000551

**B.  Payment.**    The consideration (the "Consideration") to be paid by INTELLECTUAL PROPERTY PURCHASER shall be in the amount and through escrow as set forth in the standard Escrow.com instructions, to be entered concurrent with this agreement by the parties and for the amount therein to be deposited by purchaser upon opening the escrow along with the escrow fees. Within 1 business day after notification from Escrow.com that the purchase funds have been received from the INTELLECTUAL PROPERTY PURCHASER Mitel shall change the registered ownership of the domain name with a third-party registrar so that the "WHOIS" information will be registered to Buyer, and transfer the domain name to a hosting service designated by Buyer and further execute any instrument of transfer may be required to effectuate the purchase of any of the quit intellectual property rights.  Upon notice to Escrow.com of visible "Whois" registration and all related intellectual property transfer  the purchase funds are to be released to Mitel by wire transfer as Mitel provides in the escrow instruction.

**C. Mitel's Obligations.** Mitel agrees to cooperate with INTELLECTUAL PROPERTY PURCHASER and to follow INTELLECTUAL PROPERTY PURCHASER'S reasonable instructions in order to effectuate any transfer of the Domain Name or any intellectual property in a timely manner. Specifically, upon receipt of the consideration, Mitel further agrees to prepare and transmit any necessary registration agreement or correspondence to authorize the transfers.

**D. Warranty.**  Mitel warrants and represents that: (i) it has the full power and lawful authority to enter into this quit claim assignment and transfer the Domain Name, and (ii) to the extent it is the lawful owner of the Domain Name and intellectual property.

**E. INTELLECTUAL PROPERY PURCHASER Obligations.** INTELLECTUAL PROPERTY PURCHASER agrees not to: use the Domain Name or any resulting website: (i) to disparage Mitel in any way; (ii) and (iii) disclose the material terms of this Agreement, such as the Consideration, however either party may disclose the existence of the Agreement.

2

MITEL000552

**F. Entire Agreement.** This Agreement embodies the entire understanding of the parties with respect to the subject matter hereof, and merges all prior discussions between them, and neither of the parties shall be bound by any conditions, definitions, warranties, understandings, or representations with respect to the subject matter hereof other than as expressly provided herein.   No oral explanation or oral information by either party hereto shall alter the meaning or interpretation of this Agreement.

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be made and executed on the date signed by Mitel below ("Effective Date").

**MITEL NETWORKS CORPORATION**

_____

Name: _____

Position: _____

Date: _____

**INTELLECTUAL PROPERTY PURCHASER**

_____

Name: _____

Date: _____

3

## SCHEDULE A TO
## DOMAIN NAME ASSIGNMENT AGREEMENT

# INCOMING WIRE TRANSFER

Please ensure all funds in are paid in favor of **Mitel Networks Corporation** as per instructions below:

**RECEIVING BANK / INSTITUTION**

| | |
|---|---|
| Name: | **BANK OF NOVA SCOTIA** |
| Branch: | **Toronto BSC (Servicing Transit)** |
| Address: | **20 Queen St W 4th Floor** |
| | **Toronto, Ontario** |
| | **M5H 3R3** |
| | **CANADA** |
| SWIFT BIC: | **NOSCCATT** |
| ABA Routing #: | **26002532** |

**BENEFICIARY**

| | |
|---|---|
| Name: | **MITEL NETWORKS CORPORATION** |
| Address: | **350 Legget Drive** |
| | **Ottawa, Ontario** |
| | **K2K 2W7** |
| | **CANADA** |
| Branch Transit: | **47886** |
| Inst. number: | **002** |
| Account number | **01295 18** |
| Currency code: | **CAD** |

Global Treasury & Risk Management Operations

| | | |
|---|---|---|
| **Tel:** | (613) 592-2122 | x: 71823 or 74433 |
| **Fax:** | | (613) 592-4784 |
| **@** | | treasury@mitel.com |

4

MITEL000554

EXHIBIT 10

**From:** Michelle Whittington
**Sent:** Thursday, March 03, 2016 2:09 PM
**To:** 'Corey Allen' <Corey.Allen@dividendadvisors.com>
**Subject:** RE: Attn: Michelle Whittington Re: Domain name assignment agreement in Word

Hi Corey, a few edits and questions. All changes are tracked. Also, do you have the escrow instruction/agreement to include as well?

Michelle

## DOMAIN NAME ASSIGNMENT AGREEMENT

THIS AGREEMENT is made this [Date]_____ ("the Agreement"), by and between MITEL NETWORKS CORPORATION, on behalf of itself and its subsidiaries, a Canadian corporation with offices at 350 Legget Drive, Ottawa, Ontario, Canada K2K2W7 ("Mitel") and Colocation America, Inc., a Nevada Corporation with offices at 9360 W Flamingo Rd, Suite 110-178, Las Vegas, NV 89147 ("INTELLECTUAL PROPERTY PURCHASER").

**WHEREAS**, Dividend Advisors LLC has introduced the INTELLECTUAL PROPERTY PURCHASER to intangible rights which may be claimed as a result of a prior bankruptcy proceeding, including domain name and related intellectual property.

