BRIER, IRISH, HUBBARD & ERHART, P.L.C.
2400 East Arizona Biltmore Circle, Suite 1300
Phoenix, Arizona 85016
Telephone (602) 522-3940
Facsimile (602) 522-3945
Teresa H. Foster, Of Counsel (010877)
For Court Filings/Pleadings:
ctfilings@thfosterlaw.com
Attorneys for Plaintiff

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| COLOCATION AMERICA CORPORATION,<br><br>                              Plaintiff,<br><br>v.<br><br>MITEL NETWORKS CORPORATION,<br><br>                              Defendant. | Case No. 2:17-cv-00421-NVW<br><br>**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND CROSS MOTION FOR SUMMARY JUDGMENT ON CONTRACT INTERPRETATION** |

Plaintiff Colocation America Corporation dba Colocation America, Inc. is the party that is entitled to summary judgment on contract interpretation because the Contract included a quit claim of IPv4 addresses. This Court should enter judgment in favor of Plaintiff on all counts in Plaintiff's Complaint and on Defendant Mitel Networks Corporation's Counterclaim (for breach of contract and/or rescission).

The parties agree that contract interpretation is a matter of law and that this Court should interpret the Contract as a matter of law in this summary judgment proceeding. The unambiguous language of the Contract includes a quit claim of the IPv4 addresses

and the incorporated escrow instructions include a transfer of the IPv4 addresses. Furthermore, the drafting history (adding the IPv4 addresses) confirms that the Contract included a quit claim transfer of the IPv4 addresses. Defendant's interpretation of the Contract as transferring only the goodwill associated with the IPv4 addresses belies common sense. First, there is no goodwill associated with the IPv4 addresses. Second, goodwill of an asset is never transferred separate from the actual asset.

The parties agree to the legal standards for granting summary judgment, contract interpretation (as a matter of law) and relevant contract interpretation principles.

## I. PLAINTIFF'S CONSTRUCTION OF THE CONTRACT TO INCLUDE A QUIT CLAIM OF THE IPv4 ADDRESSES IS CONSISTENT WITH THE CONTRACT AS A WHOLE.

### A. The Contract Language is Unambiguous.

The operative language of the Contract states:

> [Defendant] hereby agrees to *quit claim* to [Plaintiff] any of [Defendant's] right, title and interest in and to the Domain Name <gandalf.ca> and the registration thereof, **together with** the goodwill of the business connected with and symbolized by such Domain Name **and** the *associated IPv4 134.22.0.0/16* **and** any associated trade dress, **or** other intellectual property [sic] rights relating thereto, to the extent any such right exists.

See Exhibit 2, Defendant's Motion for Summary Judgment (Def. Ex. 2) at ¶A (emphasis added).

The Contract makes clear that Defendant was quit-claiming (without any representation as to ownership) to Plaintiff its right, title and interest in and to the following:

- the Domain Name <gandalf.ca> and the registration thereof, ***together with***
- the goodwill of the business associated with and symbolized by such Domain Name ***and***
- the associated IPv4 134.22.0.0/16 ***and***
- any associated trade dress, ***or***
- other intellectual property [sic] rights relating thereto, to the extent any such rights exist.

Defendant argues the IPv4 addresses are not "associated" with the Domain Name <gandalf.ca> with a citation to WHOIS (whois.search.results) identifying servers associated with that Domain Name. See Def. Ex. 3.[1] This IPv4 address is still registered to Gandalf at WHOIS. See Def. Ex. 7. Gandalf's assets were transferred to Mitel Corporation (and its assets were transferred to Defendant and Microsemi Ltd). See Defendant's Motion at footnote 6.

