EXHIBIT 12

1           IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF ARIZONA

3

4

5  COLOCATION AMERICA, INC.,        )

                           )

6                       )

7          Plaintiff,    )

                           )

   v.                   )    Case No.

8                     )    2:17-cv-00421-NVW

   MITEL NETWORKS CORPORATION,    )

9                     )

10         Defendant.    )

11  _____)

12

13       DEPOSITION OF MICHELLE WHITTINGTON

14        30(b)(6) Mitel Networks Corporation

15

16           Phoenix, Arizona

         Friday, August 18, 2017

17            10:10 a.m.

18

19             CERTIFIED
              TRANSCRIPT

20

21

22

          KATE E. ROUNDY, RPR

23        Certified Reporter

       Certificate Number 50582

24

25

1    discussion, I'm talking about the verbal, that's not the

2    e-mail, about the quitclaim basis?

3        A.    No.

4        Q.    Okay.  What was your understanding that the

5    quitclaim meant in this transaction?

6        A.    That in the event that Mitel had rights in the

7    domain name due to the bankruptcy that their --

8    Corey Allen's company -- whoever -- well, he says, you

9    know, the company, so I guess -- I assume the client that

10   he was working for was willing to take the risk that in

11   the event that Mitel did have rights in that domain name,

12   they would still go forward.

13       Q.    And so by "risk," in other words, if they paid

14   the money and it turned out that Mitel didn't own it, they

15   were taking that risk?

16       A.    Yes.

17       Q.    At that point in time, on February 26th, had you

18   done any investigation to see if Mitel owned that trade

19   name?

20       A.    I did.

21       Q.    Domain name.  I'm sorry.

22       A.    Yes, I did.

23       Q.    What type of investigation?

24       A.    That would have been from Paulo Ferreira, one of

25   the originals, works in the IT group.  So I would have



1   confirmed or looked on WHOIS myself to confirm that that

2   domain name was actually in the name of Mitel Network

3   Corporation.

4        Q.   What did he do to discover that it was in the

5   name of Mitel?

6        A.   That the WHOIS database showed that it was.

7        Q.   And that would have been -- would that have been

8   before the draft of the Domain Name Assignment Agreement

9   of April 24th?

10       A.   It would have been, uh-huh.  It would have been

11  necessary to draft the agreement.

12       Q.   So if Paulo would have done investigation to

13  verify that Mitel owned the domain name, why was it going

14  to be on a quitclaim basis?

15       A.   I didn't put it there.

16       Q.   Oh, the quitclaim language?

17       A.   Uh-huh.

18       Q.   And you don't recall discussions with Corey about

19  that?

20       A.   No.

21       Q.   Take a minute and look at the document that is

22  attached to this page that starts with 550.  It was

23  Bates-stamped by Mitel as 551, 52 and 53 and 54.  So I'm

24  assuming that it actually was what Corey sent to you.

25            Do you recognize this document at all?



1    Q.   And we have referenced in this litigation about
2  this IP address here in this trade as a block of
3  addresses.
4       What does a block of addresses refer to?
5    A.   My understanding is more than one.
6    Q.   Can you tell looking at the IP address that is on
7  page 551 how many IP addresses were included?
8    A.   No.  It appears to be singular.  It says the.
9    Q.   Have you -- in your experience in intellectual
10 property, have you had agreements where companies have
11 sold assets and the associated goodwill?
12   A.   Yes.
13   Q.   Have you had any situations where companies have
14 sold goodwill unrelated to an asset?
15   A.   I don't think so.  I'm not sure that it would be
16 possible.  I don't know.  No, I don't think.  I'm thinking
17 of just trademark and domain name.
18   Q.   What type of goodwill could be associated with an
19 IP address?
20   A.   I don't think there is any.  I'm not aware of
21 any.
22   Q.   Did you discuss that with Corey Allen?
23   A.   No.
24   Q.   Before the agreement was signed, did you discuss
25 this provision about IP address with anybody else at

