David E. Rogers (#019274)
David G. Barker (#024657)
Jacob C. Jones (#029971)
SNELL & WILMER L.L.P.
One Arizona Center
400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
Telephone: 602.382.6000
Facsimile: 602.382.6070
E-Mail: drogers@swlaw.com
    dbarker@swlaw.com
    jcjones@swlaw.com

Attorneys for Defendant
Mitel Networks Corporation

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Colocation America Corporation,<br><br>    Plaintiff,<br><br>v.<br><br>Mitel Networks Corporation,<br><br>    Defendant. | No. CV-17-00421-PHX-NVW<br><br>**MNC'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT (DOC. 81) AND RESPONSE TO COLOCATION'S CROSS-MOTION (DOC. 84)**<br><br>**Honorable Neil V. Wake** |
| Mitel Networks Corporation,<br><br>    Counterclaimant,<br><br>v.<br><br>Colocation America Corporation; and Corey Allen Kotler and Mojgan Tabibnia, husband and wife,<br><br>    Counterdefendants. | |

### I. Introduction.

Colocation has no response to its internal email string plotting to write up the Contract for the Domain Name and "nebulously" "slip in" a reference to the IPv4 addresses. Doc. 81 at 12:17-13:13. Colocation's owner wrote, "I would write it up for the domain [name] and somehow slip in the IPV4." MEx.[1] 16. Colocation's broker responded, "Is there a way to slip it in nebulously?" *Id.* Colocation's attorney was copied on these emails. *Id.* "Nebulous" means "indefinite," "unclear," "vague," or "obscure." Doc. 81 at 12:23-24. Colocation then went about "nebulously" "slipping in" a reference to IPv4 addresses without communicating its true intention to MNC, which was to clandestinely acquire, for a fraction of the value, rights in IPv4 addresses it believed that MNC owned. Doc. 81 at 9:27-10:17; 12:9-16; MEx. 6 at 34:5-37:4; 41:10-14. Colocation represented to MNC, and Colocation intended MNC to believe, that the Contract (MEx. 2) was solely for rights in a Domain Name <gandalf.ca> and related goodwill. *Id.*; *see* Doc. 81 at 12:9-13:13. Colocation's actions mandate summary judgment for MNC. Doc. 81 at 12:25-13:13.

Colocation's Motion (Doc. 84) should be denied, and MNC's Motion (Doc. 81) should be granted because, among other things: (1) Colocation's Contract interpretation is illogical, ignores commas and standard English grammar rules, and relies solely on some "and" connectors while ignoring others, (2) the IPv4 addresses are referenced only once in the Contract and their registrations are not mentioned at all (which they would be if the IPv4 addresses themselves were being quit claimed), (3) Colocation does not deny that (a) all communications prior to executing the Contract did not mention IPv4 addresses, or (b) its internal communications show its intent to write up the Contract for the Domain Name and "slip in" the IPv4 addresses "nebulously," (4) Colocation has no explanation for the comma removal during drafting and urges the Court to simply ignore

---

[1] "MEx." means a MNC exhibit. "CEx." means a Colocation exhibit. MNC's exhibits, MEx. 1-33, are attached to Document 81. MNC's other exhibits, MEx. 34-37, are attached here. Colocation's exhibits, CEx. 1-16, are attached to Document 84.

1   it; yet the removal of the comma clarifies that the quit claim was not for IPv4 addresses
2   themselves, but instead goodwill; (5) Colocation relies heavily on three hearsay
3   documents; one is an unsubstantiated escrow document that was not produced by
4   Escrow.com, and the other two were never produced; and (6) Colocation's draft JDA
5   Software agreement expressly includes a quit claim of IPv4 addresses themselves, their
6   registrations, and related business goodwill (Doc. 81 at 13:18-14:11); thus, Colocation
7   knew perfectly well how an IPv4 address quit claim agreement should be structured when
8   not "nebulously" trying to "slip in" the IPv4 addresses.

