**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Colocation America Corporation,<br><br>Plaintiff,<br><br>v.<br><br>Mitel Networks Corporation,<br><br>Defendant. | No. CV-17-00421-PHX-NVW<br><br>**ORDER** |
| Mitel Networks Corporation,<br><br>Counterclaimant,<br><br>v.<br><br>Colocation America Corporation; and Corey Allen Kotler and Mojgan Tabibnia, husband and wife,<br><br>Counter-defendants. | |

Before the Court are Mitel Networks Corporation's Motion Under Fed. R. Civ. P. 56 for Summary Judgment on Contract Interpretation (Doc. 81), Plaintiff's Cross Motion for Summary Judgment on Contract Interpretation (Doc. 84), and the replies.

The cross-motions for summary judgment ask the Court to determine whether the parties' Domain Name Assignment Agreement includes the sale of a block of Internet addresses (referred to as IPv4 134.22.0.0/16). Both parties agree that summary judgment should be granted for the party that prevails on this motion, subject to litigation of Mitel Networks Corporations' pleaded defenses if Colocation America Corporation prevails on contract interpretation. On its face, the executed agreement does not include the sale of

IPv4 addresses, which number about 65,536. Further, the parties' course of negotiations demonstrates that Mitel Networks had no reason to know that Colocation interpreted their agreement as including the sale of IPv4 addresses, and Colocation not only had reason to know Mitel Networks interpreted the agreement differently, it intentionally led Mitel Networks into thinking the agreement involved only the assignment of a domain name. If there is any ambiguity, under Restatement (Second) of Contracts § 201(2), the agreement is interpreted in accordance with the meaning attached by Mitel Networks.

## I. LEGAL STANDARD

A motion for summary judgment tests whether the opposing party has sufficient evidence to merit a trial. Summary judgment should be granted if the evidence reveals no genuine dispute about any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A material fact is one that might affect the outcome of the suit under the governing law, and a factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## II. MATERIAL FACTS

### A. The Parties

Plaintiff/Counter-defendant Colocation America Corporation is a Nevada corporation with offices in Nevada and California. Albert A. Ahdoot is the President of Colocation. Ahdoot signed the Domain Name Assignment Agreement on behalf of Colocation.

Defendant/Counterclaimant Mitel Networks Corporation is incorporated in Canada and maintains its principal place of business in Canada. Mitel Networks indirectly acquired assets from the Gandalf Technologies Inc. bankruptcy that include the Canadian domain name gandalf.ca. Its intellectual property counsel, Michelle R. Whittington, has an office in Arizona and negotiated the Domain Name Assignment Agreement on behalf of Mitel Networks. Mitel Networks' General Counsel signed the Domain Name Assignment Agreement on behalf of Mitel Networks.

### B. The Broker

Ahdoot hired Corey Allen Kotler to locate the owners of certain IPv4 addresses and to negotiate contracts to buy the IPv4 addresses. Ahdoot met Kotler through a friend of Ahdoot's lawyer, Paul Seligman. Before working for Ahdoot, Kotler did not know anything about IP addresses and had not previously acted as a broker for Colocation.

Ahdoot located a block of IPv4 addresses on the American Registry for Internet Numbers that were registered to Gandalf Technologies. By researching Gandalf's bankruptcy records, Ahdoot concluded that "Mitel" had acquired Gandalf's assets, but he did not determine whether "Mitel" was "Mitel Networks Corporation" and whether the bankruptcy assets acquired by "Mitel" included the block of IPv4 addresses registered to Gandalf Technologies. Ahdoot directed Kotler to negotiate a deal to acquire from Mitel Networks the block of IPv4 addresses that might have been acquired from Gandalf Technologies by "Mitel."

Kotler's email communications were signed under the name "Corey Allen" as "Principal Advisor" of "Dividend Advisors, LLC." It was Ahdoot's understanding that Kotler was the owner/member of Dividend Advisors and Dividend Advisors had the same business address as Ahdoot's attorney Seligman.

