<pre>
 1                  UNITED STATES DISTRICT COURT

 2                  FOR THE DISTRICT OF ARIZONA

 3                  _____

 4
     Colocation America         )
 5   Corporation,               )
                                )    No. CV 17-0421-PHX-NVW
 6              Plaintiff,       )
                                )
 7        vs.                   )    Phoenix, Arizona
                                )    June 13, 2018
 8   Mitel Networks Corporation, )   3:03 p.m.
                                )
 9              Defendant.       )
     _____)
10
             BEFORE:  THE HONORABLE NEIL V. WAKE, JUDGE
11
             REPORTER'S TRANSCRIPT OF PROCEEDINGS
12
                       (Motion Hearing)
13
     APPEARANCES:
14   For the Plaintiff:
             TERESA H. FOSTER PLLC
15           By:  Teresa H. Foster, Esq.
             2400 East Arizona Biltmore Circle
16           Suite 1300
             Phoenix, Arizona 85016
17
     For the Defendant:
18           SNELL & WILMER LLP
             By:  David E. Rogers, Esq.
19           By:  Jacob C. Jones, Esq.
             One Arizona Center
20           400 East Van Buren Street, Suite 1900
             Phoenix, Arizona 85004
21
     Official Court Reporter:
22   Laurie A. Adams, RMR, CRR
     Sandra Day O'Connor U.S. Courthouse, Suite 312
23   401 West Washington Street, Spc 43
     Phoenix, Arizona 85003-2151
24   (602) 322-7256
     Proceedings Reported by Stenographic Court Reporter
25   Transcript Prepared by Computer-Aided Transcription
</pre>

P R O C E E D I N G S

1

2          THE COURTROOM DEPUTY:  This is Case Number CV 17-421

3  Colocation America Corporation versus Mitel Networks

4  Corporation, before the Court for oral argument.

5          Will the parties please announce for the record.          03:03PM

6          MS. FOSTER:  Good afternoon, Your Honor.  Teresa

7  Foster here on behalf of Plaintiff Colocation.

8          MR. ROGERS:  Your Honor, Dave Rogers and Jacob Jones

9  here on behalf of the defendant, Mitel Networks Corporation.

10          THE COURT:  All right.  Good afternoon.  I will hear     03:04PM

11  whatever you all want to argue.  I have one or two threshold

12  questions.  This may be a short question with a short answer.

13  Does everyone agree that one side or the other is entitled to

14  summary judgment on these motions?

15          MS. FOSTER:  The plaintiff agrees, Your Honor.          03:04PM

16          MR. ROGERS:  We do, too, on the issue of contract

17  interpretation.

18          THE COURT:  Well, that's the whole case, isn't it?

19          MR. ROGERS:  Well, there's still defenses in the case.

20          THE COURT:  Well, if you win, though, on that, you       03:04PM

21  have won the case, right?

22          MR. ROGERS:  That's right.

23          THE COURT:  Now, was the parties' contract sent to

24  Escrow.com?  I don't find any evidence that it was.  That's why

25  I'm asking.                                                      03:05PM

1          MS. FOSTER:  Your Honor, I'm not aware of any evidence

2     that it was.

3          THE COURT:  All right.  This is somewhat in the same

4     vein.  Was the, quote, standard online escrow instructions from

5     Escrow.com, was that ever sent to Ms. Whittington?  I don't          03:05PM

6     find any evidence that it was.  If it is, tell me.

7          MS. FOSTER:  Our position is that Exhibit Number 3 of

8     the defendant's motion is that she clicked accept on that

9     Escrow.com instruction on March 25th.  At the top right-hand

10    side shows that the buyer initiated --                              03:06PM

11         THE COURT:  Clicked accept on what?

12         MS. FOSTER:  On the Escrow.com instructions.

13         THE COURT:  And what's the date on that?

14         MS. FOSTER:  March 25th, 2016.

15         THE COURT:  And I take it, then, that the form escrow        03:06PM

16    instructions -- I think you have already answered this but the

17    form escrow instructions were never tailored to fit this

18    contract, correct?

19         MS. FOSTER:  Correct, Your Honor.

20         THE COURT:  All right.  With that, I will hear what          03:06PM

21    you have to say.  Now, same question here.  Who should go

22    first?  Does anybody want to go first?

23         MR. ROGERS:  Sure.  I will go first.

24         THE COURT:  It's your lawsuit.  I suppose you get to

25    go first unless everybody thinks it's wiser for the defendant      03:07PM

```
 1    to go first.  I don't much care.
 2            MS. FOSTER:  They filed the motion.  They can go
 3    first.  They filed the first motion.
 4            MR. ROGERS:  Your Honor, I feel, though, like I'm
 5    pretty much going to be rehashing what's in our brief.        03:07PM
 6            THE COURT:  Well, come on up, and I will hear whatever
 7    you have to say.  I have read the briefs and I do have some
 8    questions for each of you.
 9            MR. ROGERS:  Your Honor, in a nutshell --
10            THE COURT:  Hold on a minute.  Well, I'm not sure this  03:07PM
11    matters.  But did Mitel have title to the IP4 block of
12    addresses or not, and does it now?  And is it in the record?
13            MR. ROGERS:  No.  And is it in the record that it
14    doesn't?  Yes.
15            THE COURT:  And does it still not own that block of    03:07PM
16    addresses?
17            MR. ROGERS:  It still does not have -- it's unclear --
18    with these addresses are two things.  There's ownership and
19    then there's a perfected title.  Without the perfected title
20    you can't do anything.  There's no evidence in the record that  03:08PM
21    we own them.  We're one of three entities that could
22    potentially own them.  There's zero evidence in the record
23    about who does.  But in terms of perfected ownership, perfected
24    title, we definitely don't have that.
25            THE COURT:  What does perfected title mean in this     03:08PM
```

1    context?