**WHEREAS**, Mitel hereby agrees to quit claim, transfer and assign, and INTELLECTUAL PROPERTY PURCHASER hereby agrees to purchase the domain name <gandalf.ca> (the "Domain Name") and related rights, subject to the terms and conditions of this Agreement.

**NOW, THEREFORE**, in consideration of the promises and agreements set forth herein, the parties, each intending to be legally bound hereby, do promise and agree as follows:

**A. Assignment of Domain Name**. For good and valuable consideration, payable as more particularly described herein, Mitel hereby agrees to quit claim to INTELLECTUAL PROPERTY PURCHASER any of Mitel's right, title and interest in and to the Domain Name <gandalf.ca> and the registration thereof, together with the goodwill of the business connected with and symbolized by such Domain Name, and the associated IPv4 134.22.0.0/16 and any associated trade dress, or other intellectual property intellectual property rights relating thereto, to the extent any such rights exist. The quit claim transfer and assignment shall take effect as set forth herein upon INTELLECTUAL PROPERTY PURCHASER'S making the payment as provided for herein.

Comment [WM1]: What is this?

Formatted: Highlight

1

026

**B. Payment**.    The consideration (the "Consideration") to be paid by INTELLECTUAL PROPERTY PURCHASER shall be in the amount and through escrow as set forth in the standard Escrow.com instructions, to be entered concurrent with this Aagreement by the parties and for the amount therein to be deposited by purchaser upon opening the escrow along with the escrow fees. Within 1 business day after notification from Escrow.com that the purchase funds have been received from the INTELLECTUAL PROPERTY PURCHASER, Mitel shall change the registered ownership of the dDomain Nname with a third-party registrar so that the "WHOIS" information will be registered to Buyer the INTELLECTUAL PROPERTY PURCHASER, or agent of its choosing, and transfer the dDomain nName to a hosting service designated by the INTELLECTUAL PROPERTY PURCHASERBuyer and further execute any instrument of transfer may be required to effectuate the purchase of any of the quit intellectual property rights.  Upon notice to Escrow.com of visible "Whois" registration and all related intellectual property transfer, the CONSIDERATIONpurchase funds are to be released to Mitel by wire transfer as Mitel provides in the escrow instruction.

**C. Mitel's Obligations.**  Mitel agrees to cooperate with INTELLECTUAL PROPERTY PURCHASER and to follow INTELLECTUAL PROPERTY PURCHASER'S reasonable instructions in order to effectuate any transfer of the Domain Name or any intellectual property in a timely manner. Specifically, upon receipt of the consideration, Mitel further agrees to prepare and transmit any necessary registration agreement or correspondence to authorize the transfers.

**D. Warranty.**  Mitel warrants and represents that: (i) it has the full power and lawful authority to enter into this quit claim assignment and transfer the Domain Name, and (ii) to the extent it is the lawful owner of the Domain Name and any associated intellectual property rights.

**E. INTELLECTUAL PROPERY PURCHASER Obligations.** INTELLECTUAL PROPERTY PURCHASER agrees not to: use the Domain Name or any resulting website: (i) to disparage Mitel in any way; (ii) and (iii) disclose the material terms

2

of this Agreement, such as the Consideration, however either party may disclose the existence of the Agreement.

**F. Entire Agreement.** This Agreement embodies the entire understanding of the parties with respect to the subject matter hereof, and merges all prior discussions between them, and neither of the parties shall be bound by any conditions, definitions, warranties, understandings, or representations with respect to the subject matter hereof other than as expressly provided herein.   No oral explanation or oral information by either party hereto shall alter the meaning or interpretation of this Agreement.

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be made and executed on the date signed by Mitel below ("Effective Date").

**MITEL NETWORKS CORPORATION**

_____

Name: _____

Position: _____

Date: _____

**INTELLECTUAL PROPERTY PURCHASER**

_____

Name: _____

Date: _____

3

028

4

**SCHEDULE A TO**
**DOMAIN NAME ASSIGNMENT AGREEMENT**

## INCOMING WIRE TRANSFER

Please ensure all funds in are paid in favor of **Mitel Networks Corporation** as per instructions below:

**RECEIVING BANK / INSTITUTION**
Name:                    **BANK OF NOVA SCOTIA**
Branch:                  **Toronto BSC (Servicing Transit)**
Address:                 **20 Queen St W 4th Floor**
                         **Toronto, Ontario**
                         **M5H 3R3**
                         **CANADA**

SWIFT BIC:

ABA Routing #:

**BENEFICIARY**
Name:                    MITEL NETWORKS CORPORATION
Address:                 **350 Legget Drive**
                         **Ottawa, Ontario**
                         **K2K 2W7**
                         **CANADA**

Branch Transit:
Inst. number:
Account number
Currency code:            CAD

Global Treasury & Risk Management Operations
**Tel:**        (613) 592-2122        x: 71823 or 74433

**Fax:**                              (613) 592-4784
**@**                                 treasury@mitel.com

5

030