Defendant's interpretation focuses on the commas and ignores the relevant coordinating conjunctions such as "and" and "or". The grammar books relied upon by Defendant (Def. Exs. 4A & 4B) do not even support its position. The Cambridge Dictionary clearly states: "We do not normally use a common before *and* at the end of a list of single words… When a subordinate clause comes before the main clause, we commonly use a comma to separate the clauses. However, we do not always do this in short sentences…" See Def. Ex. 4A at page 2199 (Def. Ex. 4A:2199). Likewise, Garner's

---

[1] This exhibit (like Exhibits 4A, 4B, 7, 19, 28, 29, 30, and 32) is technically inadmissible because it is unauthenticated, lacks foundation, and consists of hearsay. Plaintiff is not moving to strike such exhibits because Plaintiff does not dispute these exhibits and in the interest of judicial economy and efficiency Plaintiff is also including its own exhibits from whois and escrow.com. Either the Court needs to consider all such exhibits as admissible or inadmissible.

Dictionary of Legal Usage states: "The question whether to include the serial comma has sparked many arguments in law offices and judges' chambers." See Def. Ex. 4B:2196.

Based on standard custom and trade, one would expect goodwill to be associated with the business and the domain name. There is no conceivable goodwill to be associated with the IPv4 addresses and, even if there were, it belies common sense that the goodwill would be transferred separate from the IPv4 addresses. None of the cases cited by Defendant support its position that goodwill of an asset can be transferred separate from the asset itself. In all of the cases cited by Defendant, the goodwill was transferred with an associated trademark. *E & J Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280 (9th Cir. 1992); *Visa, U.S.A., Inc. v. Birmingham Tr. Nat. Bank,* 696 F.2d 1371, 1375 (Fed. Cir. 1982); *Glamorene Products Corp. V. Procter & Gamble Co.,* 528 F.2d 894 (C.C.P.A. 1976); *Hy-Cross Hatchery, Inc. v. Osborne,* 303 F.2d 947 (C.C.P.A. 1962); *Money Store v. Harriscorp Finance, Inc.,* 689 F.2d 666 (7th Cir. 1982). Defendant is arguing, however, that the Contract should be interpreted to mean that the goodwill associated with the IPv4 addresses is being transferred *without* the addresses themselves.

**B.   The Remaining Sections of the Contract Support an Interpretation that The Contract Transfers the IPv4 Addresses.**

1.   Payment Section (supports transfer of addresses).

Defendant's references to paragraph B of the payment section of the Contract actually supports Plaintiff's interpretation of the Contract. See Def. Ex. 2. Paragraph B incorporates the Escrow.com instructions (discussed below) and indicates that payment

shall be "through escrow as set forth in the **standard Escrow.com instructions, to be entered concurrent with this agreement by the parties**…" See Def. Ex. 2. Defendant's unsupported arguments about the value of the IPv4 addresses are inadmissible and irrelevant. It is irrelevant because the parties agreed to $10,000 because the transaction involved a "quit claim." To this date, Defendant is still arguing that it does not own the IPv4 addresses.[2]

    2.    <u>Warranty Section & Obligation Section (support transfer of addresses)</u>.

Both the warranty and obligation sections support Plaintiff's construction of the Contract. Defendant only warrants the ownership of the Domain Name. That is because when the Contract was negotiated, the parties knew that Defendant owned the Domain Name but the "quit claim" language was added at the same time as the IPv4 addresses because neither party new if Defendant in fact owned the IPv4 addresses. See Section II below.

    3.    <u>Consideration Section (supports a quit claim of the addresses)</u>.

The consideration owed under the Contract does not support Defendant's interpretation. The $10,000 price included a quit claim of the IPv4 addresses because neither party knew, at the time of the Contract, if Defendant actually owned those addresses. Defendant knew it owned the Domain Name but never even investigated the ownership of the IPv4 addresses until after the Contract was executed. See Section II

---

[2] The ownership is an issue for another day, although it is difficult to believe that Defendant does not own the addresses considering how hard it has fought to keep those addresses out of this Contract.

below.