Alliance
REPORTING SOLUTIONS

Alliance Reporting Solutions
www.AllReportingSolutions.com

(602) 230-8448
20174697

COLOCATION AMERICA, INC. v. MITEL NETWORKS CORPORATION
MICHELLE WHITTINGTON - August 18, 2017

30(b)(6)
Page 23

 1    Mitel?
 2         A.    I did.
 3         Q.    Without discussing the substance of it, who would
 4    that have been?
 5         A.    That would have been the gentleman I mentioned
 6    just a minute ago, the vice president of business
 7    strategy.
 8         Q.    Who is that?
 9         A.    His name is Christian Spzifgol.
10         THE COURT REPORTER:   Can you spell that?
11         THE WITNESS:   S-p-z-i-f-g-o-l.
12    BY MS. FOSTER:
13         Q.    And is he located in the United States?
14         A.    No.
15         Q.    Is he located in Canada?
16         A.    He is.
17         Q.    And you would have discussed this agreement with
18    him at or about the time of February 26th?
19         A.    Probably after.   After I received it.
20         Q.    Okay.
21         A.    Yeah.
22         Q.    Okay.   Would you have discussed it with him
23    before it was executed?
24         A.    Yes.
25         Q.    When you received this document from Corey Allen



1   on February 26th, do you recall if it was redlined?

2       A.   I don't remember.

3       Q.   And the reason I'm asking is on the e-mail

4   before, which is Bates-stamped 007, you asked him if he

5   had any further edits, please redline and return to me.

6       A.   Uh-huh.

7       Q.   And then what I received, the same document that

8   I received from both the plaintiff and defendant, wasn't

9   redlined.  So I was wondering if you remembered any

10  redlining.

11      A.   I don't remember offhand.

12      Q.   Do you recall in the February 2016 time frame if

13  you would have gone back and compared your draft to

14  Mr. Allen's draft?

15      A.   Typically, yes, to see what -- or I would have

16  read through it, sure.

17      Q.   Do you recall any phone conversation between you

18  and Corey Allen after he sent the February 26 draft to you

19  and before it was executed?

20      A.   I know there were some.  There were many, many,

21  many phone calls.

22      Q.   Do you recall specifics of any of them?

23      A.   I do recall specifics of some of them, yes.

24      Q.   Do you recall any specifics talking about what

25  other intellectual property he was looking at?



COLOCATION AMERICA, INC. v. MITEL NETWORKS CORPORATION          30(b)(6)
MICHELLE WHITTINGTON - August 18, 2017                          Page 25

1        A.   No.

2        Q.   Do you recall any specifics with Corey Allen

3   regarding the IP address?

4        A.   None.

5        Q.   What type of specifics do you recall?

6        A.   Just purchase of the domain name, the timing,

7   asking for escrow information, did not know his clients,

8   who he was -- until this draft came through, just

9   making -- just moving things along.  There was no mention

10  of any IPv4 address transfer.

11       Q.   When you say "this draft," are you talking about

12  the document that's Bates-stamped 550 or 551?

13       A.   This and the prior one.  You know, I know we

14  talked on the phone prior to me sending him a draft.

15       Q.   And at some point he disclosed to you that the

16  buyer was Colocation?

17       A.   Not until I saw this.

18       Q.   And by "this," you are referring to this

19  document?

20       A.   Yes.  I'm sorry.  Not until I saw an actual draft

21  did he ever disclose who his client was.

22       Q.   I'm looking at 551, and I didn't see that it

23  listed his client.

24       A.   Up at the top he filled in the preamble.

25       Q.   Oh.  I saw intellectual property purchaser.



1    Q.    Did you ever try to get that answer before the

2  contract was signed?

3    A.    Well, I asked Corey.

4    Q.    And I know you asked him on March 3rd.  I'm

5  asking, did you ever follow up with Corey before the

6  contract was executed?

7    A.    No.

8    Q.    Were you concerned about having the contract

9  executed before you got an answer to what is this?

10   A.    I had internal discussions with Mitel to discuss

11  it because -- when I didn't hear back from Corey.

12   Q.    And I'm not asking you the substance of those

13  discussions, but who would they have been with?

14   A.    With Christian Spzifgol.

15   Q.    And that would have been around this March 3rd

16  time frame -- well, obviously after or --

17   A.    Well, it was in the previous draft as well,

18  right, but then I don't know that I used that to discuss

19  it with him, so...

20   Q.    So it would have been sometime after

21  February 26th?

22   A.    That's safe to say, yes.

23   Q.    Would it have been before the contract was

24  executed?

25   A.    Yes.



1      Q.    And you were comfortable having the contract

2   executed based on your -- without substance, based your

3   conversations with them?

4      A.    I was.

5      Q.    I want to show you -- I'm going to show you the

6   next set of documents.  It starts with 25.  It's the same

7   date.  For some reason when the documents first printed

8   out, the changes were not tracked.  You see there are

9   lines on the side of that.