## II.   Analysis.

### A.   MNC's Construction Is Consistent with the Contract as a Whole.

#### (1)   The Quit Claim Section of the Contract Supports MNC's Construction.

Colocation admits that the Contract is a quit claim and does not deny that Paragraph A is a single sentence including commas to break it into sections. *See* Doc. 81 at 4:4-6; Doc. 84 at 2 ¶¶ 5-6. Colocation does not dispute that IPv4 addresses are mentioned only once, in Paragraph A of the Contract, and concedes that the Contract has no reference to IPv4 address registrations. *See* MEx. 2 ¶ A; Doc. 84 at 4 ¶ 1 – 6 ¶ 2; Doc. 81 at 13:14 – 14:11.

The manner in which Colocation separates Paragraph A of the Contract makes no grammatical sense. *See* Doc. 84 at 3 ¶ 1. Without explanation as to why, Colocation ignores the commas in the paragraph, and it ignores two occurrences of "and" in the Paragraph. *Id.* (not using the commas to split Paragraph A into separate sections with common subject matter, and ignoring the "and" before the word "registration" and the "and" before the word "symbolized.") Colocation provides no explanation of how its interpretation could be considered reasonable; it merely disagrees with MNC's interpretation. Doc. 84 at 3 ¶ 3 – 4 ¶ 2. Colocation mentions "standard custom and trade," but it presents no evidence as to what it is referring. Doc. 84 at 4 ¶ 2. Further, Colocation's draft JDA agreement contradicts Colocation's "standard custom and trade" argument. *See generally* Doc. 84 at 4 ¶ 4; MEx. 24 ¶ A (expressly transferring the

goodwill of the business *associated with the IPv4 addresses*).  Contrary to Colocation's assertion (Doc. 84 at 3 ¶ 3), MNC's construction of the Contract does not relate to the use or nonuse of an oxford comma.  *Id.*  Paragraph A of the Contract is a single, lengthy sentence with commas used to break it into separate items.  Ex. 2 ¶ A; Ex. MEx. 4B (commas are used in sentences to separate like items); Doc. 81 at 4:4-17.

When interpreting a contract, the most reasonable construction should be adopted.  *Hall v. Schulte*, 172 Ariz. 279, 283 (Ct. App. 1992) (adopting the "more reasonable interpretation" of a settlement agreement, as a matter of law); *Poland v. Martin,* 761 F.2d 546, 548 (9th Cir. 1985) (noting that "[a] court should not strain for interpretations to create ambiguities where none exist"); *State v. McGuire*, 131 Ariz. 93, 95 (1981) ("We cannot accept appellant's strained construction of the agreement."); *Gen. Cas. Co. of Am. v. Azteca Films, Inc.*, 278 F.2d 161, 169 (9th Cir. 1960) (adopting reasonable contract interpretation and rejecting lower court's alternative, strained interpretation).  MNC's construction is consistent with the structure of Paragraph A and the Contract as a whole.  Doc. 81 at 3:22-8:4.  Colocation's proposed construction is strained, unreasoned, and contrary to Standard English grammar rules.  *Compare* Doc. 81 at 4:4-17 *with* Doc. 84 at 3-4.

Contrary to Colocation's suggestion, the grammar rules, which were produced by MNC during discovery, are admissible by judicial notice.  CJS CONTRACTS § 306 ("In construing a contract, a court will follow elemental rules of grammar in order to ensure a reasonable application of the legal rules of construction."); *S.K.I. Beer Corp. v. Baltika Brewery*, 443 F. Supp. 2d 313, 319 (E.D.N.Y. 2006), *aff'd,* 612 F.3d 705 (2d Cir. 2010) (taking judicial notice of grammar rules "standard to English").

### (a) Including the Goodwill of the Business is a Standard Contract Provision.

Colocation does not deny that a goodwill provision is standard for an agreement such as the Contract, or that the goodwill provision in the Contract quit claims the goodwill of the business connected with and associated with the Domain Name.  Doc. 81

at 4:20-21; MEx. 2 ¶ A. Colocation incorrectly alleges that MNC asserts the Contract quit claims goodwill *in the IPv4 addresses*. Doc. 84 at 2 ¶ 1; 4 ¶ 2. What MNC asserts is that the Contract quit claims the goodwill *of the business connected with and symbolized by the Domain Name and the associated IPv4 134.22.0.0/16 and any associated trade dress*. Doc. 81 at 4:7-9; MEx. 2 ¶ A. The Contract quit claims goodwill – it does not quit claim the IPv4 addresses themselves, just as it does not quit claim any trade dress. *Id.*