### C. The Communications

On February 18, 2016, Kotler emailed Mitel Networks, stating that "we would like to purchase the domain Gandalf.ca." Kotler further stated that "we would like to issue you and/or your company immediate payment for a letter of authorization of sale for the purchase of this domain."

On February 19, 2016, Whittington sent an email to Kotler with the subject "Domain." The email stated, "As Intellectual Property Counsel for Mitel, I have been asked to respond to your email request regarding the <<gandalf.ca>> domain name." Whittington asked Kotler, "Can we set a time to discuss your offer?"

Shortly thereafter, Kotler forwarded Whittington's email to Ahdoot and Seligman with the following message: "I would write it up for the domain and somehow slip in the

IPV4." The same day, Kotler added the following to his message to Ahdoot and Seligman:

> Is there a way to slip it in nebulously? i.e **"…and should any potential intellectually properties or scenarios that may be associated at a future point in time"**

(Doc. 81-3 at 28, emphasis and errors in original.) On February 24, 2016, Kotler emailed a response to Whittington, apologizing for his delay and stating:

> As a follow up to my request, our company would like to purchase the domain Gandalf.ca as well as any potential intellectually properties or scenarios that may be associated at a future point in time with the name Gandalf.ca. My company is in position to offer Mitel the sum of ten thousand American dollars ($10,000) for all rights.

(Doc. 81-3 at 16, errors in original.)

Whittington responded the same day, February 24, 2016, stating, "Mitel accepts the offer and provides a draft Domain Name Assignment Agreement for your review."[1] Whittington asked Kotler to insert the purchaser's information and to indicate any edits by redline on the returned document. Paragraph A of Whittington's February 24, 2016 draft Domain Name Assignment Agreement stated:

> **A. Assignment of Domain Name**. For good and valuable consideration, payable as more particularly described herein, Mitel hereby agrees to transfer and assign to INTELLECTUAL PROPERTY PURCHASER all of Mitel's right, title and interest in and to the Domain Name <gandalf.ca> and the registration thereof, together with the goodwill of the business connected with and symbolized by such Domain Name, and any intellectual property rights relating thereto, to the extent any such rights exist. The transfer and the assignment shall take effect as set forth herein upon INTELLECTUAL PROPERTY PURCHASER'S making the payment provided for herein.

(Doc. 81-3 at 17.)

On February 26, 2016, Kotler sent an email to Whittington with the subject "Revised domain assignment" and an attachment named "DOMAIN NAME

---

[1] At some point before February 26, 2016, Whittington confirmed that the domain name gandalf.ca was registered to Mitel Networks Corporation.

ASSIGNMENT AGREEMENT.pdf." The email stated: "Here is the revised domain assignment . . . . The company recognizes that you may or may not have rights as a result of the old bankruptcy proceedings but is willing to go forward on quit claim basis." Kottler's revised Domain Name Assignment Agreement did not indicate the revisions made to Whittington's February 24, 2016 draft. Kotler's revisions included adding the following paragraph to the preamble:

> WHEREAS, Dividend Advisors LLC has introduced the INTELLECTUAL PROPERTY PURCHASER to intangible rights which may be claimed as a result of a prior bankruptcy proceeding, including domain name and related intellectual property.

(Doc. 81-2 at 55.) Kotler changed the original preamble paragraph from saying Mitel agrees to "sell, transfer and assign" the domain name to saying Mitel agrees to "quit claim, transfer and assign" the domain name "and related rights . . . ." (*Id.*) Kotler also inserted the phrase "the associated IPv4 134.22.0.0/16 and any associated trade dress, or other intellectual property" into Paragraph A.[2] Thus, Paragraph A of Kotler's February 26, 2016 draft Domain Name Assignment Agreement stated:

> **A. Assignment of Domain Name**. For good and valuable consideration, payable as more particularly described herein, Mitel hereby agrees to quit claim to INTELLECTUAL PROPERTY PURCHASER any of Mitel's right, title and interest in and to the Domain Name <gandalf.ca> and the registration thereof, together with the goodwill of the business connected with and symbolized by such Domain Name, and the associated IPv4 134.22.0.0/16 and any associated trade dress, or other intellectual property intellectual property rights relating thereto, to the extent any such rights exist. The quit claim transfer and assignment shall take effect as set forth herein upon INTELLECTUAL PROPERTY PURCHASER'S making the payment as provided for herein.