2              MR. ROGERS:  It means that the government

3    organization, which is called ARIN, that administers the IPv4

4    addresses recognizes you as the owner, and you are listed in

5    its database as the owner.                                       03:08PM

6              THE COURT:  Well, like I said, I don't think this

7    matters, but it was somewhat murky in your brief.  So that's

8    why I asked.  It's -- all right.

9              Now, another question for you is your counterclaim, in

10   the alternative, prays in Count 1 for, to enforce the contract,  03:09PM

11   they pay the $10,000, they get the domain name.  That's it.  In

12   the alternative, your counterclaim prays for just rescission

13   and avoidance because they breached and we can walk away.

14             MR. ROGERS:  That's right.

15             THE COURT:  It's show time.  What do you elect?        03:09PM

16             MR. ROGERS:  Two.  Why do I say two?  Even though

17   under one we would get -- we would get $10,000 and we would

18   sell the domain.  That's the deal that we thought we entered.

19   That's the deal that we wanted.  The only reason that I say two

20   is because, frankly, I can think ahead to a potential appeal.    03:10PM

21   I think that there's enough evidence in the record here to

22   show --

23             THE COURT:  Well, I think if, in fact, the

24   interpretation goes your way and, therefore, they are in breach

25   I think you have that election.  The question is if my ruling    03:10PM

1   goes your way, then I have to figure out what to do with it.

2   That's why I asked.  So, I mean, I'm not -- everything is still

3   open for discussion.

4        But okay.  Those are my questions for you.  I have

5   more for Ms. Foster.  But again, you don't have to repeat          03:10PM

6   everything.  I have read your briefs carefully.  But you are

7   welcome to say anything you want, especially anything you want

8   to emphasize.  So please proceed.  And you can respond to her

9   when you have your chance.

10       MR. ROGERS:  Okay.  Well, I will keep it very short          03:10PM

11  then.  Like I say, it's in our briefs, there are two basic

12  reasons that Mitel should prevail in this.  The first one is,

13  of course, the slip-it-in-nebulously e-mail and the fact that

14  they went about doing just that.  And that's undisputed.  It's

15  undisputed that there was no mention of IPv4 addresses at the    03:11PM

16  time.  We accepted their offer.  There was never any mention of

17  IPv4 addresses by the time we sent the original draft

18  agreement.

19       Up until the agreements were signed there was nothing

20  in any e-mails or phone calls about IPv4 addresses, and we know  03:11PM

21  about the history of the IPv4 addresses being referenced in

22  what we believe is the good will section of the contract.

23  There was never any change in the consideration to the contract

24  from day one after it was sent out by Mitel saying we accept

25  your offer.  Here's a contract for the transfer of the domain   03:12PM

1    name.  Even after the agreement was executed, the

2    communications, or maybe it was one communication from

3    Colocation said, from their broker, I will put you in touch

4    with somebody that's in house at Colocation to effect the

5    transfer of the domain.  Even then it didn't say IPv4.                    03:12PM

6            The first communication that was from them that ever

7    mentioned IPv4 was, I believe, on March 28th, which was three

8    days after the escrow.  That's the first time in any

9    communication they ever mentioned IPv4 addresses.

10           THE COURT:  Well, I have a slightly more focused            03:12PM

11   version of that point.  When was the first time they mentioned

12   in any of the exchanges that they are claiming a contract to

13   sell the IP addresses, which is more focused because there's

14   also here a reference to good will associated with the domain

15   name.  But that's sort of mentioned.  I'm more focused when did    03:13PM

16   they first say, and you agreed to sell us the IP addresses?

17           MR. ROGERS:  Well, the only time that came out was on

18   March 28th, which was 10 days after the final signature went

19   onto the contract.

20           THE COURT:  All right.  Go ahead.                          03:13PM

21           MR. ROGERS:  It's undisputed, which is why we're here,

22   there's undisputed testimony in the record as to what we

23   believe the contract meant.  And Colocation certainly knew or

24   should have known what our belief was because of all the things

25   I just said before that.  And that's exactly what you want the    03:13PM

1    other party to do or to think when you are slipping something

2    in nebulously.  You don't want them to understand what is

3    really going on, what your true intention is.