Plaintiff was gambling (hoping) that Defendant owned the IPv4 addresses and that Plaintiff could acquire them for $10,000 (plus any costs to investigate and establish ownership). Defendant, on the other hand, was willing to receive $10,000 for an asset that it had not used in over 15 years and had no idea whether or not it even owned the asset. Defendant supports it argument with a citation to *Idearc Media, LLC v. Palmisano & Assocs., P.C.,* 929 F.Supp.2d 939, 950 (D. Ariz. 2013). *Idearc* does not help Defendant, however, because in that case both the buyer and the seller were relying upon the fact that the seller owned the telephone number being transferred. Here, neither party knew if Defendant owned the IPv4 addresses.

   **C.** **The Escrow.com Instructions Support Plaintiff's Interpretation.**

The Contract expressly incorporates the Escrow.com instructions, which are "to be entered concurrent with this Agreement by the parties." See Def. Ex. 2, ¶B. The Escrow.com instructions confirm the language of the Contract, they were emailed to Michelle Whittington and she accepted them. The Escrow.com instructions clearly state that once the buyer and seller have agreed to a transaction "by selecting the 'Agree' button at the bottom of the Transaction Detail Screens, these instructions now constitute a binding agreement between all parties." See Exhibit 1 at page 2121 ("Exhibit 1:2121"), Declaration of Maureen Zachow with MITEL2121-2122 ("2121-2122") documents. The Escrow.com instructions identify IPv4 numbers (addresses) as "personal property." *Id.* at 2122.

The Escrow.com "history" confirms that the buyer initiated the transaction for Escrow No. 847266 on March 25, 2016 at 12:26 p.m. PDT and that "both parties have accepted the offer, awaiting buyer payment" on March 25, 2016 at 2:04 p.m. PDT. See Exhibit 2:2, 3, and 1677, Declaration of Albert Ahdoot with Escrow.com documents.

The Escrow.com screen shot pages from Albert Ahdoot's Escrow.com account, evidence that the IPv4 addresses are to be transferred as part of the escrow. See Exhibit 3:284-285, Declaration of Harold L. Stanford with attached screen shots.

Changes can be made on the transaction detail screen after signing onto Escrow.com only when the status is waiting for you to agree. See Exhibit 2:1 (https://www.escrow.com/support/faqs/how-do-i-change-transaction-details-and-terms). Any changes made to the escrow instructions by Albert Ahdoot would have to have been agreed upon by Michelle Whittington. One cannot change the description after the fact. See Exhibit 2:1.

Defendant represents that the screen shots are not part of the records/documents which were produced by Escrow.com in response to Defendant's subpoena, but these documents were never requested in the subpoena. See Exhibit 4:6, July 13, 2107 subpoena to Escrow.com. Defendant's subpoena only requested *communications* between Escrow.com and Plaintiff or Plaintiff's particular representatives, or documents showing any *relationship* between Escrow.com and these representatives. *Id*. There is no request specific to any escrow opened between the parties, including Milestone Details, item descriptions, or any "notes" for each transaction. See Exhibit 4:4, 5, 6.

Defendant claims that Plaintiff opened six transactions with Escrow.com. Actually, there were six transactions, three opened by each party. See Exhibit 2:2-3, a timeline of the escrow transactions. The 3rd and final transaction opened by Plaintiff is the one accepted by both parties. See Exhibit 2:2-3, and 1677.

## II. PAROL EVIDENCE SUPPORTS PLAINTIFF'S INTERPRETATION OF THE CONTRACT TO INCLUDE THE IPv4 ADDRESSES.

Both parties have argued that the Contract is unambiguous and that the Court need not consider parol evidence. Furthermore, the Contract contains an integration clause. Paragraph F of the Contract provides that it "embodies the entire standing of the parties" and "No oral explanation or oral information by either party hereto shall alter the meaning or interpretation of this Agreement." See Def. Ex. 2.