10        Towards the end of this document -- they are not

11  Bates-stamped.  I'm sorry.  I didn't know about this until

12  this morning -- this is the same document but somebody

13  went in there and had tracked the changes?

14     A.    Uh-huh.

15     Q.    So if you could take a minute and look at this.

16        At the top of this somebody made a change to the

17  date.  This is the domain name assignment, the very top.

18     A.    Yes.

19     Q.    I'm looking at these changes.  I don't know.

20        Can you tell if these are changes you made?  If

21  you can take a minute to look through the documents.  Most

22  were clean-up changes.

23     A.    Uh-huh.  Yes, I believe so.  I think that -- it

24  doesn't show who made the changes on the side?

25     Q.    No, it doesn't.  No, it doesn't.



1      Q.   Do you recall, did you e-mail it to them?  FedEx

2  it to them?

3      A.   Yes.

4      Q.   E-mail.

5           Between the time you got Corey's draft that added

6  the IP address and the time that you forwarded it to

7  general counsel for execution, do you recall any

8  discussions with general counsel about that addition of

9  the IP address?

10     A.   When you refer to the IP address, are you

11  referring to the goodwill of the IP address?

12     Q.   No.  I'm sorry.  Just the language, which I said

13  I would refer to as IP address that was there.

14     A.   Okay.

15     Q.   By IP address I mean the associated IPv4

16  134.22.0.0/16.

17          Did you have any discussion between the time you

18  received that from Corey Allen and the time that the

19  contract was executed by the general counsel, did you

20  discuss with general counsel that language?

21     A.   We would have discussed the agreement in general,

22  the domain name transfer.

23     Q.   But do you recall any specific discussions,

24  without telling me what they were, with the general

25  counsel about that language --



1     A.   Counsel.

2     Q.   So it wasn't like you went to some website or

3  something to get this definition?

4     A.   Counsel prepared the declaration.  I reviewed it,

5  and I didn't -- yes.

6     Q.   Would this have been your same personal

7  definition of an IP address before the Colocation

8  agreement was signed?

9     A.   I can't say.

10     Q.   Let me rephrase that.  That was a horrible

11  question.

12          I understand that you are taking the position

13  that the Colocation agreement did not include IP

14  addresses; correct?

15     A.   As a transfer, correct.

16     Q.   But back in March 2016, what was your

17  understanding of what an IP address was?

18     A.   I was not very familiar until the agreement.

19  And, in particular, you know, when I had internal

20  discussions to bring myself up to speed.

21     Q.   And by the agreement you are talking about the

22  Mitel Colocation agreement?

23     A.   I am.

24     Q.   Okay.  After you got up to speed in the March --

25  February/March 2016 time frame, was your understanding of

Alliance
REPORTING SOLUTIONS

Alliance Reporting Solutions
www.AllReportingSolutions.com

(602) 230-8448
20174697

```
 1              Back in March of 2016, when you were negotiating
 2    the Colocation agreement, did you know what an IPv4
 3    address was?
 4              MR. ROGERS:  Object.
 5              THE WITNESS:  I had internal discussions, yeah,
 6    with Mitel.
 7    BY MS. FOSTER:
 8       Q.   And I don't want to know what those discussion
 9    were.
10       A.   Yes.
11       Q.   I just wanted to know.
12       A.   Yes.
13       Q.   I didn't know what one was until this lawsuit.
14              Back in March of 2016, did you know the value of
15    IPv4 addresses?
16       A.   Not without internal discussions.
17       Q.   Before the contract with Colocation was signed,
18    did you have some general understanding of what the value
19    of IPv4 addresses is?
20       A.   No.
21       Q.   This paragraph 11 states that IPv4 addresses are
22    currently quite valuable.
23              Number one, what did you mean by "currently quite
24    valuable"?
25       A.   As of 2017.
```



1    A.    Yes.

2    Q.    But you would be separating the goodwill from the

3    asset?

4    A.    Not the -- the IPv4 address is not transferred.

5    It would be the goodwill.

6    Q.    And that's what I'm asking you.  How --

7    A.    And if that domain name was associated with a

8    particular IPv4 address at some point in time, which it

9    could have been during the Gandalf years, there would have

10   been goodwill associated with that.

11   Q.    But you're talking about the goodwill for a

12   single domain name, not the goodwill for hundreds or

13   thousands of addresses?