Contrary to Colocation's assertion (Doc. 84 at 2 ¶ 1 and 4 ¶ 1), it is common to transfer the goodwill of an asset, such as an entire business, apart from the underlying physical assets. *See* cases cited in Doc. 81 at 4:22-5:13. Colocation's allegation that goodwill cannot be transferred without tangible assets (Doc. 84 at 2 ¶ 1; 4 ¶ 2) is incorrect. In the cited cases, trademarks were transferred *along with the goodwill of the business*. *See* Doc. 84 at 4 ¶ 2; cases in Doc. 81 at 4:22-5:13. The same is true here. Rights in the Domain Name were quit claimed together with the goodwill *of the business connected with and symbolized by the Domain Name and the associated IPv4 134.22.0.0/16 and any associated trade dress*. Ex. 2 ¶ A; Doc. 81 at 4:7-9. The tangible assets of the business, including any potential IPv4 addresses or trade dress, were not quit claimed. Doc. 81 at 4:5-9; 5:22-6:13 (citing cases).

### (b) If the Contract Meant to Quit Claim the IPv4 Addresses Themselves, It Would State That.

Colocation does not deny that the Contract expressly quit claims the Domain Name *and* the registration thereof. Doc. 81 at 5:20-23. Colocation does not deny the lack of any reference to, or quit claim of, the *registrations of* the IPv4 addresses, or that the IPv4 addresses are referenced only once in the Contract in Paragraph A. *See* Doc. 81 at 5:16 – 6:2. If the Contract really was a quit claim of rights in the IPv4 addresses, it would expressly state that, and include their registrations, just as the JDA Software agreement does. *See* Doc. 84 at 5 ¶ 1 – 6 ¶¶ 1-2 (IPv4 addresses and their registrations not mentioned in Paragraphs B-D of the Contract); Doc. 81 at 13:14 – 14:11; *compare*

MEx. 2 (the Contract, which does not reference IPv4 registrations and only references the IPv4 addresses in Paragraph A) *with* MEx. 24 (Colocation's proposed JDA agreement, which references the IPv4 addresses in Paragraphs A-D, and references the IPv4 registrations in Paragraph A).

### (2)-(4) The Payment, Obligation, and Warranty Sections of the Contract Each Supports MNC's Construction.

Colocation does not deny that the Payment, Obligation, and Warranty Sections of the Contract (MEx. 2 ¶¶ B-D) make no reference to IPv4 addresses. *See* Doc. 81 at 6:3-8:4. Colocation does not deny MNC does not have title to the IPv4 addresses and could not have transferred them in March of 2016, as the Payment Section (MEx. 2 ¶ B) would have required under Colocation's proposed construction. *See* Doc. 84 at 5 ¶1 and note 2; Doc. 81 at 6:25 – 7:5.

Colocation believed that MNC had title to the IPv4 addresses at the time the Contract was formed, and its assertions here to the contrary are incorrect. *See, e.g.*, Doc. 84 at 5 ¶ 3 – 6 ¶ 2. Colocation's owner located the IPv4 addresses on the Internet. Doc. 81 at 9:20-21. He checked the ARIN records, which identified the owner as "Gandalf (Mitel)." MEx. 6 at 34:5 – 37:4; 41:10-14. He then assumed that MNC owned the addresses and assigned his broker, Kotler, to acquire them. *Id.* at 50:11-25; Doc. 81 at 9:21-22. That was Kotler's function for Colocation – to acquire IPv4 addresses. MEx. 6 at 46:3-12; 49:22 – 51:18; 55:3-9. After the Contract was signed, Colocation demanded *transfer* of the IPv4 addresses. MEx. 20. Colocation's unsupported attorney argument here – claiming that it knew all along MNC may not own the IPv4 addresses (Doc. 84 at 5 ¶ 3 – 6 ¶ 2) – is unsupported and contrary to Colocation's testimony and actions. *Block v. City of L.A.*, 253 F.3d 410, 419 n. 2 (9th Cir. 2001) ("A party cannot create a genuine issue of material fact to survive summary judgment by contradicting his earlier version of the facts.")