(*Id.* (repetition of "intellectual property" in original)). Kotler's revision also modified Paragraph D of Whittington's draft to include reference to intellectual property.

---

[2] "IPv4 134.22.0.0/16" refers to a block of 65,536 addresses unrelated to the domain name gandalf.ca. It is uncertain whether Mitel Networks did or does have title to the IPv4 134.22.0.0/16 addresses.

After February 26, 2016, Kotler and Whittington spoke by telephone many times regarding purchase of the domain name, escrow information, and the identity of the buyer. There was no mention of any IPv4 address transfer.

On March 1, 2016, Kotler emailed to Whittington "the domain name assignment agreement in Word." On March 3, 2016, Whittington returned the document with "a few edits and questions," shown in redline tracking. In Paragraph A, she highlighted "IPv4 134.22.0.0/16" and added a comment asking "What is this?" She changed "Domain Name and intellectual property" in Paragraph D to "Domain Name and any associated intellectual property rights."

Kotler did not respond to Whittington's question regarding "IPv4 134.22.0.0/16." Whittington asked Mitel Networks' vice president of business strategy about the reference and subsequently felt comfortable with executing the Domain Name Assignment Agreement.

On March 7, 2016, Kottler emailed Whittington, stating that the "signed agreement" was attached; however, the attached document was not signed. Kottler's March 7, 2016 revision of the Domain Name Assignment Agreement changed the title of Paragraph A from "Assignment of Domain Name" to "Quit Claim." The March 7, 2016 revision deleted a comma, but it did not correct the phrase "other intellectual property intellectual property rights relating thereto."

Kottler's email also stated: "The standard online escrow instruction [*sic*] have been forwarded to you and the internet protocol transfer form will be forwarded. Upon signature and submission of the escrow instructions, the $10,000 will be immediately funded. Upon the change in registration and transfer, the funds are immediately released." (Doc. 84-2 at 33.) The record does not include evidence that the "standard online escrow instructions" were forwarded to Whittington, and at oral argument counsel for Colocation conceded there is no such evidence.

On March 10, 2016, the Domain Name Assignment Agreement was executed by Ahdoot on behalf of Colocation. On March 18, 2016, it was executed on behalf of Mitel Networks by its General Counsel.

On March 23, 2016, Kotler introduced Whittington via email to Samantha Walters, "VP of Online Strategies" for Colocation, and said Walters would assist Whittington "in the domain transfer process." On March 24 and 25, 2016, Walters and Whittington communicated about opening escrow with Escrow.com, and six attempts were made to open an escrow account with Escrow.com. The description of each transaction referred to either Domain Name Assignment or Domain Name Transfer and did not mention transfer of IPv4 addresses. The record indicates that Escrow.com requested a copy of the parties' contract, but it does not include evidence of what was submitted to Escrow.com and by whom.

On March 24, 2016, Colocation initiated the first transaction with Escrow.com with the note "Domain name transfer only." Four minutes later, Colocation canceled it, stating the reason as "Correction." Sixteen minutes later, Colocation initiated a second transaction without any note. On March 25, 2016, Mitel Networks initiated a third transaction with the note "Domain name transfer only." An hour and eighteen minutes later, Colocation initiated the fourth transaction with the description "Modified – Gandalf.ca Domain Name Transfer" and five minutes later canceled the third transaction, stating the reason as "Modification made." Twenty minutes later, Mitel Networks initiated a fifth transaction with the note "Domain name transfer only." Twenty-three minutes later, Colocation canceled the second transaction without explanation. Seven minutes later, Mitel Networks initiated a sixth transaction with the note "Domain name transfer only." Thirty minutes later, Colocation canceled both the fifth and sixth transactions, stating the reason as "Not the right one." Thirteen minutes later, both parties accepted the fourth transaction, which was initiated by Colocation and did not have the note "Domain name transfer only."