4         So I think we win on those grounds alone, and that's,

5    I believe, the Restatement Section 2.01.                    03:14PM

6         THE COURT:  201.

7         MR. ROGERS:  201.  Thank you.

8         The other reason that we believe we win is just on

9    straightforward contract interpretation.  And you have already

10   seen how we split apart the contract.  We think that's logical. 03:14PM

11   We think it's far more logical and reasonable than what

12   Colocation proposes.  And also, Colocation never explains, not

13   in their opening brief or in their reply brief, why you would

14   break the sentence apart.  It's one whole paragraph.  It's one

15   long sentence in the way they propose.  Paragraphs B through D  03:15PM

16   of the contract support our interpretation.

17        The consideration of $10,000 and the fact that that

18   never changed supports it.  And then finally, the parol

19   evidence supports it, especially the communications between the

20   parties as we have just discussed and also the JDA Software     03:15PM

21   agreement that was created by Colocation.

22        THE COURT:  Shows they know how to do it.

23        MR. ROGERS:  Exactly.  That's it, Your Honor.

24        THE COURT:  All right.  Ms. Foster.

25        And I have a further question for you all, so I'm         03:15PM

1    pretty sure I know the answer to this question, but this is a

2    key phrasing in the contract of, quote, "together with the good

3    will of the business connected with and symbolized by such

4    domain name and the associated IP4 number and associated trade

5    dress."  It does appear to me that that language first appears          03:16PM

6    in the exchange coming from Mr. Kotler, correct?

7              MS. FOSTER:  Which portion of the language, Your

8    Honor?

9              THE COURT:  What I just read, that whole phrase.

10             MS. FOSTER:  Originally it already had the "together          03:16PM

11   with."  The original language already had, "the domain name

12   together with the good will of the business connected with and

13   symbolized by such domain name."

14             THE COURT:  Yes.  That's correct.  Yes.  You are

15   right.                                                                   03:16PM

16             MS. FOSTER:  What was added --

17             THE COURT:  The insertion of "and the associated IP4

18   address," that originated in a draft from Mr. Kotler.  Correct?

19             MS. FOSTER:  Except for the word "and."  What he added

20   was, "The associated address and any associated trade dress."           03:17PM

21             THE COURT:  Does the record show whether that was also

22   reviewed by counsel, or is it just Mr. Kotler's own drafting?

23   If the record is silent, just tell me.

24             MS. FOSTER:  You are talking by plaintiff's counsel,

25   Your Honor?                                                             03:17PM

 1          THE COURT:  Yes.

 2          MS. FOSTER:  No.  There's nothing in the record and I

 3    personally don't know one way or the other.

 4          THE COURT:  Okay.  Not that it matters, it's just that

 5    I'm curious.                                                    03:17PM

 6          MS. FOSTER:  But the language was reviewed by

 7    defendant's counsel, and that's Colocation's Exhibit Number 9

 8    where on March 3rd, Ms. Whittington wrote back with the red

 9    lined agreement.  And in the agreement she he highlighted the

10    IPv4 address.                                                  03:17PM

11          THE COURT:  Asked what is this, and she never got an

12    answer.

13          MS. FOSTER:  Correct.

14          THE COURT:  All right.  And also, the famous deletion

15    of the comma, that originated in a draft that came from Mr.    03:17PM

16    Kotler also.  Correct?

17          MS. FOSTER:  Correct, Your Honor.

18          THE COURT:  Please proceed.

19          MS. FOSTER:  Just to address one of your earlier

20    questions, you had asked about the ownership of the IPv4       03:18PM

21    address.  If you look at the defendant's Exhibit Number 7, they

22    do have the ARIN registration, and it is still identified under

23    the name of Gandalf, the entity that had filed bankruptcy.  So

24    it's still listed under Gandalf.

25          THE COURT:  Does that answer the question of whether     03:18PM

1    it passed to Mitel?

2         MS. FOSTER:  No.  If you look at Footnote 6 to Mitel's

3    Motion for Summary Judgment, they recognize that, that all the

4    Gandalf assets were purchased in the bankruptcy.  But then the

5    company that purchased them divided them up between two Mitel     03:18PM

6    entities.  I don't recall the names.

7         THE COURT:  So we don't know -- it sounds then like

8    Mr. Rogers' answer is correct.  It's not really known who owns

9    those IP addresses, correct?

10        MS. FOSTER:  Correct.  It would be one of those two       03:19PM

11   entities, but I don't know which one, Your Honor.

12        THE COURT:  All right.  With that, please.  I

13   interrupted you.  Please continue.

14        MS. FOSTER:  Not a problem.  I would like to focus on

15   a few exhibits, Your Honor.                                    03:19PM

16        THE COURT:  Pull both microphones towards you.

17        MS. FOSTER:  Is that better?

18        THE COURT:  Yes.

19        MS. FOSTER:  I thought I was taller.

20        The first one --                                          03:19PM

21        THE COURT:  We have it that way so we can have the

22   criminal defendant with one microphone and the criminal defense

23   lawyer for the other.  But we need them pointed in the same

24   way.