Both parties agree that the Contract interpretation is governed by the principles set forth in *Taylor v. State Farm Mut. Auto. Ins. Co.*, 175 Ariz. 148, 854 P.2d 1134 (1993). The court may admit parol evidence to determine the intention of the parties if "the judge . . . finds that the contract language is 'reasonably susceptible' to the interpretation asserted by its proponent." *Id*., 175 Ariz at 154, 854 P.2d at 1140. Furthermore Mutual assent is ascertained from "objective evidence, not [from] the hidden intent of the parties." *Hill-Shafer P'ship v. Chilson Family Trust,* 165 Ariz. 469, 474, 799 P.2d 810, 815 (1990).

If parol evidence is considered by the Court this evidence (specifically the history of the Contract negotiations), supports Plaintiff's interpretation of the Contract.

| Date | Event | Exhibit |
|---|---|---|
| 2/24 | Plaintiff's agent inquired about purchasing the Domain Name "as well as any potential intellectually [sic] properties or scenarios that may be associated at a future point in time with the name gandalf.ca" for $10,000.[3] | 5 |
| 2/24 | Defendant's in-house counsel prepared initial draft of Contract. Draft No. 1. | 6 |
| 2/26 | Plaintiff's agent revised Contract to include IPv4 addresses and quit claim language. Draft No. 2.[4] | 7:550 |
| 3/3 | Plaintiff's agent sent copy of Draft No. 2 in Word version. | 8:445 |
| 3/3 | Defendant's counsel sent back redlined Contract with question "***What is this?***" about the IPv4 addresses language. Draft No. 3. | 9:1 |
| 3/7 | Plaintiff's agent sent email referencing attached "signed contract." The contract is not signed but accepts the changes in Draft No. 3 and (for unknown reasons) removes the comma between "Domain Name and the associated IPv4…" | 10:221-222 |
| 3/10/16 | Plaintiff's agent emailed Contract signed by Plaintiff (no further changes). | 11 |
| Prior to 3/10 | Defendant's counsel discussed the IPv4 addresses with her in-house intellectual property people. | 12(22:24-23:24)[5] |
| Prior to 3/10 | Defendant's counsel discussed the Contract (with the IPv4 addresses language included) with Defendant's General Counsel prior to execution of the Contract. | 12(34:5-34:22) |
| 3/10 | Defendant's General Counsel executed the short 3-page Contract with the IPv4 addresses language included. | Def. Ex. 2 |
| 3/23-3/28 | Plaintiff and Defendant corresponded about completing the Escrow.com instructions. | 13 |
| 3/23 | Prior to closing, a third party (Jelly Digital) inquired about purchasing the IPv4 addresses. | 14:657 |

---

[3] The $10,000 offer included the addresses because it was conveyed after the February 19, 2016 internal communications about "slipping in" the IPv4 addresses. See Def. Ex. 16.

[4] Draft No. 2 was not redlined but a redline has been prepared to show revisions made between Draft No. 1 and Draft No. 2. See Exhibit 7A.

[5] Whittington deposition Exhibit 12 transcript at pages 22, line 24 to page 23, line 24 ("12 (22:24 – 23:24)").

| 3/24-3/25 | The escrow instructions were accepted, including an express transfer of IPv4 addresses. Escrows were cancelled and reopened (for unrelated reasons) but included a transfer of the IPv4 addresses. | 2:2-3 3:284-285 |
|---|---|---|
| 3/25 | $10,000 purchase price was deposited into escrow by wire. Plaintiff based the amount of the purchase price on the "quit claim" nature of the transaction (because of the uncertainty of whether Defendant actually owned the IPv4 addresses). | 2:1677 & 7:550 |
| 3/28 | After an inquiry from a new buyer, Defendant alleged a mistake concerning the IPv4 addresses. | 15 |
| 4/01 | Third party offered between $150,000-200,000 for the IPv4 addresses | 14:656 |

The history of negotiations (discussed above) confirm that Defendant was aware of the IPv4 addresses language added to the Contract (asking "*What is this?*"), the language was included in the Contract at the time of execution, and was also included in the subsequent escrow instructions approved by Defendant. See Exhibits 9, 11 & 3.