14   A.    Correct.  That's correct.

15   Q.    Did you have any discussions about deleting that

16   reference to IP addresses in the agreement?

17   A.    Well, I would have -- well, no, not with

18   Corey Allen, no.

19   Q.    Okay.  On paragraph 15, you state that on

20   February 24th, 2016, Mr. Allen replied, communicated an

21   offer to purchase the domain name, quote, as well as any

22   potential intellectually (sic) properties or scenarios

23   that may be associated at a future point in time with the

24   domain name.

25         But you didn't have any discussions with anybody


Alliance
REPORTING SOLUTIONS

Alliance Reporting Solutions
www.AllReportingSolutions.com

(602) 230-8448
20174697

1          MS. FOSTER:  Let me mark this as an exhibit.

2          (Exhibit 8 was marked for identification.)

3   BY MS. FOSTER:

4      Q.   Christian -- I will call him Christian, because I

5   cannot pronounce his last name.

6      A.   Yes, that's it.

7      Q.   He had some communications with a Jonathan Dona,

8   D-o-n-a, on April 18, 2016.  If you go through the

9   communications, it's talking about IPv4 addresses.

10         Have you seen this document before?

11     A.   I have.

12     Q.   When did you see this for the first time?

13     A.   Yesterday.

14     Q.   Okay.  Were you aware -- do you know who

15   Jonathan Dona is?

16     A.   No.

17     Q.   Starting back at the beginning, which is the last

18   page, it's Bates-stamped -- mine is cut off -- it looks

19   like at 658, you heard of Jelly Digital before?

20     A.   No.

21     Q.   The first e-mail, which is actually at the bottom

22   of 657, it looks like it's dated June 12th, 2015?

23     A.   Uh-huh.

24     Q.   When you were discussing the Colocation

25   transaction with Christian in 2016, did he tell you that



COLOCATION AMERICA, INC. v. MITEL NETWORKS CORPORATION
MICHELLE WHITTINGTON - August 18, 2017

30(b)(6)
Page 103

1    somebody else had asked to buy those IPv4 addresses?

2        A.   No.

3        Q.   Do you know what happened between June 2015 and

4    March 2016 regarding communications between Jonathan and

5    Christian?

6        A.   I was not aware of any of this until after the

7    Colocation litigation.  This, again, I don't -- this would

8    have been following through the IT issue because it's an

9    IP address.  It would have never come across.

10            If there had been a transaction, perhaps I would

11   have seen a legal document, but I was not aware that any

12   of this happened until after the discovery.

13       Q.   You testified earlier that the revised agreement

14   that Corey Allen sent to you in March of 2016 you had

15   reviewed with Christian.

16            Do you recall that?

17       A.   Yes.

18       Q.   Wasn't this about the same time frame that he's

19   receiving these subsequent e-mails from Jonathan?

20       A.   This one is 2015.

21       Q.   Right above it is --

22       A.   Oh, yeah.

23       Q.   -- March 23, 2016?

24       A.   Right.

25       Q.   From Jonathan to Christian?



1    A.    Right.   Right.

2    Q.    We are writing today to open dialog with you

3 regarding an unused network asset that Mitel/Gandalf

4 Technology owns.

5    A.    I'm sorry.   I don't know what page you are on.

6    Q.    Oh, I'm sorry.   Same one.   657 that we were on.

7    A.    Oh.

8    Q.    Right above the June 12th e-mail.

9    A.    March 23rd, yes.

10    Q.    And this was about the same time frame that you

11 are discussing the Colocation issue with Christian;

12 correct?

13    A.    Correct.

14    Q.    At any point during your conversations with

15 Christian did he tell you other party was interested --

16    A.    No.

17    Q.    -- in Gandalf?

18    A.    No.   There would have been no reason.   It

19 wasn't -- no.

20    Q.    But yet you testified earlier that you thought

21 that there was any goodwill at least associated with the

22 IP address that was being transferred to Colocation;

23 correct?

24    A.    In association with the domain name, yes.

25    Q.    Well, I thought you thought the reference was



# EXHIBIT 13

From: Corey Allen [mailto:Corey.Allen@dividendadvisors.com]
Sent: Wednesday, March 23, 2016 10:50 AM
To: Michelle Whittington <Michelle.Whittington@mitel.com>
Cc: samantha@colocationamerica.com
Subject: Attn: Michelle Whittington Re: The Transfer Process

Dear Michelle,
            I would like to introduce you to Samantha Walters at Colocation America, Inc.
Samantha will be further assisting you in the domain transfer process. Samantha's phone
number is (310) 709-0133 and her email is samantha@colocationamerica.com.