Colocation argues that because the Contract is a "quit claim" it would not include *any references* to IPv4 addresses other than the single reference in Paragraph A. Doc. 84

- 5 -

at 5 ¶¶ 2-6.  This is inconsistent with Colocation's draft agreement with JDA Software. MEx. 24.  That agreement is for a quit claim of rights in IPv4 addresses and includes an *express* quit claim of:  (a) IPv4 addresses themselves, (b) their registrations, and (c) the goodwill of the business connected with and symbolized by the IPv4 addresses.  Doc. 81 at 13:14-14:2; MEx. 24 ¶ A.

### (5) IPv4 Addresses Are Not "Intellectual Property."

IPv4 addresses are not "intellectual property."  Doc. 81 at 8:5-11.  Colocation's attempt to now redefine them as such during litigation (Doc. 84 at 15 ¶¶ 4-5) is more of its attempt to "nebulously" "slip in" the IPv4 addresses.  Colocation cites no expert opinion, treatise, text book, or case law supporting its assertion that IPv4 addresses are intellectual property, and MNC is not aware of any.

The term "other intellectual property rights" in Paragraph A of Exhibit 2 (MEx. 2 ¶ A) cannot mean the IPv4 addresses because:  (1) IPv4 addresses are not intellectual property rights (Doc. 81 at 8:5-11), (2) such an interpretation is inconsistent with the language of Paragraph A, which lists IPv4 addresses and "other intellectual property rights" as different things, and (3) such an interpretation contradicts Colocation's own arguments alleging that the reference to IPv4 addresses in Paragraph A means the addresses themselves.  *See* Doc. 84 at 2 ¶ 6 - 3 ¶ 1.  So, even under Colocation's interpretation, "other intellectual property rights" do not include the IPv4 addresses. *Block*, 253 F.3d at 419 n. 2 (a party cannot create a genuine issue of material fact to survive summary judgment by contradicting itself).

MNC's expert declaration is admissible.  Ms. Whittington was disclosed as an expert in intellectual property (MEx. 34) and Colocation has not challenged her credentials.  She is a licensed patent attorney with about 18 years of experience.  MEx. 8 ¶¶ 4-6.  She has a Masters in Intellectual Property law.  *Id.* ¶ 2.  The fact that she was unaware of IPv4 addresses (Doc. 84 at 15 ¶ 4) underscores the conclusion that IPv4 addresses are not intellectual property.  MEx. 8 ¶¶ 7-14.

1       Colocation's Exhibit 16 ("CEx. 16") is purportedly an August 30, 2012, redacted
2 NSF letter. It is inadmissible hearsay that was not produced during or after discovery. It
3 should be excluded under Fed. R. Evid. 801 and Fed. R. Civ. P. 37(c). *See* CEx. 16
4 (bearing no production number); Fed. R. Civ. P. 37(c) ("If a party fails to provide
5 information . . . as required by Rule 26(a) or (e), the party is not allowed to use that
6 information . . . to supply evidence on a motion, at a hearing, or at trial, unless the failure
7 was substantially justified or harmless."); *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*,
8 259 F.3d 1101, 1107 (9th Cir. 2001) (the party opposing exclusion has the burden to show
9 substantial justification or harmlessness of the late disclosure); *Gonzalez v.*
10 *ETourandTravel, Inc.*, No. 6:13-CV-827-ORL-36, 2014 WL 1250034, at *6 (M.D. Fla.
11 Mar. 26, 2014) (information counsel found on the internet is subject to disclosure under
12 Rule 26(a)).

13      Colocation's purported basis of "Agency statement of legal authority" (Doc. 84 at
14 16), even if correct (which it is not), is not a basis for judicial notice of CEx. 16. Fed. R.
15 Evid. 201(b) (limiting judicial notice to a fact "not subject to reasonable dispute because
16 it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be
17 accurately and readily determined from sources whose accuracy cannot reasonably be
18 questioned."). Colocation has provided no facts to support the conclusion that the
19 National Science Foundation, an agency of the executive branch, is empowered to make
20 undisputable, legally authoritative statements on the definition of intellectual property.
21 And there is no evidence that the information in CEx. 16 is "generally known within [the
22 district]." *Id.* CEx. 16 also does not satisfy the public records exception (Fed. R. Evid.
23 803(8)). There is no indication of any "legal duty to report" or "matter observed" in the
24 CEx. 16. *Id.*