On March 28, 2016, Walters sent an email to Whittington with the subject "Gandalf.ca Transfer Next Steps." Walters told Whittington that Colocation's Bills Payable Department had confirmed that the wire transfer to Escrow.com had been completed, and she provided the Reference Escrow Transaction number. Walters also said to Whittington, "As per our conversation last week, our next step is to transfer the IP range from Mitel to Colocation America." This was the first time in the exchanges that Colocation mentioned transfer of IPv4 addresses to Mitel Networks. Walters said that after the IPv4 addresses were transferred, then the domain name would be transferred, and it would take about two weeks before everything was confirmed and Escrow.com would release the funds. Whittington responded that "there appears to be a miscommunication that needs to be worked out first."

On March 30, 2016, via email, Kotler told Whittington that the signed agreement stated "both the domain and IP range were included and thus sold to the buyer." Kotler asked who he should speak to "to get the domain and IP range transferred to the buyer as per the executed agreement/escrow." On March 31, 2016, Whittington responded that there was "obviously a misunderstanding that needs to be cleared up" and asked if it were possible for her to speak directly with Colocation. On April 6, 2016, Kotler sent to Whittington the following email message:

> So that we can finalize the agreement of the Gandalf.ca domain sale and the associated IPv4 134.22.0.0/16 that that [*sic*] you have personally approved, authorized, overseen and customized to meet your specifications and as much as Mitel and Colocation America have mutually signed off on the agreement, please coordinate via email with Samantha so that we can effectuate the transfers of both the domain Gandalf.ca and the associated IPv4 134.22.0.0/16 this week. I will be out of the office however I will be accessible via email.

(Doc. 81-4 at 7.) On April 11, 2016, Walters, via email, requested that Whittington begin the process to transfer first the IPv4 block and then the domain name gandalf.ca. Immediately thereafter, Whittington responded: "[T]here has been a misunderstanding of what Mitel has agreed to sell. Mitel is prepared to transfer the domain name and all

- 8 -

goodwill associated thereof. The Mitel IT Dept is standing by to transfer the domain name when Colocation America is ready." Whittington further stated that she had been waiting for Kotler to arrange a meeting as she had requested a few weeks ago. On April 12 and 15, 2016, Walters repeated her request to talk to Mitel Networks' IT department to transfer the IPv4 block. On April 15, 2016, Whittington repeated her request for a meeting and affirmed that Mitel Networks was prepared to transfer the domain name as agreed upon with Kotler and in the Domain Name Assignment Agreement. On April 18, 2016, Walters referred Whittington to Colocation's attorney.

On May 14, 2017, Escrow.com emailed Colocation and Mitel Networks inquiring about the status of the transaction titled "Modified – Gandalf.ca Domain Name Transfer." On June 16, 2016, Escrow.com emailed Colocation and Mitel Networks inquiring about the status of "the transfer of the domain and the IPv4 block" in the transaction titled "Modified – Gandalf.ca Domain Name Transfer." Ahdoot responded to both emails that Colocation was waiting for Mitel Networks to honor the contract terms before it released the funds.

### D. The Contract

The contract executed on behalf of both parties is titled "Domain Name Assignment Agreement." It defines "Mitel" as Mitel Networks Corporation and "INTELLECTUAL PROPERTY PURCHASER" as Colocation America, Inc. The preamble refers to "domain name and related intellectual property" and to "the domain name . . . and related rights." "Domain Name" is defined as the domain name gandalf.ca. "Intellectual property" is not defined.