25        MS. FOSTER:  He's about a foot taller.                    03:19PM

1      THE COURT:  I won't say who is the criminal defendant.

2      MS. FOSTER:  Defendant's Exhibit Number 2 is the

3   signed contract, Your Honor.  I would like to point out a

4   couple things on that.  First is the Paragraph F at the back of

5   it that has an integration clause.  And the second one is        03:19PM

6   Paragraph B, the payment provision.  Although the initial draft

7   of this contract that was prepared by the defendant included a

8   dollar amount of $10,000, when the agreement was revised, that

9   consideration, or that purchase price amount, was actually

10  removed from the agreement and instead, it was put into part of  03:20PM

11  the Escrow.com instructions.  And Paragraph B actually

12  incorporates --

13      THE COURT:  But it was the same, right?

14      MS. FOSTER:  Same dollar amount.  Absolutely.

15  Absolutely.  But Paragraph B incorporates those Escrow.com       03:20PM

16  instructions, and you have to include them because that's the

17  only other place you come up with a price for the transaction.

18      And the Escrow.com instructions, those are Exhibit 3

19  to the plaintiff's cross motion.  And although the plaintiff

20  filed this as part of the summary judgments and it was           03:20PM

21  disclosed early in the case, the defendants have disputed it

22  but they have not provided us with a contrary Escrow.com

23  instruction.  And this is a document that we talked --

24      THE COURT:  But I think the answer I heard earlier,

25  none of it matters, because no one, anyone, even Escrow.com,     03:20PM

| | |
|---|---|
| 1 | ever wrote up text for an escrow tailored to this contract, |
| 2 | correct. |
| 3 | MS. FOSTER:  Correct.  It was not tailored. |
| 4 | THE COURT:  So how could it matter what the Escrow.com |
| 5 | language did?  There was no, broadly put, there was no text |
| 6 | communicated from anybody, including Escrow.com, to the parties |
| 7 | that they, by silence or any other reason, could be taken to |
| 8 | have acquiesced as opposed to the text in their contract. |
| 9 | MS. FOSTER:  There is Escrow.com instructions.  And I |
| 10 | would like to look at those. |
| 11 | THE COURT:  But there's nothing in those instructions |
| 12 | that say -- that would bear on whether this was a contract for |
| 13 | sale of a domain name or a domain name and IP addresses. |
| 14 | There's nothing in the form contract that would answer that. |
| 15 | MS. FOSTER:  Well, the form contract of this Exhibit 3 |
| 16 | to plaintiff's motion is a description of the merchandise.  And |
| 17 | the description of the merchandise is the Gandalf.ca and IPv4 |
| 18 | address networks. |
| 19 | THE COURT:  Where is that?  I thought you all just |
| 20 | told me there was nothing tailored to this contract in the |
| 21 | escrow instructions. |
| 22 | MS. FOSTER:  It's Exhibit 3 to Colocation's motion, |
| 23 | Your Honor.  Page 22. |
| 24 | THE COURT:  Tell me what it is. |
| 25 | MS. FOSTER:  It's Page 22 of Document 84-1. |

03:21PM (lines 4-5)
03:21PM (lines 9-10)
03:21PM (line 15)
03:22PM (lines 19-20)
03:22PM (line 25)

1      THE COURT:  What exhibit is it?

2      MS. FOSTER:  Colocation's Exhibit 3.

3      THE COURT:  Oh.  It's the screen shot.

4      MS. FOSTER:  Correct.  And up on the right hand it

5  shows that the buyer initiated the transaction, and then it          03:22PM

6  shows the date and time that both parties accepted the offer,

7  and then it shows the time that payment was approved.

8      THE COURT:  Okay.  What is this?  This was a screen

9  shot of something that existed in cyberspace for a nano second

10  or an hour or for however long.  But this is not something that   03:22PM

11  was communicated to the parties.  Correct?

12      MS. FOSTER:  Incorrect, Your Honor.  It was actually

13  communicated -- the plaintiff input the information and the

14  defendant, which was the buyer, accepted this on March --

15      THE COURT:  Input what information?                           03:23PM

16      MS. FOSTER:  The bank name, the routing number, the

17  merchandise, the purchase price.  This is the only document

18  that actually has the purchase price.

19      THE COURT:  Okay.  Just help me out.  Answer my

20  questions, then you can give explanations if you want.  But       03:23PM

21  don't start off with the explanations.  Start off with answers

22  because I'm not smart enough to follow it before hearing the

23  answer.

24      So this was a document that -- now I'm confused.  I

25  thought you all told me there was never a document created that   03:23PM

```
 1    tailored escrow instructions to the parties' contract here.

 2              MS. FOSTER:  This document was --

 3              THE COURT:  What is this then?

 4              MS. FOSTER:  This is the Escrow.com instructions.  If

 5    you look at Exhibit Number --                                    03:24PM

 6              THE COURT:  Excuse me.  The Escrow.com instructions

 7    are the instructions Escrow.com has in general.  I asked you

 8    whether there was anything done to tailor those instructions to

 9    this contract.  I was told no.  So this is not computing for

10    me.                                                              03:24PM

11              MS. FOSTER:  The only tailored part, Your Honor, was a

12    description of the merchandise, the dollar amount, and the

13    payment instructions.

14              THE COURT:  And who did this?

15              MS. FOSTER:  It was input by the plaintiff, the buyer, 03:24PM

16    and then it was accepted by the defendant.

17              THE COURT:  Help me out.  Just say Colocation and

18    Mitel.

19              MS. FOSTER:  Colocation input this information into

20    Escrow.com, and it was accepted by Mitel.                       03:24PM

21              THE COURT:  Was this sent to Mitel?

22              MS. FOSTER:  I don't know how they do it, if you have

23    to log on or it's done by e-mail.

24              THE COURT:  You said it was sent to Mitel.

25              MS. FOSTER:  I'm saying that Michelle Whittington      03:24PM
```

1    would have signed off --

2           THE COURT:  I don't care what she would have done.  I

3    want to know what the record shows actually happened.  I want

4    evidence.  Not this is what they would have done.