The transaction took place after Plaintiff agent's email recognized that Defendant may not own the subject assets, "you may or may not have rights as a result of the old bankruptcy proceedings." Exhibit 7:550 and Defendant's Motion at Footnote 6. Therefore the Contract went forward on a quit claim basis, both parties taking the risk that they did not know if the IPv4 block was being sold, or what was its value. Defendant's in-house counsel Whittington reviewed the Contract language for the transaction with Defendant's VP of Business Strategy, Christian Szpilfogel. It was only after those internal discussions that the contract was executed by Defendant's General Counsel in Ottawa, Canada.

Defendant claims mistake, despite clear facts supporting its full understanding of

the Contract it entered, and the mistake, if any, as to value after entering the Contract and once ownership was confirmed, was a risk voluntarily assumed by Defendant and is not grounds to rescind the Contract.

### A. Defendant Knew it Owned the Domain Name Before the Quit Claim Language was Added to the Draft Contract.

Defendant's in-house counsel prepared the initial draft of the Contract which included an outright transfer of the Domain Name. See Draft No. 1, Exhibit 6. Plaintiff's agent revised the draft to include the IPv4 addresses and the quit claim language. See Draft No. 2, Exhibit 7:550-551.

Defendant argues in its Motion that the quit claim language referred to a quit claim of both the Domain Name and goodwill. See Motion at page 1, lines 25-26. Yet, Defendant's in-house counsel has admitted that she knew Defendant actually owned the Domain Name prior to execution of the Contract. See Exhibit 12(16:17-17:11). Defendant's in-house counsel did not know why the quit claim language was included in the Contract and she did not discuss that with Plaintiff's agent. Exhibit 12(17:12-20). Since Defendant knew that Defendant owned the Domain Name at the time of the Contract was executed, the quit claim language for the Domain Name only would have been unnecessary.

### B. Defendant was Aware that a Quit Claim of the IPv4 Addresses was Added to the Draft Contract.

Defendant's in-house counsel reviewed Draft No. 2 (with the IPv4 language added) and responded with the question "***What is this?***" See Draft No. 3, Exhibit 9:2.

Defendant's in-house counsel discussed the IPv4 address language with Defendant's Vice President of Business Strategy, Christian Spzifgol. Exhibit 12(22:24-23:24). These discussions occurred after Draft No. 2 was received and before the Contract was actually executed. *Id.* Defendant's in-house counsel never had any discussions with Plaintiff's agent about the added IPv4 language. Exhibit 12(24:17-25:4). Defendant's in-house counsel also never had any discussions with Plaintiff's agent about deleting the IPv4 language from the Contract prior to execution. Exhibit 12(77:15 - 77:18).

Defendant's in-house counsel needed to discuss the IPv4 address language with the VP of Business Strategy because she was not familiar with IPv4 addresses prior to the negotiation of the Contract. Exhibit 12(69:16-23).

Even though Defendant's in-counsel never heard back from Plaintiff's agent about the IPv4 language, she was comfortable having the Contract executed after having internal discussions with the VP of Business Strategy (Spzifgol). Exhibit 12(29:8-30:4).

**C.    Defendant Argues that Only Goodwill Related to the IPv4 Addresses was Being Transferred but Defendant has Admitted that Goodwill Cannot be Transferred Separate from an Asset.**

Defendant argues that it was just transferring the goodwill associated with the IPv4 addresses, not the addresses itself. Defendant's Motion at page 1, line 28 to page 2, line 1. Yet, Defendant's in-house counsel has admitted that goodwill would not be associated with an IPv4 address and she does not believe it would be possible to transfer goodwill separate from the underlying asset. Exhibit 12(22:9-22:23). She did not, however, discuss the issue about goodwill with Plaintiff's agent. *Id.* Defendant's in-

house counsel believed the goodwill was associated with the Domain Name, not the addresses. Exhibit 12(77:11-77:15).