In closing, it has been a pleasure working with you.

Sincerely,

Corey Allen
Principal Advisor
Dividend Advisors, LLC.
433 North Camden Drive Suite 970
Beverly Hills, California 90210

Phone:          (310) 962-5602
www.DividendAdvisors.com

**From:** Michelle Whittington [mailto:Michelle.Whittington@mitel.com]
**Sent:** Wednesday, March 23, 2016 11:31 PM
**To:** Samantha Walters <Samantha@ColocationAmerica.com>
**Cc:** 'Corey Allen' <Corey.Allen@dividendadvisors.com>
**Subject:** RE: Attn: Michelle Whittington Re: The Transfer Process

Samantha, I am available Thursday or Friday most of the day. You can reach me at 4800-961-9000
x21352.

Michelle

From: Samantha Walters [mailto:Samantha@ColocationAmerica.com]
Sent: Wednesday, March 23, 2016 11:56 AM
To: Michelle Whittington <Michelle.Whittington@mitel.com>
Cc: 'Corey Allen' <Corey.Allen@dividendadvisors.com>
Subject: RE: Attn: Michelle Whittington Re: The Transfer Process

Corey,

Thank you for the introduction.

Michelle,

It is a pleasure to e-meet you. Do you have a moment sometime this week to discuss next steps? If so,
please propose a date and time.

Looking forward to it,

Samantha Walters
VP of Online Strategies
Colocation | Dedicated Server | About Us
Office: 818-914-4128 | Cell: 310-709-0133

From: Samantha Walters [mailto:Samantha@ColocationAmerica.com]
Sent: Thursday, March 24, 2016 2:38 PM
To: Michelle Whittington <Michelle.Whittington@mitel.com>
Cc: 'Corey Allen' <Corey.Allen@dividendadvisors.com>
Subject: RE: Attn: Michelle Whittington Re: The Transfer Process

Michelle,

Thank you so much.

We have set up the escrow and you should be receiving an email from Escrow.com shortly.  Once received, please let me know. I will call you tomorrow to discuss the next steps to finalizing this purchase.

Looking forward to talking tomorrow,

Samantha Walters
VP of Online Strategies
Colocation | Dedicated Server | About Us
Office: 818-914-4128 | Cell: 310-709-0133

From: Michelle Whittington [mailto:Michelle.Whittington@mitel.com]
Sent: Thursday, March 24, 2016 2:44 PM
To: Samantha Walters <Samantha@ColocationAmerica.com>
Cc: 'Corey Allen' <Corey.Allen@dividendadvisors.com>
Subject: RE: Attn: Michelle Whittington Re: The Transfer Process

Samantha, I received an email from escrow.com that the transaction has been cancelled by the buyer?

Michelle

**From:** Samantha Walters [mailto:Samantha@ColocationAmerica.com]
**Sent:** Thursday, March 24, 2016 2:51 PM
**To:** 'Michelle Whittington' <Michelle.Whittington@mitel.com>
**Cc:** 'Corey Allen' <Corey.Allen@dividendadvisors.com>
**Subject:** RE: Attn: Michelle Whittington Re: The Transfer Process

Michelle,

Yes, there was a mistake in the first one we did. We cancelled and created a new one. The new one is
No. 846769.
Please let me know if you did not receive this one.

Thank you for your patience,

Samantha Walters
VP of Online Strategies
Colocation | Dedicated Server | About Us
Office: 818-914-4128 | Cell: 310-709-0133

From: Samantha Walters [mailto:Samantha@ColocationAmerica.com]
Sent: Friday, March 25, 2016 10:25 AM
To: Michelle Whittington <Michelle.Whittington@mitel.com>
Cc: 'Corey Allen' <Corey.Allen@dividendadvisors.com>
Subject: RE: Attn: Michelle Whittington Re: The Transfer Process

Michelle,

I hope all is well.

Just checking in - were you able to locate the new Escrow.com information? If so, please confirm.
Ideally, I would like to make sure this first step in the process is taken care of by the end of today.

I look forward to discussing next steps.

Best,

Samantha Walters
VP of Online Strategies
Colocation | Dedicated Server | About Us
Office: 818-914-4128 | Cell: 310-709-0133

From: Michelle Whittington <Michelle.Whittington@mitel.com>
Sent: Friday, March 25, 2016 11:17 AM
To: Samantha Walters
Cc: Corey Allen
Subject: RE: Attn: Michelle Whittington Re: The Transfer Process

Samantha, I completed the escrow.com details.