25      Further, contrary to Colocation's allegation, CEx. 16 *does not* state that IPv4
26 addresses are intellectual property. On page 2 paragraph 2, it discusses a "cooperative
27 agreement" under 31 U.S.C. § 6305. It further states in part: "NSF's Policy Manual at
28 that time [referring to 1977] provided that grantees retain principal legal rights *to*

- 7 -

*intellectual property developed under NSF grants. . .*" This is a reference to government research and development grants, i.e., the grantee retains principle rights in intellectual property developed. *See, e.g., Evanston Materials Consulting Corp. v. Dancor, Inc.*, No. 01 C 6077, 2002 WL 485705, at *1 (N.D. Ill. Mar. 27, 2002) ("The conditions of the [National Science Foundation] Grant provide that EMCC, as grantee, retains all right, title and interest to any Grant-generated invention or discovery of EMCC . . . subject to the Federal government's right to have a non-exclusive, irrevocable, non-transferable, paid-up license to such Grant-generated invention."); *Thermalon Indus., Ltd. v. United States*, 34 Fed. Cl. 411, 414 (1995) ("NSF in turn acquires . . . a royalty-free, irrevocable, world-wide license to use any intellectual property developed under the grant."). The verbiage related to intellectual property in CEx. 16 has nothing to do with IPv4 addresses. IPv4 addresses are not "developed" pursuant to government grants. IPv4 addresses cannot be patented or copyrighted and are not intellectual property. MEx. 8 ¶¶ 7-14.

## B.    The Drafting History of the Contract Supports MNC's Interpretation.

Colocation admits that it removed the comma between "Domain Name" and "the associated IPv4" in Paragraph A when modifying the Contract, but alleges that it was for an "unknown" reason. Doc. 84 at 13 ¶ 2. Contrary to Colocation's assertion (*id.*), the removal of the comma in the Contract is relevant. It was this version, *with the comma removed*, that was executed by MNC. MEx. 2. MNC's understanding of the Contract, and this Court's interpretation, must consider the placement of commas and the drafting history. *See* Doc. 81 at 8:12-24. Colocation cites no law in support of ignoring the drafting history or ignoring the grammatical construction of the Contract.

There was no need to delete the reference to IPv4 addresses from the Contract (*see* Doc. 84 at 12¶ 1), just as there was no need to remove the reference to trade dress, because those references merely qualified the business goodwill being transferred. *See* Doc. 81 at 3:22-5:13.

- 8 -

### C. The Consideration Supports MNC's Interpretation.

MNC's valuation of the IPv4 addresses is admissible, and Colocation's objection (Doc. 84 at 16 ¶ 4) should be overruled. MNC's valuation is based on Colocation's written discovery responses and testimony. Doc. 81 at 6:22-25; MEx. 5 (Colocation's RFA responses 1-3); MEx. 6 at 48:8-11.

Colocation does not deny that: (1) MNC accepted Colocation's offer and sent a domain name assignment agreement with consideration of $10,000, and (2) that there was no change in the Contract price of $10,000 when the reference to IPv4 addresses was added to the goodwill section. *See* Doc. 81 at 8:25-9:12. This is consistent with MNC's understanding that the Contract was only for the transfer of the Domain Name and the associated business goodwill. *Id.*

In a further attempt to salvage its position, Colocation essentially argues that a quit claim to the IPv4 addresses has zero value. Doc. 84 at 5 ¶ 3 – 6 ¶ 2. The original draft sent by MNC was expressly for the transfer of the Domain Name for $10,000. Doc. 81 at 10:4-5. That reflected the offer by Colocation that MNC accepted. *Id.*; MEx. 14. If, as Colocation now asserts, it modified the Contract (without communicating its intent) to include a quit claim to the IPv4 addresses with no change in the consideration, that quit claim was apparently worth zero. But, even a quit claim to rights in a block of 65,000 IPv4 addresses has value, and that value is more than $10,000. Doc. 81 at 8:25-9:21; MEx. 5 (Colocation's RFA responses 1-3); MEx. 6 at 48:8-11 (Colocation acknowledging another transaction at $11 per IPv4 address). Colocation is aware of the value, which is why it has pursued MNC in litigation since May, 2016. Its fees obviously far exceed $10,000 and it has already paid MNC sanctions and costs of over $50,000 related to the California lawsuit over this Contract. MEx. 35.