The Domain Name Assignment Agreement includes Paragraphs A through F and Schedule A (wire transfer instructions). Paragraph A states:

> **A. Quit Claim**. For good and valuable consideration, payable as more particularly described herein, Mitel hereby agrees to quit claim to INTELLECTUAL PROPERTY PURCHASER any of Mitel's right, title and interest in and to the Domain Name <gandalf.ca> and the registration thereof, together with the goodwill of the business connected with and

- 9 -

symbolized by such Domain Name and the associated IPv4 134.22.0.0/16 and any associated trade dress, or other intellectual property intellectual property rights relating thereto, to the extent any such rights exist. The quit claim transfer and assignment shall take effect as set forth herein upon INTELLECTUAL PROPERTY PURCHASER'S making the payment as provided for herein.

(Doc. 81-2 at 5 (repetition of "intellectual property" in original)).

Paragraph B states:

**B. Payment**. The consideration (the "Consideration") to be paid by INTELLECTUAL PROPERTY PURCHASER shall be in the amount and through escrow as set forth in the standard Escrow.com instructions, to be entered concurrent with this Agreement by the parties and for the amount therein to be deposited by purchaser upon opening escrow along with the escrow fees. Within 1 business day after notification from Escrow.com that the purchase funds have been received from the INTELLECTUAL PROPERTY PURCHASER, Mitel shall change the registered ownership of the Domain Name with a third-party registrar so that the "WHOIS" information will be registered to the INTELLECTUAL PROPERTY PURCHASER, or agent of its choosing, and transfer the Domain Name to a hosting service designated by the INTELLECTUAL PROPERTY PURCHASER and further execute any instrument of transfer [*sic*] may be required to effectuate the purchase of any of the quit intellectual property rights. Upon notice to Escrow.com of visible "Whois" registration and all related intellectual property transfer, the CONSIDERATION funds are to be released to Mitel by wire transfer as Mitel provides in the escrow instruction.

(*Id.* at 6.)

Paragraph C states:

**C. Mitel's Obligations**. Mitel agrees to cooperate with INTELLECTUAL PROPERTY PURCHASER and to follow INTELLECTUAL PROPERTY PURCHASER'S reasonable instructions in order to effectuate any transfer of the Domain name or any intellectual property in a timely manner. Specifically, upon receipt of the consideration, Mitel further agrees to prepare and transmit any necessary registration agreement or correspondence to authorize the transfers.

(*Id.*)

Paragraph D states:

> **D. Warranty**. Mitel warrants and represents that: (i) it has the full power and lawful authority to enter into this quit claim assignment and transfer the Domain Name, and (ii) it is the lawful owner of the Domain Name and any associated intellectual property rights.

(*Id.*)

Paragraph E states:

> **E. INTELLECTUAL PROPERTY PURCHASER Obligations**. INTELLECTUAL PROPERTY PURCHASER agrees not to: use the Domain Name or any resulting website: (i) to disparage Mitel in any way; (ii) and disclose the material terms of this Agreement, such as the Consideration, however either party may disclose the existence of the Agreement.

(*Id.* at 6-7.)

Paragraph F states:

> **F. Entire Agreement**. This Agreement embodies the entire understanding of the parties with respect to the subject matter hereof, and merges all prior discussions between them, and neither of the parties shall be bound by any conditions, definitions, warranties, understandings, or representations with respect to the subject matter hereof other than as expressly provided herein. No oral explanation or oral information by either party hereto shall alter the meaning or interpretation of this Agreement.

(*Id.* at 7.)

## III. ANALYSIS

### A. Interpreting Contracts Under Arizona Law

"Generally, and in Arizona, a court will attempt to enforce a contract according to the parties' intent." *Taylor v. State Farm Mut. Auto. Ins. Co.*, 175 Ariz. 148, 152, 854 P.2d 1134, 1138 (1993). The purpose of interpreting a contract is to discover the parties' intent and to make it effective. *Id.*