5           MS. FOSTER:  The record shows that she received these          03:25PM

6    instructions, and she accepted them on March 25th at 2:04 p.m.

7           THE COURT:  Is it this instruction or just general

8    instructions that as I -- of course, I could be in error about

9    this, but my recollection was that early on, the exchange was,

10   look up their escrow instructions, and that -- so what did she         03:25PM

11   look up?  Did she look up those escrow instructions?

12          MS. FOSTER:  Your Honor, it might be helpful if I back

13   up to Colocation Exhibit Number 1.  This is the Escrow.com

14   instructions what were produced by Mitel.  And what it says is

15   once the buyer and seller have agreed to identical transaction         03:25PM

16   detail screens, which is what Exhibit Number 3 is, for a

17   specific underlying transaction and have agreed to the escrow

18   instructions by selecting the agree button at the bottom of the

19   transaction detail screens, these instructions shall constitute

20   a binding agreement between all parties.                               03:26PM

21          THE COURT:  Okay.  But you are going too fast for me.

22          What is there to show that this text that you tell me

23   Colocation added to describe this for Escrow.com, that that

24   text, as opposed to the earlier general form, was sent to Ms.

25   Whittington?                                                           03:26PM

1          MS. FOSTER:  I'm sorry.  I was not sure what you were

2     referencing earlier on the general form.

3          THE COURT:  Say that again.

4          MS. FOSTER:  You said what's to tell us that this

5     transaction detail instead of the earlier general form.          03:26PM

6          THE COURT:  Yes.  That's one way to say it.

7          MS. FOSTER:  There was --

8          THE COURT:  Let me back up.  I have heard you and I'm

9     ready to be corrected, because there's an awful lot, and I

10    might have gotten some of it wrong, that there was an earlier    03:26PM

11    reference to the Escrow.com instructions.  That may or may not

12    have been accessed by Ms. Whittington.  I want to know if

13    there's evidence that it was.  Now you are telling me that

14    Colocation actually filled out this Exhibit 3, or whatever,

15    giving their own description of what this contract was.  And    03:27PM

16    I'm asking what evidence is there that that was received by Ms.

17    Whittington.

18         MS. FOSTER:  On the top right of Exhibit 3, Your

19    Honor, it says that both parties, which would be the buyer and

20    the seller, have accepted the offer and they are waiting buyer  03:27PM

21    payment.

22         THE COURT:  Where is that?

23         MS. FOSTER:  If look, for example, it's Bates stamped

24    285 at the bottom of the screen.

25         THE COURT:  I'm on Page 284.                               03:27PM

1        MS. FOSTER:  Look at the top where it says history on

2   the top right.  Shows that on March 25th, at 12:26 p.m.

3        THE COURT:  Could you use the overhead projector and

4   turn it on and put your exhibit there and point it out to me?

5        MS. FOSTER:  Right here, Your Honor, it shows that the    03:28PM

6   buyer initiates the transaction, that was Colocation, on March

7   25th at 12:26 p.m.  And then at 2:04 on that same day, both

8   parties have accepted the offer awaiting buyer payment.  And

9   then three days later, Escrow.com approved the payment.

10       THE COURT:  Okay.  That doesn't tell me.  This is         03:28PM

11  somebody's recitation -- well, there is no dispute here that

12  Colocation -- Mitel accepted an offer.  What I'm asking is

13  something different, is whether this document that you all

14  created with Escrow.com was accepted by them.  And it doesn't

15  answer the question to say the parties had an accepted contract  03:28PM

16  that they took to Escrow.com.

17       MS. FOSTER:  There's nothing in the record, and to my

18  understanding, Escrow.com never sees a copy of the actual

19  contract.

20       THE COURT:  I'm asking whether Mitel saw this and what    03:29PM

21  evidence there is that Mitel saw this other than the

22  self-serving recitation that tells us nothing from Colocation

23  that the parties had accepted an offer.  What I'm getting at

24  is, this document that you all drafted, inputted, to Escrow.com

25  with your characterization of the contract, there's no evidence  03:29PM

1    that that was received much less approved by Mitel.  And so

2    when it says here the parties have accepted an offer to the

3    contract, that was true before anyone contacted Escrow.com.

4    That's what I'm getting at.  I'm asking if there's any evidence

5    that Mitel received this document and approved this document as    03:29PM

6    opposed to you all correctly reciting that they then accepted

7    an offer beforehand.