### D. The Removal of the Comma from the Contract is Irrelevant.

Defendant incorrectly argues that the removal of a comma in the Contract supports its interpretation of the Contract. See Defendant's Motion at page 8. First, the grammar books relied upon Defendant do not support its argument. See Section 1(A) above. Second, Defendant did not remove the comma and the removal of the comma was not negotiated. Defendant's counsel provided a redline draft of the Contract (Draft No. 3) showing all of the changes that Defendant requested. Exhibit 9:2-6. Plaintiff's agent responded with a copy of the Contract accepting all the changes from Draft No. 3 and (for unknown reasons) removing the comma between "Domain Name and the associated IPv4 addresses." Exhibit 10:221-222.

No one knows why the comma was removed, and thus its removal cannot support Defendant's interpretation of the Contract.

### E. Defendant Only Alleged "Mistake" After it Received a Higher Offer for the Addresses.

Prior to negotiation of the Contract, Defendant's in-house counsel had no understanding of what the value of an IPv4 address was. Exhibit 12(71:17-71:20). After the Contract was executed, a third party (Jelly Digital) inquired about purchasing the IPv4 addresses. Exhibit 14:657. Jelly Digital made that inquiry to the VP of Business Strategy (Spzifgol), the same person with which Defendant's in-house counsel was

discussing the IPv4 language contained in the Contract. Exhibit 12(22:14-23:24).[6] Jelly Digital had previously inquired about purchasing these IPv4 addresses in an email to Christian Spzifgol in June, 2015. Exhibit 14:658. Defendant's in-house counsel testified, however, that she was not aware of any of those communications until after litigation was filed. Exhibit 12(102:17-104:19).

On March 28, 2016, Defendant's in-house counsel alleged that there was a mistake in the Contract concerning the IPv4 addresses. Exhibit 15. A few days later, the third-party confirmed that it was offering between $150,000-$200,000 for those same IPv4 addresses. Exhibit 14:656.

It is settled under Arizona law that a party bears the risk of mistake when they are aware at the time the contract is made that they have only limited knowledge to the facts to which the mistake relates, but treats that knowledge sufficient, so that the conscious ignorance does not excuse them from a contract made. See *Nelson v. Rice,* 198 Ariz. 563, 566, 12 P. 3d 238, 241 (2000).

It was not until after the execution of the Contract and approval of escrow instructions that Defendant asserted a "mistake." Exhibit 15. This occurred after Defendant determined that the IPv4 block had a value far higher than it thought at the

---

[6] After the IPv4 address language was added, Michelle Whittington added language to the Contract asking "***What is this?***" and she had internal discussions with Christian Spzifgol (another employee of Defendant) to learn what an IPv4 address was (she admitted that she did not know what that was prior to negotiations of the Contract). Exhibits 9:2 and 12:(22:14-23:4).

time of signing the Contract. Exhibit 14:656. Defendant then refused to honor the deal. Exhibit 15.

### III. THE COURT SHOULD NOT CONSIDER IRRELEVANT AND IMMATERIAL INFORMATION.

#### A. Intellectual Property

Defendant argues that the IPv4 addresses are not intellectual property, based upon declaration of its in-house counsel, Whittington. Def Ex. 8. This evidence is inadmissible since to support Defendant's interpretation of the Contract because she did not have any understanding of IPv4 addresses prior to the Contract. Exhibit 12: (69:16-23). Furthermore, this interpretation belies the language of the Contract itself.

IPv4 is intellectual property included by the quit claim language itself. The manner in which the "IPv4 134.22.0.0/16" was designated in Defendant's quit claim of right, title, and interest comes down to Defendant selling everything it had within all of its internet rights it owned – that is, Defendant was transferring everything they associated with the domain name and the number block. This is the very gist of the Ejusdem Generis Canon of Construction respected by all courts.

By the Canon, general words that follow after annunciation of two or more things applies to other things of the same general kind or class as that specifically mentioned [Latin translation of the Ejusdem Generis is "of the same kind"]. *Yauch v. State, City of Tucson*, 109 Ariz. 576, 514 P.2d 709 (1973); *City of Phoenix v. Yates*, 69 Ariz. 68, 208 P.2d 1147 (1949); See also Holland & Webb, Learning Legal Rules 202 (3rd Edition 1996).