Michelle

EXHIBIT 14

**From:** Jonathan Dona
**To:** Christian Szpilfogel
**Sent:** 4/18/2016 2:11:50 PM
**Subject:** Re: email mitel

Hello Christian,

Ok great news, Thank you for the update as always I am grateful for the response. Looking forward..

Please have a wonderful evening Christian.

Kind Regards,
Jonathan Dona

On Mon, Apr 18, 2016 at 2:09 PM, Christian Szpilfogel <christian.szpilfogel@mitel.com> wrote:

I'm waiting on the IT guys to work it through.

**From:** Jonathan Dona [mailto:jd@jellydigital.net]
**Sent:** April 18, 2016 4:11 PM

**To:** Christian Szpilfogel <christian.szpilfogel@mitel.com>
**Subject:** Re: email mitel

Hello Christian,

I hope you had a pleasant weekend, I wanted to check and see if you got any feedback from your end ? Hoping we can take some steps moving forward.

Thank You

Kind Regards

Jonathan Dona

MITEL000653

On Wed, Apr 6, 2016 at 12:13 PM, Jonathan Dona <jd@jellydigital.net> wrote:

Hello Christian,

Sounds great, thank you so very much for the update Christian as I do appreciate it. Hopefully they will leave us some. haha

Thank You

Kind Regards

Jonathan Dona

On Wed, Apr 6, 2016 at 6:12 AM, Christian Szpilfogel <christian.szpilfogel@mitel.com> wrote:

We're working through it. As it turns out our cloud and mobile guys are desperate for IP addresses too. Right hand / left hand issue. I need to work through that too.

-C

**From:** Jonathan Dona [mailto:jd@jellydigital.net]
**Sent:** April 6, 2016 1:31 AM

**To:** Christian Szpilfogel <christian.szpilfogel@mitel.com>
**Subject:** Re: email mitel

Hello Christian,

Good Morning, I hope everything is going well for you.

I wanted to circle back around and see how things were looking on your side if you were able to get any feedback on interest in selling to us ? I have a meeting these coming week to discuss what opportunities we have on the table so we can make a decision on what directions we are going to head in on funding escrow. I am hoping to we may make a deal happen with each other.

Please do take care and it's always a pleasure.

Thank You

Kind Regards

Jonathan Dona

On Fri, Apr 1, 2016 at 11:52 AM, Jellydigital <jd@jellydigital.net> wrote:

Hello,

Great, Yes there is a lot of things on the Internet including brokers promising certain pricing but please beware as they like to lock in assets which is a risk. I am the direct buyers no middle man and also a facilitator for all the regions to help with the process and transfer and minus any broker fees.

I can also show proof of current and past acquisitions to justify the cost as their is a lot to be said by many on the price for asset but another thing is knowing the actual closing costs of the acquisitions that are actually being executed. We have cash in hand and ready to enter escrow after we sign a NDA / Purchase Agreement via escrow.

Please have a wonderful weekend and looking forward to your response.

Thank You

Kind Regards,

MITEL000655

Jonathan Dona

Sent from my iPhone

On Apr 1, 2016, at 10:38 AM, Christian Szpilfogel <christian.szpilfogel@mitel.com> wrote:

I'm pursuing it. We are verifying that we have all of the correct rights.

We also have cloud and mobile divisions that may need some of this so we may end up breaking this up to accommodate.

BTW, your offer seems low compared to what appears to be market rate. Sold all at once they seem to go for about $7.50 per address.

Christian

**From:** Jellydigital [mailto:jd@jellydigital.net]
**Sent:** April 1, 2016 1:29 PM
**To:** Christian Szpilfogel <christian.szpilfogel@mitel.com>
**Subject:** Re: email mitel

Hello Christian,

I hope your doing well.

I wanted to see if you got any feedback from your side? If it's any easier to point me in the right department/individual as I am sure you might be busy I could reach out and see if I may proceed with this acquisitions.

I would like to place a offer of $150 - $200k for this asset. We use escrow for all  financial transaction.

Thank You

Kind Regards

Jonathan Dona

On Mar 23, 2016, at 3:48 PM, Christian Szpilfogel <christian.szpilfogel@mitel.com> wrote:

Hi Jonathan.

Let me check on how we are using that today and I will get back to you.