### D. The Parol Evidence Supports MNC's Interpretation.

Colocation does not deny any of the facts in MNC's timeline of events. *See* Doc. 81 at 9:17-12:8.

- 9 -

### (1) The Parties' Communications Pre-Acceptance Did Not Mention IPv4 Addresses.

There is no dispute over this point. No emails or other communications prior to executing the Contract referenced IPv4 addresses. A reference to IPv4 addresses was added to a draft of the Contract *after* MNC accepted Colocation's offer to acquire the Domain Name. Doc. 81 at 12:9-16.

### (2) Colocation's "Slip it in Nebulously" Email String.

Colocation does not address its internal email chain to "nebulously" "slip in" a reference to the IPv4 addresses. Colocation knew, or had reason to know, that MNC believed the Contract did not quit claim IPv4 addresses themselves, and it was precisely Colocation's intent to mislead. *See* Doc. 81 at 12:17-24. Consequently, Colocation is bound by MNC's understanding that the Contract did not assign, transfer, or quit claim rights in the IPv4 addresses themselves. Doc. 81 at 12:25 – 13:13; Restatement (Second) of Contracts § 201(2) (1981); *Arizona v. Tohono O'odham Nation*, 944 F. Supp. 2d 748, 773 (D. Ariz. 2013), *aff'd*, 818 F.3d 549 (9th Cir. 2016) ("Section 201 provides a tool for determining whose meaning will prevail when . . . one party understands a term to mean something the term reasonably can be read to mean and the other party knows of the first party's understanding.").

Perhaps unwittingly, Colocation has now admitted concealing from MNC its intent when negotiating the Contract. Colocation makes the incredible assertion that its original $10,000 offer to MNC *included* the IPv4 addresses (even though that was never communicated to MNC) *because* the offer came after Colocation's internal communications about "slipping in" the IPv4 addresses "nebulously." Doc. 84 at 9, n. 3; *see* Doc. 81 at 12:9-16 (pre-acceptance communications did not mention IPv4 addresses).

### (3) Colocation's Other IPv4 Address Agreement Expressly Transfers IPv4 Addresses, Their Registrations, and Goodwill.

Colocation does not dispute that the JDA agreement *expressly* recites a quit claim of rights in: (1) IPv4 addresses, (2) their registrations, and (3) the goodwill of the

1  business connected with and symbolized by the IPv4 addresses. Doc. 81 at 13:14 – 14:11;
2  MEx. 24. Colocation also does not deny that the rest of the JDA agreement is consistent
3  with a quit claim of rights in IPv4 addresses themselves and their registrations.
4  Colocation does not dispute that:  Paragraph B (Payment) recites changing the registered
5  owner of the IPv4 addresses (MEx. 24), Paragraph C (Obligations) references transferring
6  IPv4 addresses (*id*), or Paragraph D (Warranty) references the authority to transfer IPv4
7  addresses. *Id.*  The Contract here, however, has no such provisions. MEx. 2 ¶¶ A-D;
8  Doc. 81 at 13:14 – 14:11.

9  Contrary to Colocation's assertion (Doc. 84 at 17 ¶ 2), the JDA Software
10 agreement from March 24, 2016 (*not* "May 2016" as Colocation states) is relevant
11 because it shows the language Colocation used when it was acquiring a quit claim in IPv4
12 addresses without "nebulously" slipping them in. MEx. 24. Contrast the Contract at issue
13 here (MEx. 2) with Colocation's JDA Software IPv4 Assignment agreement. MEx. 24;
14 Doc. 81 at 13:14 – 14:11. Colocation testified that it agreed to the terms of that
15 agreement, even though it was never executed. MEx. 36 at 35:20 – 36:9; 37:1 – 39:25;
16 40:15 – 41:24. Hence, Colocation knows the proper way to structure a purchase of quit
17 claim rights in IPv4 addresses, when it is not trying to "slip" them in "nebulously." *See,*
18 *e.g.*, Doc. 81 at 13:14 – 14:11.