"The interpretation of a contract is a question of law for the court. Where the language of the contract is clear and unambiguous, it must be given effect as it is written." *Hadley v. Sw. Props., Inc.*, 116 Ariz. 503, 506, 570 P.2d 190, 193 (1977). However, the court "must avoid the often irresistible temptation to automatically interpret

contract language as he or she would understand the words" and conclude the contract language is "unambiguous." *Taylor*, 175 Ariz. at 153, 854 P.2d at 1139. "Words [] are seldom so clear that they 'apply themselves to the subject matter.'" *Id.* (quoting Restatement (Second) of Contracts § 214 cmt. b); *see also* Restatement (Second) of Contracts § 212 cmt. b ("[M]eaning can almost never be plain except in a context."). "In Arizona, therefore, the interpretation of a negotiated agreement is not limited to the words set forth in the document." *Darner Motor Sales, Inc. v. Universal Underwriters Ins. Co.*, 140 Ariz. 383, 393, 682 P.2d 388, 398 (1984).

"A contract should be read in light of the parties' intentions as reflected by their language and in view of all the circumstances." *Smith v. Melson, Inc.*, 135 Ariz. 119, 121, 659 P.2d 1264, 1266 (1983); *accord Darner*, 140 Ariz. at 393, 682 P.2d at 398. Evidence of the parties' negotiations, prior understandings, and subsequent conduct may be considered to determine the parties' intent and to interpret the meaning of provisions in the contract. *Darner*, 140 Ariz. at 393, 682 P.2d at 398.

"Where the parties have attached the same meaning to a promise or agreement or a term thereof, it is interpreted in accordance with that meaning." Restatement (Second) of Contracts § 201(1); *accord Johnson v. Cavan*, 152 Ariz. 452, 455, 733 P.2d 649, 652 (Ct. App. 1986). However,

> Where the parties have attached different meanings to a promise or agreement or a term thereof, it is interpreted in accordance with the meaning attached by one of them if at the time the agreement was made
>
> > (a) that party did not know of any different meaning attached by the other, and the other knew the meaning attached by the first party; or
> >
> > (b) that party had no reason to know of any different meaning attached by the other, and the other had reason to know the meaning attached by the first party.

Restatement (Second) of Contracts § 201(2). "[T]he relevant intention of a party is that manifested by him rather than any different undisclosed intention." Restatement (Second) of Contracts § 212 cmt. a. But if a contractual provision remains unclear after considering the parties' intent, the court construes the provision against the drafter. *MT*

- 12 -

*Builders, L.L.C. v. Fisher Roofing, Inc.,* 219 Ariz. 297, 302, 197 P.3d 758, 763 (Ct. App. 2008); *Skydive Arizona, Inc. v. Hogue*, 238 Ariz. 357, 367, 360 P.3d 153, 163 (Ct. App. 2015); *see* Restatement (Second) of Contracts § 206.

### B. The Domain Name Assignment Agreement

The parties' contract is titled "Domain Name Assignment Agreement." The Domain Name Assignment Agreement provides that Colocation will pay consideration to Mitel Networks in exchange for Mitel Networks assigning the rights to use a domain name and transferring registration of the domain name to Colocation. The parties dispute whether the Domain Name Assignment Agreement provides that, in addition to assigning the domain name, for no additional consideration Mitel Networks will transfer rights to a block of 65,536 IPv4 addresses. The Domain Name Assignment Agreement does not mention IPv4 addresses except once in Paragraph A.

The parties disagree regarding the meaning of the italicized portion of the following sentence in Paragraph A:

> . . . Mitel hereby agrees to quit claim to INTELLECTUAL PROPERTY PURCHASER any of Mitel's right, title and interest in and to the Domain Name <gandalf.ca> and the registration thereof, *together with the goodwill of the business connected with and symbolized by such Domain Name and the associated IPv4 134.22.0.0/16 and any associated trade dress,* or other intellectual property intellectual property [*sic*] rights relating thereto, to the extent any such rights exist.

Mitel Networks contends that the italicized portion means Mitel Networks will quit claim the goodwill *of the business* connected with associated IPv4 addresses and associated trade dress. Colocation contends that it means that Mitel Networks will quit claim the goodwill of the business *plus* the associated IPv4 134.22.0.0/16 addresses *plus* any associated trade dress.