8            MS. FOSTER:  I will go back and look at the record.

9            THE COURT:  Again, I'm not sure it matters but there

10   was a nebulousness here that I found frustrating.  Anyway, go    03:30PM

11   ahead.

12           MS. FOSTER:  Ms. Whittington admitted that she

13   accepted the Escrow.com instructions.  This is the only spot

14   has a reference to $10,000.

15           THE COURT:  Is it in the record?  That's what I'm    03:30PM

16   asking you.

17           MS. FOSTER:  One moment, Your Honor.

18           THE COURT:  Mr. Rogers, is that correct?  Did she

19   accept this document from Escrow.com?

20           MR. ROGERS:  No.  It's right in the papers.    03:30PM

21           MS. FOSTER:  Then I won't waste my time.  I will let

22   him address it.

23           THE COURT:  I don't want to put you on the spot.  You

24   know, when I was in law school third year, everybody gets bored

25   in third year.  I was in a big class where my professor called    03:31PM

1    on a student and he said I'm unprepared.  The next day he

2    called on him again, and he said I'm unprepared.  So he said

3    read the case, and we'll wait.  I'm not going to do that to

4    you.

5           MS. FOSTER:  Your Honor, she admitted --                    03:31PM

6           THE COURT:  Also, he was sitting right next to me.  I

7    felt like the shrapnel was hitting me.

8           MS. FOSTER:  The stares were hitting you.

9           She admitted she accepted Escrow.com. instructions.

10          THE COURT:  Mr. Rogers said no.                             03:31PM

11          MS. FOSTER:  She has not admitted this language was in

12    there.  But she has not provided any other instructions.

13          THE COURT:  What you said to me was materially

14    incorrect.  So anyway, go ahead.  I appreciate you clearing it

15    up now.                                                           03:31PM

16          There is no evidence here that she accepted this text

17    from Escrow.com that your company inserted.  There's no

18    evidence of that.  And I think you have just answered that, so

19    thank you.

20          MS. FOSTER:  Okay.  She has not admitted, Your Honor.       03:31PM

21    I believe the document itself shows that the buyer accepted it.

22          THE COURT:  Go ahead.

23          MS. FOSTER:  Very, very briefly I just want to talk

24    about a couple documents leading up to the formation of this

25    contract.  The first one Colocation's Exhibit Number 5.  And      03:32PM

1    this is the February 24th e-mail from Mr. Kotler.  And what it

2    says in there is that his client, who is Colocation, wanted to

3    purchase the domain name as well as any other potentially

4    intellectual properties or scenarios that may be associated at

5    a future point in time with the name.  And he's offering                    03:32PM

6    $10,000 for all rights.

7            And then when he submits the redline to Ms.

8    Whittington on February 26, and this is Colocation's Exhibit

9    Number 7, he made some substantial changes.

10           THE COURT:  Slow down five miles an hour.                           03:32PM

11           MS. FOSTER:  He made some substantial changes.  He

12    changed it to a quit claim deed.  He took the purchase price

13    out of the contract and incorporated the escrow instructions

14    and he added the IPv4 language.  And although there's been

15    discussion about whether or not plaintiff knew defendant owned          03:33PM

16    these e-mail addresses, in the e-mail, Corey Allen Kotler

17    states the company recognizes that you may or may not have

18    rights as a result of the old bankruptcy proceedings but is

19    willing to go forward on a quit claim basis.

20           THE COURT:  So what.  What is the significance of               03:33PM

21    that?  What strikes me as being significant is that Colocation

22    started off with internal communications saying, we want to

23    acquire these IP addresses.  But their offer wasn't to do that.

24    It was to buy a domain name.  And they said maybe we can

25    nebulously slip in the IP address.  That's what's significant         03:33PM

1    here.

2              MS. FOSTER:  Colocation and Mitel both knew that Mitel

3    owned the domain name.  And they also both knew a Mitel entity

4    had purchased assets in the Gandalf bankruptcy, but no one knew

5    for sure whether Mitel actually owned those IPv4 addresses.          03:33PM

6              THE COURT:  So my point is, the e-mails reveal that

7    your principal and his agent had a purpose of acquiring the IP

8    addresses.  But that's not what they asked for in their offer.

9    They wanted the domain name, and they got, we'll take $10,000

10   for it.  They never came clean and said we want the IP               03:34PM

11   addresses.  Instead they say, hmm, let's make an offer for the

12   domain names and see if we can nebulously slip in the IP

13   addresses.  That's the undisputed fact that begins all of this

14   which I think shows an intention for Mitel not to understand

15   what you were trying to achieve as opposed to coming clean or        03:34PM

16   to follow the text of Section 201 of the Restatement.  You had

17   reasons to believe the other side did not intend what you

18   intended.  If you intended to acquire the IP addresses, you did

19   it nebulously in a way that looks like they are selling you the

20   domain name?  You had every reason -- not only do you -- this        03:35PM

21   is a smoking gun case.  Not only do the circumstances allow

22   that persuasive inference, we have a smoking gun.  You sent out

23   one internally that's what you are trying to get, but you

24   didn't put it in your negotiation.  It doesn't show up until

25   after the contract was signed.  And he said, now we're getting       03:35PM

1    your IP addresses and they say, well, wait a minute.  There's a

2    misunderstanding.  You not only knew they had a different

3    understanding, you created their different understanding.