Therefore, under the Canon, construction of the phrase "or other intellectual property [sic] and rights relating thereto" simply means to include other similar intangible property providing internet access and use such as: Domain Name, goodwill, IPv4 addresses and trade dress. Defendant argues this Court should stand the Canon on its head, so that the phrase "other intellectual property" does not include the enumerated IPv4. Defendant contends for a change in the common sense Canon, which has stood unchanged for over 520 years since announced in the *Archbishop of Canterbury's* case, 76 E.R. 519 (1596).

Furthermore an "IPv4 number block" was determined to be intellectual property by the official US Government agency, National Science Foundation ("NSF). The NSF is governed by the National Science Foundation Act of 1950 (42 U.S.C. Sec1861-75). The NSF distributed the blocks to recipients "to transfer a thing of value." See Exhibit 16, Statement of General Counsel of the National Science Foundation. (Judicial Notice requested of Agency statement of legal authority, pursuant to Fed. R. Evid., Rules 201(b), (d), and (f)). In 2012, the NSF reaffirmed that the blocks are "intellectual property," and once transferred to a recipient, there is no authority to change the property rights – there is no authority to "reclaim IPv4 number blocks, once distributed." *Id.*

**B.   Valuation**

Defendant's argument about the value of the IPv4 addresses is also irrelevant and based on inadmissible evidence. See Defendant's Motion at page 6, lines 21-25, page 9, lines 7-12 and Def. Ex 5 and 6.

### C. Subsequent events

Defendant's references to events that occurred after March 28, 2016 (when Defendant alleged a mistake) are irrelevant to the parties' intentions in entering into the Contract and should be excluded. See Defendant's Motion at pages 10-12, with a chronological summary of activity between March 30, 2016 and August 24, 2016 (Def. Exs. 22-27). The Escrow.com emails (dated May 14, 2017 and June 16, 2017) (Def. Exs. 25, 26 & 27) are not disputed, but they are irrelevant. Furthermore, they were not even produced by Escrow.com in its July 28, 2017 response to the subpoena for all communications. See Def. Ex. 29.

### D. Unrelated Subsequent Draft Contract with Third Party

Colocation's negotiations with JDA Software in May 2016 (Def. Ex. 24) are also irrelevant for three reasons. First, this draft agreement was prepared after Defendant alleged a mistake in the Contract,[7] Second, JDA Software actually owned the IPv4 addresses involved (whereas Defendant's ownership was unknown). Third, the proposed agreement with JDA Software never closed. See Defendant's Motion at pages 13-14.

## IV. CONCLUSION.

This is a simple breach of contract case and the undisputed facts confirm that Defendant agreed to transfer the IPv4 addresses in both the Contract and the subsequent

---

[7] Plaintiff also had the opportunity to clarify terms in the proposed Contract with JDA Software since learning of issues raised by Defendant in this matter.

escrow instructions. Defendant did not allege any "mistake" until a third-party offered to pay 15 to 20 times the amount of the purchase price set forth in the Contract. The Court should enter summary judgment in Plaintiff's favor on all counts of the Complaint and on both counts of the Counterclaim.

DATED: May 17, 2018.

>BRIER, IRISH, HUBBARD & ERHART, P.L.C.
>
> /s/ Teresa H. Foster
> Teresa H. Foster, Of Counsel
> 2400 E. Arizona Biltmore Circle, Ste 1300
> Phoenix, AZ 85016
> Attorneys for Plaintiff

CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of May, 2018, I electronically transmitted the attached document to the Clerk's Office using the ECF System for filing and emailed a copy same date to:

David E. Rogers
David G. Barker
Jacob C. Jones
SNELL & WILMER, LLP
One Arizona Center
400 E. Van Buren, Suite 1900
Phoenix, AZ 85004-2202
drogers@swlaw.com
dbarker@swlaw.com
jcjones@swlaw.com

 /s/ Harry Stanford