Christian

**From:** Jonathan Dona [mailto:jd@jellydigital.net]
**Sent:** March 23, 2016 6:26 PM
**To:** Christian Szpilfogel <christian.szpilfogel@mitel.com>
**Subject:** Re: email mitel

Hello Christian,

I am Jonathan Dona with Jelly Digital, LLC. in San Diego, California.  We are writing today to open a dialog with you regarding an unused network asset that Mitel / Gandalf Technologies owns.  We were hoping you could help or point us in the right direction as we are interested in purchasing part of or all of the IP Address Assets under Mitel listed below.

   134.22.0.0/16

Thank You
Kind Regards
Jonathan Dona

On Fri, Jun 12, 2015 at 4:21 PM, Norman Jester <nj@jellydigital.net> wrote:

Christian,

Thank you for your call the other day.

The asset I would like to discuss with you is listed below.

It appears that Mitel purchased a company called Gandalf Technologies, Inc.

As such, this makes Mitel the owner of the network asset listed below.

We are prepared to purchase this IP address space from Mitel as soon

MITEL000657

as possible if we can come to terms.


Norman J.

619-319-7055

Jelly Digital, LLC.

http://www.jellydigital.net



On Jun 12, 2015, at 1:37 PM, Jonathan Dona <jd@jellydigital.net> wrote:


CIDR: 134.22.0.0/16——https://ca.linkedin.com/in/szpilfogel-left VM june 1st 2015

NetName: GANDALF

NetHandle: NET-134-22-0-0-1

Parent: NET134 (NET-134-0-0-0-0)

NetType: Direct Assignment

OriginAS:

Organization: Gandalf Technologies Inc. (GANDAL)

RegDate: 1989-04-14

Updated: 2008-12-24

Ref: http://whois.arin.net/rest/net/NET-134-22-0-0-1

http://aboutus.mitel.com/content/default.aspx?NewsAreaId=141



---

Jonathan Dona
Jelly Digital, LLC.
Direct: 619-451-8414
Email:jd@jellydigital.net

CONFIDENTIAL COMMUNICATION - THIS MESSAGE IS INTENDED SOLELY FOR THE USE AND VIEW OF THE ADDRESSEE AND
MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE

# EXHIBIT 15

From: Michelle Whittington <Michelle.Whittington@mitel.com>
Sent: Monday, March 28, 2016 4:23 PM
To: Samantha Walters
Cc: Corey Allen
Subject: RE: Gandalf.ca Transfer - Next Steps

Dear Samantha, there appears to be a miscommunication that needs to be worked out first

Michelle

EXHIBIT 16

**NATIONAL SCIENCE FOUNDATION**
4201 Wilson Boulevard
ARLINGTON, VIRGINIA 22230

August 30, 2012



**OFFICE OF THE
GENERAL COUNSEL**

███████████████
███████████████
███████████
███████

My apologies for the delay in responding to your letter, dated July 2, 2012. Because you raised several significant issues involving a matter in which the National Science Foundation ("NSF") was integrally involved, I wanted to be certain that my answer was consistent with the underlying facts of NSF's stewardship of the Internet Protocols and registrations at the time of our Cooperative Agreement with Network Solutions, Inc. ("NSI") and that I wouldn't be simply relying upon my own recollection.

You request guidance concerning your company's rights in and to a block of Internet Protocol version 4 ("IPv4") numbers, given to your company by Network solutions, Inc. on or about ████████████. According to your letter, this IPv4 Number Block is ███████████/16), representing 65,536 contiguous numbers from ████████ to ████████. You further maintain that your company, ████████ ████████ has asserted continuous custody and control over this Number Block from the time it was given to you until the present time. Finally, you state that you have read recent conflicting news articles concerning your ownership rights in this Number Block and the assertion of purported authority over it by the American Registry for Internet Numbers, Ltd. ("ARIN"). In short, you have asked NSF two questions: "Is this IPv4 Number Block ████████ and "[C]an a newly-formed organization, such as ARIN, come along years later and attempt to control or take this Number Block from us?"

As the General Counsel of a U.S. government agency, it would be inappropriate for me to provide you – a private party – with specific legal advice regarding your rights. Because your questions, however, are also relevant to *different* Number Blocks that similarly may be within the custody and control of various Federal agencies, including NSF, I believe that answering your questions will be relevant to any rights that the U.S. government may wish to assert in the future with respect to other Number Blocks distributed to or held by federal agencies. Nevertheless, I strongly recommend that you seek your own competent legal counsel to further advise you.