19           **III.**    <u>**Comments on Some of Colocation's Other Arguments.**</u>

20 (1) Colocation states that after an inquiry from a "new buyer" on March 28, 2016,
21 MNC stated that there had been a mistake. Doc. 84 at 13 ¶ 4 – 14 ¶ 1; 18 ¶1. This is
22 objectively untrue, and even contradicted in Colocation's own brief. *See* Doc. 84 at 14
23 ¶ 2; *Block*, 253 F.3d at 419 n. 2 (a party cannot create a genuine issue of material fact to
24 survive summary judgment by contradicting itself). MNC stated on March 28, 2016 that
25 there was a mistake. Doc. 81 at 10:25-26. The "offer" from the "new buyer" occurred
26 four days later on April 1, 2016. Doc. 84 at 10 (last row in the table); CEx. 14 at 655.
27 (2) Colocation does not dispute that the Domain Name never directed to any of
28 the IPv4 addresses. Yet, Colocation still alleges that the IPv4 addresses are "associated"

- 11 -

1    with the Domain Name because both assets were once owned by a defunct business
2    called Gandalf, which went bankrupt in about 2000.  Doc. 84 at 3 ¶ 2.  There is no
3    support for this proposition.
4         (3)  MNC denies that it ever "accepted" new escrow instructions of the type in
5    CEx. 3.  Doc. 84 at 10:1-4; *see* Section IV, B, *infra* at 12-14.

## IV. Colocation's Inadmissible Documents Should Be Excluded.

In addition to Colocation's inadmissible CEx. 16, addressed in Section II, A(5), *supra* at 6-8, Colocation's exhibits CEx. 2:1 and CEx. 3 should be excluded.

### A. Colocation's Exhibit 2:1 Is Inadmissible.

Colocation's Exhibit 2:1 (with the header "How do I change transaction details and terms?") is inadmissible because it was allegedly obtained from the Escrow.com website on May 15, 2018.  CEx. 2 at ¶ 2.  Even if accurate, CEx. 2:1 is irrelevant to events related to the Contract, which was negotiated in March, 2016, and there is no evidence that CEx. 2:1 was in place or available in March, 2016.  Also, CEx. 2:1 should be excluded pursuant to Rule 37(c) for failure to timely disclose because Colocation never produced it.  *See* CEx. 2:1 (bearing no production number); Fed. R. Civ. P. 37(c) ("If a party fails to provide information . . . as required by Rule 26(a) or (e), the party is not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or harmless."); *Yeti by Molly*, 259 F.3d at 1107 (the party opposing exclusion has the burden to show substantial justification or harmlessness of the late disclosure); *Gonzalez*, No. 6:13-CV-827-ORL-36, 2014 WL 1250034, at *6 (information counsel found on the internet is subject to disclosure under Rule 26(a)).

### B. Colocation's Exhibit 3 Is Inadmissible.

A large portion of Colocation's case centers on instructions typed into an escrow document by Colocation's owner after the Contract was executed.  CEx. 3.  These "instructions" are inadmissible hearsay, were produced by Colocation late and under suspicious circumstances, were never produced by Escrow.com, and are wholly unreliable.

1    First, CEx. 3 is inadmissible hearsay.  To the extent it could be a business record, it
2    would be a record of Escrow.com.  Escrow.com has not provided any foundation to
3    substantiate it as a business record.  *See* Fed. R. Evid. 803(6).  In fact, not even
4    Colocation's owner has declared that CEx. 3 is genuine, or explained its origin.  *See, e.g.*,
5    CEx. 2 (declaration of Colocation's owner).  Fed. R. Evid. 803(14) does not apply to CEx.
6    3 because that pertains to property records "kept in a public office," and there is no
7    evidence that CEx. 3 was ever recorded.  Fed. R. Evid. 803(15) does not apply because
8    the information in CEx. 3 is not "contained in a document that purports to establish or
9    affect an interest in property," such as a deed of title or other legal instrument.  *Id.*
10   Consequently, CEx. 3 is inadmissible hearsay.