None of the other provisions of the Domain Name Assignment Agreement support Colocation's interpretation, beginning with the title which does not mention IPv4 addresses. The preamble refers to transfer of the domain name and related rights. Paragraph B provides that after Escrow.com notifies Mitel Networks that the purchase

- 13 -

funds have been received from Colocation, Mitel Networks will change the registered ownership of the domain name and transfer the domain name to a designated hosting service. Paragraph C requires Mitel Networks to follow Colocation's reasonable instructions regarding registration and transfer of the domain name. Paragraph D requires Mitel Networks to warrant that it has authority to transfer the domain name and it is the lawful owner of the domain name and "any associated intellectual property rights." Paragraph E prohibits Colocation from using the domain name or any resulting website to disparage Mitel Networks. The Domain Name Assignment Agreement does not include any provisions regarding transferring IPv4 134.22.0.0/16 after notification of payment, following instructions for transfer of IPv4 134.22.0.0/16, warranting authority to transfer IPv4 134.22.0.0/16, or disparaging use of IPv4 134.22.0.0/16. Further, although IPv4 134.22.0.0/16 is registered to Gandalf Technologies, Inc., IPv4 134.22.0.0/16 is not associated with the domain name gandalf.ca.

Paragraph B refers to "the standard Escrow.com instructions, to be entered concurrent with this Agreement by the parties and for the amount therein to be deposited by purchaser upon opening escrow along with the escrow fees." Colocation asserts that Escrow.com instructions were incorporated into the Domain Name Assignment Agreement, confirm the language of the Contract, were emailed to Whittington, and accepted by Whittington. However, the record does not include evidence of escrow instructions that were emailed to Whittington, what those escrow instructions actually stated, or evidence that Whittington accepted those escrow instructions. Colocation cites to general instructions that do not state the amount of consideration and do not indicate whether the transaction between Colocation and Mitel Networks involved domain names and/or IPv4 addresses. Moreover, the general instructions for transactions involving IPv4 addresses require that specific information regarding transfer be included in the escrow instructions at the commencement of the transaction. There is no evidence that Whittington had knowledge of or provided the necessary information to commence an Escrow.com transaction involving the transfer of IPv4 addresses. Screenshots of

Escrow.com's summary notes that mention transfer of "IPv4 134.22.0.0/16 netblocks" do not show what escrow instructions Whittington actually received and accepted.

Colocation asserts that it added the quit claim language at the same time it added the reference to IPv4 134.22.0.0/16 because neither party knew if Mitel Networks in fact owned the addresses. However, screen shots of Ahdoot's Escrow.com account show a partial transaction description appearing to require actual transfer of the IPv4 134.22.0.0/16 addresses before payment would be released to Mitel Networks. If accurate, Mitel Networks would not be paid unless it in fact owned the addresses.

Although Paragraph A is poorly drafted and contains grammatical and typographical errors, both the express language of Paragraph A and the remainder of the Domain Name Assignment Agreement require interpreting Paragraph A as meaning that Mitel Networks will quit claim rights to a domain name, its registration, and the goodwill of *the business* that is associated with the domain name and associated with a block of IPv4 addresses and trade dress.

### C. The Parties' Intent

"[T]he relevant intention of a party is that manifested by him rather than any different undisclosed intention." Restatement (Second) of Contracts § 212 cmt. a. Colocation wanted to acquire a block of IPv4 addresses from Mitel Networks, but there is no evidence that Colocation disclosed that intent to Mitel Networks before the Domain Name Assignment Agreement was executed.