4          MS. FOSTER:  I don't think that's accurate.  If you

5    look at the chronology, on February 24th, the plaintiff said          03:35PM

6    they wanted to acquire the domain name and any other scenarios

7    associated with that domain name and offered $10,000 for all

8    rights.  It was Mitel that did the initial draft of the

9    contract, and the initial draft of the contract said domain

10   name.  That's when plaintiffs sent back a revised contract and       03:36PM

11   added in the IPv4 addresses.

12         It was obvious to the defendants that those addresses

13   were added because the defendant's in-house counsel, Mitel's

14   in-house counsel, came back and said what is this.

15         THE COURT:  And you never responded.  Candid, basic,          03:36PM

16   good faith and fair dealing would have required you to say what

17   that is is that is a big part of what we want.  We're not just

18   trying to slip it in nebulously.  That's what we are trying to

19   buy from you, and we want that in with no additional

20   consideration.  That's what -- you know, this is -- I view this     03:36PM

21   as a Section 201 case, but it could also be viewed as a good

22   faith and fair dealing case.

23         MS. FOSTER:  I cited in our original cross motion

24   Michelle Whittington's deposition transcript where she said she

25   never followed up with Corey because she discussed the IPv4        03:36PM

1    addresses internally, and she was comfortable with the

2    language.  That was what her response was.

3         THE COURT:  Now, if you look at this language, it says

4    we're selling, quit claiming, the domain name and the

5    registration thereof, together with the good will of the          03:37PM

6    business connected with and symbolized by such domain name and

7    the associated IP addresses and associated trade dress.  It is

8    pretty plain, ordinary grammar and punctuation says that this

9    description of associated with and symbolized by the domain

10   name and associated IP addresses is specification of the good    03:37PM

11   will.  It's not the IP addresses in addition to the good will

12   associated with the domain name.  That's plain -- without

13   falling back on Section 201, that's what it says.

14        MS. FOSTER:  And, Your Honor --

15        THE COURT:  And it's even more clear when you all,          03:38PM

16   whoever it was, dropped the comma out, made it even more clear

17   that this and the associated IP, et cetera, specifies the good

18   will that is being sold, good will of the business what

19   business connected with the domain name and IP address.

20        By the way, good will, it's hard to think what good         03:38PM

21   will associated with IP addresses could possibly mean if there

22   are IP addresses that are not being used by anyone.  They are

23   just available for sale.  But, you know, the practical reality

24   is, we all know this, that lawyers draft overkill.  And there's

25   nothing immoral about it.  Sometimes courts pretend like every   03:39PM

1    word means something.  The truth is, lawyers repeat and

2    over-include over and over again.  So when it says, "or other

3    intellectual property related thereto," related to the good

4    will, the good will of the business connected with it.

5            So anyway, what I'm sort of rambling through is you        03:39PM

6    all briefed this.  I'm telling you, this looks to me to be

7    clear, without Section 201, this is describing the good will as

8    being conveyed, contracted to be conveyed.  It's not describing

9    the underlying property be conveyed.  The underlying property

10   conveyed is just the domain name and the good will.              03:39PM

11           So anyway, I'm sorry I'm quarrelling with you instead

12   of asking you a question.  I'm giving you the chance to tell me

13   why I'm wrong.

14           MS. FOSTER:  One brief comment, Your Honor.  The

15   defendant, Mitel, when it did the original draft, it said, "The  03:40PM

16   good will of the business connected with and symbolized by such

17   domain name," that's the original draft.  Ms. Whittington

18   admitted and we cited in our response there is no good will

19   associated with the IPv4 addresses.  You are absolutely

20   correct.  There's no good will.  No one has used them, and they  03:40PM

21   are hidden numbers that no one knows what they are.  It was the

22   plaintiff, Colocation, that added in the language "associated

23   IPv4 addresses."

24           THE COURT:  That was your nebulous way to bring IP

25   addresses in here for what it might or might not mean.  Again    03:40PM

1    my point is, this drafting is an example of good will.

2    Frankly, when you sell a business you don't have to say you are

3    selling good will because that's included in the business.  But

4    lawyers do it anyway, because they are paranoid.  That's what

5    lawyers do.                                                        03:41PM

6              So the business of the domain name, it being

7    hyper-careful, and there's nothing wrong with it, lawyers don't

8    want to have their clients turn around and say -- don't want to

9    have to tell the client, well, that was necessarily included in

10   what I drafted.  And so why didn't you spell it out?  So fine,   03:41PM

11   you are buying the good will associated with the business.

12             MS. FOSTER:  The problem with that interpretation is

13   that Mitel has argued that you are buying the good will

14   associated with the addresses, but you are not getting the

15   addresses.                                                        03:41PM

16             THE COURT:  That's exactly what they are saying

17   because you only asked for the good will.  By the way, I'm not

18   a tech person.