By way of background, NSF issued a Project Solicitation on March 19, 1992, inviting "proposals for one or more NIS [Network Information Services] Manager organizations to: extend and coordinate directory and database services and information services for the NSFNET [National Science Foundation Network]; and provide registration services for non-military internet networks now performed by the Defense Information Systems Agency Network Information Center (the DISA NIC). It is anticipated that this solicitation will result in one or more five-year cooperative agreements between NSF and the organization(s) chosen as the NIS Manager(s)."

This Project Solicitation was issued pursuant to the National Science Foundation Act of 1950, as amended (42 U.S.C. Sections 1861 et seq.), and in accordance with the applicable provisions of the Federal Grant and Cooperative Agreement Act of 1977 (31 U.S.C. Sections 6301 et seq.). NSF also incorporated Special Conditions and NSF's Grant General Conditions and Cooperative Agreement General Conditions, as part of the cooperative agreement to be entered into between NSF and the successful awardee.

In contrast to a procurement contact subject to the Federal Acquisition Regulations, which the U.S. Government uses to obtain goods or services, a cooperative agreement is used whenever "the principal purpose of the relationship is *to transfer a thing of value to* the ... recipient to carry out a public purpose ...." See 31 U.S.C. Section 6305 (emphasis added). Further, NSF's Policy Manual at that time provided that grantees retain principal legal rights to intellectual property developed under NSF grants, and our award conditions similarly provided that "[e]xcept as otherwise specified in the award or by this paragraph, the awardee may own or permit others to own copyright in all subject writings." These provisions confirm that any and all intellectual property arising from an awardee's operation of the registration business under the Cooperative Agreement belonged to the awardee.

Effective January 1, 1993, the NSF awarded Cooperative Agreement No. NCR-92-18742 to Network Solutions, Inc. ("NSI"), a minority-owned business, and NSI immediately began performing its Internet registration functions for non-military domain name registrations and network numbers. More specific to your inquiry, NSI's responsibility over Internet Protocol ("IP") number assignments, Autonomous system number assignment, and IN-ADDR.ARPA tasks continued until NSI was relieved of and discharged from those responsibilities, under Amendment No. 7 to the cooperative Agreement, effective December 1, 1997. From January 1, 1993, to December 1, 1997, NSI was authorized by NSF to distribute IPv4 Number Blocks.

Your IPv4 Number Block, along with any attendant rights, appears to have been given to you by NSI during the five-year, eleven-month period of NSI's performance of IP number assignments under its Cooperative Agreement with the NSF. In other words, NSF transferred "a thing of value" to the awardee under the NSF-NSI Cooperative Agreement, and that awardee in turn gave it to you. This distribution, as with all other distributions by NSI, was pursuant to and consistent with the authority granted by NSF under the Cooperative Agreement.

As to your second question, NSF cannot offer an opinion as to what an outside organization such as ARIN may or may not be able to do with respect to future actions unrelated to or outside NSF's previously authorized transactions. What NSF can unequivocally state, however, is that we know of no provision under the Cooperative Agreement which would have authorized the awardee (NSI) to unilaterally reclaim IPv4 number blocks, once distributed. We know of no instance where such action had been taken under the NSF Cooperative Agreement. Indeed, as stated above, NSI (whether or not it exists today) ceased performing those IP number assignment functions in late 1997, and has no further authority. We understand that, beginning in December, 1997, a newly-incorporated entity in Virginia, known as ARIN, began distributing IP number blocks from that date forward. The NSF has never had a cooperative agreement, or any other agreement, with ARIN or any other similarly situated entity. In short, NSF does not believe that ARIN, or for that matter any other organization, could retroactively affect property and rights distributed to you (or any other recipient) by awardee NSI under its Cooperative Agreement with the National Science Foundation.

I hope this explanation helps clarify NSF's view of the authority in place and rights that arose from the NSF-NSI Cooperative Agreement. Because of the direct involvement of the Office of General Counsel with one of the Foundation's landmark cooperative agreements, I appreciate why you sought our views.

NSF, of course, is also fully aware of the complex origins and history of the Internet domain name registrations and numbers distributions, and we have closely followed the evolution of and difficult legal issues associated with the Internet's growth over the years.

If you have any further questions regarding the views expressed in this letter, please do not hesitate to contact my Office.

Sincerely,

Lawrence Rudolph
General Counsel