11   Second, CEx. 3 was not included in Escrow.com's production pursuant to a
12   subpoena, even though requested.  Ex. 28 at 2 ¶ 4; 3 ¶¶ 10-11.  Colocation's position that
13   the subpoena to Escrow.com did not call for CEx. 3's production (Doc. 84 at 7:14-21) is
14   baseless.  The subpoena defined "communications" to be produced in sufficient breadth to
15   include the escrow history relevant to this dispute, including Escrow No. 847266.  *See*
16   MEx. 28 at 1 ¶ 9.  Moreover, Escrow.com *did* produce the record for Escrow No. 847266
17   in response to MNC's subpoena (CEx. 2 at 1677), but Escrow.com's record is different
18   from CEx. 3, and *does not* include the language about transferring IPv4 addresses that is
19   in CEx. 3.  *Compare* CEx. 2 at 1677 *with* CEx. 3.

20   Third, CEx. 3 was not produced by Colocation until August 24, 2017, two days
21   after the 30(b)(6) deposition of Colocation.  MNC propounded discovery requests to
22   Colocation that encompassed CEx. 3.  MEx. 37 at 6 (Request No. 7 and Response).
23   Colocation produced documents, but did not produce CEx. 3.  MEx. 6 at 52:5-8; 109:1-3.
24   Colocation's deposition was taken on August 22, 2017, and its owner was provided the
25   documents produced by Escrow.com, and shown that none relating to MNC referenced
26   IPv4 addresses.[2]  Two days later, Colocation produced CEx. 3.  Doc. 81 at 12:1-8.  No

---

[2] In contrast, other escrows for Colocation that were for the transfer of IPv4 addresses from other parties specifically referenced IPv4 addresses.  *See* MEx. 30.

- 13 -

1  explanation was or has been provided as to why it had not been produced earlier, how it
2  was created, or why it contradicts the Escrow.com documents.

3  Finally, CEx. 3 is inconsistent with the Contract terms.  Even under Colocation's
4  theory the Contract calls for only a quit claim of the IPv4 addresses, but CEx. 3 calls for
5  a complete transfer of IPv4 addresses.  CEx. 3; *Apollo Group v. Avnet, Inc.,* 58 F.3d 477,
6  482 (9th Cir. 1995) (extrinsic evidence rejected because it contradicts parties' final
7  agreement); *Thurston v. Citizens Utility Co.,* 1994 WL 462117 * 7 (D. Ariz., June 30,
8  1994), *aff'd,* 91 F.3d 155 (9th Cir. 1996) (extrinsic evidence rejected because it varied or
9  contradicted, rather than explained or elaborated on, the terms of agreement).

## V.  Conclusion.

Colocation plotted internally to "write up" the Contract for the Domain Name and "nebulously" "slip in" IPv4 addresses.  Colocation never communicated its intention to MNC and used "nebulous" language in the Contract.  This alone mandates summary judgment in MNC's favor.  Moreover, the only reasonable interpretation of the Contract is that it is a quit claim of rights in a Domain Name and the related business goodwill.  This interpretation is supported by the Contract language, the drafting history, the consideration, and the parol evidence.  The Court should deny Colocation's Motion, and enter summary judgment in favor of MNC on all of Colocation's counts, and on either Count One or Count Two of MNC's counterclaim.

DATED this 25th day of May, 2018.

SNELL & WILMER L.L.P.

By: *s/ Jacob C. Jones*
   David E. Rogers
   David G. Barker
   Jacob C. Jones
   One Arizona Center, 400 E. Van Buren
   Phoenix, Arizona  85004-2202
   Attorneys for Mitel Networks Corporation

- 14 -

# **CERTIFICATE OF SERVICE**

I hereby certify that on May 25, 2018, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Teresa H. Foster, Esq.
Brier, Irish, Hubbard & Erhart, P.L.C.
2400 East Arizona Biltmore Circle
Suite 1300
Phoenix, AZ 85016
ctfilings@thfosterlaw.com

Paul Stephen Sigelman
Sigelman Law Corporation
433 N Camden Dr., Suite 970
Beverly Hills, CA 90210
paul@sigelmanlaw.com

Attorneys for Colocation


s/ *Jacob C. Jones*