Before execution of the agreement, Colocation manifested only the intent to acquire a domain name. The parties never negotiated a sale of IPv4 addresses. Colocation offered to pay $10,000 for the domain name gandalf.ca and intellectual property associated with the name gandalf.ca. Mitel Networks accepted the offer and drafted an agreement to sell the domain name gandalf.ca and "the goodwill of the business connected with and symbolized by such Domain Name, and any intellectual property rights relating thereto." Colocation added a reference to the business's goodwill associated with IPv4 134.22.0.0/16 without explanation, without increasing its offer, and

without seeking acceptance from Mitel Networks. Kotler and Whittington exchanged emails and spoke by telephone many times, but Kotler never mentioned transferring IPv4 134.22.0.0/16—a block of 65,536 IPv4 addresses unrelated to the domain name gandalf.ca.

"Where the parties have attached different meanings to . . . an agreement . . . , it is interpreted in accordance with the meaning attached by one of them if at the time the agreement was made . . . that party had no reason to know of any different meaning attached by the other, and the other had reason to know the meaning attached by the first party." Restatement (Second) of Contracts § 201(2). As discussed above, Mitel Networks had no reason to know that Colocation interpreted the Domain Name Assignment Agreement as an agreement to transfer IPv4 addresses. Colocation had reason to know Mitel Networks interpreted the Domain Name Assignment Agreement as an agreement to assign a domain name and not as an agreement to transfer IPv4 addresses. Although Ahdoot hired Kotler to acquire the IPv4 134.22.0.0/16 addresses, Kotler intentionally misled Mitel Networks by offering only to buy a domain name. Kotler told Ahdoot and Seligman, "I would write it up for the domain and somehow slip in the IPV4." Kotler asked, "Is there a way to slip it in nebulously?" Then Kotler suggested slipping the IPv4 addresses in "nebulously," using words almost identical to the language he used in his email to Whittington: "any potential intellectually [*sic*] properties or scenarios that may be associated at a future point in time."

Moreover, IPv4 addresses were never mentioned before Colocation offered and Mitel Networks accepted the offer of $10,000 for the assignment of a domain name. It would not have been reasonable for Colocation to expect Mitel Networks to add to the deal the transfer of 65,536 IPv4 addresses of value far greater than $10,000 without any additional consideration. That further proves that Colocation knew that Mitel Networks did not intend to transfer the IPv4 addresses.

This case is a poster child for the rule of § 201(2) of the Restatement. Colocation's objective from the outset was to acquire the IPv4 addresses. But it

purported to negotiate only for a domain name without ever leveling with Mitel Networks. Colocation not only had "reason to know" Mitel Networks attached a "different meaning" to their agreement, it created and promoted that different meaning on the part of Mitel Networks. Thus, the Domain Name Assignment Agreement must be interpreted in accordance with the meaning attached by Mitel Networks, that is, as an agreement to assign a domain name and goodwill and not as an agreement to transfer IPv4 addresses.

There is no genuine dispute about the material facts of this case. The parties do not dispute the evidence of their communications and course of dealing. They agree that the Court can and should interpret their contract as a matter of law. Summary judgment is therefore appropriate.

Mitel Networks' counterclaim seeks alternatively specific performance of the contract for $10,000 or rescission and termination of the contract based on Colocation's material breach. At oral argument Mitel Networks elected the latter remedy.

IT IS THEREFORE ORDERED that Mitel Networks Corporation's Motion Under Fed. R. Civ. P. 56 for Summary Judgment on Contract Interpretation (Doc. 81) is granted and Plaintiff's Cross Motion for Summary Judgment on Contract Interpretation (Doc. 84) is denied.

IT IS FURTHER ORDERED that the Clerk enter judgment against Plaintiff Colocation America Corporation on its complaint and in favor of Defendant Mitel Networks Corporation and that Plaintiff take nothing.

IT IS FURTHER ORDERED that the Clerk enter judgment in favor of Counterclaimant Mitel Networks Corporation on its counterclaim and against Counter-defendant Colocation America Corporation, declaring that the Domain Name Assignment

/ / /

/ / /

/ / /

Agreement is rescinded and terminated based on Colocation's material breach of the Agreement.

The Clerk shall terminate this case.

Dated this 15th day of June, 2018.

_____
Neil V. Wake
Senior United States District Judge