19             MS. FOSTER:  Neither am I.

20             THE COURT:  But my sense is, there probably is no such  03:41PM

21   thing as good will associated with unused IP addresses.  But

22   that doesn't mean that lawyers aren't super cautious and

23   duplicative in saying, we're getting the -- you are the ones

24   who -- you are the ones who added good will of the IP address.

25   You added it.  They didn't add it.  You added the IP address     03:42PM

| | |
|---|---|
| 1 | language.  So we all know that contra preferendum will construe |
| 2 | things against the person that wrote it. |
| 3 | MS. FOSTER:  Two minor comments, Your Honor. |
| 4 | Colocation did not add the good will of the IPv4. |
| 5 | THE COURT:  You added the associated IP addresses. |
| 6 | That's what you told me earlier. |
| 7 | MS. FOSTER:  Yes. |
| 8 | THE COURT:  So the good will is already there, but you |
| 9 | are the ones who had the good will of the associated IP |
| 10 | addresses which is either meaningless or of no consequence or |
| 11 | simply lawyerly paranoia for which they pay us handsomely. |
| 12 | MS. FOSTER:  But under that interpretation you are |
| 13 | separating the good will from the IPv4 addresses and saying |
| 14 | we're transferring the good will associated with those |
| 15 | addresses but not the addresses. |
| 16 | THE COURT:  Well, then you should have said we're |
| 17 | transferring the addresses.  So again, you are the people who |
| 18 | said, among the good will we want is the good will associated |
| 19 | with the IP addresses.  And that, by inference, means we also |
| 20 | bought the IP addresses for no additional consideration.  That |
| 21 | is simply not -- you know, if we go back to Arizona law, that |
| 22 | is not a plausible interpretation of this language.  You have |
| 23 | to have a -- you look at the underlying evidence and ask is |
| 24 | that a plausible interpretation, and if so, we go forward. |
| 25 | It's not a plausible interpretation to say we'll take $10,000 |

03:42PM
03:42PM
03:42PM
03:43PM
03:43PM

| | |
|---|---|
| 1 | for the domain name.  You slip in the good will of the IP |
| 2 | addresses so we're getting that for free.  That is not a |
| 3 | reasonable plausible interpretation of this at all. |
| 4 | MS. FOSTER:  But, Your Honor, that's not what the |
| 5 | offer was.  This is Colocation's Exhibit Number 5. |
| 6 | THE COURT:  Excuse me for interrupting you.  The offer |
| 7 | from the other side was to sell you the domain name of the good |
| 8 | will for $10,000.  That was their offer.  They didn't accept |
| 9 | your language.  They drafted it.  You invited a proposal from |
| 10 | them and they gave it to you. |
| 11 | MS. FOSTER:  But Colocation's offer to Mitel was |
| 12 | $10,000 for the domain name and any other associated rights. |
| 13 | It even said $10,000 for all rights. |
| 14 | THE COURT:  And these were IP addresses that were |
| 15 | unused? |
| 16 | MS. FOSTER:  And no one knew -- |
| 17 | THE COURT:  They weren't part of the business, they |
| 18 | weren't being used.  They were just -- anyway. |
| 19 | MS. FOSTER:  They were part of the Gandalf business, |
| 20 | Your Honor.  They were purchased from the Gandalf.  Neither the |
| 21 | domain name nor the addresses were used since they were |
| 22 | purchased from bankruptcy. |
| 23 | THE COURT:  I'm sorry.  I'm interrupting you.  Please |
| 24 | continue. |
| 25 | MS. FOSTER:  Did you have any specific questions? |

03:43PM
03:44PM
03:44PM
03:44PM
03:44PM

1          THE COURT:  Let me look at my notes.

2          No.  I think that covers it.

3          MS. FOSTER:  Thank you, Your Honor.

4          THE COURT:  Any brief reply, Mr. Rogers?

5          MR. ROGERS:  No, Your Honor, unless you have any        03:45PM

6    questions.

7          THE COURT:  No.  By the way, if I do rule for Mitel

8    and if you do make an attorney's fees claim, I want to be clear

9    that I'm directing you to separately itemize and quantify the

10   fees incurred with the efforts to add additional        03:45PM

11   counterdefendants to make it easy to exclude them.

12          With that, thank you, counsel.  The motion is taken

13   under advisement.

14          (Proceeding concluded at 3:45 p.m.)

15

16

17

18

19

20

21

22

23

24

25

```
 1
 2
 3
 4
 5
 6                    C E R T I F I C A T E
 7
 8          I, LAURIE A. ADAMS, do hereby certify that I am duly
 9   appointed and qualified to act as Official Court Reporter for
10   the United States District Court for the District of Arizona.
11          I FURTHER CERTIFY that the foregoing pages constitute
12   a full, true, and accurate transcript of all of that portion of
13   the proceedings contained herein, had in the above-entitled
14   cause on the date specified therein, and that said transcript
15   was prepared under my direction and control.
16          DATED at Phoenix, Arizona, this 20th day of June,
17   2018.
18
19                              s/Laurie A. Adams
20                              _____
                                Laurie A. Adams, RMR, CRR
21
22
23
24
25
```